UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PENTACON BV and BALTISSE NV,<br><br>                        Plaintiffs,<br><br>            -against-<br><br>GUY VANDERHAEGEN, GUY VANDERHAEGEN REVOCABLE TRUST, PELICAN INVEST, LLC, PELICAN INTERNATIONAL, LLC, ORIGIS ENERGY LLC, formerly Origis Energy NV, and ORIGIS USA LLC,<br><br>                     Defendants. | Case No.<br><br>Removed from the Supreme Court of the State of New York, New York County, Index No. 650847/2023 |

**NOTICE OF REMOVAL**

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------- X

PENTACON BV and                              :
BALTISSE NV,
                                             :
                        Plaintiffs,
                                             :     Index No.
              -against-
                                             :
GUY VANDERHAEGEN,                            :     **SUMMONS**
GUY VANDERHAEGEN REVOCABLE TRUST,            :
PELICAN INVEST, LLC,
PELICAN INTERNATIONAL, LLC,                  :
ORIGIS ENERGY LLC, formerly Origis Energy          Date Index No. Purchased:
NV, and                                      :
ORIGIS USA LLC,
                                             :
                        Defendants.
                                             :

------------------------------------------- X

To the above-named Defendants:

You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer on the Plaintiffs' attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

The Plaintiffs designate New York County as the venue and the place of trial.  The basis

of venue is NY CPLR §§ 501-503, pursuant to which venue is proper in New York County based

on (i) the written agreement contained in Section 9.13(a) of the Share Redemption Agreement,

1

(ii) the location of occurrence of a substantial part of the events or omissions giving rise to the

claims, and (iii) the designation by Plaintiffs of New York County as the place of trial.

Dated: New York, New York                   DECHERT LLP
       February 14, 2023

                                    By: /s/ Matthew L. Mazur
                                    Matthew L. Mazur
                                    Three Bryant Park
 New York, New York 10036
 Tel. 212 698 3500 Ext. 7487
 Matthew.Mazur@dechert.com

 160 Queen Victoria Street
 London EC4V 4QQ
 United Kingdom
 Tel. +44 20 7184 7487

 Steven B. Feirson (*pro hac vice* forthcoming)
 Cira Center, 2929 Arch Street
 Philadelphia, Pennsylvania 19104-2828
 Tel. 215 994 2489
 Steven.Feirson@dechert.com

 David L. Attanasio
 1900 K Street, NW
 Washington, DC 20006-1110
 Tel. 202 261 3379
 David.Attanasio@dechert.com

 *Attorneys for Plaintiffs*
 *Pentacon BV and Baltisse NV*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------ X

PENTACON BV and                              :
BALTISSE NV,
                                             :

             Plaintiffs,              :

      -against-                              :                    Index No.

GUY VANDERHAEGEN,                            :      **COMPLAINT**
GUY VANDERHAEGEN REVOCABLE TRUST,            :
PELICAN INVEST, LLC,
PELICAN INTERNATIONAL, LLC,                  :      **JURY TRIAL DEMANDED**
ORIGIS ENERGY LLC, formerly Origis Energy
NV, and                                      :
ORIGIS USA LLC,
                                             :
             Defendants.
                                             :

------------------------------------------ X

       Plaintiffs Pentacon BV ("Pentacon") and Baltisse NV ("Baltisse"), for their complaint

against defendants Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust ("Vanderhaegen

Trust"), Pelican Invest, LLC ("Pelican Invest"), Pelican International, LLC ("Pelican

International"), Origis Energy LLC, formerly Origis Energy NV ("Origis Energy"), and Origis

USA LLC ("Origis USA" and, together with Origis Energy, "Origis"), allege, upon knowledge,

documents, and information and belief, as follows:

### Introduction

     1.    Plaintiffs Pentacon and Baltisse bring this action to redress the harm they suffered

because of Defendants' multiple violations of law, including, but not limited to, their deliberate

and fraudulent scheme to acquire Plaintiffs' combined majority interest in Origis for a price far

below its true value, their breaches of contract, and their breaches of fiduciary duty.

2.      Over a period of at least two years, Defendants withheld critical information from and intentionally misrepresented material facts to Plaintiffs relating to the value of Origis and its assets, including its pipeline of solar energy projects, cash flows, profit margins, platform, and good will.

3.      Initially, they embarked on a plan to isolate Plaintiffs by minimizing the ability of Plaintiffs to understand Origis' business, set strategy, and effectively exercise oversight of management.

4.      Defendants, building upon their successful isolation of Plaintiffs and using a similar pattern of unlawful conduct, including further breaches of their fiduciary duties and breaches of the contract they had fraudulently induced Plaintiffs to execute, consummated a scheme to fraudulently seize Plaintiffs' shares at a grossly deficient price.

5.      Once Defendants had deceitfully acquired Plaintiffs' shares, Defendants proceeded with their plan to sell the entire company, which they did, for over a billion dollars.

6.      As a result of Defendants' breaches of their contractual and fiduciary duties and outright fraud, Plaintiffs have suffered and continue to suffer damage in an amount well in excess of half a billion dollars.

7.      In 2008, Origis, a solar energy start-up, was founded in Belgium. These were the very early days of the solar energy business, and there were very few, if any, successful businesses in this space. Paul Thiers, Sr., the primary investor in Plaintiff Pentacon, saw the enormous potential in this emerging area, and he loved the idea of being on the forefront of the effort to develop climate friendly alternatives to fossil fuels. Thiers became the driving force

2

behind the creation of Origis, providing both the entrepreneurial vision and the financing to launch this enterprise.

8.      Defendant Vanderhaegen, a former management consultant, was the CEO of Origis and ran the day-to-day business. Over the next decade, Thiers provided tens of millions of dollars in financial support to Origis and to Vanderhaegen, personally. That support kept the business and Vanderhaegen afloat, including through multiple looming bankruptcies and during the eventual transfer of Origis' primary operations from Europe to the United States.

9.      In addition to supplying strategic oversight and financially supporting Origis and Vanderhaegen, Thiers also introduced customers and additional sources of financing to the company. For example, Thiers introduced Vanderhaegen to Filip Balcaen, another successful Belgian entrepreneur and investor. Balcaen, largely in reliance on his personal relationship with Thiers and based on his recommendation, initially provided critical financing for Origis through his company Baltisse. And Baltisse later infused even more capital into Origis when it became a shareholder in 2016.

10.     Moreover, as they continued to invest in Origis, Pentacon and Baltisse provided financial assistance to Vanderhaegen so that his interest in Origis would not be diluted.

11.     By 2019, Origis had grown and carved out a niche in the US solar energy business. At that point, Pentacon and Baltisse, with their employees, each held approximately a 29% interest in Origis.[1] Vanderhaegen owned a substantial portion of the remaining interest in Origis.

---

[1]      Pentacon and Baltisse, with their employees, each held approximately 36% of the shares of Origis Energy, which in turn held approximately 80% of the shares of Origis USA, the

12. Pentacon and Baltisse came to depend upon Vanderhaegen, who was Origis' CEO, President, and a member of the board, to provide them with detailed information about the business in which they had invested tens of millions of dollars. And they trusted him to do so in an honest and straightforward manner.

13. As CEO, director, and a shareholder in a closely held company, Vanderhaegen[2] owed fiduciary duties to all of Origis' shareholders, including Pentacon and Baltisse. In particular, he had solemn duties of good faith, candor, and loyalty, which required him to operate Origis for the benefit of all of its shareholders, including to provide Pentacon and Baltisse with timely, accurate, complete, and honest information about the business and its value, and to put the shareholders' interests before his personal self-interest.

14. Instead, Vanderhaegen breached these duties by deliberately misleading Pentacon and Baltisse as to the condition and value of Origis and its assets. He did this intentionally, initially to deprive Plaintiffs of the information flow necessary for them to fully understand the business to enable them to exercise the effective oversight necessary to evaluate the performance

operating subsidiary of Origis Energy. In the body of this Complaint, references to shareholdings and valuations of "Origis" refer to Origis USA unless otherwise stated.

[2] Guy Vanderhaegen held these positions directly and/or through entities he controlled, including Pelican International and Vanderhaegen Trust, which held shares in Origis, and Pelican Invest through which he held his directorship in Origis. In this Complaint, all references to Vanderhaegen also include the entities he controlled, including Origis, for which he at all relevant times acted and over which he exercised full operational control.

4

of the company and his performance as CEO. He used similar misrepresentations and omissions to execute a plan to profit at Plaintiffs' expense by acquiring their combined majority shareholding interest at a bargain price.

15.     Beginning in early 2019, in an effort to isolate Plaintiffs and consolidate their control over Origis, Defendants consistently failed to provide the cash flow projections requested by Plaintiffs; failed, despite Plaintiffs' requests, to keep them advised of the specifics of the development of projects; and failed to divulge the fact of their own, the market's, and third parties' views of the value of Origis and its assets. Thus, Defendants played upon Plaintiffs' trust to intentionally block Plaintiffs from a full understanding of the financial condition of the company, developments relating to the business, and its prospects going forward. In this way, Defendants succeeded in their plan to increase Plaintiffs' isolation from the functioning of the business.

16.     In pursuit of a scheme to seize Plaintiffs' shareholding at a price far below its real value, Defendants repeatedly, consciously, and deliberately downplayed the true value of Origis and its assets, intentionally misrepresenting key facts about the business, including the profit margins on and valuations of its pipeline of solar energy projects.

