UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------:

PENTACON BV, et al.,            : Case No.: 23cv2172

            Plaintiffs,    :

    v.                          :

VANDERHAEGEN, et al.,          : New York, New York

            Defendants.   : May 19, 2023

----------------------------: CONFERENCE

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE KATHERINE POLK FAILLA

UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff:      DECHERT, LLP
                    BY: Steven B. Feirson, Esq.
                        Matthew Mazur, Esq.
                    2929 Arch Street
                    Philadelphia, PA 19104

For Defendants:     NORTON ROSE FULBRIGHT, LLP
                    BY:  Thomas J. McCormack, Esq.
                         Robin Ball, Esq.
                         Robert Kirby, Esq.
                    1301 Avenue of the Americas
                    New York, New York 10019


For Defendant:      LATHAM & WATKINS, LLP
Origis              BY:  Blake T. Denton, Esq.
                    1271 Avenue of the Americas
                    New York, New York  10020


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    THE DEPUTY CLERK:  Your Honor, this is in
 2       the matter of Pentacon BV, et al., versus
 3       Vanderhaegen, et al.
 4                    Counsel, please state your name for the
 5       record, beginning with plaintiffs.
 6                    MR. FEIRSON:  Steve Feirson on behalf of
 7       the plaintiffs from Dechert.
 8                    THE COURT:  Sir, good morning.  This is
 9       Judge Failla.  Assisting you this morning is who,
10       please?
11                    MR. MAZER:  Good morning, Your Honor.
12       Matthew Mazur from Dechert as well.
13                    THE COURT:  There we go.  Thank you, sir.
14       And good morning to you.
15                    Representing Mr. Vanderhaegen and the
16       Pelican entities, may I have an appearance, please.
17                    MR. McCORMACK:  Yes.  Good morning, Your
18       Honor.  This is Tom McCormack, and I'm with my
19       colleagues, Robin Ball and Bob Kirby from Norton
20       Rose Fulbright, on behalf of Vanderhaegen,
21       Vanderhaegen Trust and the Pelican entities.
22                    THE COURT:  Sir, thank you so much.  And
23       good morning to you as well.
24                    And then representing Origis USA LLC?
25                    MR. DENTON:  Good morning, Your Honor.
```

1    Blake Denton from Latham & Watkins for Origis USA

2    LLC.

3              THE COURT:  Thank you, sir.

4              And there's no one represent -- are you

5    also representing Origis Energy LLC, sir?

6              MR. DENTON:  No.  That would be the

7    Norton Rose -- one of the Norton Rose parties.

8              THE COURT:  Okay.  Thank you.

9              And, Mr. McCormack, are you volunteering

10   for Origis Energy LLC?

11             MR. McCORMACK:  Actually, that entity no

12   longer exists.  So we are, yes.  So to the extent

13   that it had any role in any of these matters, we

14   would be representing it.

15             THE COURT:  Okay.  I very much appreciate

16   the clarification.

17             Good morning to each of you this morning.

18   Thank you very much for participating in this, our

19   initial conference in this case, which is also a

20   pre-motion conference in this case.  In preparation

21   for this proceeding, I've reviewed the complaint and

22   the removal notice, and I've reviewed as well the

23   pre-motion letters and plaintiffs' responses to

24   them.

25             Looking through the materials I have, I

1    don't actually think I have a copy of the share

2    redemption agreement, so, to a degree, I am limited

3    in my knowledge because I haven't had a chance to

4    review it.  I suspect that I will not be able to

5    persuade the defendants, the extant defendants, from

6    moving to dismiss the claims against their

7    respect -- each of them.  And so, instead, I guess

8    I'd like to just understand a little bit more about

9    the case, and as well to understand from plaintiffs

10   whether they wish to amend their complaint before

11   motion practice.

12            I do understand that prior to the

13   removal, there had been an agreed-upon motion to

14   dismiss briefing scheduled.  But, again, I don't

15   want to have the situation where a motion to dismiss

16   is filed and it's responded to with a proposed

17   amended complaint.  So I'd like to get that out of

18   the way now.  And then just, again, as I mentioned a

19   few moments ago, I don't have the SRA, so I'm, sort

20   of, speaking from a position of ignorance in some

21   respects.  But I was having -- and I'd like to

22   engage with plaintiffs' counsel on this.  I was

23   having a little difficulty with some of the

24   arguments, in particular the alter-ego arguments

25   with respect to Mr. Vanderhaegen.

1          So let me ask Mr. Feirson if -- first,

2     whether there's an appetite for amendment, and

3     second, if he could engage with me on my issues with

4     their alter ego.  Thank you.

5          MR. FEIRSON:  Yes, thank you, Your Honor.

6     This is Mr. Feirson.

7          The -- there is, as there always is in a

8     situation like this, an appetite, having seen the

9     three-page letters, to consider whether some

10    amendment could take place which would clarify some

11    of the claims, and I think here we can probably do

12    that.  We can certainly attempt, even though it's

13    prediscovery and before we see any motion to

14    dismiss, to flesh out the alter-ego point.

15         We -- the complaint -- the benefit, at

16    least we thought, of the complaint being as lengthy

17    and detailed as it was, was that it set forth a lot

18    of the interaction.  But some of it, as it pertains

19    specifically to the alter-ego point, probably not as

20    clear as it might have been.

21         So, yes, with respect to the alter-ego

22    point and the -- whether it's an aiding and abetting

23    point that goes along with the alter-ego point, we

24    would have an interest in amending to try to clarify

25    that.

