UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENTACON BV and BALTISSE NV,<br><br>                         Plaintiffs,<br><br>                v.<br><br>GUY VANDERHAEGEN, GUY VANDERHAEGEN<br>REVOCABLE TRUST, PELICAN INVEST, LLC,<br>PELICAN INTERNATIONAL, LLC, and ORIGIS USA<br>LLC,<br><br>                      Defendants. | Case No. 1:23-cv-02172-KPF<br><br>(ECF Case)<br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

**Table of Contents**

I. Introduction ....................................................................................................................... 1

II. Jurisdiction .....................................................................................................................11

III. Venue ............................................................................................................................11

IV. Parties ...........................................................................................................................11

   A. Plaintiffs ...................................................................................................................... 11

   B. Vanderhaegen Defendants .......................................................................................... 11

   C. Origis USA Defendant ............................................................................................... 14

V. Factual Allegations .........................................................................................................17

   A. Plaintiffs Provide the Vision and Capital Critical to Create and Grow Origis ................ 17

   B. Defendants Withhold Critical Information from Plaintiffs in Breach of Their Fiduciary
   Duties ............................................................................................................................... 20

   C. Defendants Propose a Management Buyout in a Deliberate Scheme to Seize Plaintiffs'
   Interest at a Grossly Deficient Price ................................................................................ 21

   D. Defendants Knowingly and Intentionally Misrepresent the Financial Condition, Assets,
   and True Value of Origis .................................................................................................. 22

      1. Defendants Persuaded Plaintiffs to Participate in Buyout Discussions through
      Misrepresentations and Material Omissions ..................................................................24

      2. In Order to Induce Plaintiffs to Sign the Letter of Intent, Defendants Make Further
      Misrepresentations and Material Omissions ..................................................................26

      3. Plaintiffs Sign a Letter of Intent Based on Defendants' Deliberately False Promise to
      Provide Complete and Accurate Information ..................................................................28

      4. Based on Further Misrepresentations and Material Omissions, Defendants Convince
      Plaintiffs to Further Reduce the Buyout Price ...............................................................30

      5. Defendants' Misrepresentations and Material Omissions Persist Up Until the Execution
      of the SRA.....................................................................................................................32

      6. The Value and Salability of the Rockhound Projects are also the Subject of Defendants'
      Misrepresentations and Omissions ...............................................................................36

   E. Plaintiffs Sign the SRA Based on Defendants' Misrepresentations and Critical Omissions
   about the True Value of Origis ......................................................................................... 37

      1. The SRA Contains a Representation and Warranty that Plaintiffs had Received
      Materially Complete and Accurate Information as of the date of the SRA, the First
      Closing, and the Second Closing ...................................................................................38

      2. The Vanderhaegen Defendants Agreed in the SRA that, for a Period of One Year, they
      Would Not Permit any Origis Sale to Occur ..................................................................40

      3. The SRA and All Connected Claims Are Subject to New York Law without Regard to
      Choice of Law................................................................................................................41

F. Because Defendants Deliberately Misrepresented and Concealed Critical Information and Breached Their Fiduciary Duties and Obligations Under the SRA, Plaintiffs Go Through with the First and Second Closings ........................................................................................ 41

G. No Sooner Was the Ink Dry from the Second Closing than Defendants Redouble their Efforts to Resell Plaintiffs' Interest ............................................................................... 43

    1. Immediately Upon Escalating their Sales Efforts, Defendants Receive Further Market Data that Reconfirms the Massive Value of Origis USA ................................................ 44

    2. Defendants Continue to Conceal from Plaintiffs Key Information About Their Origis Sale Process and the Valuations It Already Had Produced ................................................ 46

    3. Defendants' Sales Process Results in the Sale of Origis USA for $1.4 Billion ............. 47

H. Plaintiffs Discover that They Had Been Deceived and Take Action to Enforce Their Rights ............................................................................................................................. 49

    1. After Investigating their Claims, Plaintiffs Serve Indemnity Notices on Defendants .... 49

    2. Defendants Fail to Fulfill their SRA Obligation to Allow Plaintiffs to Investigate their Claims ............................................................................................................................. 50

VI. Claims ............................................................................................................................. 51

A. Claims as Regards All Defendants ..................................................................................... 51

Count One: Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA) .......................................................................................... 51

Count Two: Fraudulent Inducement of Contract (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA) ..................................................... 54

Count Three: Aiding and Abetting Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA) ................................................................. 57

Count Four: Civil Conspiracy (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA) .......................................................................... 60

B. Claims as Regards the Vanderhaegen Defendants .......................................................... 62

Count Five: Constructive Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International) ......................................................................................................... 62

Count Six: Breach of Fiduciary Duty (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International) .................................................................................................. 65

Count Seven: Breach of Contract – Representations and Warranties (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International) ....................................... 66

Count Eight: Breach of Contract – Sale of Origis (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International) ......................................................................... 67

Count Nine: Breach of Implied Covenant of Good Faith and Fair Dealing – Sale of Origis (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International) .............. 69

C. Claims as Regards the Origis USA Defendant ................................................................... 70

Count Ten: Aiding and Abetting Breach of Fiduciary Duty (Origis USA) ........................ 70

Count Eleven: Tortious Interference with Contract – Representations and Warranties (Origis USA)............................................................................................................72

Count Twelve: Tortious Interference with Contract – Sale of Origis (Origis USA)..........74

VII. Prayer for Relief ...............................................................................................................76

Plaintiffs Pentacon BV ("Pentacon") and Baltisse NV ("Baltisse"), for their complaint against defendants Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust ("Vanderhaegen Trust"), Pelican Invest, LLC ("Pelican Invest"), Pelican International, LLC ("Pelican International"), and Origis USA LLC ("Origis USA"), allege, upon knowledge, documents, and information and belief, as follows:

## I.   Introduction

1.     Plaintiffs Pentacon and Baltisse bring this action to redress the harm they suffered because of Defendants' multiple violations of law, including, but not limited to, their deliberate and fraudulent scheme to acquire Plaintiffs' combined majority interest in Origis USA for a price far below its true value, their breaches of contract, and their breaches of fiduciary duty.

2.     Over a period of at least two years, Defendants deliberately withheld critical information and intentionally misrepresented material facts to Plaintiffs relating to the value of Origis USA and its assets, including its pipeline of solar energy projects, cash flows, profit margins, platform, and goodwill.

3.     To implement their plan, they sought to separate Plaintiffs from the day-to-day business, with the objective of making Plaintiffs dependent on Defendants to understand Origis USA's business and its value, set its strategy, and effectively exercise oversight of management. Then, having successfully isolated Plaintiffs and using a similar pattern of unlawful conduct, including further breaches of their fiduciary duties and breaches of the contract they had fraudulently induced Plaintiffs to execute, Defendants consummated a scheme to fraudulently seize Plaintiffs' interest at a grossly deficient price.

4.     Once Defendants had deceitfully acquired Plaintiffs' shares, Defendants proceeded with their plan to turn around and sell Origis USA, which they did, for well over a billion dollars.

5. As a result of Defendants' breaches of their contractual and fiduciary duties and outright fraud, Plaintiffs have suffered and continue to suffer damages in an amount in excess of half a billion dollars.

6. In 2008, Origis Energy NV ("Origis Energy," and together with Origis USA, "Origis"), a solar energy start-up, was founded in Belgium. These were the very early days of the solar energy business, and there were very few, if any, successful businesses in this space. Paul Thiers, Sr., the primary investor in Plaintiff Pentacon, saw enormous potential in this emerging area and the opportunity to be at the forefront of the effort to develop climate friendly alternatives to fossil fuels. Thiers became the driving force behind the creation of Origis, providing both the entrepreneurial vision and the financing to launch this enterprise.

7. Defendant Vanderhaegen, a former management consultant, was the CEO and President of both Origis Energy—which housed the original Belgian business—and later Origis USA—its U.S. operating subsidiary. He ran the day-to-day business. The Origis entities were close corporations and functioned as a single business under Vanderhaegen's command and control. Over the next decade, Thiers provided tens of millions of dollars in financial support to Origis and to Vanderhaegen, personally. That support kept the business and Vanderhaegen afloat, including through multiple close calls with bankruptcy and during the transfer of the primary focus of the business from Europe to the United States.

8. In addition to personally supporting the company and Vanderhaegen, Thiers also introduced customers and additional sources of financing to the company. For example, Thiers introduced Vanderhaegen to Filip Balcaen, another successful Belgian entrepreneur and investor. Balcaen, largely in reliance on his personal relationship with Thiers and based on his

recommendation, provided critical financing for the company through his company Baltisse. And Baltisse later infused even more capital when it became a shareholder in 2016.

9.    Moreover, as they continued to invest in Origis, Pentacon and Baltisse provided financial assistance to Vanderhaegen personally to enable him to purchase additional shares to maintain his interest in Origis.

10.    By 2019, Origis USA had grown and carved out a niche in the U.S. solar energy business. It had become the sole focus of Origis' operations and repository of its assets. At that point, Pentacon and Baltisse, with their employees, each effectively held approximately a 29% indirect interest in Origis USA. Vanderhaegen held approximately a 22% interest in Origis USA, and an insurance company that had acquired a 20% minority interest in 2018 held the rest.

11.    As a result of having been deliberately distanced by Vanderhaegen from the business, which was an ocean away, Pentacon and Baltisse came to depend upon Vanderhaegen, who was the CEO, President, managing director, and board member of both Origis Energy and Origis USA, and on the Origis USA management team to provide them with accurate information about the business in which they had invested tens of millions of dollars. And, in light of the consistent and generous support they had provided to Vanderhaegen and the business, they trusted him to do exactly that in an honest and straightforward manner.

12.    As CEO, President, managing director, board member, and a shareholder in a closely held company, Vanderhaegen[1] owed fiduciary duties to all of the owners, including Pentacon and Baltisse. In particular, he had solemn duties of good faith, candor, and loyalty,

_____

[1]    Guy Vanderhaegen held these positions directly and/or through entities he controlled, including Pelican International and Vanderhaegen Trust, which held his ownership interests in Origis, and Pelican Invest through which he held his directorship in Origis. In this Complaint, all references to Vanderhaegen also include the entities he controlled, including Origis USA, for which he at all relevant times acted and over which he exercised control.

which required him to operate the company for the benefit of all of its owners, including by providing Pentacon and Baltisse with timely, accurate, complete, and honest information about the business and its value, and to put shareholders' interests before his personal self-interest.

13.    Instead, Vanderhaegen breached these duties by deliberately misleading Pentacon and Baltisse as to the condition and value of Origis USA and its assets. He did this intentionally, initially to deprive Plaintiffs of the information flow necessary for them to fully understand the business. Without such complete and accurate information, Vanderhaegen understood it would be impossible for Pentacon and Baltisse to exercise the effective oversight necessary to evaluate the company, the market and Origis USA's place in that market, the growth prospects for the company and the market, and ultimately the value of their investment. He then used similar misrepresentations and omissions to execute a plan to profit at Plaintiffs' expense by acquiring their combined majority shareholding interest at a price he knew was a bargain for him and which he intentionally led them to believe was both full and fair.

14.    Beginning in early 2019, in an effort to isolate Plaintiffs and further consolidate their control over Origis USA, Defendants consistently failed, despite Plaintiffs' requests, to provide the cash flow projections requested by Plaintiffs; to keep them advised of the specifics of the development of projects; to update them on the financial condition of the company; and to report Defendants' own, the market's, and third parties' views of the value of Origis USA's assets and the company as a whole. Throughout this entire period, Pentacon and Baltisse continued to trust Vanderhaegen, relying on what they believed to be a relationship founded on their long-standing partnership and their support of him personally over the years.

15.     Defendants played upon Plaintiffs' trust to intentionally block Plaintiffs from a full understanding of the financial condition of the company, its assets, developments relating to the

business, its market, and its prospects going forward. In this way, Defendants succeeded in their plan to isolate Plaintiffs and prevent them from understanding the business.

16.     In pursuit of their scheme to seize Plaintiffs' ownership interests at a price far below its objective value, Defendants repeatedly, consciously, and deliberately downplayed what it knew to be the value of Origis USA and its assets, intentionally misrepresenting key facts about the business, including the profit margins on and valuations of its pipeline of solar energy projects.

17.     Defendants, at all relevant times, fully understood that Plaintiffs were relying on Defendants' statements, which Defendants knew to be false and misleading, in deciding whether or not to sell their ownership interests. Defendants lied about and concealed critical information to enrich themselves in violation of their fiduciary and contractual duties, including their obligations to provide complete and accurate information about Origis USA to Plaintiffs in connection with their buyout proposals.

18.     To take just one example of many, on August 28, 2020, just before Plaintiffs had agreed to sell their interests by executing a Share Redemption Agreement ("SRA"),[2] Vanderhaegen wrote to Plaintiffs that Origis USA was preparing new valuations of the pipeline projects that would "remove your uncertainty about the value of our projects." Then, on September 10, 2020—immediately before Plaintiffs signed the SRA and in response to a specific demand from Plaintiffs for the promised valuations—Vanderhaegen provided a report setting out a value of $147 million for 13 specific solar energy projects. Plaintiffs, upon receipt of this critical information, requested a call with Vanderhaegen to have him confirm directly the validity of these valuations and his other representations. In that call, Vanderhaegen doubled down and

---

[2] The SRA is attached hereto as **Exhibit 1**.

reassured Plaintiffs, as he had done on multiple occasions in the past, that the combined value of these projects as shown in the report was accurate and essentially reflected the value of Origis USA as a whole. Without these representations, the Plaintiffs would not have moved forward to execute the SRA. However, trusting Vanderhaegen and his Origis USA team and having no reason to believe that Defendants had been privy to any inconsistent information, Plaintiffs proceeded with the transaction.

19.     Yet, Defendants, at the very moment they were making these representations, knew them to be false. Shortly before, in June and July 2020, they, themselves, had prepared internal analyses of projects in Origis USA's pipeline—including for almost all of the projects listed in the report to Plaintiffs. Defendants had also consulted with investment bankers about current values and added the bankers' valuations into their internal analyses. These internal analyses assigned far greater value to Origis USA than the sham report which they had presented to Plaintiffs with the intention to "remove" any "uncertainty" about value.

20.     Defendants carefully and intentionally concealed from Plaintiffs their internal analyses and the facts of the retention of the investment bankers by Origis USA and the role they had played. They did so with the specific intent to avoid having to explain the much higher values and to end any further questions about the value of Origis USA and thereby ensure the success of Defendants' scheme to acquire Plaintiffs' interest at a value which Defendants knew, but Plaintiffs did not, would dramatically shortchange Plaintiffs.

21.     Origis USA actively supported the unlawful scheme to redeem Plaintiffs' interests at an artificially low price. Working with Origis USA's executives, Defendants provided false and misleading valuations of Origis USA and its pipeline projects, while concealing much higher valuations prepared by Origis USA's executives. These secret, higher internal valuations were

based on extensive data as well as the input from independent investment bankers enlisted by Origis USA. They represented the result of extensive and carefully conducted deliberations of the officers at the highest levels of Origis USA. And Origis USA painstakingly did all this just before the deliberately misleading report was provided to Plaintiffs on September 10, 2020. Origis USA's active and knowing connivance in the misrepresentations and omissions by other Defendants, including through its senior executives and its minority shareholder, were essential to the success of Defendants' scheme.