17.     Defendants, at all relevant times, fully understood that Plaintiffs were reasonably relying on these false and misleading statements in deciding whether or not to sell their interests in Origis. Defendants lied about and concealed critical information to enrich themselves in violation of their fiduciary and contractual duties, including their obligations to provide complete and accurate information about Origis to Plaintiffs in connection with their buyout proposals.

5

18.    To take just one example of many, on August 28, 2020, just before Plaintiffs had agreed to sell their interests by executing a Share Redemption Agreement ("SRA"), Vanderhaegen wrote to Plaintiffs that Origis was preparing new valuations of the pipeline projects that would "remove your uncertainty about the value of our projects." Then, on September 10, 2020—immediately before Plaintiffs signed an agreement to sell their shares and in response to a specific request from Plaintiffs for the promised values—Vanderhaegen provided a report setting out a value of $147 million for 13 specific solar energy projects. In a call with Plaintiffs to discuss the report, Vanderhaegen reassured them, as he had done on multiple occasions in the past, that the combined value of these projects in the report reflected the real value of Origis as a whole. Trusting Vanderhaegen's representation of current value and having no reason to believe that Vanderhaegen had been privy to any information showing higher values, Plaintiffs accepted Defendants' representations and relied on them to conclude the transaction that Defendants sought.

19.    Yet, Defendants, at the very moment they were making these representations, knew them to be false. Shortly before, in June and July 2020, they, themselves, had prepared internal analyses of projects in Origis' pipeline—including for almost all of the projects listed in the report to Plaintiffs. Defendants had consulted with investment bankers about current values and added the bankers' valuations into their internal analyses. These internal analyses assigned far greater value to Origis than the report which had been presented to Plaintiffs to "remove" any "uncertainty" about value.

20.    Defendants carefully and intentionally concealed all of these internal analyses and the role of the investment bankers from Plaintiffs. They did so with the specific intent of

6

Case 1:23-cv-02172-KPF   Document 1-1   Filed 03/14/23   Page 10 of 54

avoiding the need to answer any further questions about the value of Origis and thereby to ensure the closing of a transaction that Defendants knew, but Plaintiffs did not, would dramatically shortchange Plaintiffs for their shares.

21.     Defendants' hidden analyses of Origis' project pipeline were not just some off-the-cuff musings of lower-level employees. Defendants did the necessary work to reach their conclusion that dramatically greater valuations for Origis were warranted. They analyzed data, conferred at the highest levels of the company, and used the input from independent investment bankers to reach their valuation conclusions. And, they painstakingly did all this just before providing the deliberately misleading report to Plaintiffs on September 10, 2020.

22.     Defendants were right to fear the consequences of their undisclosed analyses surfacing. If Plaintiffs had seen those analyses, they would not have gone forward with the buyout agreement, which was executed just days after Defendants had presented Plaintiffs with the misleading document which was supposed to remove all uncertainty about value.

23.     The SRA was one of the devices Defendants used to successfully accomplish their scheme. Through the deliberately false and misleading statements and omissions set out above, as well as others, Defendants fraudulently induced Pentacon and Baltisse to enter into the SRA, which provided for the transfer of Plaintiffs' position in Origis to Defendants for a total of $105 million in two closings, one on October 15, 2020 (the "First Closing") and one on January 4, 2021 (the "Second Closing").

24.     The SRA, which is governed by New York law and contains New York forum selection provisions, contains within it various representations by Defendants that were

7

fraudulent and calculated, along with a raft of other misrepresentations and omissions, to induce Plaintiffs to sell their shares in Origis at what Defendants knew to be a grossly deficient price.

25.    Defendants represented and warranted in the SRA that Origis already had provided Pentacon and Baltisse with complete and accurate information about the "business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries," "the Company's development pipeline of solar power and energy storage projects," and "any value indications by any party showing an interest to acquire" shares in Origis or its subsidiaries or any of its assets. SRA §§ 4.4(a), (b) and (c). Importantly, the SRA made it a condition precedent to the two subsequent closings on October 15, 2020 and January 4, 2021, that these representations and warranties be true not only at the time the SRA was signed, but also as if made at the time of each of those closings. *Id*. §§ 2.5, 2.6.

26.    But these representations and warranties were intentionally false and misleading on the date of the SRA, and again on the date of each closing. Defendants had continually and intentionally misrepresented and withheld material information about their actions, their communications with third parties, the value analyses in their possession, the role and advice of the investment bankers, and ultimately what they knew to be the true, full picture of Origis, including the value of Origis and its assets. All of these things, and other independent deliberately misleading conduct set out above and in greater detail elsewhere in this Complaint, fraudulently induced Plaintiffs' entry into the SRA and breached both Defendants' fiduciary duties to Plaintiffs and the SRA itself. Had Plaintiffs, rather than relying on Defendants, known the truth, they never would have executed the SRA.

27.     Vanderhaegen, to induce Plaintiffs to sell their shares, also repeatedly told Plaintiffs that he wanted to be a long-term shareholder in Origis. Vanderhaegen made this claim to lead Plaintiffs to believe that he had no interest in exploring a sale of Origis at any point in the foreseeable future or in participating in any such sale. Vanderhaegen knew when he made these long-term holder statements that they were false, and he correctly believed that Plaintiffs would rely upon these misrepresentations in agreeing to proceed with any sale to him. This "I am a long-term holder" misrepresentation was an independent and critical component of Vanderhaegen's fraudulent scheme to acquire Plaintiffs' shares at a grossly inadequate price.

28.     At the time he was saying he was a long-term holder with no intention of being a seller, Vanderhaegen was in the process of exploring the sale of Origis in its entirety or most of its assets. Again, these representations, knowingly false when made, were designed to deceive and mislead Plaintiffs. Had Plaintiffs known that Vanderhaegen was planning and, in fact, already exploring arrangements for a sale of all or substantially all of Origis' assets prior to the execution of the SRA, they would not have executed the SRA.

29.     Even before the Second Closing, Defendants were entering into agreements with investment bankers and discussing the potential sale of the entire company. By April 2021, barely three months after the Second Closing, Defendants already had put together their data room for the potential sale. In early Summer 2021, the investment bankers had finished their preparatory work to go out to contact potential buyers and solicit bids for the company. A short time later, the sales process had progressed to the point where Defendants had received multiple bids that confirmed what they had already known well before the execution of the SRA, but which they deliberately concealed—that Origis was worth dramatically more than the valuations

provided to Plaintiffs by Defendants to "remove [their] uncertainty" and on which Plaintiffs had justifiably relied in deciding to sell their shares. The bids ranged as high as $1.25 billion, with multiple bids in excess of $700 million. And, ultimately, just months after the closing of the SRA transaction, Defendants' carefully calibrated fraudulent scheme culminated in Antin Infrastructure Partners agreeing to pay materially more than a billion dollars. After cheating Plaintiffs, whose vision had launched Origis, whose money had financed its birth and development, and who had made him a rich man, Vanderhaegen, out of the fruits of the Antin transaction, wasted no time in putting the fruits of his deceit to work in his new $32 million mansion in Coral Gables, Florida.

30.     Defendants' fraud, breaches of their fiduciary duties, and breaches of the SRA were the direct causes of hundreds of millions of dollars in damages to Pentacon and Baltisse. Had Defendants not engaged in this unlawful conduct, Pentacon and Baltisse would never have permitted Defendants to steal such enormous wealth from them.

31.     Pentacon and Baltisse are therefore entitled to damages based on the difference between the payment they received and the value of their shares based on the Antin purchase price and/or the present value of the interests which were unlawfully taken from them. They should also be awarded punitive damages based on Defendants' fraud and breaches of fiduciary duties and such other relief as is permitted under law.

## Parties

32.     Plaintiff Pentacon BV is a Belgian limited liability company with its principal place of business located at Optimismelaan 1, Bus 3, 1140 Evere, Belgium.

10

33.     Plaintiff Baltisse NV is a Belgian limited liability company with its principal place of business at Pauline Van Pottelsberghelaan 10, 9051 Sint-Denijs-Westrem, Belgium.

34.     Defendant Guy Vanderhaegen is a natural person of Belgian nationality who resides in Coral Gables, Florida. Defendant Vanderhaegen acted at all relevant times and continues to act both in his own capacity and in his capacity as officer, director, agent, and/or employee of the remaining Defendants. In the latter capacities, he acted at all relevant times and continues to act within the scope of the actual or apparent authority afforded him by his positions in each.

35.     Defendant Guy Vanderhaegen Revocable Trust is a Florida revocable trust with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Defendant Vanderhaegen has exercised absolute domination and control over Defendant Guy Vanderhaegen Revocable Trust at all relevant times. Defendant Vanderhaegen is believed to act as its sole director, officer, employee, and/or agent. Defendant Guy Vanderhaegen Revocable Trust is believed to have no independent business and instead serves solely as an instrument of Defendant Vanderhaegen's purposes, including to hold Defendant Vanderhaegen's personal wealth, including shares in Origis Energy.

36.     Defendant Pelican Invest, LLC is a Delaware limited liability company with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Defendant Vanderhaegen has exercised absolute domination and control over Pelican Invest, LLC at all relevant times. Defendant Vanderhaegen is believed to own or control all or substantially all of Defendant Pelican Invest, LLC and to act as its sole director, officer, employee, and/or agent without regard to corporate formalities. Defendant Pelican Invest, LLC is believed to have no independent business and instead serves solely as an instrument of

11

Defendant Vanderhaegen's purposes. These purposes include having Defendant Pelican Invest, LLC serve as board director for Origis Energy based on Defendant Vanderhaegen's shareholding in Origis Energy and then, in turn, to appoint Defendant Vanderhaegen himself to serve as Defendant Pelican Invest, LLC's permanent representative.