```
 1              THE COURT:  Let me understand this well,
 2   sir, your position with respect to the release.  As
 3   I understand it, Mr. Vanderhaegen and his team
 4   believe that it bars all of these claims, and you --
 5   is it really the case that there's a carve-out for
 6   fraud?  I simply don't know.  I haven't seen the
 7   document.
 8              MR. FEIRSON:  Yeah, well -- and we
 9   apologize to the Court because we obviously should
10   have -- someone should have supplied the Court with
11   the SRA.  But, yeah, there is -- there are
12   carve-outs, and the carve-outs appear in Section 4.8
13   and Section 8.6(a).  And this specific lead-in
14   language, including the language if you look at
15   9.11, which is what Norton Rose points to, says,
16   "except to the extent provided in the transaction
17   documents."  So the waiver is predicated and
18   conditioned on the fact that there be nothing else
19   in the transaction documents that in any way would
20   undercut that.
21              And if you look at 4.8, it carves out
22   quoting cases of fraud, also carves out cases that
23   depend on Article 4.  And 8.6, similarly, the exact
24   wording is, "except for claims based on fraud," so
25   yeah.  So, I mean, our position is -- and you can --
```

1  we will be able to see it, and would have been able

2  had someone provided the Court with the SRA, that,

3  yeah, there are, in fact, these carve-outs.

4          THE COURT:  And, sir, I appreciate you

5  beating yourself up, I do, but just to be clear, you

6  didn't know the case was coming to me.  And maybe

7  somewhere in the state court file, it's there.  I

8  just don't have it in the materials I've received.

9          Mr. Feirson, you'll excuse me for asking

10  this because, for me, it is the triumph of hope over

11  experience, but is there any discussion, or has

12  there been any discussion, regarding a pre-motion

13  ADR proceeding, either a settlement conference or a

14  mediation before we get into what, for me, is going

15  to be some pretty extensive motion practice.

16          MR. FEIRSON:  There's an -- I think my

17  colleagues would agree with this.  At least with

18  respect to the Norton Rose parties, there's been a

19  very, sort of, superficial, cursory discussion about

20  that, which I think didn't go very far because it

21  ended more with, well, maybe we ought to see what

22  the motion to dismiss stage looks like first, or at

23  least have some fact discovery first.  But I

24  wouldn't say that we had any serious discussion

25  about that.