22.    Origis USA participated in Defendants' scheme because Plaintiffs' redemption of their interests in Origis USA was in the financial interest of Origis USA, including its CEO, Vanderhaegen, its other senior executives, and its minority shareholder. The executives knew that they would benefit from being freed from any oversight from the Plaintiffs, including oversight of their financial compensation. The clear benefit to Origis USA was confirmed just a week after the execution of the SRA, when Vanderhaegen boasted to Origis USA's CIO that "*we did a golden deal a week ago.*" If Plaintiffs had seen the secret analyses, they would not have gone forward with the "golden deal" for Origis USA, which was executed just after Defendants had presented Plaintiffs with the misleading document that was supposed to remove all uncertainty about value and had subsequently verified the facts set forth therein orally.

23.    The SRA was one of the devices Defendants used to successfully accomplish their scheme. Through the deliberately false and misleading statements and omissions set out above, as well as others, Defendants fraudulently induced Pentacon and Baltisse to enter into the SRA, which provided for the transfer of Plaintiffs' position in Origis Energy and Origis USA to Defendants for a total of $105 million in two closings, one on October 15, 2020 (the "First Closing") and one on January 4, 2021 (the "Second Closing").

24.     The SRA, which is governed by New York law and contains New York forum selection provisions, contains within it various representations by Defendants that were fraudulent and calculated, along with a raft of other misrepresentations and omissions, to induce Plaintiffs to sell their ownership interests in Origis at what Defendants knew to be a grossly deficient price.

25.     Defendants represented and warranted in the SRA that Pentacon and Baltisse had been provided with complete and accurate information about the "business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries," "the Company's development pipeline of solar power and energy storage projects," and "any value indications by any party showing an interest to acquire" all or part of Origis or its subsidiaries or any of its assets. SRA §§ 4.4(a), (b) and (c). Importantly, the SRA also made the provision of up-to-date complete and accurate information a condition precedent to the two subsequent closings on October 15, 2020 and January 4, 2021, *i.e.*, that these representations and warranties be true not only at the time the SRA was signed, but also as if made at the time of each of those closings. *Id.* arts. IV, VI §§ 6.2(a), 6.4(a).

26.     But these representations and warranties were intentionally false and misleading on the date of the SRA, and again on the date of each closing. Defendants had continually and intentionally misrepresented and withheld material information about their actions, their communications with third parties, the existence of value analyses in their possession, the role and advice of the investment bankers, and ultimately what they knew to be the true, full picture of Origis, including the value of Origis USA and its assets. All of these things, and other independent deliberately misleading conduct set out above and in greater detail elsewhere in this Complaint, fraudulently induced Plaintiffs' entry into the SRA and breached both Defendants'

fiduciary duties to Plaintiffs and the SRA itself. Had Plaintiffs known the truth, they never would have executed the SRA.

27.   Vanderhaegen, to induce Plaintiffs to sell their interest, also repeatedly told Plaintiffs that, in order to build value going forward, he intended to be a long-term shareholder in Origis. Vanderhaegen made this claim to lead Plaintiffs to believe that he had no interest in exploring a sale of Origis at any point in the foreseeable future. Vanderhaegen knew when he made these "I am not going to flip the company" statements that they were false, and he correctly believed that Plaintiffs would rely upon these misrepresentations in agreeing to proceed with any sale. This "I am a long-term holder" misrepresentation was an independent and critical component of Defendants' fraudulent scheme to acquire Plaintiffs' interest at a grossly inadequate price.

28.   At the time Vanderhaegan was saying he was a long-term holder with no intention of being a seller, Defendants were in the process of exploring the sale of most or all of Origis USA. Again, these representations, knowingly false when made, were designed to deceive and mislead Plaintiffs. Had Plaintiffs known that Defendants were planning and, in fact, already exploring arrangements for a sale of all or substantially all of Origis USA's assets prior to the execution of the SRA, they would not have executed the SRA.

29.   Even before the Second Closing, Defendants were entering into agreements with investment bankers and discussing the potential sale of Origis USA and/or its assets. By April 2021, barely three months after the Second Closing, Defendants already had put together their data room for the potential sale. By early Summer 2021, the investment bankers had finished their necessary preparatory work to contact potential buyers and solicit bids for the company.

30.     A short time later, the sales process had progressed to the point where Defendants had received multiple bids that confirmed what they had already known well before the execution of the SRA, but which they deliberately concealed—that Origis USA was worth dramatically more than the valuations provided to Plaintiffs by Defendants to "remove [their] uncertainty" and on which Plaintiffs had relied in deciding to sell their interest. The bids ranged as high as $1.25 billion, with multiple bids in excess of $700 million.

31.     And, ultimately, just months after the closing of the SRA transaction, Defendants' carefully calibrated fraudulent scheme culminated in Defendants agreeing to sell Origis USA to Antin Infrastructure Partners for $1.4 billion dollars. After cheating Plaintiffs, whose vision had launched Origis, whose money had financed its birth and development, and who had made him a rich man, Vanderhaegen wasted no time in harvesting the fruits of his deceit when he bought a new $32 million mansion in Coral Gables, Florida.

32.     Defendants' fraud, breaches of their fiduciary duties, and breaches of the SRA were the direct causes of hundreds of millions of dollars in damages to Pentacon and Baltisse. To state the obvious, had Defendants not engaged in this unlawful conduct, Pentacon and Baltisse would never have permitted Defendants to steal such enormous wealth from them.

33.     Pentacon and Baltisse are therefore entitled to damages based on the difference between the payment they received and the value of their ownership based on the Antin purchase price and/or the present value of the interests which were unlawfully taken from them. They should also be awarded punitive damages based on Defendants' fraud and breaches of fiduciary duties and such other relief as is permitted under law.

**II.   Jurisdiction**

34.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Plaintiffs are both citizens of Belgium, and Defendants are all reportedly citizens of Florida or Delaware. The amount in controversy is greater than $75,000.

**III.   Venue**

35.   Venue lies with this Court pursuant to Section 9.13 of the SRA, which provides that any action will be instituted exclusively in a federal or state court within New York County, New York. It also lies with this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District and, in the alternative, Defendants are subject to personal jurisdiction in this District.

**IV.   Parties**

**A.  Plaintiffs**

36.   Plaintiff Pentacon BV is a Belgian corporation (*besloten vennootschap*) with its principal place of business located at Optimismelaan 1, Bus 3, 1140 Evere, Belgium.

37.   Plaintiff Baltisse NV is a Belgian corporation (*naamloze vennootschap*) with its principal place of business at Pauline Van Pottelsberghelaan 10, 9051 Sint-Denijs-Westrem, Belgium.

**B.  Vanderhaegen Defendants**

38.   Defendant Guy Vanderhaegen is a natural person who resides and is domiciled in Coral Gables, Florida and who claims to be a citizen of the United States. Defendant Vanderhaegen acted at all relevant times and continues to act both in his own capacity and in his capacity as officer, director, agent, and/or employee of the remaining Defendants. In the latter capacities, he acted at all relevant times and continues to act within the scope of the actual or apparent authority afforded him by his positions in each.

39.     Defendant Guy Vanderhaegen Revocable Trust is a Florida revocable trust with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Defendant Vanderhaegen is the trustee of and has exercised absolute domination and control over Defendant Guy Vanderhaegen Revocable Trust at all relevant times. Defendant Vanderhaegen is believed to act as its sole director, officer, employee, and/or agent. Defendant Guy Vanderhaegen Revocable Trust is believed to have no independent business and instead serves solely as an instrument of Defendant Vanderhaegen's purposes, including to hold Defendant Vanderhaegen's personal wealth and, specifically, his ownership interest in Origis Energy and Origis USA.

40.     Defendant Pelican Invest, LLC is a Delaware limited liability company with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Defendant Vanderhaegen has exercised absolute domination and control over Pelican Invest at all relevant times. Defendant Vanderhaegen is believed to own or control substantially all of Defendant Pelican Invest through Defendant Guy Vanderhaegen Revocable Trust. *See* Notice of Removal ¶ 12(g), ECF No. 1. The remaining ownership or control lies with the Natacha Standaert Revocable Trust, the trustee of which is Natacha Standaert, who is the spouse of Guy Vanderhaegen. *See id.* Vanderhaegen is believed to act as the managing director as well as the sole officer, employee, and/or agent of Pelican Invest. Pelican Invest is believed to have no independent business and instead serves, without regard to corporate formalities, solely as an instrument of Vanderhaegen's purposes. These purposes include having Pelican Invest serve as board director for Origis Energy based on Vanderhaegen's shareholding in Origis Energy and then, in turn, to appoint Vanderhaegen himself to serve as Pelican Invest's permanent representative.

41.     Defendant Pelican International, LLC is a Delaware limited liability company with its principal place of business believed to be located in Florida at the residence of Defendant Vanderhaegen. Vanderhaegen has exercised absolute domination and control over Pelican International at all relevant times. Vanderhaegen is believed to own or control all of Pelican International through Defendant Guy Vanderhaegen Revocable Trust. *See* Notice of Removal ¶ 12(e). Vanderhaegen is believed to act as its sole director, officer, employee and/or agent. Pelican International is believed to have no independent business and instead serves, without regard to corporate formalities, solely as an instrument of Defendant Vanderhaegen's purposes, including to hold Defendant Vanderhaegen's personal wealth and, specifically, shares in Origis Energy and Origis USA.

42.     Defendant Pelican International is the successor and/or assign to and has retained all liabilities of Origis Energy LLC, formerly Origis Energy NV. Defendant Vanderhaegen, in his capacity as managing director, officer, and/or employee of Origis Energy, at all relevant times exercised full operational control over Origis Energy. Origis Energy reportedly ceased to exist through statutory merger with Pelican International, where Pelican International was the surviving company, retaining all of Origis Energy's assets and liabilities. *See* Notice of Removal ¶ 14.

43.     Defendants Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust, Pelican Invest, Pelican International, *including* its predecessor Origis Energy (together, the "Vanderhaegen Defendants") have acted at all relevant times and continue to act as one combined, unified entity under the common control of Vanderhaegen, and Vanderhaegen has acted at all relevant times and continues to act on behalf of and through the other Vanderhaegen Defendants in accomplishing the violations of law set forth in this Complaint.

44.     By virtue of Vanderhaegen's common control over the Vanderhaegen Defendants, the Vanderhaegen Defendants have agreed and acted together in pursuit of a common plan to commit the violations of law set forth in this Complaint. And, by virtue of their collective participation in the negotiation and execution of the SRA through Vanderhaegen, they all intended to be bound by that contract.

45.     Whenever one Vanderhaegen Defendant is referred to in this Complaint, that reference should be read as referring to all Vanderhaegen Defendants.

**C.  Origis USA Defendant**

46.     Defendant Origis USA LLC is a Delaware limited liability company with a principal place of business located in Miami, Florida. Defendant Vanderhaegen, in his capacity as managing director, officer, and/or employee of Origis USA, at all relevant times has exercised operational control over Origis USA and participated in, authorized, and directed all relevant actions and omissions of all other officers and employees of Origis USA.

47.     Origis USA was and is the sole operating company in the Origis close corporation structure and essentially comprised the only real value in that structure. Origis USA either actively perpetrated and/or materially supported all the unlawful conduct set forth in this Complaint, including all the relevant misrepresentations and omissions. Its motive was to enable its senior management—including CEO Vanderhaegen, its chief investment officer ("CIO"), its chief commercial officer ("COO"), and its minority shareholder—to acquire a majority interest in its business for far less than its true value, award themselves bonuses without obstacle from Plaintiffs, escape any possible interference from Plaintiffs in the management of the company, and thereby entrench and enrich themselves. Origis USA's senior management and other employees carried out all material actions within the scope of their employment at Origis USA and ultimately considered their actions to be in the business interests of Origis USA. Origis

14

USA's knowing and intentional participation in the violations of law described herein were essential to the successful completion of those violations and included at least the following:

- Origis USA had exclusive control over and possession of all material information about itself and its value, including about its business, financial statements, assets, liabilities, results, project pipeline, future prospects, interactions with investment bankers, investment banker valuations and analyses, and sales processes. Any time such material information was provided to or concealed from Plaintiffs, Origis USA knowingly and intentionally participated in providing deliberately misleading facts or concealing materially inconsistent information through one or more of its officers or employees, including its CEO Vanderhaegen.

- Origis USA prepared, through its officers and employees, all relevant information about itself and its value—whether truthful, false, or misleading—that Defendants provided to Plaintiffs or to third parties. In particular, all valuations of Origis USA and its assets that Defendants provided to Plaintiffs or third parties were the work product of Origis USA officers and employees—including its CEO, CIO, and COO.

- Origis USA retained and directed the investment bankers that prepared valuations and analyses of itself and its assets and received and controlled those valuations and analyses. It also retained and directed the investment bankers that developed and executed the sales processes for Origis USA and its assets and received and controlled all information from them about those sales processes. Origis USA executives, including CEO Vanderhaegen, directed and controlled all engagements with investment bankers and the results of those engagements.

15

- Origis USA was the entity that effectively redeemed Plaintiffs' interests, not Origis Energy or Vanderhaegen. Origis USA negotiated for and obtained the funds used to buy out the Plaintiffs' ownership interests through a loan from its minority shareholder. Origis USA's assets served as collateral for the loan. In addition to having to repay the loan, Origis USA issued penny warrants to the lender/minority shareholder for a 20% additional shareholding in Origis USA, which increased the lender's ownership from 20% to 40%.

- Origis USA enabled its CEO Vanderhaegen to speak authoritatively about all aspects of Origis USA, including on the value of Origis USA and its assets. Plaintiffs and all relevant third parties accepted, believed, and relied upon Vanderhaegen's representations about Origis USA only because he had direct access to all information about the company through his positions as CEO and President of Origis USA, the operational entity.

48.   Origis USA acted at all relevant times and continues to act with the Vanderhaegen Defendants as one combined, unified entity under the common control of Vanderhaegen, and Vanderhaegen has acted at all relevant times and continues to act on behalf of and through Origis USA in accomplishing the violations of law set forth in this Complaint. By virtue of Vanderhaegen's control over Origis USA and in order to enrich its senior management and its minority shareholder, Origis USA has agreed and acted together with Vanderhaegen in pursuit of a common plan to commit the violations of law set forth in this Complaint. Defendants were able to carry out the actions material to the violations of law described in this Complaint only by virtue of Vanderhaegen's roles as CEO and President of Origis USA, with the active participation of its CIO, COO, and minority shareholder, and because the assets and capabilities

of Origis USA were dedicated to the accomplishment of the unlawful scheme described in this Complaint.

49.    Whenever this Complaint refers to Vanderhaegen, that reference is to Vanderhaegen acting in his capacity as CEO, President, and board director of Origis USA *in addition to* Vanderhaegan acting in his capacity as a Vanderhaegen Defendant.

## V.    Factual Allegations

### A.   Plaintiffs Provide the Vision and Capital Critical to Create and Grow Origis

50.    Origis Energy was founded in 2008. Paul Thiers, the entrepreneur and investor behind Pentacon, was the driving force behind the creation of Origis Energy. Moreover, he was Vanderhaegen's patron, providing the financial support that allowed him to acquire a significant stake in Origis. In other words, the company's success and Vanderhaegen's great wealth today trace back directly to Pentacon's initial and subsequent support. As Origis developed over the next decade and relocated to the United States, Pentacon continued to provide key financial backing for the growth of the business and to protect Vanderhaegen's financial interests.