37.     Defendant Pelican International, LLC is a Delaware limited liability company with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Defendant Vanderhaegen has exercised absolute domination and control over Pelican International, LLC at all relevant times. Defendant Vanderhaegen is believed to own or control all or substantially all of Defendant Pelican International, LLC and to act as its sole director, officer, employee and/or agent without regard to corporate formalities. Defendant Pelican International, LLC is believed to have no independent business and instead serves solely as an instrument of Defendant Vanderhaegen's purposes, including to hold Defendant Vanderhaegen's personal wealth, including shares in Origis Energy and later Origis USA.

38.     Defendant Origis Energy LLC, formerly Origis Energy NV, is or was[3] a Delaware limited liability company with a principal place of business believed to be located in Miami, Florida. Defendant Vanderhaegen, in his capacity as managing director, officer, and/or employee of Defendant Origis Energy LLC, at all relevant times has exercised full operational control over Defendant Origis Energy LLC.

39.     Defendant Origis USA LLC is a Delaware limited liability company with a principal place of business located in Miami, Florida. Defendant Vanderhaegen, in his capacity

---

[3]     Origis Energy as used in this Complaint includes its successors or assigns.

as managing director, officer, and/or employee of Defendant Origis USA LLC, at all relevant times has exercised full operational control over Defendant Origis USA LLC and participated in, authorized, and directed all relevant actions and omissions of all other officers and employees of Origis USA LLC.

40.    Defendants have acted at all relevant times and continue to act as one combined, unified entity under the common control of Vanderhaegen, and Vanderhaegen has acted at all relevant times and continues to act on behalf of and through the other Defendants in accomplishing the violations of law set forth in this Complaint. By virtue of Vanderhaegen's common control over Defendants, Defendants have agreed and acted together in pursuit of a common plan to commit the violations of law set forth in this Complaint. And, by virtue of their collective participation in the negotiation and execution of the SRA through Vanderhaegen, Defendants all intended to be bound by that contract. Whenever one Defendant is referred to in this Complaint, that reference should be read as referring to all Defendants.

## Factual Allegations

### A.  Plaintiffs Provide the Vision and Capital Critical to Create and Grow Origis

41.    Origis was founded in 2008. Paul Thiers, the entrepreneur and investor behind Plaintiff Pentacon, was the driving force behind the creation of Origis. Moreover, he was Defendant Vanderhaegen's patron, providing the financial support that allowed him to acquire a significant stake in Origis. In other words, the company's success and Vanderhaegen's great wealth today both trace back directly to Pentacon's initial and subsequent support. As Origis

developed over the next decade and relocated to the United States, Pentacon ultimately came to hold approximately a 29% interest in Origis.[4]

42.     Plaintiff Baltisse became involved in Origis somewhat later than Pentacon. Origis' business model required regular access to financing, which Baltisse helped provide for a number of years. This critical source of financing was a direct consequence of Pentacon's pre-existing relationship with Baltisse and its request for Baltisse to invest in the building of Origis. Later, Baltisse introduced Vanderhaegen to an additional financing source for Origis. In 2016, Baltisse became an Origis shareholder. Like Pentacon, Baltisse came to hold approximately a 29% interest in Origis.

43.     By 2019, Origis had grown into a leading renewable energy developer with a strong development pipeline of solar energy and energy storage projects across the United States. Pentacon's and Baltisse's long-standing and critical support was essential to the development of Origis' business. Or, to put it another way, Origis and Vanderhaegen owe their success in very large part to Pentacon and Baltisse.

44.     As Origis shareholders, Pentacon and Baltisse each had representatives on the boards of Origis. Multiple board meetings and other meetings of the company took place in New York City. However, Vanderhaegen was the CEO, President, managing director, a board member,[5] and managing shareholder of Origis. As such, he exercised day-to-day control over the

---

[4]     As noted above, ownership interests are specified with respect to Origis USA.

[5]     Guy Vanderhaegen was the permanent representative of his entity Pelican Invest to the board of Origis Energy and was a member of the board of Origis USA.

14

flow of information to Plaintiffs. Vanderhaegen functioned as the final report for the employees who were pursuing new development opportunities; he analyzed Origis' finances; and he managed its ongoing projects. He interacted directly with financiers, investors, bankers, and consultants. He was the point person for dealing with customers and vendors. He tracked investment opportunities, performed necessary analyses or ordered such analyses to occur and supervised their preparation, and advised the boards of directors on all aspects of the business. Vanderhaegen alone knew or had access to anything and everything that Origis was doing.

45.     Thus, Vanderhaegen had effective control over the detail and flow of information to Plaintiffs about Origis. Plaintiffs were consequently heavily dependent on Vanderhaegen to identify and accurately transmit all relevant information to them. And, they trusted him to do exactly that and had no reason to believe he was dishonest. This control, especially after the onset of the COVID pandemic, only became more complete. The COVID pandemic prevented Plaintiffs from traveling to the United States and engaging in varied and multiple meetings and communications, both formal and informal, with Origis employees at all different levels of the company. Vanderhaegen typically organized the remote meetings, decided upon attendance, and honed the messages to be delivered. This served to intensify Vanderhaegen's virtual stranglehold on the flow of information to Plaintiffs.

46.     In his various roles, Vanderhaegen owed, among other things, fiduciary duties of good faith, loyalty, and candor to Plaintiffs. Vanderhaegen reassured Plaintiffs that he was being transparent with them and, in fact, touted his compliance with these duties. But the reality was quite different. Vanderhaegen, unknown to Plaintiffs, had breached his fiduciary duties by the manner in which he exercised the power he had accumulated. He intentionally restricted,

15

Case 1:23-cv-02172-KPF Document 1-1 Filed 03/14/23 Page 19 of 54

omitted, and misrepresented company information to achieve his goal of control. Unfortunately, power, especially when coupled with greed, often corrupts. In this case, it turned out that it had corrupted absolutely.

**B. Defendants Withhold Critical Information from Plaintiffs in Breach of Their Fiduciary Duties**

47.     Over time, some friction developed not only over Vanderhaegen's attempts to isolate Plaintiffs, but also as Plaintiffs and Defendants began to express a difference of views over how to allocate certain portions of the funds available to the company. Vanderhaegen proposed to pay large bonuses to management but not pay dividends to the shareholders. For their part, Plaintiffs wanted to link the bonuses to dividends, so there would be some balance between those who had an interest in being fairly compensated for their investments and those who had an interest in being fairly compensated for their work. Vanderhaegen impatiently pressed for current cash bonuses disconnected from profitability level even while simultaneously contending that there were insufficient funds to pay any dividends because of the needs of the company.

48.     In response to Plaintiffs' attempt to get involved in critical decisions like bonuses and dividends, Vanderhaegen began to make it even more difficult for Plaintiffs to obtain the critical information about the business necessary to effectively participate in decision-making, including reliable cash flow forecasts and an accurate picture of all aspects of the pipeline of solar energy projects.

49.     Though they were sometimes frustrated by Vanderhaegen, Plaintiffs viewed that, mistakenly, as nothing more than the normal give and take with a strong-willed executive. They

never suspected him of dishonesty. They had worked with and trusted him for years and had never had any reason to think that he was not trustworthy.

### C. Defendants Propose a Management Buyout of Plaintiffs' Shares

50. To take advantage of the situation he had created and his carefully orchestrated plan to restrict Plaintiffs' access to company information, Vanderhaegen decided to try to remove Plaintiffs from the picture, gain total control of Origis, and expropriate for himself an overwhelming portion of the value of the company owned by Plaintiffs.

51. Vanderhaegen knew that he could mislead Plaintiffs to sell at significantly below Origis' true value because, as he stated on March 25, 2019, Plaintiffs, thanks to his machinations, "[l]ack [an] understanding of the business . . . ." In other words, the information inequality between Plaintiffs and Defendants prevented Plaintiffs from gaining an independent understanding of the real value of Origis. Defendants then quickly proceeded to act on the vulnerability, which they had created, by seeking to pocket for themselves the value of Plaintiffs' holdings.

52. Just a few weeks later, on April 30, 2019, Vanderhaegen made a first proposal to buy Plaintiffs out of the company. He claimed that Plaintiffs' insistence on tying management bonuses to dividends meant that they were only interested in short-term profit, whereas he wanted to hold his interest in Origis for the long term. And he stated that the best way to solve this impasse was for Plaintiffs to exit.

53. In his initial buyout proposal, Vanderhaegen told Plaintiffs that Origis and its assets were worth only about $160 million. He therefore proposed to pay just under $100 million for their shares. Vanderhaegen supported the accuracy of his proposed buyout valuation with claims

17

that the market did not put much value on good will in the solar industry—*i.e.*, value was overwhelmingly determined by the aggregate value of specific project assets in the pipeline which, if you are knowledgeable about the company and industry, was objectively ascertainable.

54.   Vanderhaegen, using his control over the company's information, reassured Plaintiffs that the price he was offering was actually generous. Plaintiffs trusted Vanderhaegen and, while they considered whether his valuation might be on the low side, they never thought for a second that he would knowingly lie to them.

**D.  Defendants Knowingly and Intentionally Misrepresent the Financial Condition, Assets, and True Value of Origis**

55.   Even while repeatedly assuring Plaintiffs that the buyout price was based on the true value of Origis and that Plaintiffs had received complete and correct information, Defendants had in their possession secret analyses, which they themselves had developed, showing values that were massively higher than those provided to Plaintiffs. These internal analyses, which were deliberately and carefully concealed from Plaintiffs, also included value input that Origis had received from outside investment bankers which supported the internal analyses. Vanderhaegen knew the true value of Origis and knew that he could become rich if only he could acquire Plaintiffs' shares at the price he was representing to be their actual objective value.