```
 1                    THE COURT:  All right.  No, I appreciate
 2      that.  Okay.
 3                    Mr. Feirson, those were the questions
 4      that I had for you, sir.  I do want to hear from
 5      defense counsel, but before I do, is there anything
 6      that you want to call to my attention that you
 7      believe might not be as clear as you want it to,
 8      either in the complaint or in the pre motion
 9      correspondence?
10                    MR. FEIRSON:  Again, I would -- I'd go
11      back to the fact that a lot of the items that were
12      set forth in the admittedly very brief three-page
13      letter from the Norton Rose parties and from Latham
14      is -- has its answer in various allegations in the
15      complaint and/or in the SRA itself.  And so any
16      process which can lay that out for the Court in
17      greater detail, I think, would be beneficial for
18      all -- for everyone.
19                    THE COURT:  Okay.  Thank you very much.
20                    Mr. McCormack, I'll turn to you, sir.
21      And, Mr. McCormack, I appreciate your clients'
22      desires -- your clients', plural, desires to have
23      this case dismissed, but, you know, as cases go, as
24      complaints go, it was pretty detailed.  So I can
25      hear from you with respect to the relief provision
```

1  or with respect to anything else that you've heard

2  me discuss with Mr. Feirson this morning, or you can

3  stand on your written submissions.

4        MR. McCORMACK:  Well, thank you.  I

5  appreciate the opportunity this morning to speak

6  with you.

7        Let me cover a couple of things first,

8  which is you are correct.  We think that we have

9  several bases on both legal and pleadings issues to

10  have these claims dismissed.  And I think that's --

11  you said correctly at the outset that we were

12  inclined to do that.  We remain inclined to do that.

13  And I appreciate the inquiry.

14        Relative to this -- remember, this is a

15  contract that was signed by certain parties, and

16  then there's non-signatories to this contract.  And,

17  obviously, to the extent that one seeks to bring

18  breach of contract claims against a non-signatory,

19  that's a fundamental problem.  And that -- that's

20  true with several of our defendants.  And then -- so

21  that's with regard to the breach of contract claims,

22  generally.

23        Now, with regard to the release, I

24  think -- and you are at disadvantage not having the

25  SRA in front of you.  I mean, the SRA is exactly

```
 1    what you think it is.  It's a part -- remember,
 2    these are immensely sophisticated people.  The
 3    sellers to my client are very successful, wealthy,
 4    private equity types in Belgium, and they got into
 5    this contract.  And it's one of those classic
 6    contracts -- I'm sure you've seen it, Your Honor --
 7    a very, very sophisticated contract with people that
 8    very carefully lay out what the -- what claims are
 9    in and what claims are out, et cetera.  And you'll
10    see that when you see the agreement.  And they made
11    the decision to sell making three times their money,
12    and they now have, as we said, seller's regret, but
13    I have a set piece here, but I won't bore you with
14    it.  I'll just get to your question.
15            THE COURT:  All right.
16            MR. McCORMACK:  I'll get to your
17    question, which is relative -- I think that when you
18    read the relevant sections of this agreement, first
19    of all, the release is completely valid against the
20    three non-parties that we're seeking to get out of
21    the case.  And that's because 9.11, as Mr. Feirson,
22    said, excludes from its broad scope only
23    hypothetical claims that are pursuant to and to the
24    extent provided in the transaction documents.
25            But Section 4.8, which, apparently, he's
```