51.    Plaintiff Baltisse became involved in Origis somewhat later than Pentacon. The business model required regular access to financing, which Baltisse helped provide for a number of years. This critical source of financing was a direct consequence of Pentacon's pre-existing relationship with Baltisse and its request for Baltisse to invest in the building of the U.S. business. Later, Baltisse introduced Vanderhaegen to an additional financing source for the business. In 2016, Baltisse became an Origis Energy shareholder.

52.    In order to build the U.S. business, Origis Energy formed Origis USA to serve as the operating company for all of its U.S. activity. Once Origis Energy had wound down its businesses in Europe, its 80% stake in Origis USA became the principal asset of Origis Energy and its principal source of value. It was Origis USA alone that had personnel, operations, and

projects. Through their shareholding in Origis Energy, Pentacon and Baltisse each came to effectively hold approximately a 29% ownership interest in Origis USA.

53.    By 2019, Origis USA had grown into a leading renewable energy developer with a strong development pipeline of solar energy and energy storage projects across the United States. Pentacon's and Baltisse's long-standing and critical support was essential to the development of Origis USA's business. Or, to put it another way, Origis USA and Vanderhaegen owe much of their success to Pentacon and Baltisse.

54.    As Origis shareholders, Pentacon and Baltisse each had representatives on the boards of Origis Energy and Origis USA. Multiple board meetings and other meetings of the company took place in New York City. Vanderhaegen was the CEO, President, managing director, a board member,[3] and managing shareholder of Origis Energy and Origis USA.

55.    Origis Energy served as a holding company, with no operations of its own at the material times and no operating subsidiaries other than Origis USA.

56.    As a consequence of the manner in which he chose to perform his duties as CEO and President of Origis USA, Vanderhaegen gathered day-to-day knowledge of and exercised control over all material information about the business. Vanderhaegen functioned as the final report for the employees who were pursuing new development opportunities. He personally analyzed Origis USA's financial condition and directed others to perform such analyses. He focused on the company's market and its prospects in that market. He managed its ongoing projects. He interacted directly with financiers, investors, bankers, and consultants. He was the point person for dealing with customers and vendors. He tracked investment opportunities. He

---

[3]    Guy Vanderhaegen was the permanent representative of his entity Pelican Invest to the board of Origis Energy and was a direct member of the board of Origis USA.

advised the boards of directors on all aspects of the business. Vanderhaegen alone knew or had access to anything and everything that Origis USA was doing.

57.    Vanderhaegen exercised effective control over the detail and flow of information to Plaintiffs about Origis USA's business. Through his roles at both Origis Energy and Origis USA, he screened the information Plaintiffs received as directors and shareholders. Plaintiffs were consequently heavily dependent on Vanderhaegen to identify and accurately transmit all relevant information to them. And they trusted him to do exactly that and did not believe he was dishonest.

58.    Vanderhaegen's control, especially after the onset of the COVID pandemic, only became more complete. The COVID pandemic prevented Plaintiffs from traveling to the United States and fully interacting with Origis USA employees at all different levels of the company. Vanderhaegen did organize certain remote meetings. However, he decided upon attendance and honed the messages to be delivered. Rather than serving to reveal information to the Plaintiffs, these sessions actually worked to intensify Vanderhaegen's virtual stranglehold on the flow of information to Plaintiffs.

59.    In his various roles, Vanderhaegen owed, among other things, fiduciary duties of good faith, loyalty, and candor to Plaintiffs. Vanderhaegen reassured Plaintiffs that he was being transparent with them and, in fact, touted his compliance with these duties. But the reality was quite different. Vanderhaegen, unknown to Plaintiffs, had breached his fiduciary duties by the manner in which he exercised the power he had accumulated. He intentionally restricted, omitted, and misrepresented company information to achieve his goal of control. Unfortunately, power, especially when coupled with greed, often corrupts. In this case, it turned out that it had corrupted absolutely.

**B.  Defendants Withhold Critical Information from Plaintiffs in Breach of Their Fiduciary Duties**

60.   Over time, some friction developed not only over Vanderhaegen's attempts to isolate Plaintiffs, but also as Plaintiffs and Defendants began to express a difference of views over how to allocate certain portions of the funds available to the company. Vanderhaegen proposed to pay large bonuses to Origis USA management but not pay dividends to the owners. However, for those funds that were not to be invested back into the business, Plaintiffs wanted to link the bonuses to dividends, so there would be some balance between those who had an interest in being fairly compensated for their investments and those who had an interest in being fairly compensated for their work. Vanderhaegen impatiently pressed for current cash bonuses disconnected from profitability level even while simultaneously contending that there were insufficient funds to pay any dividends because of the needs of the company.

61.   In response to Plaintiffs' attempts to get involved in critical decisions like bonuses and dividends, Vanderhaegen began to make it even more difficult for Plaintiffs to obtain the critical information about Origis USA's business necessary to effectively participate in decision-making, including reliable cash flow forecasts and an accurate picture of all aspects of the pipeline of solar energy projects. Vanderhaegen was able to control this flow of information only by virtue of his position as Origis USA's CEO. Although Plaintiffs had representatives on Origis USA's board, they received only the information that Vanderhaegen wanted them to see.

62.   Though they were sometimes frustrated by Vanderhaegen, Plaintiffs viewed his conduct, albeit as it turns out mistakenly, as nothing more than the normal give and take with a strong-willed executive. They never suspected him of dishonesty. They had worked with and trusted him for years and had never had any reason to think that he was dishonest.

### C. Defendants Propose a Management Buyout in a Deliberate Scheme to Seize Plaintiffs' Interest at a Grossly Deficient Price

63.    To take advantage of the situation he had created and his carefully-orchestrated plan to restrict Plaintiffs' access to Origis USA information, Vanderhaegen decided to try to remove Plaintiffs from the picture, gain total control of the company, and expropriate for himself an overwhelming portion of the value of Origis USA held by Plaintiffs.

64.    Vanderhaegen knew that he could mislead Plaintiffs into selling their interest at a price that grossly understated Origis USA's true value. As he admitted in an email on March 25, 2019 to Origis USA's minority shareholder, Plaintiffs, thanks to his machinations, "are not fully on top of things anymore due to lack of knowledge." The presentation attached to the email underscored that Plaintiffs could be convinced to sell at a valuation less than even the value of the pipeline projects due to their "[l]ack of understanding of the business." In other words, the information inequality created by Vanderhaegen had achieved its desired goal, *i.e.*, Plaintiffs had been blocked from gaining an independent understanding of Origis USA and its value.

65.    In that same email of March 25, 2019, Vanderhaegen expressly stated his plan to take advantage of Plaintiffs' lack of knowledge: "I probably will be able to convince them to sell their shares to me at an attractive valuation." He underscored that, "I expect that in the coming months, we are going to sign some very attractive new PPA's what will make that the price they will be asking will go up [sic]." In other words, Vanderhaegen and the minority shareholder in Origis USA intended to prey on Plaintiffs' perceived lack of understanding and information in order to convince them to sell their interest in Origis USA for an unconscionably low price. And this is precisely what they set about doing.

66.    Vanderhaegen and Origis USA's minority shareholder acted on Plaintiffs' vulnerability by seeking to pocket for themselves the overwhelming value of Plaintiffs' holdings.

Just a few weeks after noting Plaintiffs' lack of knowledge and his ability to take advantage of the situation he had created, Vanderhaegen, on April 30, 2019, made a first proposal to buy Plaintiffs out. He claimed that Plaintiffs' insistence on tying management bonuses to dividends meant that they were only interested in short-term profit, whereas he wanted to hold his interest in Origis USA for the long term in order to build value over the years. And he claimed that the best way to solve this impasse was for Plaintiffs to exit.

67.    In his initial buyout proposal, Vanderhaegen told Plaintiffs that Origis USA was worth only about $160 million. He therefore proposed to pay just under $100 million for Plaintiffs' 58% ownership interests in Origis USA. Vanderhaegen purported to support the accuracy of his proposed buyout valuation with claims that the market did not put much value on goodwill in the solar industry—*i.e.*, value was overwhelmingly determined by the aggregate value of specific project assets in the pipeline which, if you are knowledgeable about the company and industry like he was, could be objectively ascertained.

68.    Vanderhaegen, using his control over Origis USA's information, reassured Plaintiffs that the price he was offering was actually generous. While Plaintiffs considered whether his valuation might be on the low side, they never thought for a second that he would knowingly lie to them. Plaintiffs trusted Vanderhaegen as their long-time business partner who had superior command of company information as CEO and President of Origis USA.

**D.  Defendants Knowingly and Intentionally Misrepresent the Financial Condition, Assets, and True Value of Origis**

69.    Even while repeatedly assuring Plaintiffs that the buyout price was based on the true value of Origis USA and that Plaintiffs had received complete and correct information, Defendants had in their possession secret analyses showing values that were massively higher than those provided to Plaintiffs. Origis USA had developed these analyses, working through

Vanderhaegen and other Origis USA officers and employees operating within the scope of their usual business duties. These internal analyses, which were deliberately and carefully concealed from Plaintiffs, also included value input that Origis USA had acquired from outside investment bankers with whom it had consulted.

70.   Vanderhaegen and the executives of Origis USA knew that, if the secret analyses were ever revealed to the Plaintiffs, their dreams of wealth and power would vanish. They well understood the unremarkable fact that if Plaintiffs were told about the secret analyses showing valuations for Origis USA at a billion dollars above what had been represented to them, there was simply no way that their carefully constructed fraudulent transaction would go forward.

71.   Each and every time Defendants represented to Plaintiffs that their valuations of Origis USA and its project pipeline were accurate, while concealing from Plaintiffs Origis USA's higher internal analyses, the analyses from the investment bankers used by Origis USA, and their own actual views of value, it was fraud, a breach of fiduciary duty, and ultimately also a violation of the SRA.

72.   Instead of providing complete and accurate information about Origis USA's business, Defendants deliberately gave Plaintiffs information, which they knew to be inaccurate in that it appeared to support a low buyout price. For example, one component of Origis USA's value, which Defendants repeatedly claimed was essentially determinative of its overall value, was its project pipeline. Vanderhaegen—though, as Origis USA's CEO and President, he knew better—repeatedly told Plaintiffs that it was the value of the advanced projects in the pipeline (and very little else) that constituted the value of the company. And Plaintiffs believed and relied upon all Defendants' representation that the value of Origis USA was almost solely its pipeline

of projects and on the absence of the information to the contrary which Defendants had concealed.

73.   In contrast to the valuations of the pipeline that Origis USA prepared and that Defendants represented to Plaintiffs as being true and accurate, other documents and analyses, consciously concealed from Plaintiffs, painted a very different picture. Those hidden valuations concluded that there were much higher values for the projects in the pipeline than those included in the valuations presented to Plaintiffs. And the hidden analyses also attributed substantial value to various projects that had not even been included in the valuations provided to Plaintiffs.

74.   From Vanderhaegen's initial buyout proposal in April 2019 through the completion of the buyout in January 2021, Defendants repeatedly and falsely represented that the proposed buyout price for Plaintiffs' interest accurately reflected the true value of Origis USA based on, among other things, the accurate valuations of its project pipeline. But, from April 2019 to the completion of the buyout in January 2021 and beyond, Defendants, in addition to intentionally misrepresenting the existing values of projects in the pipeline and the absence of any value in other assets, also deliberately concealed from Plaintiffs critical information on the value of Origis USA which they knew would cause Plaintiffs to refuse to go forward with the fraudulent transaction constructed by Defendants.

       1.      Defendants Persuaded Plaintiffs to Participate in Buyout Discussions through Misrepresentations and Material Omissions

75.   As noted above, in his initial buyout proposal, on April 30, 2019, Vanderhaegen emailed a presentation to Plaintiffs—which other Origis USA employees had helped prepare— falsely stating that an accurate value of Origis USA was $160 million. In light of that valuation, Vanderhaegen offered to pay just under $100 million for Plaintiffs' interest.

76.    However, just days before, on April 22, 2019, Vanderhaegen had emailed a very different valuation of Origis USA—which was prepared by Origis USA officers and employees and which was expressly designated as coming from Origis USA[4]—to a potential financing source. That valuation, which represented it was accurate, stated that Origis USA's portfolio of projects by itself was worth as much as 70% *more* than the valuation Vanderhaegen told Plaintiffs was his carefully considered objective value of the entire company. The valuation also underscored that, in the months since Origis USA had achieved a $204 million valuation on the market, it had actually acquired additional solar projects that *added* at least $70 to $120 million to its value. This implied that the true value of Origis USA itself was now no less than $274 to $324 million—potentially *double* the valuation that Vanderhaegen told Plaintiffs accurately represented the value of Origis USA.

77.    Just weeks later, Plaintiffs suggested to Vanderhaegen that Origis USA could be worth more than $160 million when taking into account goodwill, *i.e.*, the value of Origis USA as a going concern beyond that of its assets. However, claiming superior access to information as Origis USA's CEO and President, in an email on May 19, 2019, Vanderhaegen firmly dismissed Plaintiffs' suggestion as to the greater company's value, including because "nobody pays much goodwill."

78.    But that *very same day*, May 19, 2019, Vanderhaegen secretly emailed Origis USA's other minority shareholder, which also stood to benefit in the event the Plaintiffs could be bought out at a low price and who would potentially finance the buyout to achieve that end. In the email, Vanderhaegen reported the true value of Origis USA at *no less than* $230 to $260

---

[4] It was specifically issued by Origis Energy USA Inc., a wholly owned subsidiary of Origis USA through which Origis USA acted.

million, *i.e.*, as much as $100 million more than Vanderhaegen was claiming to Plaintiffs the company was worth. And, directly contrary to what he had told Plaintiffs, a valuation attached to his email included between $50 to $80 million for goodwill, an amount over and above the valuation of Origis USA's project pipeline.

79.   Defendants neither disclosed to Plaintiffs that their analyses had produced these higher figures nor that they had affirmatively represented such higher values to Origis USA's other shareholder with whom they were allied. Defendants never revealed that they were telling one thing to Plaintiffs and something very different to others *on the very same day*. Plaintiffs would never have agreed to the buyout that Defendants were proposing had they known of these secret communications laying out dramatically conflicting information.

2.    In Order to Induce Plaintiffs to Sign the Letter of Intent, Defendants Make Further Misrepresentations and Material Omissions

80.   Somewhat later, during the negotiation of a letter of intent between December 2019 and February 2020, Vanderhaegen proposed to buy out Plaintiffs' interest in Origis USA based on what he claimed to be a company valuation of $205 million.

81.   Vanderhaegen then set about to convince Plaintiffs that that his proposal for the buyout was, if anything, exceedingly generous. For example, on December 11, 2019, Vanderhaegen emailed a buyout proposal to Plaintiffs that valued Origis USA's project pipeline—which Vanderhaegen had maintained was the nearly-exclusive source of the company's value—at about $161 million. A few days later, on December 17, 2019, he emailed Plaintiffs another proposal in which he claimed that it was "unlikely" Origis USA could fetch a valuation over $200 million on the market. In other words, he told Plaintiffs that Origis USA was worth much less than the $205 million at which he was willing to buy out their interest.