56.   Each and every time Vanderhaegen represented to Plaintiffs that the offered share price was objectively accurate, while concealing from Plaintiffs the company's internal analyses, the analyses from the investment bankers used by the company, and his own actual views of

value, it was fraud, a breach of fiduciary duty, and ultimately also a violation of Defendants'
contractual promises.

57.    Instead of providing complete and accurate information about Origis' business,
Vanderhaegen deliberately gave Plaintiffs information, which he knew to be inaccurate, that
appeared to support a low buyout price. For example, one component of Origis' value, which
Vanderhaegen repeatedly claimed was determinative of its value, was its project pipeline.
Vanderhaegen, though he knew better, repeatedly told Plaintiffs that it was the value of these
projects and very little else that constituted the value of the company. And, Plaintiffs believed
and relied upon Vanderhaegen's representation that the value of Origis was almost solely its
pipeline of projects.

58.    In contrast to the valuations of the pipeline that Defendants provided and
represented to Plaintiffs were true and accurate, other documents and analyses, consciously
concealed from Plaintiffs, painted a very different picture. Those hidden valuations concluded
that there were much higher values for the projects in the pipeline than those included in the
valuations presented to Plaintiffs. And the hidden analyses also attributed substantial value to
various projects that had not even been included in the valuations provided to Plaintiffs.

59.    From Vanderhaegen's initial buyout proposal in April 2019 through the completion
of the buyout in January 2021, Defendants repeatedly and falsely represented that the proposed
buyout price for Plaintiffs' shares accurately reflected the true value of Origis based on the
accurate valuations of the project pipeline. But, from April 2019 to the completion of the buyout
in January 2021 and beyond, Defendants, in addition to intentionally misrepresenting the existing
values of projects in the pipeline and the absence of any value in other assets, also deliberately

19

Case 1:23-cv-02172-KPF   Document 1-1   Filed 03/14/23   Page 23 of 54

concealed from Plaintiffs critical information on the value of Origis which they knew would cause Plaintiffs to refuse to go forward with the transaction proposed by Vanderhaegen.

60.    For example, as noted above, in his initial buyout proposal on April 30, 2019, Vanderhaegen stated that an accurate value of Origis was $160 million and offered to pay just under $100 million for Plaintiffs' shares. Just weeks later, on May 19, 2019, he dismissed Plaintiffs' suggestions that Origis could be worth more.

61.    But that *very same day*, May 19, 2019, Vanderhaegen secretly emailed another minority shareholder who would potentially finance the buyout. In the email, Vanderhaegen reported the true value of Origis at between $230 to $260 million and therefore that Plaintiffs' combined 59% interest in Origis would be actually worth at least $136 to $153 million, many millions more than the $100 million he had told Plaintiffs was the actual value of their interest. And, contrary to what he had told Plaintiffs, a valuation of the business attached to the email included between $50 to $80 million for good will, over and above the valuation of Origis' project pipeline.

62.    Defendants never disclosed these higher figures to Plaintiffs. Defendants never revealed that they were telling one thing to Plaintiffs and something very different to others—including on the very same day. Plaintiffs were unaware that Defendants had secretly prepared and sent out this alternative valuation to another shareholder—a valuation that attributed substantial value to something which Vanderhaegen had assured Plaintiffs had no material value, *i.e.*, good will. Plaintiffs would never have agreed to the buyout Vanderhaegen was proposing had they known of this secret communication.

63.     Later, during the negotiation of a letter of intent between December 2019 and February 2020, Vanderhaegen offered up revised valuations for Origis, based almost exclusively on valuations of the various solar energy projects in its pipeline. For example, on December 11, 2019, Vanderhaegen sent a buyout proposal to Plaintiffs that valued Origis' project pipeline at about $161 million.

64.     But Vanderhaegen knew this valuation too was phony. As part of his efforts to obtain financing to buy out Plaintiffs, between the time he provided the $161 million pipeline valuation in December and the time of the signing of the letter of intent in February, on January 7, 2020, Vanderhaegen sent a materially different version of this purported value to potential financing sources. This version expressly represented that the proper Origis valuation was $60 to $80 million greater than what Vanderhaegen had communicated to Plaintiffs. And this valuation, which Vanderhaegen never disclosed to Plaintiffs, also reported the true value of the Origis project pipeline as $197 million, not $161 million. Had Vanderhaegen disclosed this valuation to Plaintiffs, they would not have agreed to the buyout Vanderhaegen was proposing.

65.     As the negotiations went forward, Vanderhaegen continued to provide false and misleading information that he claimed supported his fraudulently low valuation. For example, on January 28, 2020, just days before a letter of intent for the SRA was signed and in response to a request from Plaintiffs, Vanderhaegen sent Plaintiffs an overview of the pipeline projects that valued them at $153 million. He claimed that all other pipeline projects were so unimportant to value that he did not even follow them. Vanderhaegen provided Plaintiffs with this valuation and explanation to reassure them that the proposed buyout price was more than fair.

21

66. But the very next day, on January 29, 2020, Vanderhaegen sent a very different pipeline overview to a potential financing source for the buyout, Ares Management. That communication, which was never disclosed to Plaintiffs, set forth facts in complete conflict with those presented to Plaintiffs. The Ares Overview reported that the pipeline projects had a value of $205 million, *i.e.* 34% or $52 million more than what Plaintiffs had just been told. If Plaintiffs had received the Ares Overview, they would not have agreed to Vanderhaegen's proposed transaction.

### E. Plaintiffs Sign a Letter of Intent Based on Defendants' Promise to Provide Complete Information

67. Defendants' intentionally false and misleading statements about the value of Origis and the value of its pipeline of solar energy projects induced Plaintiffs to agree to a buyout at an artificially low share price. The letter of intent for Plaintiffs' sale of their shares was signed on February 3, 2020. In that letter of intent, the purchase price was set at $56 million each for Pentacon's and Baltisse's shares. The letter of intent rested on a foundation of Defendants' breaches of fiduciary duty and their material misrepresentations and omissions.

68. Vanderhaegen understood that he needed to maintain Plaintiffs' trust if the deal he had so carefully planned to enrich himself was to proceed to conclusion. So, Vanderhaegen stated on January 24, 2020, that the information he had provided to Plaintiffs was complete and accurate and should be relied upon because: "[y]ou are members of the board of directors to which I have reporting obligations and this should be sufficient. If I were to deliberately misrepresent things there, then I would have a problem." In other words, Vanderhaegen used his

fiduciary duties as a weapon to convince Plaintiffs to rely on the honesty and completeness of his statements and to accept his fraudulently low price.

69.    Plaintiffs signed the letter of intent on February 3, 2020, because they had relied on Defendants' honesty and integrity and consequently believed what they had been told about Origis' value. Had Vanderhaegen not misrepresented the value of the company and concealed critical contrary information, Plaintiffs would never have moved forward on the basis of that letter of intent.

### F.    Defendants' Misrepresentations and Key Omissions Continue Between the Letter of Intent and the Signing of the SRA

70.    In the seven-month interval between the signing of the letter of intent on February 3, 2020 and the effective date of the SRA on September 14, 2020, Vanderhaegen continued to spin and expand upon his previous deliberate falsehoods and omissions.

71.    On March 2, 2020, in advance of an informal board meeting with Baltisse and Pentacon, with the supposed purpose of keeping everyone "informed of the evolution of the pipeline and how it is going with the business," Vanderhaegen sent Plaintiffs an updated pipeline report. This report put the value of Origis' pipeline at $134 million.

72.    But, *that very same day*, March 2, 2020, Vanderhaegen sent a very different pipeline valuation to another Origis shareholder that he was allied with and who, unlike Plaintiffs, was not being bought out. This version of the pipeline included projects not even listed in the pipeline valuation sent to Plaintiffs. And, it valued the pipeline at $215 million—*i.e.*, more than the total Origis buyout valuation for the entire company and 60% (almost $80 million) more than what Vanderhaegen had told Plaintiffs the pipeline was worth on the very same day. This

23

valuation was never provided to Plaintiffs. Had they received the same valuation that was sent to this other shareholder, Plaintiffs would never have gone forward with Vanderhaegen's proposed deal.

73.    In March 2020, Vanderhaegen also used the COVID pandemic as an excuse to retrade the deal contemplated in the letter of intent and to convince Plaintiffs that an even lower price was needed. Even though Vanderhaegen had repeatedly assured Plaintiffs that he was pursuing the buyout strictly in the best interests of Origis and of Plaintiffs themselves, unbeknownst to them, Vanderhaegen secretly schemed to extract an even more unrealistic price from them through deception and fraud.

74.    In an email on March 16, 2020, sent to a potential financing source and deliberately withheld from Plaintiffs, Vanderhaegen reported that he would move forward with the buyout while, at the same time, stating that he would tell Plaintiffs "things are on hold" in order to "try to get something out of them." To this end, Vanderhaegen told Plaintiffs that his financing source, the source which would provide the money to buy them out, had demanded Plaintiffs make an "effort" to lower their asking price in light of the COVID pandemic. He also represented that, if Plaintiffs agreed to this new COVID discount, the financing could be approved by April 4, 2020, and the deal potentially signed on that date.

75.    These were all lies. The financing source had never agreed, at that point, to fund on any specific timeline conditioned only on some type of COVID discount. Further, Vanderhaegen knew that the promise of accelerated timing he had used in an attempt to induce Plaintiffs to agree to the COVID discount was never going to happen because it was "unrealistic."