```
 1    relying upon, does not provide for claims against
 2    non-party affiliates.  To the contrary, that section
 3    is a disclaimer of additional representation and
 4    warranties made by contracting parties or any of
 5    their respective affiliates or representatives.  It
 6    does not purport to affirmatively create any claims
 7    or liabilities.  The plaintiffs' reading of
 8    Section 4.8 is also inconsistent with the
 9    plaintiffs' express disclaimer in Section 9.11 of,
10    "any reliance upon any non-party affiliates with
11    respect to any representational warranty made as an
12    inducement to this agreement."
13            In our view, the contracting parties
14    excluded cases of fraud from the disclaimer of
15    additional representations and warranties in
16    Section 4.8, but chose not to exclude cases of fraud
17    from Section 9.11's disclaimer and release.  And I'm
18    going to say this because I believe it.  I don't
19    think it's close.  So we think that when you look at
20    the specific provisions involved, recognizing the
21    sophistication of the agreement here, 9.11 was
22    intended to release these claims independent of what
23    was ever going on at 4.8.  That had to do with a
24    whole different set of subject matters having to do
25    with reps and warranties.  So that's our view on
```

1    that, Your Honor.

2            Relative to the -- one of the key things

3    that we've noticed in their complaint is that they

4    take a great deal of issue with so-called opinions

5    of value, and we have lots of reasons for why that

6    is not actionable fraud.  And I know you've been

7    down this path many times, Your Honor, as have we

8    and Mr. Feirson, but Rule 12 and Rule 9(b) require

9    you to do certain things.  And one of the things

10   that we are fortunate about is that many of the

11   items that are listed in the complaint are

12   referenced.  And so we can actually put some of

13   those documents and materials before the Court to

14   see that they are very different than what they're

15   alleged to be in the complaint.

16           And, therefore, with regard to both the

17   statement of alleged fraud and then reliance on the

18   alleged fraud, et cetera, there are many things that

19   are lacking, from our perspective, relative to the

20   pleading requirements.

21           And then one key issue that you've seen

22   us raise, and perhaps also our friends at Latham,

23   which is, there's a rather promiscuous use of

24   everybody did everything all at the same time.  And

25   that is not acceptable either under the relevant

1    standards.

2              So our arguments with regard to fraud, I

3    think, are well stated.  They use a lot of

4    adjectives in their complaint, but that -- but a lot

5    of adjectives doesn't create a relevant or pertinent

6    or cognizant fraud claim.

7              And then one of the issues in the case,

8    Your Honor, is fiduciary duties.  And in the

9    fiduciary duty claims, you've seen what we said in

10   our presentation, which is effectively that these --

11   there are no fiduciary duty claims here, that the

12   fiduciary duty issues here are governed by Belgian

13   law, and Belgian law doesn't recognize --

14             THE COURT:  And I'd ask you, please,

15   actually, to pause right there.  Thank you so much.

16             MR. McCORMACK:  Yes.

17             THE COURT:  That's what confuses me.

18   Does the SRA recite New York law anywhere?

19             MR. McCORMACK:  Yes, it does.  It says --

20             THE COURT:  What does it say, please.

21             MR. McCORMACK:  Let me find it and I'll

22   give it to you.

23             Sorry, Judge.  I didn't have that one

24   tagged.

25             THE COURT:  Oh, it's no problem.  That's

1    okay.

2             MR. McCORMACK:  It's Section 9.12,

3    Governing Law, "This agreement and any claim arising

4    out of or in connection with this agreement shall be

5    governed by, construed and enforced in accordance

6    with the laws of the State of New York without

7    giving effect to any conflict of law, rules or

8    principles that would result in the application of

9    the laws of any other jurisdiction."

10            And their argument is that that trumps

11   the internal affairs doctrine, and our argument is

12   that it does not.  And there's case law in this

13   district that -- it says the same thing that we're

14   saying, that the internal affairs doctrine is not

15   trumped by a choice of law provision in a contract.

16   And there's good reason for that.  But as a

17   fundamental question, I appreciate your asking it.

18   Of course, we would brief it if it comes to that,

19   that the internal affairs doctrine of Belgium will

20   apply.  And under Belgian law, there is no fiduciary

21   duty owed to shareholders.  There is a notional

22   sense of loyalty in Belgium, but that runs only to

23   the company, not to the shareholders.  So we'll have

24   a Belgian law affidavit which carefully lays out the

25   reasons why there is no fiduciary duty claim here.