82.     But Vanderhaegen knew these valuations were phony. First, as set out above, he had previously provided much higher valuations to third parties. Second, as part of his efforts to obtain financing to buy out Plaintiffs, on January 7, 2020, Vanderhaegen emailed to potential financing sources a materially different valuation, which had been prepared by Origis USA employees and which was discussed with Origis USA's CIO and CCO. This version expressly represented that the proper Origis USA valuation was at least $60 to $80 million *greater* than the $205 million that Vanderhaegen had only weeks before represented to Plaintiffs as the actual value of the company. In other words, Vanderhaegen reported that the correct valuation of Origis USA was at least $265 to $285 million, not $205 million. And this valuation, which Defendants never disclosed to Plaintiffs, also reported the true value of the Origis project pipeline as $197 million, not $161 million. Had Defendants disclosed to Plaintiffs that they had communicated such differing values to others, Plaintiffs would not have agreed to the buyout Vanderhaegen was proposing.

83.     As the negotiations went forward, Vanderhaegen continued to provide false and misleading information that he claimed supported his fraudulently low valuation. For example, on January 28, 2020, just days before a letter of intent for the SRA was signed and in response to a request from Plaintiffs, Vanderhaegen emailed Plaintiffs an overview of the advanced pipeline projects, prepared at Origis USA, that valued the projects at $153 million. He claimed that all other pipeline projects were so unimportant to value that he did not even follow them. Vanderhaegen provided Plaintiffs with this valuation and explanation to reassure them that the proposed buyout price was more than fair.

84.     But the very next day, on January 29, 2020, copying Origis USA's CIO, Vanderhaegen emailed a very different valuation report—prepared with other Origis USA

employees—to a potential financing source for the buyout, Ares Management. That valuation, which was never disclosed to Plaintiffs, set forth facts in complete conflict with those presented to Plaintiffs. The Ares valuation in fact reported that the pipeline projects had a value of $205 million, *i.e.*, 34% or $52 million more than what Plaintiffs had just been told. It also explained that Origis USA was worth at least $60 to $80 million more than $204 million, the valuation Vanderhaegen had vouched for and Plaintiffs had accepted for the buyout.

85.    If Plaintiffs had received the Ares valuation, they would never have agreed to Vanderhaegen's proposed transaction. And, by contrast, if Vanderhaegen had not known that Origis USA was worth far more than he was telling Plaintiffs, he would not have gone forward with the transaction either.

> 3.    Plaintiffs Sign a Letter of Intent Based on Defendants' Deliberately False Promise to Provide Complete and Accurate Information

86.    Defendants' intentionally false and misleading statements about the value of Origis USA and the value of its pipeline of solar energy projects induced Plaintiffs to agree to a buyout at an artificially low share price. The letter of intent for Plaintiffs' sale of their interests was signed on February 3, 2020. In that letter of intent, the purchase price was set at $56 million each for Pentacon's and Baltisse's interests and was based on a false Origis USA valuation of $205 million. The letter of intent rested on a foundation of Defendants' breaches of fiduciary duty and their material misrepresentations and omissions.

87.    Vanderhaegen understood that he needed to maintain Plaintiffs' trust if the deal he had so carefully planned to enrich himself was to proceed to conclusion. So, Vanderhaegen stated in an email on January 24, 2020, that Plaintiffs should trust that the information he was providing was complete and accurate because: "[y]ou are member[s] of the Board of Directors to which I have reporting obligations and this should be sufficient. If I were to deliberately

28

misrepresent things there, then I would have a problem." In other words, Vanderhaegen used his fiduciary status as a weapon to convince Plaintiffs to rely on the honesty and completeness of his statements and accordingly to accept his fraudulently low price.

88.    Despite Vanderhaegen's assurance that his fiduciary duties would require him to fully disclose all material information, Plaintiffs insisted that his full disclosure obligation also be memorialized in the contract. Vanderhaegen ultimately accepted that the letter of intent would require such an information warranty. That warranty would provide "confirmation that the Sellers have received from the Buyer (i) materially complete and non-misleading information relating to Origis' current direct and indirect subsidiaries and assets and (ii) materially complete and non-misleading information relating to Origis' . . . project pipeline based on a reasonable assessment by Origis or Buyer of information reasonably available to Origis or Buyer and taking into account Origis' and Buyer's experience."

89.    Plaintiffs signed the letter of intent on February 3, 2020, because they had relied on Defendants' honesty and integrity and consequently believed what they had been represented to them as the Defendants' objective analysis of Origis USA's value. They were further reassured by Vanderhaegen's promise that he had fiduciary duties to them and therefore would provide the information warranty. Had Defendants not made these commitments, misrepresented the value of the company, and concealed critical contrary information, Plaintiffs would neither have entered into nor have moved forward on the basis of that letter of intent.

90.    No sooner had Vanderhaegen made commitments to provide Plaintiffs with complete and accurate information about Origis USA, he violated them. He did so in the course of feigning compliance with the very commitments to honesty and truthfulness that he was busily violating. Shortly after signing the letter of intent, Vanderhaegen offered to "organize a meeting"

with Plaintiffs "to discuss the pipeline and business in general"—as the information warranty and his fiduciary duties demanded. In advance of that informal meeting with Baltisse and Pentacon, supposedly for the purpose of keeping everyone "informed of the evolution of the pipeline and how it is going with the business," Vanderhaegen emailed Plaintiffs an updated pipeline report on March 2, 2020 prepared by Origis USA. This report put the value of Origis USA's pipeline at $134 million.

91. *But, that very same day*, March 2, 2020, Vanderhaegen emailed a very different pipeline valuation prepared by Origis USA to Origis USA's minority shareholder who was allied with Defendants and who, unlike Plaintiffs, was not being bought out. This version of the pipeline valued projects not even valued in the pipeline sent to Plaintiffs. And it valued the pipeline at $215 million—*i.e.*, more than the total buyout valuation for the entirety of Origis USA and 60% (almost $80 million) more than what Vanderhaegen had told Plaintiffs the pipeline was worth on the very same day.

92. This valuation was never provided to Plaintiffs. Had they received the same valuation that was sent to this other shareholder, Plaintiffs would never have gone forward with Vanderhaegen's proposed buyout. They would have realized that Vanderhaegen—far from being the trustworthy business partner they believed him to be—was violating his fiduciary duties and the provisions of the letter of intent by failing to provide complete and truthful information.

               4.       Based on Further Misrepresentations and Material Omissions, Defendants Convince Plaintiffs to Further Reduce the Buyout Price

93. During March 2020 and April 2020, Vanderhaegen continued to spin and expand upon his previous deliberate material falsehoods and omissions.

94. In March 2020, Vanderhaegen used the COVID pandemic as an excuse to retrade the deal contemplated in the letter of intent and to convince Plaintiffs that an even lower price

was needed. Even though Vanderhaegen had repeatedly assured Plaintiffs that he was pursuing the buyout strictly in the best interests of Origis USA and of Plaintiffs themselves, unbeknownst to them, Vanderhaegen secretly schemed to extract even further price concessions from them through deception and fraud.

95.   In an email on March 16, 2020, which was deliberately withheld from Plaintiffs but sent to Origis USA's other minority shareholder (the potential financing source for the buyout), Vanderhaegen reported that he would move forward with the buyout but, at the same time, tell Plaintiffs "things are on hold" in order to "try to get something out of them." To this end, Vanderhaegen emailed Plaintiffs that his financing source, the source which would provide the money to buy them out, had demanded Plaintiffs make an "effort" to lower their asking price in light of the COVID pandemic. He also represented that, if Plaintiffs agreed to this new COVID discount, the financing could be approved by April 4, 2020, and the buyout deal potentially signed by that date.

96.   These were all lies. The financing source had never agreed at that point to approve the financing on any specific timeline conditioned only on some type of COVID discount. Further, Vanderhaegen knew that the promise of accelerated timing he had used in an attempt to induce Plaintiffs to agree to the COVID discount was never going to happen because it was "unrealistic." Nevertheless, still trusting Vanderhaegen, Plaintiffs agreed to a further 10% price reduction for the buyout to get the deal done by April 4, 2020.

97.   When April 4, 2020, came and went, Vanderhaegen needed an excuse to maintain the 10% price reduction that he had extracted from Plaintiffs. He therefore requested in an email on April 8, 2020, that his financing source, the other Origis USA minority shareholder, prepare a buyout loan letter that reported a lower loan amount than the source was actually willing to

extend. He made this request for a false letter with the specific intent to "put pressure on [Plaintiffs] to reduce the purchase price." Vanderhaegen then provided the false letter to Plaintiffs via email on April 14, 2020. This latest independent fraud succeeded, and the 10% price reduction was kept in place.

98.   Once again, Defendants deliberately misled Plaintiffs into proceeding with a grossly unlawful transaction at a dramatically low price on the basis of wholly fabricated representations. Had Plaintiffs known any of this about the "discount" or the timing, they would never have agreed to Vanderhaegen's proposed deal.

        5.      Defendants' Misrepresentations and Material Omissions Persist Up Until the Execution of the SRA

99.   In the summer of 2020, with the possible transaction still pending, Plaintiffs expressed concerns about the level of the purchase price and the value of Origis USA (although then they could not even imagine how far those figures were from reality). Vanderhaegen reassured Plaintiffs in an email on August 28, 2020 that they would receive an updated set of valuations and that the updated set of valuations would "remove[] your uncertainty about the value of our projects," the projects Vanderhaegen had over and over again promised represented the full value of Origis USA.

100.   On September 10, 2020, Vanderhaegen emailed Plaintiffs the promised "remove your uncertainty" valuations—prepared by Origis USA's CIO. Those valuations represented that the correct value of the pipeline was $147 million. Vanderhaegen then doubled down on these knowingly false valuations by going through it in detail on the phone with Plaintiffs, assuring them all over again of their accuracy.

101.   But Vanderhaegen, at the very moment in September 2020 that he was vouching for the accuracy of the $147 million valuation to Plaintiffs, knew that Origis USA's value was far

beyond what he was telling Plaintiffs. This information, which Defendants deliberately concealed from Plaintiffs, showed that Origis USA's projects were potentially worth over $1.5 billion. That figure made Plaintiffs' interests worth not the $50 million each Vanderhaegen had convinced Plaintiffs to accept through his misrepresentations and omissions, but instead well over $400 million each. Had Plaintiffs known of the information concealed by Defendants, they obviously never would have gone forward with the proposed Vanderhaegen transaction. And, had Vanderhaegan *not* known that Origis USA's value was far more than he was telling Plaintiffs, he too would not have gone forward with the transaction.

102.  Defendants' undisclosed calculations of a value for Origis USA in excess of $1 billion were not simply some daydream of a few out-of-touch souls working deep within the bowels of Origis USA. Far from it. They were the product of careful analysis and input from the top-ranking officers in Origis USA, including Vanderhaegen himself, Origis USA's CIO, and Origis USA's Executive Director. These top-ranking officers exchanged emails regarding the internal, undisclosed valuations at least on July 22, 2020—and apparently on other occasions— and then discussed them in subsequent meetings.

103.  The undisclosed calculations were also the product of input from outside investment bankers enlisted by Origis USA. For example, in July 2020—only weeks before signing the SRA—three different investment bankers working for Origis USA provided information to Defendants on value. This information supported that the value of Origis USA far exceeded what had been represented to Plaintiffs and rather was consistent with the secret internal Origis USA valuations which were concealed from Plaintiffs. The work of the investment bankers was overseen by Origis USA's CIO and its Director of Finance in addition to Vanderhaegen himself. And the resulting investment banker valuations were incorporated into the internal valuations

that Origis USA's top-ranking officers circulated via email on July 22, 2022. Neither the fact of the use of multiple investment bankers nor their valuation conclusions was ever disclosed to Plaintiffs. Had Plaintiffs known of these facts, they would not have proceeded to consummate the SRA transaction.

104.  By the summer of 2020, Vanderhaegen also knew from Origis USA's investment bankers that the solar energy market in the U.S. had changed dramatically in favor of substantially higher values for sellers.

105.  In fact, at least as early as July 2020, months before his final assurances to Plaintiffs of Origis USA's low value, Defendants began to plan with the investment bankers for the sale of Origis USA. Vanderhaegen and Origis USA's CIO drove this sale process. They had conversations and communications with the bankers enlisted by Origis USA to begin planning for an eventual sale of the company on several occasions in July 2020, including on July 27, 2020. None of these facts were ever disclosed to Plaintiffs. Had Plaintiffs known of these facts they never would have gone forward with the SRA transaction.

106.  As a further inducement to his benefactor Paul Thiers, Vanderhaegen had also promised that Pentacon could remain a shareholder in Origis or reinvest in Origis after the buyout. Vanderhaegen knew that Thiers wanted to remain an investor in Origis, and he initially told Thiers that he would be willing to buy out Baltisse alone. But, as soon as Pentacon asked to remain a shareholder in any buyout, Vanderhaegen began to insist that he needed to first buy out both Baltisse and Pentacon simultaneously. But he told Thiers not to be concerned since Pentacon would be permitted to remain a shareholder by reinvesting after the transaction. When Pentacon raised the subject again, shortly after the buyout transaction had closed, Vanderhaegen dissembled, falsely claiming that Origis' remaining minority shareholder, which had financed the

buyout, would not allow it. And, just to make sure that there would be no Pentacon reinvestment, the story changed yet again when Vanderhaegen claimed that the value of the company had miraculously increased in just a few months, foreclosing any reinvestment by Pentacon. Pentacon relied on Vanderhaegen's promise to permit reinvestment when agreeing to the SRA transaction. It would not have proceeded as it did to consummate that transaction had it known that it would not be permitted to reinvest.

107.   Vanderhaegen knew that if he could acquire Plaintiffs' interests at the price contemplated in the SRA, they could be resold quickly at a massive profit. Defendants engaged in the various misrepresentations and omissions to hide that basic fact. Had Plaintiffs known the truth, they would never have entered into the SRA nor tendered their interests at the closings. And, if Plaintiffs had learned the truth at any point before the Antin transaction, they would have taken action to prevent Defendants from closing that transaction.

108.   During the entire buyout process through the second and final closing in January 2021, Plaintiffs accepted and relied upon Defendants' misrepresentations about the value of Origis USA and its assets. They did so in light of the past history of the parties; Vanderhaegen's control of the facts as CEO and President of Origis USA; the fiduciary duties which Vanderhaegen touted he owed to Plaintiffs; the representations and warranties in the SRA about Defendants' duty to provide complete and accurate information about Origis; the multiple times Defendants repeated to Plaintiffs, both orally and in writing, essentially the same low-value story; and ultimately Plaintiffs' trust in Vanderhaegen as someone who had been their partner for a very long time and who they had treated generously throughout all those years. It was just impossible for Plaintiffs to even contemplate that this individual for whom they had done so much could stab them in the back.

6.    The Value and Salability of the Rockhound Projects are also the Subject of Defendants' Misrepresentations and Omissions

109.  In addition to deliberately misleading Plaintiffs as to the value of Origis USA and its assets, Defendants had also gone to great lengths to mislead them about the prospects of three specific Origis USA solar energy projects in Texas, known as the Rockhound projects, both before and after the SRA was signed.

110.  Defendants had regularly and deliberately misrepresented to Plaintiffs that the Rockhound projects were virtually impossible to value accurately, were very risky, and would be extraordinarily difficult, if not impossible, to sell. In reliance on Defendants' representation that the Rockhound projects could not be reliably valued and were not saleable, Plaintiffs ultimately agreed to a Rockhound carve-out from the purchase price.