Nevertheless, trusting Vanderhaegen, Plaintiffs agreed to a further 10% price reduction for the buyout to get the deal done by April 4, 2020.

76.    When April 4, 2020, came and went, Vanderhaegen needed an excuse to maintain the 10% price reduction that he had extracted from Plaintiffs. He therefore requested that his financing source prepare a buyout loan letter that reported a lower loan amount than the source was actually willing to extend, specifically to "put pressure on [Plaintiffs] to reduce the purchase price." This latest independent fraud succeeded, and the 10% price reduction was kept in place. Once again, Vanderhaegen deliberately misled Plaintiffs into proceeding with a grossly unlawful transaction at a dramatically low price on the basis of wholly fabricated misrepresentations. Had Plaintiffs known any of this about the "discount" or the timing, they would never have agreed to Vanderhaegen's proposed deal.

### G. Defendants' Misrepresentations and Material Omissions Persist Up Until the Execution of the SRA

77.    In the summer of 2020, with the possible transaction still pending, Plaintiffs expressed uncertainty about the purchase price and the value of Origis (although then they could not even imagine how far those figures were from reality). Vanderhaegen reassured them by saying that they would receive an updated set of valuations and told Plaintiffs on August 28, 2020, that the updated set of valuations would eliminate any remaining concerns because it will "remove[] your uncertainty about the value of our projects," the projects Vanderhaegen had over and over again promised represented the full value of Origis.

78.    On September 10, 2020, Vanderhaegen sent Plaintiffs the promised "remove your uncertainty" valuations. Those valuations represented that the correct value of the pipeline was

$147 million. Vanderhaegen then doubled down on this knowingly false valuation by going through it in detail on the phone with Plaintiffs, assuring them all over again of its accuracy.

79.    But Vanderhaegen, at the very moment he was vouching for the accuracy of the $147 million valuation to Plaintiffs, knew from Origis' own secret internal reports and the analyses from investment bankers that Origis' value was far beyond what he was telling Plaintiffs. This information which he deliberately concealed from Plaintiffs showed that Origis was worth over $1 billion, making Plaintiffs' shares worth not the $50 million each Vanderhaegen had convinced Plaintiffs to take through his misrepresentations and omissions, but instead more than $280 million each. Had Plaintiffs known of the information concealed by Defendants, they never would have gone forward with the proposed Vanderhaegen transaction.

80.    Defendants' undisclosed calculations of a value for the company in excess of $1 billion were not simply some daydream of a few out of touch souls working deep within the bowels of Origis. Far from it. They were the product of careful analysis and input both from the top-ranking officers in Origis, including Vanderhaegen himself, and from outside investment bankers. For example, in July 2020—only weeks before signing the SRA—three different investment bankers working for Origis provided information to Defendants on value. This information supported that the value of Origis far exceeded what Plaintiffs had been told and rather was consistent with the secret internal Origis valuations which were concealed from Plaintiffs.

81.    By the summer of 2020, Vanderhaegen also knew from the company's investment bankers, and undoubtedly from his own observations, that the solar energy market in the U.S.

26

had changed dramatically in favor of substantially higher values for sellers. Once again, all of this information was intentionally concealed from Plaintiffs.

82. Despite producing internal analyses which showed dramatically different values from the ones Defendants had provided to Plaintiffs and the sea change in the market reported by the bankers, Defendants pressed forward with their plan to buy out Plaintiffs at the contrived, grossly deficient price which they had put forward. Had Plaintiffs known the truth about Defendants' conduct, they never would have agreed to the then imminent SRA transaction with Defendants.

83. Vanderhaegen also deliberately concealed the true value of three specific solar energy projects in Texas, known as the Rockhound projects. Vanderhaegen consistently and intentionally misrepresented to Plaintiffs that no reliable value could be assigned to those projects because they were very risky and would be difficult to sell. In reliance on Defendants' representation that the Rockhound projects could not be reliably valued and were not saleable, Plaintiffs ultimately agreed to a Rockhound carve-out from the purchase price.

84. However, contrary to what Plaintiffs had been told, Defendants' secret internal analyses showed that the Rockhound projects were very valuable assets in Origis' pipeline. Defendants intentionally concealed these high valuations from Plaintiffs behind a wall of misrepresentations and omissions. And, contrary to Defendants' continuing claims that the Rockhound projects would be difficult to sell, they pursued the sale of these projects even before the SRA was signed. Defendants ultimately succeeded in selling these projects along with the rest of Origis' project pipeline in the Antin transaction, in which they apparently represented a substantial portion of the $1.4 billion purchase price. Had Plaintiffs known about Defendants'

27

dissembling on the Rockhound projects, they never would have agreed to proceed with the Vanderhaegen buyout.

85.     During the entire buyout process through the final closing, Plaintiffs accepted and relied upon Defendants' misrepresentations about the value of Origis. They did so in light of the past history of the parties; Vanderhaegen's control and apparent mastery of the facts; the fiduciary duties which Vanderhaegen touted he owed to Plaintiffs; the representations and warranties in the SRA about Defendants' duty to provide complete and accurate information about Origis; the multiple times Defendants repeated to Plaintiffs, both orally and in writing, essentially the same low value story; and ultimately Plaintiffs' trust in Vanderhaegen as someone who had been their partner for a very long time and who they had treated generously throughout all those years. It was just impossible for Plaintiffs to even contemplate that this individual for whom they had done so much could stab them in the back.

86.     As a further inducement to his benefactor Paul Thiers, Vanderhaegen had also promised that Pentacon could remain a shareholder in Origis or reinvest in Origis after the buyout. Vanderhaegen knew that Thiers wanted to remain an investor in Origis, and he initially told Thiers that he would be willing to buy out Baltisse alone. But, as soon as Pentacon asked to remain a shareholder in any buyout, Vanderhaegen began to insist that he first wanted to buy out both Baltisse and Pentacon simultaneously. However, he told Thiers that Pentacon would be permitted to remain a shareholder by reinvesting after the transaction. When Pentacon raised the subject again, shortly after the buyout transaction had closed, Vanderhaegen dissembled, falsely claiming that Origis' remaining minority shareholder, which had financed the buyout, would not allow it. And, just to make sure that there would be no Pentacon reinvestment, the story changed

yet again when Vanderhaegen claimed that the value of the company had miraculously increased in just a few months.

87.    Vanderhaegen knew that if he could acquire Plaintiffs' shares at the price contemplated in the SRA, they could be resold quickly at a massive profit. Defendants engaged in the various misrepresentations and omissions to hide that basic fact. Had Plaintiffs known the truth, they would never have entered into the SRA nor tendered their shares at the closings. And, if Plaintiffs had learned the truth at any point before the Antin transaction, they would have taken action to prevent Defendants from closing that transaction.

**H.  Plaintiffs Sign the SRA Based on Defendants' Misrepresentations and Critical Omissions about the True Value of Origis**

88.    At the time the SRA became effective on September 14, 2020, Defendants had spent a year and a half trying to convince Plaintiffs to sell their shares based on false and misleading information about the true value of Origis, its pipeline, and its ongoing sales process. They had also repeatedly concealed other critical information in their possession—including their secret valuations of Origis, its project pipeline, and value of its platform and good will.

89.    The SRA contemplated that the purchase of Plaintiffs' shares would take place in two closings, the First Closing and the Second Closing. On each closing date, Plaintiffs agreed to convey to Origis a defined number of shares and Defendants agreed to make payment for those shares just over two months following each closing date. SRA §§ 2.1, 2.2.

90.    Section 4.4 of the SRA included a representation and warranty that—as of the date of the SRA, as of the date of the First Closing, and as of the date of the Second Closing—Origis

had provided all information material to the valuation of Origis (the "Information Warranty")

and that such information provided was true and correct:

> Buyer has made available to each Seller documents and information regarding (a) the business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries, (b) the Company's development pipeline of solar power and energy storage projects and (c) any value indications by any party showing an interest to acquire part or all of the shares of a direct or indirect Subsidiary of the Company, any assets held by a direct or indirect Subsidiary of the Company or by any party showing an interest in acquiring Origis Energy or Assets. Those documents and that information are (i) complete in all material respects and (ii) do not contain any untrue statement of a material fact or fail to state a material fact necessary to make the statements therein, not misleading, in the case of clauses (i) and (ii) based on a reasonable assessment by Buyer or the Company of information reasonably available to Buyer or the Company and taking into account the experience of Buyer and the Company.

91.    In Section 5.1(a) of the SRA, Origis covenanted to "use its commercially

reasonable efforts to satisfy or cause to be satisfied all of the conditions to the First Closing set

forth in Section 6.2 and all of the conditions to the Second Closing set forth in Section 6.4." The

conditions to the First and Second Closings required that all representations and warranties in

Section 4—including the Information Warranty—remained in place and were true and correct as

of the date of the SRA, as of the date of the First Closing, and as of the date of the Second

Closing. SRA §§ 6.2(a), 6.4(a) (the "Information Covenant").

92.    Pursuant to the SRA, Plaintiffs had no obligation to complete the First Closing and

Second Closing unless the Information Warranty and Information Covenant were satisfied as of

the dates of those closings. SRA §§ 6.2, 6.4.

93.    The SRA also contained a provision that, following the Second Closing, Defendants

agreed not to participate in a sale of Origis equity or its assets for a period of one year from the

date of the SRA (the "No Origis Sale Clause"). SRA § 5.5(a). If a breach of that provision

occurred, Plaintiffs were to be paid their proportionate share of the transaction price, as if no

SRA transaction had happened. SRA § 5.5(c).