```
 1              And then finally, Your Honor -- and I
 2    keep going until stopped, Your Honor, as you
 3    noticed.
 4              THE COURT:  Yeah, well -- and I'm going
 5    to ask you to pause because, were you here, you'd
 6    see my hand being raised.
 7              Mr. McCormack, with respect to the
 8    affidavit that you're contemplating, is it your
 9    belief that I can consider that in the context of a
10    12(b)(6) motion?
11              MR. McCORMACK:  Yes.  Our assumption has
12    been that you can.
13              THE COURT:  Okay.
14              MR. McCORMACK:  It's a -- and it's funny.
15    I just talked about that yesterday with Robin and
16    Bob.  It is a question of law, interestingly.  And
17    once you submit such an affidavit -- now that I'm
18    being open, I wondered whether there was an element
19    of question of fact to it, but the case law is a
20    question of law.  And so the answer is, yes, I think
21    we can put that in at this motion stage.
22              THE COURT:  Okay.  So I'll let you give
23    me your final point.  Thank you so much.
24              MR. McCORMACK:  Yes, Your Honor.
25              Just the final point is that -- and this
```

1    has been frustrating for my client, certainly.  This
2    is a very comprehensive contract drafted by very
3    sophisticated people which intended to limit
4    entirely the types of claims that could be brought.
5    And relative to the breach of contract claims -- and
6    I don't know if you've seen a lot of it, Your Honor,
7    but this has really gained some force in the
8    corporate world in the last few years, which is they
9    have contracts that eliminate all claims, all common
10   law claims, all statutory claims, all claims except
11   for very specific claims that the parties have been
12   building in their contract.  And that's the case
13   here.
14            And the provisions that are relevant here
15   are really 4.4, which is the actual statement of the
16   reps and warranties that are really the core of the
17   claim, and then an indemnification right.  So on the
18   strict breach of contract issues, we would argue
19   that the way that they pled contract claims are
20   inconsistent with the specifics of the provisions in
21   the contract that deal with what was allowed and
22   what wasn't, and that there's specific language in
23   the contract that says, other than these very, very
24   specific things that we'll let a lawsuit proceed on,
25   we don't let anything -- no other statements or

1    comments, et cetera, are going to be subject to

2    that.

3              So our breach of contract defense is,

4    effectively, your breach of contract is wildly

5    inconsistent with the provisions you agreed to

6    relative to the breach of contract claims.  So

7    that's our pitch on that one, Your Honor.

8              THE COURT:  Okay.  Thank you very much.

9    And I do appreciate the detail that you've just

10   given me in your presentation because, again, I'm

11   looking forward to reading the actual documents that

12   go with this.  Okay.

13             And, Mr. McCormack, I think Mr. Feirson

14   has answered this question for you, but I'm

15   understanding from his comments and your

16   presentation to me this morning that it is your

17   client's wish to, first, engage in some dispositive

18   motion practice and then see what remains before

19   discussing ADR.  Am I correct?

20             MR. McCORMACK:  Yes, Your Honor.  And

21   another thing you should be aware of, because of the

22   nature of these parties and their sophistication,

23   they had a very specific protocol to deal with any

24   kind of issues that might come up after all this

25   ended.  And there is a -- Mr. Feirson's client