111.  However, even while making these misrepresentations, Defendants had, during Summer 2020 and before, received internal valuations of the Rockhound projects, prepared by Origis USA and circulated among Origis USA senior management, that showed them to be some of the most valuable of Origis USA's projects. And they had confirmed that view of value and salability with the investment bankers they had consulted. Moreover, on September 3, 2020, just days before the SRA was signed, Origis USA prepared further valuations of the Rockhound projects that again confirmed their outsized value in the Origis USA pipeline. These valuations were circulated among Origis USA's CEO Vanderhaegen, CIO, Executive Director, and Director of Project Finance. Defendants intentionally concealed these high valuations from Plaintiffs behind a wall of misrepresentations and omissions.

112.  None of this information was ever disclosed to Plaintiffs before the signing of the SRA, the closings, or the announcement of the Antin transaction. Defendants kept this critical information secret for one reason and one reason only—to defraud Plaintiffs into accepting a

grossly deficient price for their interest in Origis and to prevent Plaintiffs from discovering the fraud, at least until Defendants could pocket the tainted proceeds of a sale.

113.  And, contrary to Defendants' representations that the Rockhound projects were not salable, Defendants had no problem selling them along with the rest of Origis USA's project pipeline in the Antin transaction, in which they apparently represented a substantial portion of the $1.4 billion purchase price. Had Plaintiffs known about Defendants' dissembling on the Rockhound projects, they never would have agreed to proceed with the Vanderhaegen buyout.

114.  Because Plaintiffs trusted Defendants and believed their misrepresentations, they agreed, at Defendants' urging, during Spring 2020 to carve out these projects from the buyout valuation and price they were to receive. And because they also believed Defendants' later, similar misrepresentations about the Rockhound projects, they never insisted that the original buyout valuation and price be restored. Had Plaintiffs known of the concealment of the Rockhound value and salability information, they never would have signed the SRA or gone through with the closings.

### E.  Plaintiffs Sign the SRA Based on Defendants' Misrepresentations and Critical Omissions about the True Value of Origis

115.  By the time Plaintiffs entered into the SRA on September 14, 2020, Defendants had spent a year and a half trying to convince Plaintiffs to sell their interests based on false and misleading information about their true beliefs as to the value of Origis USA, its pipeline, and the market for assets like Origis USA. They had also repeatedly concealed other critical information in their possession—including their secret valuations of Origis USA, its project pipeline, and value of its platform and goodwill.

116.  The buyout nominally took the form of a share redemption by Origis Energy but, in material reality, it was a buyout by Origis USA, financed by Origis USA's minority shareholder,

for the benefit of Origis USA. The SRA contemplated that funds would be obtained—not by the Vanderhaegen Defendants nor by Origis Energy—but by Origis USA. At the time the SRA was executed, Origis USA entered into a loan agreement with its minority shareholder. In addition to taking on the obligation to repay that loan, Origis USA also issued penny warrants to the lender/minority shareholder to increase that entity's ownership interest in Origis USA from 20% to 40%.

117.   The SRA contemplated that the purchase of Plaintiffs' interests would take place in two closings, the First Closing and the Second Closing. The First Closing was to occur by October 15, 2020 and the Second Closing by January 4, 2021. SRA §§ 2.5, 2.6. On each closing date, Plaintiffs agreed to convey a defined number of shares and Defendants agreed to make payment for those shares just over two months following each closing date. SRA §§ 2.1, 2.2. Those payments were made from the escrow account containing the proceeds of the loan to Origis USA. SRA § 2.1(d), (f).

118.   The SRA, in addition to specifying the basic financial and economic terms, included key provisions to guarantee the fundamental fairness and transparency of the transaction in a situation in which Defendants had full possession and control of the information material to the transaction value—most notably, information material to the value of Origis USA and its project pipeline.

        1.      The SRA Contains a Representation and Warranty that Plaintiffs had Received Materially Complete and Accurate Information as of the date of the SRA, the First Closing, and the Second Closing

119.   Section 4.4 of the SRA included a representation and warranty that—as of the date of the SRA, as of the date of the First Closing, and as of the date of the Second Closing— Plaintiffs had been provided all information material to the valuation of Origis and its assets (the "Information Warranty") and that such information provided was true and correct:

> Buyer has made available to each Seller documents and information regarding (a) the business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries, (b) the Company's development pipeline of solar power and energy storage projects and (c) any value indications by any party showing an interest to acquire part or all of the shares of a direct or indirect Subsidiary of the Company, any assets held by a direct or indirect Subsidiary of the Company or by any party showing an interest in acquiring Origis Energy or Assets. Those documents and that information are (i) complete in all material respects and (ii) do not contain any untrue statement of a material fact or fail to state a material fact necessary to make the statements contained therein, not misleading, in the case of clauses (i) and (ii) based on a reasonable assessment by Buyer or the Company of information reasonably available to Buyer or the Company and taking into account the experience of Buyer and the Company.

120. The Information Warranty was included in the SRA at Plaintiffs' insistence, as an extra layer of protection beyond their general trust in Vanderhaegen's honesty, his fiduciary duties, and the representations which had been made and relied upon throughout the sale process. As Plaintiffs communicated to Vanderhaegen on January 24, 2020, "we are not assuming bad intentions either, but we feel that when we decide to sell we should decide it based on accurate information and since we are not at the source this is our only protection." In accepting those clauses, Vanderhaegen confirmed, the same day, that, "I understand your point and it is not my intention to mislead or to withhold information." The Parties thus understood that the Information Warranty required accurate disclosure of all information material to the transaction—most notably to the value of Origis USA and its project pipeline.

121. Pursuant to the SRA, the Information Warranty in the SRA was not only operative as of the date of the execution of the SRA, but was brought down to each of the two closings, on October 15, 2020 and January 4, 2021 as if that Warranty had been reissued and reaffirmed as of that date. *See* SRA arts. IV, VI §§ 6.2(a), 6.4(a). In other words, Plaintiffs had no obligation to

complete the First Closing and Second Closing unless Defendants were in full compliance with the Information Warranty as of the dates of those closings. *See* SRA §§ 6.2, 6.4.

> 2.   The Vanderhaegen Defendants Agreed in the SRA that, for a Period of One Year, they Would Not Permit any Origis Sale to Occur

122.   The SRA also contained a provision in which the Vanderhaegen Defendants agreed, for a period of one year from the date of the SRA, not to permit any sale of Origis equity or its assets (the "No Origis Sale Clause"). *See* SRA § 5.5(a). If a breach of that provision occurred, Plaintiffs were to share in the proceeds of any transaction as if no SRA transaction had happened, *i.e.*, to the extent such a sale implied a higher valuation of the company, Plaintiffs would reap the benefits as if they still held 58% of the company. *See* SRA § 5.5(c).

123.   In connection with the No Origis Sale Clause, the Vanderhaegen Defendants also promised to "promptly inform" Plaintiffs of any "potential Origis Sale" (the "Origis Sale Information Clause"). Section 5.5(c) of the SRA provides:

> For the purpose of this Section 5.5(c), Buyer shall (i) promptly inform Sellers of any potential Origis Sale to occur within a period of twelve (12) months after the date of this Agreement, (ii) keep Sellers informed on the progress of such potential Origis Sale on at least a quarterly basis and (iii) submit to Sellers any transaction documents (including any Proposal) relating to a potential Origis Sale.

124.   The No Origis Sale Clause and the price correction mechanism were included in the SRA as an additional protection against the information disparity between Defendants and Plaintiffs. As Plaintiffs explained to Vanderhaegen, "[t]he clause is there to protect us against arbitrage, even if it happens on a smaller stake." Vanderhaegen accepted Plaintiffs' characterization. The SRA thus restrained Defendants from seeking or striking a deal within the one-year period so that Defendants could not realize a risk-free profit at Plaintiffs' expense through his control of company information.

3.    The SRA and All Connected Claims Are Subject to New York Law without Regard to Choice of Law

125.   The SRA finally provided that any and all claims connected with the agreement would be subject to New York law without regard to any conflict-of-law rules. Section 9.12 of the SRA provides that "[t]his Agreement and any claim arising out of or in connection with this Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of New York without giving effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction."

126.   At Defendants' request, this governing law clause in the SRA was deliberately given the broadest possible scope, extending even to corporate matters. Plaintiffs proposed that, because the SRA implicated matters arguably related to a Belgian company, Belgian law should apply. Defendants disagreed. They proposed instead that, because the transaction was being financed by Origis USA (and was effectively a redemption of interests in Origis USA), New York law should govern all matters related to the transaction—even if related to the rights and obligations flowing from a Belgian company. Defendants' argument won the day and the parties ultimately agreed that New York law would govern all matters related to the transaction.

**F.   Because Defendants Deliberately Misrepresented and Concealed Critical Information and Breached Their Fiduciary Duties and Obligations Under the SRA, Plaintiffs Go Through with the First and Second Closings**

127.   Following the effective date of the SRA on September 14, 2020, and before the closings, Defendants continued to intentionally withhold, among other material information, the secret internal and other valuations of Origis USA, accurate information on Origis USA's pipeline of projects, and material information regarding an ongoing Origis USA sales process. Defendants did this with the purpose of making certain that the closings would occur as scheduled. They knew that if this information was disclosed, Plaintiffs would understand that

41

there had been breaches of contract and fiduciary duty and consequently would not be obligated to go through with those closings.

128.  For example, on September 21, 2020, only a week after the SRA's effective date, Vanderhaegen, as a part of his ongoing dialogue with his investment bankers on behalf of Origis USA, received a solar market report from one of those firms confirming that the SRA valuation was far too low and that Origis USA's valuations from Summer 2020, which had been hidden from Plaintiffs, were spot on. The report confirmed that the renewables market was going like gangbusters, with "capital pouring into" "[a] [w]hite [h]ot [m]arket for [s]ustainability." This report from the investment banker was hardly a surprise. It simply confirmed what Vanderhaegen well knew before the SRA was executed.

129.  In response to this latest unsurprising confirmation of Defendants' prior, pre-SRA knowledge of Origis USA's immense value, Vanderhaegen triumphantly wrote concerning the SRA to Origis USA's CIO on September 21, 2020 that "we did a golden deal a week ago and that the IPO track is certainly real." Vanderhaegen then held another meeting with the investment banker to discuss how best to pursue its options to monetize the equity of the company.

130.  Defendants—including through Origis USA's senior officers and other employees—continued to deliberately hide this critical information from Plaintiffs. They acted in this unlawful manner with the deliberate intent to blind Plaintiffs to the truth in order to ensure that they would not walk away from the SRA before the First and/or Second Closings. Defendants correctly understood that, if this information was not successfully concealed from Plaintiffs, the closings contemplated by the SRA never would have taken place.

131.  In October 2020, Origis USA's officers and employees, at the direction of Vanderhaegen, began to correspond with bankers about the possibility of pursuing a SPAC or IPO transaction as part of their now underway Origis USA sales process.

132.  In November 2020, Defendants, in keeping with their at least year-long plan to flip Origis USA as quickly as possible to reap the value stolen from Plaintiffs, held further discussions with investment bankers about a potential sale of Origis USA and its assets. The bankers provided significant information about Origis USA's value, and Defendants received detailed information on their options for such a sale. The bankers then quietly contacted potential buyers. Defendants were thus laying the groundwork to rapidly undertake an Origis USA sale as soon as Plaintiffs had finally conveyed their interest.

133.  As the direct result of Defendants' intentional misrepresentations and the concealment of highly material information on multiple occasions, Plaintiffs conveyed their interests in accordance with the SRA on the dates of the First Closing, October 15, 2020, and the Second Closing, January 4, 2021. In exchange, Plaintiffs received about $105 million, a price which Defendants knew, but Plaintiffs did not, was unconscionably deficient.

**G. No Sooner Was the Ink Dry from the Second Closing than Defendants Redouble their Efforts to Resell Plaintiffs' Interest**

134.  Despite negotiating and signing a covenant not to permit, for 12 months *after* the SRA, any sale of Origis USA assets or equity, unbeknownst to Plaintiffs, Defendants were already actively lining up such a sale even *before* signing the SRA. Defendants concealed this sales process from Plaintiffs until after the Second Closing and withheld almost all material information about it thereafter. This tainted sales process resulted in the sale of Origis USA to Antin for $1.4 billion.

      1.     Immediately Upon Escalating their Sales Efforts, Defendants Receive Further Market Data that Reconfirms the Massive Value of Origis USA

135.  Defendants received an updated U.S. solar market report from an investment banker just a couple of weeks after the Second Closing, yet again confirming what the bankers had previously told them during the summer and fall of 2020 and what they, themselves, had concluded even before the signing of the SRA—Origis USA was worth a fortune. Vanderhaegen promptly forwarded the report to the other remaining Origis USA shareholder which had collaborated with him to get the buyout done. Vanderhaegen exulted that, based on information almost identical to that from 2020, "you get to a value as of today of more than $500 million" for Origis USA. And then he flatly stated, "[n]ot bad if you compare with the buyout value." Vanderhaegen certainly could not have been surprised in the least to receive further confirmation that the buyout was—as he had said at the time of the signing of the SRA—a "golden deal" for Defendants. This fact had been at the center of his scheme from its start almost two years before.

136.  With the Second Closing past, Defendants removed any remaining inhibitions on their moving as rapidly as possible to flip Origis USA and reap the gigantic reward of their unlawful scheme. The investment bankers kicked into high gear. They first tested the market by putting individual Origis USA assets up for sale. The results confirmed yet again what Defendants already knew—Origis USA was worth far more than what Defendants had represented to Plaintiffs. In fact, the valuations were, unsurprisingly, in line with Defendants' secret internal valuations and the investment banker reports that Defendants had received prior to the execution of the SRA during Summer 2020.

137.  Indeed, the Rockhound projects *alone*—which Vanderhaegen had claimed were almost impossible to value and sell—promptly received a bid of $145 million on February 26, 2021, just weeks after the Second Closing.

138.  Upon receiving the $145 million Rockhound bid, Vanderhaegen acknowledged what he had known before, *i.e.*, contrary to what he had sworn to Plaintiffs, the Rockhound assets were not virtually impossible to value nor difficult to sell. He acknowledged what was obvious—that there was "serious interest in our Rockhound assets." And there undoubtedly was. But, contrary to his contractual promise to inform Plaintiffs of any and all Rockhound proposals, Vanderhaegen kept this information concealed to prevent Plaintiffs from taking any action to seek relief.

139.  Then, on March 1, 2021, Onpeak Capital reported to Vanderhaegen that Origis USA could be worth $600 million in a private transaction. If, instead, Origis USA were to pursue a SPAC transaction, the investment bankers predicted that Origis USA might be worth as much as $1.25 billion. Again, these values were consistent with Defendants' concealed, pre-SRA valuations from the prior summer which they hid from Plaintiffs. Vanderhaegen, revealing the depth of his deception of Plaintiffs, responded to Onpeak that its striking $600 million valuation—many times greater than the buyout valuation—in fact understated the true value of Origis USA. And, as it turned out, Vanderhaegen, unsurprisingly, given his intimate knowledge of the business, knew what he was talking about. It was only Plaintiffs who had been kept in the dark.

140.  Knowing that Origis USA was worth over $1 billion, Vanderhaegen approached Plaintiffs on March 25, 2021, to seek a waiver of the SRA's No Origis Sale Clause in order to pursue a SPAC transaction.

141.  But, yet again, the truth and Vanderhaegen were strangers. He did not inform Plaintiffs that he had been told by his investment banker that the SPAC transaction could be worth $1.25 billion. He instead told them effectively just the opposite—that the transaction

would not produce much, if anything, in the way of profit and hence there was no upside to be shared with Plaintiffs. Then, to emphasize that point, he told them that he too stood to make nothing. As Vanderhaegen put it on April 6, 2021, "[t]he deal we are talking about is not an exit for me but only a nice opportunity for the company so I thought that giving a waiver should actually be possible." He explained that, "[a]s there is no exit, and therefore no upward, I don't see what I can share."