94.    In connection with the No Origis Sale Clause, Defendants also promised to

"promptly inform" Plaintiffs of any "potential Origis Sale" (the "Origis Sale Information

Clause"). Section 5.5(c) of the SRA provides:

> For the purpose of this Section 5.5(c), Buyer shall (i) promptly
> inform Sellers of any potential Origis Sale to occur within a period
> of twelve (12) months after the date of this Agreement, (ii) keep
> Sellers informed on the progress of such potential Origis Sale on at
> least a quarterly basis and (iii) submit to Sellers any transaction
> documents (including any Proposal) relating to a potential Origis
> Sale.

**I.    Plaintiffs Are Also Induced into Signing the SRA Because of Defendants'**

**Misrepresentations and Omissions about the Value and Salability of the**

**Rockhound Projects**

95.    In addition to deliberately misleading Plaintiffs as to the value of Origis and its

assets, as noted above, Defendants had also gone to great lengths to mislead them about the

prospects of the Rockhound projects before and after the SRA was signed. Defendants had

regularly and deliberately misrepresented to Plaintiffs that these solar projects in Texas were

virtually impossible to value accurately and that they would be extraordinarily difficult to sell.

96.    However, even while making these misrepresentations, Defendants had, during

Summer 2020 and before, prepared internal valuations of the Rockhound projects that showed

them to be some of the most valuable of Origis' projects. And, prior to the signing of the SRA,

they had confirmed that view of value and salability with the investment bankers they had

retained. None of this information was ever disclosed to Plaintiffs before the signing of the SRA,

the closings, or the announcement of the Antin transaction. Defendants kept this critical

information secret for one reason and one reason only—to defraud Plaintiffs into accepting a

grossly deficient price for their interest in Origis and to block any effort by Plaintiffs to alleviate

the harm of the wrong until Defendants could pocket the tainted proceeds of a sale.

97.    Because Plaintiffs trusted Defendants and believed their misrepresentations, they

agreed, at Defendants' urging, during Spring 2020 to carve out these projects from the buyout

valuation and price they were to receive. Had Plaintiffs known of the concealment of the

Rockhound value and salability information, they never would have signed the SRA or gone

through with the closings.

**J.    Because Defendants Deliberately Concealed Critical Information and Breached Their Fiduciary Duties and Obligations Under the SRA, Plaintiffs Go Through with the First and Second Closings**

98.    Following the effective date of the SRA on September 14, 2020, and before the

closings, Defendants continued to intentionally withhold, among other material information,

their secret internal and other valuations of Origis, accurate information on Origis' pipeline of

projects, and material information regarding an ongoing Origis sales process. Defendants did this

with the express purpose of making certain that the closings would occur as scheduled. They

knew that if this information was disclosed, Plaintiffs would not go through with those closings.

And, Defendants were correct in that belief.

99.    For example, on September 21, 2020, only a week after the SRA's effective date,

Vanderhaegen, as a part of his ongoing dialogue with his investment bankers, received a solar

market report from one of those firms confirming that the SRA valuation was far too low and that Origis' valuations from Summer 2020, which had been hidden from Plaintiffs, were spot on. The report confirmed that the renewables market was going like gangbusters, with "capital pouring into" "[a] [w]hite [h]ot [m]arket for [s]ustainability." This report from the investment banker was hardly a surprise. It simply confirmed what Vanderhaegen knew, and had been told by the bankers, to be true before the SRA was executed.

100.  In response to this latest unsurprising confirmation of Defendants' prior, pre-SRA knowledge of Origis' immense value, Vanderhaegen triumphantly wrote to his Chief Financial Officer on September 21, 2020, that "we did a golden deal a week ago and that the IPO track is certainly real." Vanderhaegen then held another meeting with the investment banker to discuss how best to pursue this option.

101.  Defendants continued to deliberately hide this critical information from Plaintiffs. They acted in this unlawful manner with the deliberate intent to blind Plaintiffs to the truth in order to ensure that they could not exercise their contractual rights to walk away from the SRA before the First and/or Second Closings. Had this information not been intentionally concealed from Plaintiffs, Defendants correctly understood that the closings contemplated by the SRA never would have taken place.

102.  In November 2020, Defendants, in keeping with their at least yearlong plan to flip Origis as quickly as possible to reap the value stolen from Plaintiffs, held further discussions with investment bankers about a potential sale of Origis and its assets. The bankers provided significant information about Origis' value, and Defendants received detailed information on

their options for such a sale. Defendants were thus laying the groundwork to rapidly undertake

an Origis sale as soon as Plaintiffs had finally conveyed their shares.

103.   As the direct result of Defendants' intentional misrepresentations and the

concealment of highly material information on multiple occasions, Plaintiffs conveyed their

shares to Origis in accordance with the SRA on the dates of the First Closing, October 15, 2020,

and the Second Closing, January 4, 2021. In exchange, Plaintiffs received about $105 million, a

price which Defendants knew, but Plaintiffs did not, was unconscionably low.

### K.  No Sooner Was the Ink Dry from the Second Closing than Defendants Redouble their Efforts to Resell Plaintiffs' Shares

104.   Despite negotiating and signing a covenant not to permit any sale of Origis assets or

equity for 12 months *after* the SRA, unbeknownst to Plaintiffs, Defendants were already actively

pursuing such a sale even *before* signing the SRA. Defendants concealed this sales process from

Plaintiffs until after the Second Closing and withheld almost all material information about it

thereafter. This tainted sales process culminated in an agreement to sell Origis to Antin for $1.4

billion.

105.   Just a couple of weeks after the Second Closing, Defendants received an updated

U.S. solar market report from an investment banker dated January 22, 2021, which confirmed,

yet again, what the bankers had previously told them during the summer and fall of 2020—

Origis was worth a fortune. Vanderhaegen promptly forwarded the report to the other remaining

Origis shareholder. He exulted that, based on information almost identical to that from 2020,

"you get to a value as of today of more than $500 million" for Origis. And then he flatly stated,

"[n]ot bad if you compare with the buyout value." Vanderhaegen certainly could not have been

surprised in the least to receive further confirmation that the buyout was—as he had said at the time of the signing of the SRA—a "golden deal" for Defendants. This fact had been at the center of his scheme from its start almost two years before.

106.  With the Second Closing past, Defendants removed all of the remaining artificial constraints which had been put into place to prevent Plaintiffs from learning the true value of their holdings. The investment bankers almost immediately kicked into high gear. They first tested the market by putting individual Origis assets up for sale. The results confirmed yet again what Defendants already knew—Origis was worth far more than what Defendants had represented to Plaintiffs. In fact, the valuations were, unremarkably, in line with Defendants' secret internal valuations and the investment banker reports that Defendants had received during Summer 2020 prior to the execution of the SRA.

107.  Indeed, the Rockhound projects *alone*—which Vanderhaegen had claimed and continued to claim were almost impossible to value and difficult to sell—promptly received a bid of $145 million on February 26, 2021, just weeks after the Second Closing. By contrast, the Rockhound payments in the SRA had been calculated based on a Rockhound valuation of only $33 million, and Vanderhaegen had convinced Plaintiffs through fraud and deception that it was highly uncertain that the Rockhound projects would fetch even that figure.

108.  Upon receiving the $145 million Rockhound bid, Vanderhaegen acknowledged what he had known before, *i.e.*, contrary to what he had sworn to Plaintiffs, the Rockhound assets were not virtually impossible to value nor difficult to sell. He acknowledged what was obvious— that there was "serious interest in our Rockhound assets . . . ." And, there undoubtedly was. But, contrary to his contractual promise to inform Plaintiffs of any and all Rockhound

proposals, Vanderhaegen kept this information concealed to prevent Plaintiffs from taking any action to seek relief.

109.  Then, on March 4, 2021, Onpeak Capital reported to Vanderhaegen that Origis could be worth as much as $600 million in a private transaction. If, instead, Origis were to pursue a SPAC transaction, the investment bankers predicted that Origis might be worth up to $1.25 billion. Again, these values were consistent with Defendants' concealed, pre-SRA valuations from the prior summer which they hid from Plaintiffs. Vanderhaegen, revealing the depth of his deception of Plaintiffs, responded to Onpeak that its striking $600 million valuation—many times greater than the buyout valuation—in fact understated the true value of Origis. And, as it turned out, Vanderhaegen, unsurprisingly, given his intimate knowledge of the business and the assistance of the company's investment bankers, knew what he was talking about. It was only Plaintiffs who had been kept in the dark.

110.  With the information firmly in hand that Origis might be worth over $1 billion, Vanderhaegen approached Plaintiffs on March 25, 2021, to seek a waiver of the SRA's No Origis Sale Clause in order to pursue a SPAC transaction.

111.  But, yet again, the truth and Vanderhaegen were strangers. He did not inform Plaintiffs that the SPAC transaction might be worth $1.25 billion. He instead told them effectively just the opposite—that the transaction would not produce much, if anything, in the way of profit and hence there was no upside to be shared with Plaintiffs. Then, to emphasize that point, he told them that he too stood to make nothing. As Vanderhaegen put it on April 6, 2021, "[t]he deal we are talking about is not an exit for me but only a nice opportunity for the company

so I thought that giving a waiver should actually be possible," explaining that, "[a]s there is no exit, and therefore no upward, I don't see what I can share . . . ."

112.  That is, Vanderhaegen yet again swore that he was a long-term holder not looking for an exit to cash in. The SPAC transaction, he claimed, would provide nothing more than additional financing for Origis' growth, without any profit for himself, personally. These misrepresentations were meant to hide the reality, *i.e.* that Vanderhaegen was speeding toward the incredibly lucrative off-ramp he had constructed with his carefully planned fraud and breaches of contractual and fiduciary duty.