```
 1    pressed the button that exists in this SRA to allow
 2    them to seek significant documentation and
 3    information from us prior to a lawsuit being filed.
 4    I think we produced 136,000 pages of documents.
 5              THE COURT:  Oh, okay.
 6              MR. McCORMACK:  And so there has been a
 7    significant amount of information exchanged.  But,
 8    you know, on a fundamental level, we talked about --
 9    and I guess Mr. Feirson probably characterized it
10    exactly right today.  There was some conversations,
11    but I think the parties are so far apart as to what
12    they think happened here that there wasn't a great
13    deal of opportunity to settle it until -- to use the
14    term that litigators -- and sorry, Your Honor,
15    because you're going to be involved in that, which
16    is drawing a little blood.  So I don't think there's
17    an appetite for our clients to settle this at this
18    point, either side.
19              THE COURT:  Understood.  And, again, just
20    appreciate the candor about that.
21              Mr. Denton, may I hear from you, please,
22    sir.
23              MR. DENTON:  Yes, Your Honor.  Good
24    morning.  Blake Denton from Latham & Watkins for
25    Origis USA LLC.
```

1              So, Your Honor, you had asked earlier
2    about alter ego, which I think is particularly
3    relevant for my client.  My client wasn't the buyer
4    or seller in this transaction.  My client didn't get
5    any money from it.  My client -- you'll see when you
6    see the SRA, my client didn't make the contractural
7    representations that plaintiffs say were violated.
8    My client wasn't the one providing diligence
9    materials or swearing to their accuracy.  My client
10   did no fiduciary duties to the plaintiffs.  And
11   so -- and the plaintiffs, in their letter, really
12   don't lay a glove on any of that.  And instead, they
13   raise this alter-ego argument that is not in their
14   complaint, and I think for good reason.  And I think
15   it would be a mistake for them to add it now against
16   my client.
17             So, you know, Your Honor already knows
18   that alter-ego claims are, you know, rarely
19   permitted.  They -- you know, courts, in general,
20   respect the corporate form, and you need to really
21   fit in a rare exception.  And this case certainly is
22   not one of those rare exceptions.  Indeed, my
23   client, Origis USA, is not even a wholly owned
24   subsidiary of Origis Energy.  And we included a
25   little chart in our pre-motion letter which shows

1    that.

2            So my client, USA, was owned 80 percent

3    by Origis Energy and 20 percent by a wholly separate

4    company unrelated to Mr. Vanderhaegen called Global

5    Atlantic, and that's a sophisticated $70 billion

6    company.  It's not a defendant.  It's not accused of

7    doing anything wrong.  And I think that right there

8    ends any claim that Origis USA and its non-wholly

9    owned parent are somehow one and the same, or Origis

10   USA and Mr. Vanderhaegen are one and the same.  And

11   even the cases that plaintiffs' cite in their letter

12   confirm that the American Fuel Corp. case denied

13   alter-ego liability because the company had two

14   shareholders and only one was accused of wrongdoing.

15           And then further, Your Honor, within USA,

16   there were five directors.  Mr. Vanderhaegen was

17   just one of them.  In fact, the plaintiffs had

18   double as many seats.  They had two.  They had more

19   voting power.  And so, again, I don't understand how

20   they even can, with a straight face, make the

21   argument that Mr. Vanderhaegen and Origis USA are

22   the same thing.  And as Your Honor will see when you

23   see the contract, my client was only party to the

24   contract that's written right on the front cover.

25   Could not be clearer.  Origis USA is only party to

 1   the contract for very limited purposes, which is to

 2   pay a dividend up to Origis Energy, which is where

 3   the plaintiffs' shares are and where the plaintiffs

 4   were bought out of and where this entire dispute

 5   sits.  My client was to pay a dividend up to there

 6   that was used to buy out the plaintiffs.  And the

 7   plaintiffs, as directors of Origis USA, specifically

 8   authorized that dividend.

 9           And so, given these facts, I don't know

10   how they can make the argument with a straight face

11   that my client, USA, is somehow the same as

12   Mr. Vanderhaegen, and Your Honor should disregard

13   the contract, which, right on the front cover, makes

14   clear we're not party to these provisions they claim

15   were breached and, instead, somehow hold us to

16   those, that Your Honor should say that whenever

17   Mr. Vanderhaegen was negotiating on his own behalf

18   with the plaintiffs for a transaction that

19   personally benefited him and the plaintiffs, that

20   somehow downstream Origis USA is responsible for all

21   that, or on the hook as an alter ego because I don't

22   think any of it makes sense.

23           And, frankly, it's really unfair, Your

24   Honor, because, you know, my client, as I mentioned,

25   didn't get anything out of this transaction.  We

1   didn't get any money.  We didn't -- nothing changed

2   in our structure.  We were owned by two entities

3   before.  We were owned by those exact same two

4   entities afterwards.

5        So my -- USA got no benefit.  And the

6   party that later bought USA is Antin Infrastructure

7   Partners.  Antin is not alleged to have done

8   anything wrong.  Antin was not even on the scene

9   when the plaintiffs were bought out of

10  Origis Energy.  The only thing Antin is alleged to

11  have done is to have paid a lot of money when it

12  bought USA a year and change later.  And now, the

13  plaintiffs' argument seems to be, well, they should

14  pay a second time.  They're trying to hold USA and,

15  you know, by extension, its owner on the hook for

16  something that we were not a part of at all.

17       And so this lawsuit is having real costs.

18  It's imposing, you know, a real impact on my

19  client's business.  And so whether the plaintiffs

20  amend or don't amend, we would like to move to

21  dismiss quickly if they don't do the right thing and

22  just dismiss us out because we're not the right

23  party in this case.

24       THE COURT:  Okay.  I'm confident,

25  Mr. Denton, you've expressed these same thoughts to

1    Mr. Feirson and his team, correct?

2              MR. DENTON:  Yes, Your Honor.  Sure.

3    Yes.  In our conversations, we've made that clear,

4    yes.

5              THE COURT:  Okay.  All right.  Well, I

6    mean, not that my opinion matters at this point

7    because it's an under-informed opinion, but I do

8    find the allegations against this Origis Energy to

9    be part -- perhaps the weakest part of plaintiffs'

10   complaint.  Plaintiff may be able to remediate it;

11   I'm just not so sure.  But I'm -- I am sure that

12   Mr. Feirson and his team will think and think and

13   think some more before deciding finally on who makes

14   it into the next amended complaint.

15             Mr. Feirson, there was a schedule that

16   the parties proposed when the case was in state

17   court.  May I please have a sense of the time that

18   you need to file or to consider filing an amended

19   complaint?

20             MR. FEIRSON:  Yeah, we would -- if we're

21   going to file an amended complaint, we would intend

22   to do it within the 21 days provided for under

23   Rule 15.

24             THE COURT:  Oh, okay.  Although that's

25   what 20 -- are you saying 21 days from today, sir?