142.   Vanderhaegen's misrepresentations were meant to cover up the reality that had existed well before the signing of SRA, *i.e.*, that Defendants were speeding toward the incredibly lucrative off-ramp they had constructed with their carefully planned fraud and breaches of contractual and fiduciary duty.

143.   Because Plaintiffs trusted that Vanderhaegen had been telling the truth when he had promised he would not profit, accepting in return only a very modest potential payment if a SPAC transaction occurred, they signed the waiver on April 23, 2021. Once again, Defendants had successfully defrauded the Plaintiffs.

> 2.   Defendants Continue to Conceal from Plaintiffs Key Information About Their Origis Sale Process and the Valuations It Already Had Produced

144.   Despite actively pursuing a potential Origis Sale and Rockhound Sale, Defendants failed to keep Plaintiffs updated on their progress as required by the SRA. The extremely limited information provided was largely at the instigation of Plaintiffs themselves.

145.   For instance, in response to an inquiry from Pentacon about the possibility of reinvesting in Origis, as Vanderhaegen had previously promised they could, Vanderhaegen emailed Plaintiffs on April 29, 2021, that, while considering the sales transaction route, he had valuations prepared, which showed Origis USA had increased significantly in value since the buyout. In an email on May 11, 2021, Vanderhaegen falsely attributed the changed valuation to a

miraculous increase in the value of the Origis USA pipeline from $152 million at the time of the Second Closing to $413 million just four months later. There was no miracle. After all, Origis USA's internal, concealed calculations in the summer of 2020, before the signing of the SRA in September 2020, had valued the pipeline at even more than $413 million.

146.  Moreover, Vanderhaegen still did not disclose that the Origis USA pipeline alone— not including other assets, the platform, and goodwill—was potentially worth over a billion dollars, as Origis USA had determined in Summer 2020. The supposedly "new" valuation he reported was thus yet another attempt to mislead Plaintiffs and, even more importantly, to stop them from taking any action until Defendants' planned sale of the business had become a *fait accompli*.

3.    Defendants' Sales Process Results in the Sale of Origis USA for $1.4 Billion

147.  Defendants had been preparing to go to market since well prior to the signing of the SRA. And now, in early 2021 shortly after the Second Closing, the final pieces of their fraudulent scheme began to fall into place.

148.  Working with and through Origis USA officials and employees, Defendants had by April 2021 built their data room containing the materials to be reviewed by potential buyers. In May 2021, Goldman Sachs had come on board and had put together a value presentation for a sale of the entire company. In June, the investment bankers were developing various financial models to calculate the value of Origis USA. By July of 2021, Origis USA had formally retained the two investment bankers, Onpeak and Goldman Sachs; had identified a pool of potential buyers; had circulated Non-Disclosure Agreements to those potential buyers; had created a Confidential Information Memorandum; and provided that Information Memorandum to a long list of potential buyers. Late in July 2021, invitations were issued to buyers to submit preliminary bids.

149.   The bids obtained proved, as if further evidence was necessary, that the valuation information which Defendants had possessed in Summer 2020 prior to the signing of the SRA, but concealed from Plaintiffs, accurately demonstrated that Origis USA was exceptionally valuable and that the information Defendants had provided to Plaintiffs was false. In August 2021, Defendants received fifteen bids for Origis USA's common shares.[5] Six of the bids valued the shares from $900 million to $1.25 billion and the remaining nine essentially from $500 million to $900 million. All of the bids came in light years ahead of the valuations which Defendants had represented to Plaintiffs just prior to the signing of the SRA to be accurate.

150.   Defendants did not share any of these bids with Plaintiffs now that a sale was a foregone conclusion. Again, Defendants deliberately kept Plaintiffs in the dark to prevent them from taking any action which could upset their unlawful and carefully laid plans.

151.    By August 2021, for all practical purposes, less than a year after the signing of the SRA, it was a done deal. Defendants had engineered the sale of Origis USA at an immense profit. All that remained to do was for Defendants to decide which bidder would get the chance to make them rich.

152.   Defendants' preferred bid for Origis USA came from Antin, a highly experienced solar energy investor. After preparations with other senior officers of Origis USA, Vanderhaegen met with Antin on September 8, 2021 to confirm that a deal had been reached. And, by the close of that meeting, that is exactly what had happened. A short time later, the lawyers had finished papering their deal and Antin had bought Origis USA for an eye-popping $1.4 billion.

---

[5]    One additional bid was for preferred equity—a hybrid between debt and equity—and therefore did not directly imply a common share valuation. However, it suggested a massive valuation for the company.

153.  Vanderhaegen and Origis USA's lender/minority shareholder had gone from holding minority interests in Origis USA to sole ownership of Origis USA as the result of the SRA transaction. That increased ownership interest made Vanderhaegen, in particular, as rich as Croesus when Antin purchased Origis USA for $1.4 billion. The enormity of Vanderhaegen's newfound wealth, which he owed almost entirely to Pentacon and Baltisse, was the direct result of one thing—the success of Defendants' fraudulent scheme.

## H.  Plaintiffs Discover that They Had Been Deceived and Take Action to Enforce Their Rights

154.  On October 18, 2021, Antin and Origis USA publicly announced that they had agreed on a sale of Origis USA, but they did not reveal the purchase price. The outrageous scale of Defendants' deception would only be revealed months later.

155.  It was not until early 2022 that the approximate value of the Antin transaction became public and known to Plaintiffs. At that point, the minority shareholder in Origis USA announced that it had sold its equity in Origis USA to Antin for 12x cost and had realized a gain of $429 million. The announcement potentially implied a valuation for Origis USA of well over $1 billion—totally at odds with the facts as Defendants had represented them to Plaintiffs.

1.  After Investigating their Claims, Plaintiffs Serve Indemnity Notices on Defendants

156.  On October 7, 2022, in accordance with Section 8.3(b) of the SRA, Plaintiffs served Defendants with a formal Indemnity Notice that set out Plaintiffs' indemnification claims under the SRA.

157.  Defendants responded to Plaintiffs' Indemnity Notice on October 18, 2022. The response disputed Plaintiffs' claims pursuant to the SRA in a conclusory fashion but provided no factual or legal basis for denying them, nor any benign explanation for the massive increase in

Origis USA's value in the short time between the signing of the SRA and the closings and the $1.4 billion Antin purchase.

2.   Defendants Fail to Fulfill their SRA Obligation to Allow Plaintiffs to Investigate their Claims

158.  In conjunction with the Indemnity Notice, Plaintiffs demanded access to the information from Origis necessary to carry out a complete investigation of their claims. Plaintiffs had the right to this information pursuant to Section 8.4 of the SRA.

159.  Defendants produced only a small portion of the information Plaintiffs requested. Rather than a complete production, Defendants proposed a list of search terms, to which Plaintiffs proposed revisions. But then Defendants refused to produce all documents responsive to their own proposed search terms. Defendants instead produced the Antin transaction documents as well as an overwhelming amount of irrelevant technical information from the Antin data room. Beyond that, Defendants produced *only* certain documents expressly relating to discussions with investment bankers and the financing of the buyout and largely did so from the email account of a single custodian—Vanderhaegen. Defendants also failed to provide access to Origis employees for interviews as provided for in the SRA.

160.  The failure to provide all information necessary for Plaintiffs to investigate their claims breached Plaintiffs' information access rights in the SRA. But for these breaches, Plaintiffs would be able to set forth their claims with even more particularity.

**VI.    Claims**

**A.  Claims as Regards All Defendants**

**Count One: Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA)**

161.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 160 above and paragraphs 168 through 252 below as if fully set forth herein.

162.  Between 2019 and 2021, Defendants engaged in a fraudulent scheme, including multiple independent frauds, in order to obtain Plaintiffs' ownership interests in Origis at a fraudulently low price, and then promptly turn around and reap a massive profit by selling the company at what they knew would be a dramatically higher amount. Defendants did all of this intentionally to steal large amounts of money from Plaintiffs in order to enrich themselves and, in the case of the Origis USA Defendant, to enrich its senior management and its minority shareholder, to free its senior management from any interference by Plaintiffs, and to facilitate the awarding of large bonuses to the senior management.

163.  Defendants repeatedly misrepresented material factual information to Plaintiffs, with the conscious intent to mislead Plaintiffs, about, among other things, the following topics: that they wanted to remain invested over the long haul to grow the Origis business; that they had no intention of selling the business in the foreseeable future and, consequently, would have no incentive to lie about current value; that they were accurately portraying the value of the projects in the Origis USA pipeline; that the real value of Origis USA was nothing more than the value of the advanced projects in its pipeline and accordingly neither the platform nor goodwill had any material value; that, based on their knowledge and experience, they were not privy to any information suggesting nor otherwise had any reason to believe Origis USA was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would

51

continue to provide complete and accurate information bearing on the value of the Plaintiffs'
ownership interests, including all value information about the company and about its specific
assets; that they were at all times abiding by their fiduciary and later contractual duties in
providing or failing to provide such information; that a SPAC transaction would not provide any
real profit to them; that they had and would continue to update all information relevant to the
company, including its financial condition, assets, business operations, and value, through the
time of each Closing; that the Rockhound projects could not be valued and would be virtually
impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the
purchase of its interest.

164.   Defendants also repeatedly concealed and failed to disclose material facts, with the
conscious intent to mislead Plaintiffs, about, among other things, the following topics: that
Defendants had deliberately restricted the flow of information to Plaintiffs in an effort to limit
Plaintiffs' understanding of the business; that Defendants had consulted with investment bankers
to advise on selling Origis USA and its assets; that at least as early as September 2020
Vanderhaegen had confessed to the CIO of Origis USA that they had just so successfully fleeced
Plaintiffs as to make it a "golden deal" for them; that the investment bankers who had been
consulted by Origis USA provided valuations to the Defendants; that Origis USA officers and
employees had carried out the preparation of internal valuations of Origis USA in preparation for
and in conjunction with the execution of the SRA; that both the bankers' analyses and the secret
internal analyses done by Origis USA personnel showed dramatically greater values than the
values the Defendants were representing to Plaintiffs were accurate, complete, and substantial
enough to allay any doubts that Plaintiffs had about value; that Defendants had provided
valuations of Origis USA and its assets to third parties and those valuations claimed much higher

values for Origis USA and its assets than those provided to Plaintiffs; that Defendants had commenced a sale process even prior to the signing of the SRA and the Closings; that within days after the Second Closing, Vanderhaegen had written that "you get to a value as of today of more than $500 million"; that additional material information had come into Defendants' possession after the signing of the SRA but before the closings; that, in August 2021, Defendants had received fifteen bids for Origis USA equity at or above $500 million, including three bids at or above $1 billion; and that Origis USA was to be sold for $1.4 billion.

165.  Defendants deliberately misrepresented these material facts and concealed this critical material information to accomplish the fraud and cover-up their unlawful conduct. Defendants did all this with the knowledge that their representations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and with the specific intent to take control of Origis, to acquire Plaintiffs' ownership interests at what they knew to be a fraudulent and abysmally deficient price, to free Origis USA's senior management from any interference by Plaintiffs, and to facilitate the awarding of large bonuses to the senior management.

166.  Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and omissions in at least the following ways: (a) continuing to trust that Vanderhaegen was being honest and forthcoming, (b) agreeing to sell their ownership interests at a grossly inadequate price, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis USA, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) not remaining invested until an appropriate and attractive opportunity arose to dispose of their ownership interests, (f) signing the SRA, (g) going through with the First Closing and Second Closing, (h) refraining from seeking to affect the sales

process being conducted by Defendants, and (i) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

167.  Plaintiffs suffered injury because of Defendants' fraudulent scheme and acts because, among other things, they were thereby induced to sell their controlling ownership interest to Defendants for a price dramatically below its true value.

**Count Two: Fraudulent Inducement of Contract (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA)**

168.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 167 above and paragraphs 175 through 252 below as if fully set forth herein.

169.  Between 2019 and 2020, Defendants deliberately and repeatedly misrepresented material facts and omitted material information as set forth above, including but not limited to information about Origis USA and the various solar energy projects in its pipeline, and thereby fraudulently induced Plaintiffs into signing the SRA. Defendants did all this intentionally to induce Plaintiffs into entering into the SRA and thereby unlawfully expropriate large amounts of money from Plaintiffs in order to enrich themselves and, in the case of the Origis USA Defendant, in order to enrich its senior management and its minority shareholder, to free its senior management from any interference by Plaintiffs, and to facilitate the awarding of large bonuses to the senior management.

170.  Defendants repeatedly misrepresented material factual information to Plaintiffs— with the conscious intent to induce Plaintiffs into entering the SRA and sell their ownership interests at an artificially and grossly inadequate price—about, among other things, the following topics: that they wanted to remain invested over the long haul to grow the Origis business; that they had no intention of selling the business in the foreseeable future and, consequently, would have no incentive to lie about current value; that they were accurately portraying the value of the

projects in the Origis USA pipeline; that the real value of Origis USA was nothing more than the value of the advanced projects in its pipeline and accordingly neither the platform nor goodwill had any material value; that, based on their knowledge and experience, they were not privy to any information suggesting nor otherwise had any reason to believe Origis USA was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information bearing on the value of the Plaintiffs' ownership interests, including all value information about the company and about its specific assets; that they were at all times abiding by their fiduciary and later contractual duties in providing or failing to provide such information; that a SPAC transaction would not provide any real profit to them; that they had and would continue to update all information relevant to the company, including its financial condition, assets, business operations, and value, through the time of each Closing; that the Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its interest.

171. Defendants also repeatedly concealed and failed to disclose material facts, with the conscious intent to mislead Plaintiffs, about, among other things, the following topics: that Defendants had deliberately restricted the flow of information to the Plaintiffs in an effort to limit Plaintiffs' understanding of the business; that Defendants had consulted with investment bankers to advise on selling Origis USA and its assets; that at least as early as September 2020 Vanderhaegen had confessed to the CIO of Origis USA that they had just so successfully fleeced Plaintiffs as to make it a "golden deal" for them; that the investment bankers who had been consulted by Origis USA provided valuations to the Defendants; that Origis USA officers and employees had carried out the preparation of internal valuations of Origis USA in preparation for

and in conjunction with the execution of the SRA; that both the bankers' analyses and the secret internal analyses done by Origis USA personnel showed dramatically greater values than the values the Defendants were representing to Plaintiffs were accurate, complete, and substantial enough to allay any doubts that Plaintiffs had about value; that Defendants had provided valuations of Origis USA and its assets to third parties and those valuations claimed much higher values for Origis USA and its assets than those provided to Plaintiffs; that Defendants had commenced a sale process even prior to the signing of the SRA and the Closings; that within days after the Second Closing, Vanderhaegen had written that "you get to a value as of today of more than $500 million"; that additional material information had come into Defendants' possession after the signing of the SRA but before the closings; that, in August 2021, Defendants had received fifteen bids for Origis USA equity at or above $500 million, including three bids at or above $1 billion; and that Origis USA was to be sold for $1.4 billion.

172.  Defendants deliberately misrepresented these material facts and concealed this critical material information to accomplish the fraud and cover-up their unlawful conduct. Defendants did all this with the knowledge that the misrepresentations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and with the specific intent that Plaintiffs would thereby be induced to sign the SRA, allowing Defendants to acquire Plaintiffs' ownership interests at what they knew to be a fraudulent and abysmally deficient price, freeing Origis USA's senior management from any interference by Plaintiffs, and facilitating the awarding of large bonuses to the senior management.