113.  Because Plaintiffs trusted that Vanderhaegen had been telling the truth when he had promised he would not profit, they signed the waiver on April 23, 2021. Once again, Vanderhaegen had successfully lied to Plaintiffs.

**L.  Defendants Continue to Conceal from Plaintiffs Key Information About Their Origis Sale Process and the Valuations It Already Had Produced**

114.  Despite actively pursuing a potential Origis Sale and Rockhound Sale, Defendants failed to keep Plaintiffs updated on their progress as required by the SRA. For instance, in response to an inquiry from Pentacon about the possibility of reinvesting in Origis, as Vanderhaegen had previously promised they could, Vanderhaegen told Plaintiffs on April 29, 2021, that, while considering the sales transaction route, he had determined that the value of Origis had increased significantly since the buyout. On May 11, 2021, Vanderhaegen falsely attributed the changed valuation to a miraculous increase in the value of the Origis pipeline from $152 million at the time of Second Closing to $413 million just four months later. There was no

miracle. After all, Origis' internal, concealed calculations in the summer of 2020, before signing of the SRA in September 2020, had valued the pipeline at even more than $413 million.

115.  Moreover, Vanderhaegen still did not disclose that Origis as a whole—including the pipeline, other assets, the platform, and good will—was potentially worth over a billion dollars. The supposedly "new" valuation he reported was thus yet another attempt to mislead Plaintiffs and, even more importantly, to stop them from taking any action until Defendants' planned sale of the business could become a *fait accompli*.

### M. Defendants Aggressively Push Their Sales Process Forward

116.  Defendants had been preparing to go to market since well prior to the signing of the SRA. And now, in early 2021 shortly after the Second Closing, all the additional pieces of their fraudulent scheme began to fall into place. Their data room containing the materials to be reviewed by potential buyers had been built by April 2021. In May 2021, Goldman Sachs had come on board and had put together a value presentation for a sale of the entire company. In June, the investment bankers were developing various financial models to calculate the value of Origis. By July of 2021, the two investment bankers, Onpeak and Goldman, had been formally retained, they had identified a pool of potential buyers, had circulated Non-Disclosure Agreements to those potential buyers, had created a Confidential Information Memorandum, and provided that to the potential buyers. Late in July 2021, invitations were issued to buyers to submit preliminary bids.

117.  The bids obtained proved, as if further evidence was necessary, that the valuation information which Defendants had possessed in the summer of 2020 prior to the signing of the SRA, but concealed from Plaintiffs, accurately demonstrated that Origis was exceptionally

valuable. In August 2021, Defendants received sixteen bids. Five ranged from $900 million to $1.25 billion; nine were essentially between $500 million and $900 million; and all of the bids came in light years ahead of the valuations which Defendants had provided to Plaintiffs. Thus, by August 2021, for all practical purposes, less than a year after the signing of the SRA, it was a done deal. Defendants had been successful in selling Origis at an immense profit. All that remained to do was to decide which bidder Defendants were going to choose to make them rich.

118.  None of these bids were shared with Plaintiffs nor that a sale was now a foregone conclusion. Again, Defendants deliberately kept Plaintiffs in the dark to prevent them from taking any action which could upset their unlawful and carefully laid plans.

119.  Defendants' preferred bid for Origis came from Antin, a highly experienced solar energy investor. Vanderhaegen met with Antin on September 8, 2021 to eliminate any doubt that a deal had been reached. And, by the close of that meeting, that is exactly what had been accomplished. A short time later, the lawyers had finished papering their deal and Antin had bought Origis for an eye-popping $1.4 billion.

120.  Vanderhaegen had gone from holding a minority 22% of Origis to holding a significant majority of Origis as the result of the SRA transaction. That increased ownership interest made Vanderhaegen as rich as Croesus when Antin purchased Origis for $1.4 billion. The value of Vanderhaegen's ownership position, a position he owed almost entirely to Pentacon and Baltisse, had increased by hundreds of millions of dollars as the successful culmination of his fraudulent scheme.

39

Case 1:23-cv-02172-KPF   Document 1-1   Filed 03/14/23   Page 43 of 54

### N.  Plaintiffs Discover that They Had Been Deceived and Take Action to Enforce Their Rights

121.  On October 18, 2021, Antin and Origis publicly announced that they had agreed on the purchase of Origis, but they did not reveal the purchase price. The outrageous scale of Defendants' deception would only be revealed months later.

122.  It was not until early 2022 that the approximate value of the Antin transaction became public and known to Plaintiffs. At that point, a minority shareholder in Origis, announced that it had sold its equity in Origis to Antin for 12x cost and had realized a gain of $429 million. The announcement implied a valuation for Origis of well over $1 billion—totally at odds with the facts as Defendants had represented them to Plaintiffs.

123.  On October 7, 2022, in accordance with Section 8.3(b) of the SRA, Plaintiffs served Defendants with a formal Indemnity Notice that set out Plaintiffs' indemnification claims under the SRA.

124.  Defendants responded to Plaintiffs' Indemnity Notice on October 18, 2022. The response disputed Plaintiffs' claims pursuant to the SRA in a conclusory fashion but provided no factual or legal basis for denying them, nor any benign explanation for the massive increase in Origis' value in the short time between the signing of the SRA and the closings and the $1.4 billion Antin purchase.

### Causes of Action

### Count One: Fraud

125.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 124 above as if fully set forth herein.

126.  Between 2019 and 2021, Defendants engaged in a fraudulent scheme, including multiple independent frauds, in order to take control of Origis, acquire Plaintiffs' shares in Origis at a fraudulently low price, and then promptly turn around and sell the company for a dramatically higher amount. Defendants did all this intentionally to steal large amounts of money from Plaintiffs in order to enrich themselves.

127.  Defendants repeatedly misrepresented and failed to disclose material facts with the conscious intent to mislead Plaintiffs, including but not limited to Defendants' statements and omissions: that they wanted to remain invested over the long haul to grow the Origis business and that therefore they had no intention of selling the business; concerning the value of the projects in the pipeline; that the real value of Origis was nothing more than the value of the projects in its pipeline and that accordingly neither the platform or good will had any material value; that, based on their knowledge and experience, they had no reason to believe Origis was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information about Origis, including all value information about the company and about its specific assets; that a sale process had been undertaken even prior to the signing of the SRA and the Closings and that, in August, 2021, Defendants had received fourteen bids at or above $500 million, including three bids at or above $1 billion; that they were at all times abiding by their fiduciary, and later contractual, duties in providing or failing to provide such information; that they had and would update all information relevant to the company, including its value, at and through the time of each Closing; that the Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its shares.

128.    Defendants deliberately misrepresented these material facts and omitted material information that would have contradicted or cast doubt on the statements set forth above and, in fact, engaged in a cover-up of their unlawful conduct thereby extending and exacerbating their wrongdoing. Defendants did all this with the knowledge that their representations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and with the specific intent to take control of Origis and to acquire Plaintiffs' shares in Origis at what they knew to be a fraudulent and abysmally deficient price.

129.    Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and omissions in at least the following ways: (a) agreeing to sell their controlling interest in Origis to Vanderhaegen, (b) agreeing to an artificially low price for Origis, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) signing the SRA, (f) going through with the First Closing and Second Closing; and (g) refraining from seeking to affect the sales process being conducted by Defendants, (h) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

130.    Plaintiffs suffered injury because of Defendants' fraudulent scheme and acts because they were thereby induced to sell their shares in Origis to Defendants for a price dramatically below their true value.

131.    Plaintiffs are therefore entitled to a declaratory judgment that the SRA is null and void by reason of fraud; compensatory damages and/or rescissory damages—*i.e.*, the difference between the payments received and the actual value of their shares—whichever is greater; and such other relief as the Court deems just and proper.

**Count Two: Fraudulent Inducement of Contract**

132.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 131 above as if fully set forth herein.

133.  Between 2019 and 2020, Defendants deliberately and repeatedly misrepresented material facts and omitted material information, including but not limited to information about Origis and the various solar energy projects in its pipeline, and thereby fraudulently induced Plaintiffs into signing the SRA.

134.  Defendants repeatedly misrepresented and failed to disclose material facts with the conscious intent to mislead Plaintiffs, including but not limited to Defendants' statements and omissions: that they wanted to remain invested over the long haul to grow the Origis business and that therefore they had no intention of selling the business; concerning the value of the projects in the pipeline; that the real value of Origis was nothing more than the value of the projects in its pipeline and that accordingly neither the platform or good will had any material value; that, based on their knowledge and experience, they had no reason to believe Origis was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information about Origis, including all value information about the company and about its specific assets; that a sale process had been undertaken even prior to the signing of the SRA and the Closings and that, in August, 2021, Defendants had received fourteen bids at or above $500 million, including five bids at or above $1 billion; that they were at all times abiding by their fiduciary, and later contractual, duties in providing or failing to provide such information; that they had and would update all information relevant to the company, including its value, at and through the time of each Closing; that the

Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its shares.

135.  Defendants deliberately misrepresented these material facts and omitted material information that would have contradicted or cast doubt on the statements set forth above and, in fact, engaged in a cover-up of their unlawful conduct thereby extending and exacerbating their wrongdoing. Defendants did all this with the knowledge that the misrepresentations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and with the specific intent that Plaintiffs would thereby be induced to sign the SRA, allowing Defendants to acquire Plaintiffs' shares in Origis at what they knew to be a fraudulent and abysmally deficient price.