```
 1                    MR. FEIRSON:  Yes, 21 days from today.
 2                    THE COURT:  Okay.  Hold on, please.
 3     Sorry.  My computer is freezing on me this morning.
 4                    Would that be June 9th, sir?
 5                    MR. FEIRSON:  Now you're really testing
 6     me.  You're --
 7                    THE COURT:  Okay.  Okay.
 8                    MR. FEIRSON:  I have to look at a
 9     calendar.
10                    THE COURT:  No, don't do -- please don't
11     do that.  June 9th it is.
12                    For my friends who are considering filing
13     a motion, is 30 days a sufficient time period to do
14     that, or would you need more time?  I -- because I'm
15     looking at -- I guess I'm looking at July 14th, if
16     that works for Mr. McCormack and Mr. Denton.
17                    MR. McCORMACK:  Your Honor, thank you.
18     One of the things we've seen is that -- I guess it
19     depends on what Steve -- I'm sorry -- what
20     Mr. Feirson does with his complaint.  If he makes
21     minor additions to it, then that won't change our
22     circumstance, but if he does something more
23     significant, maybe it would.  And a couple of
24     things --
25                    THE COURT:  I'm sorry.  Mr. McCormack,
```

1    you're coming in very faintly.  I'm only hearing

2    about half of what you're saying.  Could you just

3    repeat that last sentence again.  Thank you, sir.

4            MR. McCORMACK:  Sorry about that.  I hope

5    this is better.

6            THE COURT:  It is, sir.

7            MR. McCORMACK:  I think it depends on

8    what Mr. Feirson does with his complaint.  If he

9    changes three paragraphs and tries to bolster the

10   alter-ego issues, then that won't be much of an

11   issue.  We've done a lot of our work already.  But

12   if he does something more meaningful to it, then

13   maybe we'd want a little bit more time.  So hedging

14   that risk, I would say 45 days, if that -- if that's

15   tolerable to you, Your Honor.

16           THE COURT:  It will be.  It's slightly in

17   tension with Mr. Denton's desire to get this done

18   more quickly.

19           But, Mr. Denton, my schedule is awful

20   anyway, so does July 28th work for you, Mr. Denton?

21           MR. DENTON:  Yes.  I think that would

22   work on our -- and you're correct, Your Honor.  I

23   mean, my client is very eager to try to get out of

24   this lawsuit as quickly as possible, but if that's

25   the best day for the parties, that's fine.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE COURT:  Okay.  Now, Mr. Feirson, are

 2   you contemplating a single unified brief in response

 3   to the two motions?

 4              MR. FEIRSON:  To be honest, Your Honor, I

 5   hadn't thought about that because I hadn't -- I was

 6   expecting to see the motions and then decide, but

 7   my --

 8              THE COURT:  All right.

 9              MR. FEIRSON:  -- predilection is to do

10   one unified brief.

11              THE COURT:  Okay.

12              MR. FEIRSON:  I think --

13              THE COURT:  All right.

14              MR. FEIRSON:  Okay.

15              THE COURT:  So let's imagine, sir --

16   because I'm not interested in extending page limits

17   here, so let's imagine there'll be 25-page briefs

18   from Mr. McCormack and from Mr. Denton's teams.  And

19   then you're asking -- at one point, sir, you were

20   asking for 60 days.  I did not know whether that was

21   something you're still requesting.

22              MR. FEIRSON:  Well, obviously, there's no

23   magic in 60 days, but at least 45 would be good,

24   Your Honor.

25              THE COURT:  All right.  Yes.  But I'm
```

1    going to end up destroying someone's summer holidays

2    if I do that, so I will give you until

3    September 29th to file your opposition.  And then

4    let me have, please, reply briefs by October 13th,

5    and we'll go from there.  What we'll do is we'll

6    issue a minute entry that has all of these dates in

7    case you weren't able to write them down, but that

8    is the schedule for now.