173.  Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and omissions in at least the following ways: (a) continuing to trust Vanderhaegen was being honest and forthcoming, (b) agreeing to sell their ownership interests at a grossly inadequate price,

(c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis USA, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) not remaining invested until an appropriate and attractive opportunity arose to dispose of their ownership interests, (f) signing the SRA, (g) going through with the First Closing and Second Closing, (h) refraining from seeking to affect the sales process being conducted by Defendants, and (i) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

174.  Plaintiffs were injured because they were induced to execute the SRA, through which they sold their controlling ownership interest for a price dramatically below its true value.

**Count Three: Aiding and Abetting Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA)**

175.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 174 above and paragraphs 182 through 252 below as if fully set forth herein.

176.  Each Defendant aided and abetted the remaining Defendants' fraud against Plaintiffs.

177.  As set out in Counts One and Two and above, each Defendant engaged in a fraudulent scheme, including multiple independent frauds, in order to obtain Plaintiffs' ownership interests in Origis at a fraudulently low price, and then promptly turn around and reap a massive profit by selling the company at what they knew would be a dramatically higher amount. Defendants did all this intentionally to take large amounts of money from Plaintiffs in order to enrich themselves and, in the case of the Origis USA Defendant, to enrich its senior management and its minority shareholder, to free its senior management from any interference by Plaintiffs, and to facilitate the awarding of large bonuses to the senior management.

57

178.  Defendants acted at all relevant times and continue to act as one combined, unified entity under the common control of Vanderhaegen, and Vanderhaegen has acted at all relevant times and continues to act on behalf of and through the other Defendants in committing the fraudulent scheme and acts. Vanderhaegen confided the details of the fraudulent scheme in all other Defendants as well as in Origis USA's CIO, CCO, and minority shareholder.

179.  All Defendants knew of the fraudulent scheme and acts committed by each remaining Defendant. Each Defendant knowingly participated in and substantially assisted the fraudulent scheme and acts committed by each remaining Defendant, which included misrepresenting material factual information to Plaintiffs about, among other things, the following topics: that they wanted to remain invested over the long haul to grow the Origis business; that they had no intention of selling the business in the foreseeable future and, consequently, would have no incentive to lie about current value; that they were accurately portraying the value of the projects in the Origis USA pipeline; that the real value of Origis USA was nothing more than the value of the advanced projects in its pipeline and accordingly neither the platform nor goodwill had any material value; that, based on their knowledge and experience, they were not privy to any information suggesting nor otherwise had any reason to believe Origis USA was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information bearing on the value of the Plaintiffs' ownership interests, including all value information about the company and about its specific assets; that they were at all times abiding by their fiduciary and later contractual duties in providing or failing to provide such information; that a SPAC transaction would not provide any real profit to them; that they had and would continue to update all information relevant to the company, including its financial condition, assets, business

operations, and value, through the time of each Closing; that the Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its interest.

180.   Each Defendant also knowingly participated in and substantially assisted the fraudulent scheme and acts committed by each remaining Defendant through concealing and failing to disclose material facts, about, among other things, the following topics: that Defendants had deliberately restricted the flow of information to the Plaintiffs in an effort to limit Plaintiffs' understanding of the business; that Defendants had consulted with investment bankers to advise on selling Origis USA and its assets; that at least as early as September 2020 Vanderhaegen had confessed to the CIO of Origis USA that they had just so successfully fleeced Plaintiffs as to make it a "golden deal" for them; that the investment bankers who had been consulted by Origis USA provided valuations to the Defendants; that Origis USA officers and employees had carried out the preparation of internal valuations of Origis USA in preparation for and in conjunction with the execution of the SRA; that both the bankers' analyses and the secret internal analyses done by Origis USA personnel showed dramatically greater values than the values the Defendants were representing to Plaintiffs were accurate, complete, and substantial enough to allay any doubts that Plaintiffs had about value; that Defendants had provided valuations of Origis USA and its assets to third parties and those valuations claimed much higher values for Origis USA and its assets than those provided to Plaintiffs; that Defendants had commenced a sale process even prior to the signing of the SRA and the Closings; that within days after the Second Closing, Vanderhaegen had written that "you get to a value as of today of more than $500 million"; that additional material information had come into Defendants' possession after the signing of the SRA but before the closings; that, in August 2021, Defendants

had received fifteen bids for Origis USA equity at or above $500 million, including three bids at or above $1 billion; and that Origis USA was to be sold for $1.4 billion.

181.  Plaintiffs suffered injury from each Defendants' aiding and abetting of the fraudulent scheme and acts of the remaining Defendants because, among other things, Plaintiffs were thereby induced to sell their controlling ownership interest to Defendants for a price dramatically below its true value.

### Count Four: Civil Conspiracy (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, Pelican International, and Origis USA)

182.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 181 above and paragraphs 188 through 252 below as if fully set forth herein.

183.  Defendants engaged in a civil conspiracy to commit the violations of law described in this Complaint, including the fraud, fraudulent inducement of contract, constructive fraud, breach of fiduciary duty, and tortious interference with contract that are set out and described in this Complaint.

184.  Defendants agreed in Spring 2019 and at multiple times thereafter to pursue a scheme in which they would convince Plaintiffs to sell their ownership interests to Defendants for far less than their true value through fraudulent misrepresentations and material omissions and breaches of fiduciary duty. They also agreed that they would capitalize on Plaintiffs' lack of understanding of Origis' business, which they had created, to further this scheme. They further agreed that, once Plaintiffs had sold their interests to Defendants, they would then sell Origis and/or its assets for a massive profit. In addition to the other Defendants, Origis USA was party to these agreements not only through its CEO Vanderhaegen but also through its other senior executives, including its CIO and COO, and its minority shareholder.

185.  Each Defendant individually and collectively committed numerous actions in furtherance of their agreements. These acts included, but were not limited to: making false and misleading representations to Plaintiffs, including on the value of Origis USA and its assets; concealing material facts from Plaintiffs, including facts with respect to the value of Origis USA and its assets, the preparation of valuations of Origis USA and its assets, the retention of investment bankers, the valuations prepared by those bankers, the preparation for and pursuit of a sale of Origis USA and its assets, and the sale of Origis USA to Antin; the actual preparation of valuations of Origis USA and its assets; the provision of financing for the buyout of Plaintiffs' interest; the retention of investment bankers; the preparation for and pursuit of a sale of Origis USA and its assets; and the sale of Origis USA to Antin.

186.  Each Defendant intentionally participated in advancing their collective plans pursuant to their agreements. Defendants did all this intentionally to induce Plaintiffs into entering into the SRA and thereby unlawfully expropriate large amounts of money from Plaintiffs in order to enrich themselves and, in the case of the Origis USA Defendant, in order to enrich its senior management and its minority shareholder, to free its senior management from any interference by Plaintiffs, and to facilitate the awarding of large bonuses to the senior management.

187.  Plaintiffs suffered injury as a result of Defendants' civil conspiracy because they were thereby induced to sell their controlling ownership interests for a price dramatically below their true value and because they were never paid the amount that they should have received under the SRA in the event of a breach of the No Origis Sale provision of the SRA.

### B.  Claims as Regards the Vanderhaegen Defendants

### Count Five: Constructive Fraud (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International)

188.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 187 above and paragraphs 196 through 252 below as if fully set forth herein.

189.  Between 2019 and 2021, the Vanderhaegen Defendants repeatedly misrepresented material facts and omitted material information about, among other things, Origis USA's financial condition, assets, and the true value of the business and its assets, in breach of their fiduciary duties to Plaintiffs, and thereby constructively defrauded Plaintiffs of their controlling interest in Origis.

190.  As officers, directors, and fellow shareholders in a close corporation, the Vanderhaegen Defendants owed fiduciary duties to Plaintiffs, including duties of good faith, candor, and loyalty. Plaintiffs were therefore justified in trusting and relying upon the Vanderhaegen Defendants to be careful in their representations to them, to operate at the highest levels of integrity, and to act at all times in Plaintiffs' best interests as shareholders.

191.  The Vanderhaegen Defendants repeatedly misrepresented material factual information to Plaintiffs, with the conscious intent to mislead Plaintiffs, about, among other things, the following topics: that they wanted to remain invested over the long haul to grow the Origis business; that they had no intention of selling the business in the foreseeable future and, consequently, would have no incentive to lie about current value; that they were accurately portraying the value of the projects in the Origis USA pipeline; that the real value of Origis USA was nothing more than the value of the advanced projects in its pipeline and accordingly neither the platform nor goodwill had any material value; that, based on their knowledge and experience, they were not privy to any information suggesting nor otherwise had any reason to believe Origis

USA was worth more than $200 million; that they had been totally open with Plaintiffs and had provided and would continue to provide complete and accurate information bearing on the value of the Plaintiffs' ownership interests, including all value information about the company and about its specific assets; that they were at all times abiding by their fiduciary and later contractual duties in providing or failing to provide such information; that a SPAC transaction would not provide any real profit to them; that they had and would continue to update all information relevant to the company, including its financial condition, assets, business operations, and value, through the time of each Closing; that the Rockhound projects could not be valued and would be virtually impossible to sell; and that Plaintiff Pentacon would be allowed to reinvest in Origis after the purchase of its interest.

192.  The Vanderhaegen Defendants also repeatedly concealed and failed to disclose material facts, with the conscious intent to mislead Plaintiffs, about, among other things, the following topics: that Defendants had deliberately restricted the flow of information to the Plaintiffs in an effort to limit Plaintiffs' understanding of the business; that Defendants had consulted with investment bankers to advise on selling Origis USA and its assets; that at least as early as September 2020 Vanderhaegen had confessed to the CIO of Origis USA that they had just so successfully fleeced the Plaintiffs as to make it a "golden deal" for them; that the investment bankers who had been consulted by Origis USA provided valuations to the Defendants; that Origis USA officers and employees had carried out the preparation of internal valuations of Origis USA in preparation for and in conjunction with the execution of the SRA; that both the bankers' analyses and the secret internal analyses done by Origis USA personnel showed dramatically greater values than the values the Defendants were representing to Plaintiffs were accurate, complete, and substantial enough to allay any doubts that Plaintiffs had about

value; that Defendants had provided valuations of Origis USA and its assets to third parties and those valuations claimed much higher values for Origis USA and its assets than those provided to Plaintiffs; that Defendants had commenced a sale process even prior to the signing of the SRA and the Closings; that within days after the Second Closing, Vanderhaegen had written that "you get to a value as of today of more than $500 million"; that additional material information had come into Defendants' possession after the signing of the SRA but before the closings; that, in August 2021, Defendants had received fifteen bids for Origis USA equity at or above $500 million, including three bids at or above $1 billion; and that Origis USA was to be sold for $1.4 billion.

193.  The Vanderhaegen Defendants deliberately misrepresented these material facts and concealed this critical material information to accomplish the fraud and cover-up their unlawful conduct. All this was done with knowledge that their representations and omissions were false and misleading, or with reckless disregard for their truth or falsity, and/or negligence. The false statements and omissions were made with the intent that Plaintiffs rely on them and with the intent to induce Plaintiffs into surrendering their control of Origis and ultimately to sell their interest at a fraudulently deficient price.

194.  Plaintiffs justifiably relied to their detriment on the Vanderhaegen Defendants' misrepresentations and omissions in at least the following ways: (a) continuing to trust Vanderhaegen was being honest and forthcoming, (b) agreeing to sell their ownership interests at a grossly inadequate price, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis USA, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) not remaining invested until an appropriate and attractive opportunity arose to dispose of their ownership interests, (f) signing

the SRA, (g) going through with the First Closing and Second Closing, (h) refraining from seeking to affect the sales process being conducted by Defendants, and (i) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

195. Plaintiffs suffered injury because of the Vanderhaegen Defendants' unlawful conduct set out above including because they were induced to transfer their interests in Origis to the Vanderhaegen Defendants for much less than their true value.

### Count Six: Breach of Fiduciary Duty (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International)

196. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 195 above and paragraphs 201 through 252 below as if fully set forth herein.

197. The Vanderhaegen Defendants breached their fiduciary duties to Plaintiffs.

198. As officers, directors, and fellow shareholders in a close corporation, the Vanderhaegen Defendants owed fiduciary duties to Plaintiffs. Among other things, the Vanderhaegen Defendants owed Plaintiffs duties of good faith, candor, and loyalty.

199. In breach of their duties, the Vanderhaegen Defendants provided false and misleading information to Plaintiffs and omitted to provide material information to them so as to make those false statements not misleading. All of this was provided with the intent to induce Plaintiffs to rely on that false and misleading information in an effort to seize Plaintiffs' ownership interests for what these Defendants knew to be an inadequate price. In addition, these Defendants breached their fiduciary duties by consciously constricting the flow of Origis' information to Plaintiffs in order to prevent Plaintiffs from exercising effective oversight of their investment, with the goal of, among other things, making certain that Plaintiffs did not understand Origis USA and its current and future prospects, its market position, and its value.

200.  The Vanderhaegen Defendants' breaches of their fiduciary duties to Plaintiffs caused injury to Plaintiffs, who were injured as a direct result of: (a) continuing to trust Vanderhaegen was being honest and forthcoming, (b) agreeing to sell their ownership interests at a grossly inadequate price, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis USA, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) not remaining invested until an appropriate and attractive opportunity arose to dispose of their ownership interests, (f) signing the SRA, (g) going through with the First Closing and Second Closing, (h) refraining from seeking to affect the sales process being conducted by Defendants, and (i) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

### Count Seven: Breach of Contract – Representations and Warranties (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International)

201.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 200 above and paragraphs 209 through 252 below as if fully set forth herein.

202.  Provision 4.4 of the SRA contains the Information Warranty. It was a vital component of the bargain and was specifically sought by and negotiated for by Plaintiffs. Without that provision, Plaintiffs would never have entered into the SRA.

203.  Plaintiffs fulfilled all of their material obligations under the SRA, including by tendering their Origis interests at the First Closing and Second Closing.

204.  The Vanderhaegen Defendants breached the Information Warranty contained in the SRA at the time of the SRA's signing, again at the time of the First Closing, and finally, yet again, at the time of the Second Closing. SRA arts. IV, VI §§ 6.2(a), 6.4(a).

205.  The Vanderhaegen Defendants breached the Information Warranty by, among other things, making false and misleading statements of material fact regarding Origis, its financial

condition, and its assets—including the value of Origis USA and its pipeline. They also omitted material facts needed to make the information provided on those matters not misleading. These misrepresentations and omissions included the claim that the Rockhound projects could not be reliably valued or sold.

206. But for these breaches, the Plaintiffs would never have proceeded to complete the First and Second Closings.

207. But for these breaches, the Plaintiffs, even after the Second Closing would have taken action to seek to prevent the transfer of their ownership interests which Defendants had unlawfully acquired.

208. By breaching the Information Warranty, the Vanderhaegen Defendants injured Plaintiffs by, among other things, causing them to lose their controlling interests for far less than their true value.

### Count Eight: Breach of Contract – Sale of Origis (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International)

209. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 208 above and paragraphs 217 through 252 below as if fully set forth herein.

210. Section 5.5 of the SRA was a vital component of the bargain and was specifically sought by, and negotiated for, by Plaintiffs. Without that provision, Plaintiffs would never have entered into the SRA.