136.  Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and omissions in at least the following ways: (a) agreeing to sell their controlling interest in Origis to Vanderhaegen, (b) agreeing to an artificially low price for Origis, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) signing the SRA, (f) going through with the First Closing and Second Closing; and (g) refraining from seeking to affect the sales process being conducted by Defendants, (h) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

137.  Plaintiffs were injured because they were induced to execute the SRA, through which they sold their controlling interest in Origis for a price dramatically below its true value.

138.  Plaintiffs are therefore entitled to a declaratory judgment that the SRA is null and void by reason of fraud; compensatory damages and/or rescissory damages—*i.e.*, the difference

between the payments received and the actual value of their shares—whichever is greater; and such other relief as the Court deems just and proper.

### Count Three: Constructive Fraud

139.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 138 above as if fully set forth herein.

140.  Between 2019 and 2021, Defendants repeatedly misrepresented material facts and omitted material information about, among other things, Origis' financial condition, assets, and the true value of the business and its assets, in breach of their fiduciary duties to Plaintiffs, and thereby constructively defrauded Plaintiffs of their controlling interest in Origis.

141.  Defendants repeatedly misrepresented and failed to disclose material facts with the conscious intent to mislead Plaintiffs, including but not limited to Defendants' statements and omissions: that they wanted to remain invested over the long haul to grow the Origis business and that therefore they had no intention of selling the business; concerning the value of the projects in the pipeline; that the real value of Origis was nothing more than the value of the projects in its pipeline and that accordingly neither the platform or good will had any material value; that, based on their knowledge and experience, they had no reason to believe Origis was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information about Origis, including all value information about the company and about its specific assets; that a sale process had been undertaken even prior to the signing of the SRA and the Closings and that, in August, 2021, Defendants had received fourteen bids at or above $500 million, including three bids at or above $1 billion; that they were at all times abiding by their fiduciary, and later contractual, duties in

Case 1:23-cv-02172-RPF   Document 1-1   Filed 03/14/23   Page 49 of 54

providing or failing to provide such information; that they had and would update all information relevant to the company, including its value, at and through the time of each Closing; that the Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its shares.

142.   Defendants misrepresented these material facts and omitted material information that would have contradicted the misleading nature of what had been represented. All this was done with knowledge that their representations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and/or negligence. The false statements and omissions were made with the intent that Plaintiffs rely on them and with the intent to induce Plaintiffs into surrendering their control of Origis and ultimately to sell their shares in Origis at a fraudulently deficient price.

143.   As officers, directors, and fellow shareholders in a close corporation, Defendants owed fiduciary duties to Plaintiffs, including duties of good faith, candor, and loyalty. Plaintiffs were therefore justified in trusting and relying upon Defendants to be careful in their representations to them, to operate at the highest levels of integrity, and to act at all times in Plaintiffs' best interests as shareholders.

144.   Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and omissions in at least the following ways: (a) agreeing to sell their controlling interest in Origis to Vanderhaegen, (b) agreeing to an artificially low price for Origis, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) signing the SRA, (f) going through with the First Closing and Second Closing; and (g) refraining from

46

seeking to affect the sales process being conducted by Defendants, (h) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

145.  Plaintiffs suffered injury because of Defendants' unlawful conduct set out above including because they were induced to transfer their shares in Origis to Defendants for much less than their true value.

146.  Plaintiffs are therefore entitled to a declaratory judgment that the SRA is null and void by reason of fraud; compensatory damages as well as rescissory damages—*i.e.*, the difference between the payments received and the actual value of their shares—whichever is greater; and such other relief as the Court deems just and proper.

### Count Four: Breach of Fiduciary Duty

147.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 146 above as if fully set forth herein.

148.  Defendants breached their fiduciary duties to Plaintiffs.

149.  As officers, directors, and fellow shareholders in a close corporation, Defendants owed fiduciary duties to Plaintiffs. Among other things, Defendants owed Plaintiffs duties of good faith, candor, and loyalty.

150.  In breach of their duties, Defendants provided false and misleading information to Plaintiffs and omitted to provide material information to them so as to make those false statements not misleading. All of this was provided with the intent to induce Plaintiffs to rely on that false and misleading information. These false and misleading misrepresentations and omission permitted Defendant to seize control of Origis' information, preventing Plaintiffs from exercising effective oversight of their investment, including by potentially replacing

47

management, hiring outside advisors, or by exploring options transactions other than a management buyout.

151.  Defendants' breaches of their fiduciary duties to Plaintiffs caused injury to Plaintiffs, who were injured as a direct result of (a) not replacing Vanderhaegen or the other top executives of Origis, (b) agreeing to sell their controlling interest in Origis to Vanderhaegen, (c) agreeing to a price for their Origis shares far beneath their true value, (d) not exploring other possible transactions, (e) selling their shares to Defendants on terms tainted by fraud, and (f) refraining from seeking to enjoin the Antin sale process and closing.

152.  Plaintiffs are therefore entitled to compensatory damages and/or rescissory damages—*i.e.*, the difference between the payments received and the actual value of their shares—whichever is greater, and such other relief as the Court deems just and proper.

### Count Five: Breach of Contract – Representations and Warranties

153.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 152 above as if fully set forth herein.

154.  The Information Warranty of the SRA and related Covenant were a vital component of the bargain and were specifically sought by and negotiated for by Plaintiffs. Without those provisions, Plaintiffs would never have entered into the SRA.

155.  Plaintiffs fulfilled all of their material obligations under the SRA, including by selling their Origis shares at the First Closing and Second Closing.

156.  Defendants breached the Information Warranty and Covenant contained in the SRA at the time of the SRA's signing, again at the time of the First Closing, and finally, yet, again at the time of the Second Closing.

157.  Defendants breached the Information Warranty and Covenant by making false and misleading statements of material fact regarding Origis, its financial condition, and its assets, including the value of Origis and its pipeline. They also omitted material facts needed to make the information provided on those matters not misleading. These misrepresentations and omissions included the claim that the Rockhound projects could not be reliably valued or sold.

158.  By breaching the Information Warranty and Covenant, Defendants injured Plaintiffs by causing them to transfer their shares for far less than their true value.

159.  Plaintiffs are therefore entitled to damages and such other relief as the Court deems just and proper.

### Count Six: Breach of Contract – Sale of Origis

160.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 159 above as if fully set forth herein.

161.  Section 5.5(a) of the SRA prohibited Defendants from doing precisely what they did here. It provides that "[f]rom and after the Second Closing Date until twelve (12) months after the date of this Agreement, Pelican shall not permit any Origis Sale to occur." Not only did Defendants fail to act to block any sale within this twelve-month period, they actively pursued such a sale both before the SRA had been signed and during the period afterwards and up to the signing of the agreement to sell Origis to Antin.

162.  Additionally, Section 5.5(c) of the SRA required Defendants to inform Plaintiffs during the 12 months following the date of the SRA whenever a potential Origis sale was reasonably possible to occur within a 12 month period after the execution of the SRA. It specifically provides that:

> For the purpose of this Section 5.5(c), Buyer shall (i) promptly inform Sellers of any potential Origis Sale to occur within a period of twelve (12) months after the date of this Agreement, (ii) keep Sellers informed on the progress of such potential Origis Sale on at least a quarterly basis and (iii) submit to Sellers any transaction documents (including any Proposal) relating to a potential Origis Sale. Sellers will, and will cause each of their respective Affiliates and their and their respective Affiliates' Representatives to, maintain in strict confidence any and all information relating to any potential Origis Sale.

163. Every contract includes an implied covenant of good faith and fair dealing, including the SRA. The definition and interpretation of each provision of each contract is subject to that covenant.

164. Defendants breached the No Origis Sale Clause of the SRA, the Origis Sale Information Clause of the SRA, and the implied covenant of good faith and fair dealing attaching to those obligations by commencing a sales process even before Plaintiffs had signed the SRA and redeemed their Origis shares; failing to promptly and regularly provide Plaintiffs with information on the potential Origis sale; effectively reaching an agreement to sell Origis before the expiration of the 12 month No Origis Sale period; deliberately delaying the formal closing of the sale to avoid having to pay Plaintiffs their share of the profits; and selling Origis without meeting their commitments under the SRA.

165. Plaintiffs were damaged because of Defendants' breaches by at least, among other things, the amount that they should have received under the SRA in the event of an Origis Sale within 12 months of the signing of the SRA.

166. Plaintiffs are therefore entitled to damages and such other relief as the Court deems just and proper.

WHEREFORE, Plaintiffs demand a jury trial and demand that judgment be entered in their favor in an amount to be determined at trial by jury, plus interest, an award of punitive damages, and such other and further relief as the Court deems just and proper, including reasonable attorney's fees and costs and expenses.


Dated: New York, New York                    DECHERT LLP
       February 14, 2023

                                             By: _/s/ Matthew L. Mazur_____
                                             Matthew L. Mazur
                                             Three Bryant Park
                                             New York, New York 10036
                                             Tel. 212 698 3500 Ext. 7487
                                             Matthew.Mazur@dechert.com

                                             160 Queen Victoria Street
                                             London EC4V 4QQ
                                             United Kingdom
                                             Tel. +44 20 7184 7487

                                             Steven B. Feirson (*pro hac vice* forthcoming)
                                             Cira Center, 2929 Arch Street
                                             Philadelphia, Pennsylvania 19104-2828
                                             Tel. 215 994 2489
                                             Steven.Feirson@dechert.com

                                             David L. Attanasio
                                             1900 K Street, NW
                                             Washington, DC 20006-1110
                                             Tel. 202 261 3379
                                             David.Attanasio@dechert.com

                                             *Attorneys for Plaintiffs*
                                             *Pentacon BV and Baltisse NV*