9            Mr. Feirson, from my perspective, I've

10   addressed the things I wanted to.  Is there anything

11   else you wish to bring to my attention?

12           MR. FEIRSON:  The only thing is that, as

13   I'm sitting here thinking about whether it's going

14   to be one unified brief or two, some of that is

15   going to depend -- if we're going to have to respond

16   to 50 pages, our -- is our page limit going to be 25

17   if it's one?

18           THE COURT:  No.  If it's one brief, it's

19   one 50-page response.

20           MR. FEIRSON:  Okay.  Thank you, Your

21   Honor.

22           THE COURT:  Yes.  No, I mean, I'm cruel,

23   but not unreasonable, so I'm not worried about that.

24   Okay.  Thank you.

25           Mr. McCormack, anything else to address

1    today, sir?

2            MR. McCORMACK:  Yes.  My team will kill

3    me if I don't raise this issue, Your Honor.

4            THE COURT:  Go ahead.

5            MR. McCORMACK:  We have been working hard

6    on this.  As you know, it is a significant case,

7    involves, according to plaintiffs, $500 million.  It

8    involves foreign law.  It involves multiple causes

9    of action.  It involves comprehensive claims of

10   wrongdoing in the form of fraud and

11   misrepresentations.  And I know that in our draft

12   briefing to deal with all that, it certainly

13   exceeded the page limits that Your Honor typically

14   uses.  I know -- and we had put in, on behalf of all

15   the parties, a request for 35 pages.  I was told

16   yesterday that even that was insufficient, but I

17   have the sense that you're not overly inclined to do

18   beyond that, but I'm going to catch a lot of heat

19   from my team off the phone call if I don't ask for

20   at least the 35 pages that we have.

21            And, again, I'm not wishing to take

22   anything from Latham.  I think their arguments are

23   pretty straightforward and similar to what Mr. Blake

24   said today.  Ours are a little bit more complicated.

25   They have lots of pieces to them.  We're going to

1    write you a good brief and we're going to keep it as

2    short as we can, but it's very difficult to deal

3    with everything that's in that complaint and the

4    international pieces of it and the law piece,

5    everything in that 25 pages.  So they begged me to

6    come and ask you for 40 pages.  I'm going to, now,

7    retreat and beg for 35.

8            THE COURT:  Okay.  I'll give 35 to each

9    of you and Mr. Denton.

10           Mr. Feirson, I'm honor-bound to give you

11   70, but I have to believe there's some common facts.

12   You won't need all 70 pages.  And for the love of

13   God, don't ask for more.  But I'll give 35 pages,

14   and then 70 for the -- for a unified opposition

15   because I don't want to see Mr. McCormack's team

16   cry, so that's fine.

17           So, sir, yes, that has succeeded.

18           Mr. Denton, anything else to bring to my

19   attention today?

20           MR. DENTON:  No.  Thank you very much for

21   your time, Your Honor.

22           THE COURT:  Of course.  I thank you all

23   for your time and for coming prepared to this

24   conference.  I wish you all well.  We are adjourned.

25   Thank you.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1              MR. FEIRSON:  Thank you, Your Honor.

2

3                          0o0

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3       I, Adrienne M. Mignano, certify that the

 4   foregoing transcript of proceedings in the case of

 5   Pentacon BV v. Vanderhaegen, et al.,

 6   Docket #23cv2172 was prepared using digital

 7   transcription software and is a true and accurate

 8   record of the proceedings.

 9

10

11   Signature   _____
                      Adrienne M. Mignano
12               ADRIENNE M. MIGNANO, RPR

13

14   Date:       May 20, 2023

15

16

17

18

19

20

21

22

23

24

25
```