211. Plaintiffs fulfilled all of their material obligations under the SRA, including by tendering their Origis interests at the First Closing and Second Closing.

212. Every contract includes an implied covenant of good faith and fair dealing. Here, that covenant applies to Section 5.5 of the SRA.

213.  Section 5.5(a) of the SRA prohibited the Vanderhaegen Defendants from doing precisely what they did here. It provides that "[f]rom and after the Second Closing Date until twelve (12) months after the date of this Agreement, Pelican shall not permit any Origis Sale to occur." However, not only did the Vanderhaegen Defendants fail to act in a manner consistent with not permitting a sale to occur within this 12-month period, they actively pursued such a sale both before the SRA had been signed and during the period thereafter preceding the expiration of the one-year restricted period. The Vanderhaegen Defendants, in pursuit of such a sale, reached an agreement to sell Origis USA to Antin, within the 12-month No Origis Sale Period.

214.  Additionally, Section 5.5(c) of the SRA required the Vanderhaegen Defendants to provide certain information to Plaintiffs during the 12 months following the date of the SRA. That Section specifically provides that:

> For the purpose of this Section 5.5(c), Buyer shall (i) promptly inform Sellers of any potential Origis Sale to occur within a period of twelve (12) months after the date of this Agreement, (ii) keep Sellers informed on the progress of such potential Origis Sale on at least a quarterly basis and (iii) submit to Sellers any transaction documents (including any Proposal) relating to a potential Origis Sale. Sellers will, and will cause each of their respective Affiliates and their and their respective Affiliates' Representatives to, maintain in strict confidence any and all information relating to any potential Origis Sale.

215.  The Vanderhaegen Defendants breached both the No Origis Sale Clause of the SRA and the Origis Sale Information Clause of the SRA by commencing a sales process even before Plaintiffs had signed the SRA and sold their Origis interest; failing to promptly and regularly provide Plaintiffs with information on a potential Origis sale as required by Section 5.5(c), including commencing a sales process, hiring investment bankers, and obtaining bids for Origis USA. The Vanderhaegen Defendants breached Section 5.5(a) of the SRA by agreeing to sell Origis USA before the expiration of the 12-month No Origis Sale period and by refusing to make

the payments required by Section 5.5 in the event that such a sale occurred within the 12-month No Origis Sale period.

216.  Plaintiffs were damaged because of the Vanderhaegen Defendants' breaches by at least, among other things, the amount that they should have received under Section 5.5 of the SRA.

### Count Nine: Breach of Implied Covenant of Good Faith and Fair Dealing – Sale of Origis (Vanderhaegen, Vanderhaegen Trust, Pelican Invest, and Pelican International)

217.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 216 above and paragraphs 225 through 252 below as if fully set forth herein.

218.  Every contract, including the SRA, contains an implied covenant of good faith and fair dealing that prohibits either party from acting to deny the rights of the other party to receive the fruits of the contract.

219.  Plaintiffs bargained for and received the right under the Information Warranty contained in Section 4.4 of the SRA to receive full and complete information relating to the contemplated acquisition of their ownership interests.

220.  However, the Vanderhaegen Defendants failed to comply with this provision. And, that failure constituted a breach of the covenant of good faith and fair dealing which damaged Plaintiffs by causing them to relinquish their ownership interests at a grossly deficient value.

221.  Plaintiffs bargained for and received the rights under the SRA that, for 12 months after the date of the SRA, the Vanderhaegan Defendants would "not permit any Origis Sale to occur," inform Plaintiffs whenever a potential Origis sale was reasonably possible to occur within a 12-month period after the date of the SRA, and pay Plaintiffs liquidated damages if those provisions were violated. SRA § 5.5.

222.  However, not only did the Vanderhaegen Defendants fail to act in a manner consistent with not permitting a sale to occur within this 12-month period, they actively pursued such a sale both before the SRA had been signed and during the period afterwards preceding the expiration of the one year restricted period. The Vanderhaegen Defendants, in pursuit of such a sale, reached an agreement to sell Origis USA to Antin within the 12-month No Origis Sale period.

223.  The Vanderhaegen Defendants breached the implied covenant of good faith and fair by commencing a sales process even before Plaintiffs had signed the SRA and sold their Origis interest; failing to promptly and regularly provide Plaintiffs with information on a potential Origis sale, including commencing a sale process, hiring investment bankers, and obtaining bids for Origis USA. The Vanderhaegen Defendant breached Section 5.5 (a) of the SRA by agreeing to sell Origis USA before the expiration of the 12-month No Origis Sale period and by refusing to make the payments required by Section 5.5 of the SRA in the event that such a sale occurred with the 12-month No Origis Sale period.

224.  Plaintiffs were damaged because of the Vanderhaegen Defendants' breaches by at least, among other things, the amount that they should have received under Section 5.5 of the SRA.

### C.  Claims as Regards the Origis USA Defendant

#### Count Ten: Aiding and Abetting Breach of Fiduciary Duty (Origis USA)

225.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 224 above and paragraphs 232 through 252 below as if fully set forth herein.

226.  Origis USA aided and abetted the Vanderhaegen Defendants' breaches of their fiduciary duties to Plaintiffs.

227.  As officers, directors, and fellow shareholders in Origis Energy, a close corporation, the Vanderhaegen Defendants, among other things, owed fiduciary duties to Plaintiffs as set forth above.

228.  Origis USA knowingly induced and participated in the breaches of fiduciary duties committed by the Vanderhaegan Defendants. It did so in order to, among other things, free itself and its senior management from any oversight by Plaintiffs and enrich itself, its senior management, and its minority shareholder.

229.  Origis USA knew that the Vanderhaegen Defendants owed fiduciary duties to Plaintiffs. Origis USA's senior officers and employees—including its CEO, CIO and CCO—and its other minority shareholder all knew that the Vanderhaegen Defendants were officers, directors, and fellow shareholders of Plaintiffs in Origis Energy. Vanderhaegen, its CEO, admitted he had such duties. Through its senior officers and employees and its minority shareholder, Origis USA also knew that, in breach of their duties, Defendants restricted the flow of information to Plaintiffs, provided false and misleading information to Plaintiffs, failed to provide material information to them so as to make those false statements not misleading, and that Plaintiffs were relying on the fact that those with fiduciary duties would comply with those obligations.

230.  Origis USA knowingly participated in and substantially assisted the Vanderhaegen Defendant's breaches of their fiduciary duties. Origis USA's senior officers and employees— including its CEO, CIO and CCO—and its other minority shareholder all participated in the preparation of the false and misleading information that the Vanderhaegen Defendants provided to Plaintiffs, possessed full information about the true value of Origis USA and its assets, obtained the financing to permit Defendants to buy out Plaintiffs, worked with Origis USA's

investment bankers and received their valuations, assisted in the preparation of Origis USA's own analyses and valuations, and intentionally concealed all information which would have alerted Plaintiffs to the breaches of duty and the fraudulent conduct set out in this Complaint.

231.  Origis USA's aiding and abetting the Vanderhaegen Defendants' breaches of their fiduciary duties to Plaintiffs caused injury to Plaintiffs, who were injured as a direct result of: (a) continuing to trust Vanderhaegen was being honest and forthcoming, (b) agreeing to redeem their ownership interests in Origis at a grossly inadequate price, (c) not replacing or seeking greater control over Vanderhaegen or the other top executives of Origis USA, (d) not doing what was necessary to explore transactions other than the Vanderhaegen proposed transaction, (e) not remaining invested until an appropriate and attractive opportunity arose to dispose of their ownership interests, (f) signing the SRA, (g) going through with the First Closing and Second Closing; (h) refraining from seeking to affect the sales process being conducted by Defendants; and (i) not mitigating their harm by seeking to prevent the Antin sale agreement and closing.

**Count Eleven: Tortious Interference with Contract – Representations and Warranties (Origis USA)**

232.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 231 above and paragraphs 243 through 252 below as if fully set forth herein.

233.  Origis USA tortiously interfered with the SRA through the Vanderhaegen Defendants' breaches of the Information Warranty contained in that contract. It did so in order to free itself and its senior management from any oversight by Plaintiffs and to enrich itself, its senior management, and its minority shareholder.

234.  Origis USA knew of the existence and contents of the SRA because it was a party to that contract and had participated in the necessary work leading up to the signing of the agreement.

235.  The Information Warranty of the SRA was a vital component of the bargain and was specifically sought by and negotiated for by Plaintiffs. Without that provision, Plaintiffs would never have entered into the SRA.

236.  Plaintiffs fulfilled all of their material obligations under the SRA, including by tendering their Origis interest at the First Closing and Second Closing.

237.  The Vanderhaegen Defendants breached the Information Warranty contained in the SRA at the time of the SRA's signing, again at the time of the First Closing, and finally, yet again at the time of the Second Closing. SRA arts. IV, VI §§ 6.2(a), 6.4(a). The Vanderhaegen Defendants breached the Information Warranty by making false and misleading statements of material fact regarding Origis, its financial condition, and its assets, including the value of Origis and its pipeline. They also omitted material facts needed to make the information provided on those matters not misleading. These misrepresentations and omissions included the claim that the Rockhound projects could not be reliably valued or sold.

238.  Origis USA intentionally procured the Vanderhaegen Defendants' breaches of the Information Warranty without justification. Origis USA's senior officers and other employees—including CEO Vanderhaegen, the CIO and the CCO—as well as its minority shareholder, participated in the preparation of the false and misleading information that the Vanderhaegen Defendants provided Plaintiffs, financed the buyout, possessed full information about the true value of Origis USA and its assets, worked with Origis USA's investment bankers and received their valuations, assisted in the preparation of Origis USA's own analyses and valuations, failed to update the Plaintiffs about Origis USA's value upon receiving information that confirmed the buyout was a "golden deal," and intentionally concealed all of this information from Plaintiffs. If the Origis USA senior officers, other employees, and minority shareholder had not taken these

actions, the Vanderhaegen Defendants could not have committed their specific breaches of the Information Warranty.

239.  Moreover, Origis USA had a motive and intended that the Vanderhaegen Defendants provide Plaintiffs with the false and misleading information that Origis USA had prepared or possessed and conceal other material information prepared by or in the possession of Origis USA. This was because Origis USA, including its senior executives and shareholders, was the effective beneficiary of the sale of Plaintiffs' ownership interests and the breaches of the Information Warranty.

240.  But for the direction to and assistance of Origis USA and its senior management, including Vanderhaegen, the Information Warranty would not have been breached and the Plaintiffs would never have proceeded to complete the First and Second Closings.

241.  But for the interference of Origis USA and its executives, the Information Warranty would have been complied with and never breached. And, even after the Second Closing, the conduct of Origis USA and its executives blocked compliance with the Information Warranty and consequently prevented Plaintiffs from taking action that would have blocked the transfer of their ownership interests which Defendants had unlawfully acquired.

242.  Origis USA's tortious interference facilitated the breach of the Information Warranty which injured Plaintiffs by causing the transfer of their interests for far less than their true value.

**Count Twelve: Tortious Interference with Contract – Sale of Origis (Origis USA)**

243.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 242 above as if fully set forth herein.

244.  Origis USA tortiously interfered with the SRA through the Vanderhaegen Defendants' breaches of Section 5.5 of that contract.

245.  Origis USA knew of the existence of the SRA because it was a party to that contract and had participated in the necessary work leading up to the signing of the agreement.

246.  The No Origis Sale provision of the SRA was a vital component of the bargain and were specifically sought by and negotiated for by Plaintiffs. Without this provision, Plaintiffs would never have entered into the SRA.

247.  Plaintiffs fulfilled all of their material obligations under the SRA, including by tendering their Origis interests at the First Closing and Second Closing.

248.  The Vanderhaegen Defendants breached Section 5.5 of the SRA. Section 5.5(a) provides that "[f]rom and after the Second Closing Date until twelve (12) months after the date of this Agreement, Pelican shall not permit any Origis Sale to occur." Additionally, Section 5.5(c) of the SRA required Defendants to inform Plaintiffs during the 12 months following the date of the SRA whenever a potential Origis sale was reasonably possible to occur within a 12-month period after the execution of the SRA. Every contract includes an implied covenant of good faith and fair dealing, including the SRA.

249.  The Vanderhaegen Defendants breached the No Origis Sale Clause of the SRA, the Origis Sale Information Clause of the SRA, and the implied covenant of good faith and fair dealing by commencing a sales process even before Plaintiffs had signed the SRA and transferred their interest; failing to promptly and regularly provide Plaintiffs with information on the potential Origis sale; obtaining bids for and reaching an agreement to sell Origis USA on September 8, 2020 before the expiration of the 12-month No Origis Sale period; deliberately delaying the formal closing of the sale to avoid having to pay Plaintiffs their share of the profits; and selling Origis USA without meeting their commitments under the SRA.

250.  Origis USA intentionally procured the Vanderhaegen Defendants' breaches of Section 5.5 of the SRA without justification. Among other actions, Origis USA senior officers and other employees, as well as its minority shareholder, oversaw the entire sales process, procured potential buyers, presented them to the Vanderhaegen Defendants, struck the deal for the sale, and thereby caused the Vanderhaegen Defendants to breach the SRA. Origis USA enlisted and worked with the investment bankers for the sale, they prepared the data room made available to the bidders, they drafted and developed the confidential information memorandum for the sale process, they received and reviewed the bids submitted for Origis USA, they met with potential buyers and provided them with further information, they oversaw the entirety of the sales process, and they concealed this activity from Plaintiffs, all within the 12-month No Origis Sale period. And, moreover, Origis USA senior officers and other employees prepared for and met with Antin on September 8, 2020, where they struck the deal for the sale of Origis USA.

251.  Knowing full well that their actions would cause the breach of the Vanderhaegen Defendant's obligations under the SRA, Origis USA, including its senior executives and shareholders, nevertheless intentionally pursued and concluded the sale of Origis USA during the No Origis Sale period.

252.  Plaintiffs were damaged because of the breaches by at least, among other things, the amount that they should have received under Section 5.5 of the SRA.

## VII.   Prayer for Relief

WHEREFORE, Plaintiffs demand a jury trial and that a judgment be entered in their favor with the following relief:

a) a declaratory judgment stating that the SRA is null and void by reason of fraud;

b) an award of compensatory damages and/or rescissory damages—*i.e.*, the difference between the payments received by Plaintiffs and the actual value of ownership interests

as it existed at the time of the signing of the SRA, the Second Closing, or as determined

by the Antin transaction—whichever is greater;

c)  disgorgement of the benefits that Defendants received by virtue of their unlawful

conduct;

d)  punitive damages;

e)  interest on the amounts awarded; and

f)  such other relief as the Court deems just and proper, including reasonable attorneys' fees

and costs and expenses.

Dated: New York, New York
      June 9, 2023

DECHERT LLP

By: _/s/ Steven B. Feirson_____
Steven B. Feirson (*pro hac vice*)
Cira Center, 2929 Arch Street
Philadelphia, Pennsylvania 19104-2828
Tel. 215 994 2489
Steven.Feirson@dechert.com

Matthew L. Mazur
Three Bryant Park
New York, New York 10036
Tel. 212 698 3500 Ext. 7487
Matthew.Mazur@dechert.com

160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Tel. +44 20 7184 7487

David L. Attanasio
1900 K Street, NW
Washington, DC 20006-1110
Tel. 202 261 3379
David.Attanasio@dechert.com

*Attorneys for Plaintiffs*
*Pentacon BV and Baltisse NV*