UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENTACON BV and BALTISSE NV,<br><br>                         Plaintiffs,<br><br>          -against-<br><br>GUY VANDERHAEGEN, GUY VANDERHAEGEN REVOCABLE TRUST, PELICAN INVEST, LLC, PELICAN INTERNATIONAL, LLC, and ORIGIS USA LLC,<br><br>                       Defendants. | Case No. 1:23-cv-02172-KPF<br><br>Removed from the Supreme Court of the State of New York, New York County, Index No. 650847/2023 |

**MEMORANDUM OF LAW OF DEFENDANTS GUY VANDERHAEGEN, GUY VANDERHAEGEN REVOCABLE TRUST, PELICAN INVEST, LLC, AND PELICAN INTERNATIONAL, LLC IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

NORTON ROSE FULBRIGHT US LLP
Thomas J. McCormack
Robert Kirby
Anthony Lauriello
1301 Avenue of the Americas
New York, NY  10019-6022
Tel.: (212) 408-5100

Robin Ball (*pro hac vice*)
555 South Flower Street, 41st Floor
Los Angeles, CA  90071
Tel.: (213) 892-9200

*Attorneys for Defendants Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust, Pelican Invest, LLC, and Pelican International, LLC*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS................................................................................................... 3

A.      Private Equity Plaintiffs Assert "Friction" with Minority Owner of Origis.......................3

B.      Plaintiffs Negotiate at Arms' Length to Sell their Majority Shares in Origis ...................5

C.      Plaintiffs Sell their Shares for a Sizeable Return Pursuant to a Rigorously
Negotiated Share Redemption Agreement.........................................................................7

          1.      Potential Price Adjustments ................................................................................7

          2.      Representations and Warranties ..........................................................................8

          3.      Mutual Release of Non-Party Affiliates..............................................................8

          4.      Exclusive Remedy and Dispute Resolution ........................................................9

D.      Plaintiffs Regret Their Decision to Cash Out When, More than a Year Later,
a New Investor Acquires a Majority Interest in Origis USA............................................10

E.      Plaintiffs Falsely Accuse Defendants of a "Fraudulent Scheme"....................................12

          1.      Alleged Misrepresentations as to "True Value of Origis USA"..........................12

               a.      Alleged "Internal Valuations"................................................................14

               b.      Alleged Statements to "Potential Financing Sources" .............................15

          2.      Alleged Misrepresentations as to Rockhound Projects........................................15

          3.      Alleged Miscellaneous Misrepresentations ........................................................16

APPLICABLE LEGAL STANDARDS................................................................................18

ARGUMENT.......................................................................................................................18

I.      All Counts Should Be Dismissed against Defendants Vanderhaegen, the Trust,
and Invest because Plaintiffs Released those Claims .......................................................18

II.      Plaintiffs' Fiduciary Duty and Constructive Fraud Claims (Counts Five and Six)
Should Be Dismissed Because Defendants Did Not Owe Plaintiffs Fiduciary Duties.....20

III.      Plaintiffs' Fraud Claims (Counts One, Two, and Five) Should Be Dismissed.................22

          A.      Plaintiffs Fail to Plead Alleged Statements With Particularity ...........................22

B.      Plaintiffs Fail to Plead Alleged Opinions Were Believed False when Stated.......23

C.      Plaintiffs Fail to Plead Actual Reliance .............................................................27

D.      Plaintiffs Fail to Plead Such Reliance Would Have Been Reasonable.................28

E.      Plaintiffs Fail to Plead Fraud by Omission .........................................................30

IV.     Plaintiffs' Aiding and Abetting Fraud and Civil Conspiracy Claims
        (Counts Three and Four) Should Be Dismissed....................................................31

V.      Plaintiffs' Breach of Contract Claims Should Be Dismissed ..........................................32

A.      Defendants Not Party to the SRA ........................................................................32

B.      Count Seven (Representations and Warranties) ...................................................33

C.      Counts Eight and Nine (Sale of Origis) ...............................................................33

CONCLUSION....................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ........................34

*Acito v. Imcera Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995) ..................................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................18

*Bailey v. N.Y. Law School*, 2021 WL 5500078 (2d Cir. 2021) ......................................24

*BBS Norwalk One v. Raccolta, Inc.*,
    60 F. Supp. 2d 123 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000) ...........................21

*Beana v. Woori Bank*, 2006 WL 2935752 (S.D.N.Y. 2006) .........................................21

*Broad-Bussel Family LP v. Bayou Group LLC*,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007) ..............................................................31

*Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008) .....................23, 24

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
    17 N.Y.3d 269 (2011) ..................................................................... 18, 19, 30

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,
    76 A.D.3d 310 (1st Dep't 2010), *aff'd*, 17 N.Y.3d 269 (2011) ..................................... 18, 19

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ..............................................................21

*In re Crude Oil Commodity Litig.*, 2007 WL 1946553 (S.D.N.Y. 2007) ...................................22

*Diamond v. Shiftpixy, Inc.*, 2021 WL 3085405 (S.D.N.Y. 2021) ...................................21

*DiMuro v. Clinique Labs., LLC*, 572 Fed. App'x 27 (2d Cir. 2014) .........................................26

*Emergent Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ..............29, 30

*Filler v. Hanvit Bank*, 156 Fed. App'x 413 (2d Cir. 2005) ....................................... 31, 32

*First Hill Partners, LLC v. Bluecrest Cap. Mgmt. Ltd.*,
    52 F. Supp. 3d 625 (S.D.N.Y. 2014) ..............................................................31

*Gao v. Yang*, 2022 WL 2193290 (S.D.N.Y. 2022) ...................................................23

*Geller Biopharm, Inc. v. Amunix Pharm., Inc.*,
    2021 WL 4155015 (S.D.N.Y. 2021) ............................................................34

*Goldman v. Barrett*, 2017 WL 4334011 (S.D.N.Y. 2017) ...........................................32

*Granite Partners, LP v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999) ..................28

*Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439 (S.D.N.Y. 2004) ..........................32

*HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012) ..........................................29

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d Cir. 2011) ...................................4

*Jacobs v. Lewis*, 261 A.D.2d 127 (1st Dep't 1999) .......................................................27

*Kaye Dentistry, PLLC v. Turchin*, 2014 WL 2649967 (S.D.N.Y. 2014) ...................................28

*Larkem v. Dep't of Educ.*, 2018 WL 1959555 (S.D.N.Y. 2018) .................................................18

*Latifi v. Gonzales*, 430 F.3d 103 (2d Cir. 2005) .......................................................10

*MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458 (1st Dep't 2014) .....................................28

*Merkin v. Berman*, 123 A.D.3d 523 (1st Dep't 2014) .......................................................31

*Morefun Co. v. Mario Badescu Skin Care Inc.*, 588 Fed. App'x 54 (2d Cir. 2014) ....................19

*Nakahara v. Bal*, 1998 WL 35123 (S.D.N.Y. 1998) .......................................................23

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    975 F. Supp. 2d 392 (S.D.N.Y. 2013) .................................................32

*Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 25 A.D.3d 309 (1st Dep't 2006) ..............................34

*Nelson v. Publishers Circulation Fulfillment, Inc.*,
    2012 WL 760335 (S.D.N.Y. 2012) .................................................26

*Newton v. Meyer*, 2023 WL 2563115 (S.D.N.Y. 2023) .......................................................27

*Phoenix Cap. Invs. LLC v. Ellington Mgmt. Grp., LLC*,
    51 A.D.3d 549 (1st Dep't 2008) .................................................34

*Project Verte, Inc. v. Zuchaer & Zuchaer Consulting, LLC*,
    2021 WL 2856522 (S.D.N.Y. 2021) .................................................28

*Quattro Parent LLC v. Rakib*, 181 A.D.3d 518 (1st Dep't 2020) ............................................24

*Riker v. Premier Capital, LLC*, 2016 WL 5334980 (S.D.N.Y. 2016) ..........................................23

*Rombach* v. *Chang*, 355 F.3d 164 (2d Cir. 2004).................................................................18, 22

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007)........................................................................4

*Rubenstein v. S1 Corp.*, 2005 WL 743121 (S.D.N.Y. 2005)...................................................24

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
    81 F.3d 1224 (2d Cir. 1996) ...........................................................................................21

*SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352 (1st Dep't 2004)........................................31

*SSA Holdings LLC v. Kaplan*, 120 A.D.3d 1111 (1st Dep't 2014) .........................................31

*Standex Int'l Corp. v. QCP, Inc.*,
    2017 WL 481447 (S.D.N.Y. Feb. 6, 2017) (Failla, J.).....................................................33

*Stone v. Sutton View Cap., LLC*, 2017 WL 6311692 (S.D.N.Y. 2017) ...................................27

*Tavares v. N.Y.C. Health and Hospitals Corp.*, 2015 WL 158863 (S.D.N.Y. 2015) ..................18

*Treppel v. Biovail Corp.*, 2005 WL 2086339 (S.D.N.Y. 2005)...............................................32

*Universal Church, Inc. v. Universal Life Church/ULC Monastery*,
    2017 WL 3669625 (S.D.N.Y. Aug. 8, 2017).....................................................................3

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ...............................................................................4

*Wilson v. Dantas*, 746 F.3d 530 (2d Cir. 2014).....................................................................20

*Xue v. Jensen*, 2020 WL 6825676 (S.D.N.Y. 2020)...............................................................32

## Rules and Statutes

Fed. R. Civ. P. 9(b) ...............................................................1, 18, 22, 26, 27, 31

Fed. R. Civ. P. 12(b)(6)...........................................................................1, 18

N.Y.U.C.C. § 2-106(1)..................................................................................34

Inflation Reduction Act, H.R. 5376, 117th Cong. ....................................................10

Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), defendants Guy Vanderhaegen ("Vanderhaegen"), Guy Vanderhaegen Revocable Trust ("Trust"), Pelican Invest, LLC ("Invest"), and Pelican International, LLC ("Pelican" and, together, "Defendants"), hereby move to dismiss the amended complaint filed by plaintiffs Baltisse NV ("Baltisse") and Pentacon BV ("Pentacon" and, together, "Plaintiffs").  ECF No. 30 (the "AC").

## PRELIMINARY STATEMENT

There was no "fraud" or "breach[] of contractual and fiduciary duty" here.  AC ¶ 142. Plaintiffs, sophisticated private equity funds, chose, with eyes open, to sell their Origis Energy NV ("Origis") shares for $105 million, over three times their investment.  Plaintiffs' regret—in hindsight—that they cashed out prematurely, or did not negotiate better terms, does not make their claims viable.  They are not.  Even as amended, the complaint still fails to state any claim.

Plaintiffs were majority shareholders in Origis.  They held seats on its board and that of Origis USA LLC ("Origis USA"), a solar power and energy storage project developer of which Origis was majority member.  Pelican was a minority shareholder in Origis.  Beginning in 2019, after agitating for greater shareholder dividends at the expense of investment in the business, Plaintiffs negotiated with Vanderhaegen, Pelican's manager, for a cash buyout of Plaintiffs' shares in Origis.  Plaintiffs executed the Share Redemption Agreement ("SRA") on September 14, 2020, and closed on the sale of their shares on October 15, 2020, and January 4, 2021.  They had extensively negotiated the SRA's terms, including a potential price increase if an equity sale reflecting a higher valuation of Origis USA occurred by September 14, 2021.

Meanwhile, the "solar energy market in the U.S. had changed dramatically in favor of substantially higher values for sellers."  AC ¶ 104.  After the November 2020 elections, increased government support for solar power was expected.  In late 2021, over 14 months after SRA

execution and months after the price adjustment period expired, a new investor purchased a majority of Origis USA at a higher valuation at the conclusion of a broad marketing process that solicited over 100 potential investors.   A year later, dissatisfied with more than tripling their money, Plaintiffs claimed to be victims of a "fraudulent scheme" to misrepresent the "true value" of Plaintiffs' shares.  *Id.* ¶ 1.  Not so.

The AC should be dismissed in its entirety.  ***First***, Plaintiffs released the claims they assert against Vanderhaegen, the Trust, and Invest, in a broad mutual release of Non-Party Affiliates.[1] ***Second***, Plaintiffs fail to state a fiduciary duty (or constructive fraud) claim because no Defendant owed Plaintiffs fiduciary duties under applicable Belgian law.   While directors of a Belgian company like Origis owe a type of duty of loyalty, it runs only to the company, not to individual shareholders.  ***Third***, Plaintiffs' fraud claims suffer numerous fatal defects.  The alleged fraudulent statements lack the requisite particularity, are contradicted by documents (to the extent identifiable) relied upon, and are nonactionable opinions.  Plaintiffs' theories of fraud by hindsight from later events, and their generalized, conclusory references to alleged internal valuations, fail to show that the alleged opinions were believed false when stated.  Plaintiffs, highly sophisticated professional investors who held their own opinions as to value, also fail to adequately plead actual reliance or that such reliance was reasonable when entering into a $105 million transaction. ***Fourth***, Plaintiffs' aiding and abetting and civil conspiracy claims fail absent an underlying tort, among other defects.  ***Fifth***, Plaintiffs state no breach of contract claims.  Such claims cannot be brought against Vanderhaegen, the Trust, or Invest, none of whom is a party to the SRA.  Contrary to Plaintiffs' allegations, the SRA contained no representation and warranty of "the value of Origis

---

[1] Capitalized terms not defined herein are as defined in the SRA.

and its pipeline." *Id.* ¶ 205. Nor was the SRA's price adjustment provision breached given that no sale occurred until months after it expired. Plaintiffs' claims should proceed no further.

### STATEMENT OF FACTS[2]

#### A.   Private Equity Plaintiffs Assert "Friction" with Minority Owner of Origis

Plaintiffs are each incorporated and have their headquarters in Belgium. AC ¶¶ 36-37. Filip Balcaen is a "successful Belgian entrepreneur and investor" and Baltisse is "his company." *Id.* ¶ 8. Baltisse is "a top-tier investment company" that "understand[s] that fact-based, data-driven decisions and risk-taking are the foundation for success." Ex. A (home page) at p. 1.[3] Its Private Equity team has "operational, strategic, financial & legal know-how" and commits "vast international experience, know-how, & capital" to a "hands-on approach." Ex. B (private equity page) at pp. 2, 9. The team is "[a]ctive in industrial and consumer, health and self-care, B2B and energy services" with up to "€250m equity investment per opportunity." *Id.* at p. 6. Sander Boekema, Baltisse's Head of Private Equity until 2022, had 30 years of experience. Ex. C (team page). His team included in-house counsel. *Id.* Paul Thiers is "the entrepreneur and investor behind Pentacon" and "the driving force behind the creation of Origis," who supplied "entrepreneurial vision" and "introduced customers and . . . sources of financing." AC ¶¶ 6, 8, 50.

In 2008, Origis "was founded in Belgium" as "a solar energy start-up," and subsequently was threatened by "multiple close calls with bankruptcy." *Id.* ¶¶ 6-7. Origis was incorporated in

---

[2] Citations to the AC are for purposes of this motion to dismiss only.

[3] Unless otherwise indicated, all "Ex." citations refer to exhibits to the declaration of Thomas J. McCormack. The Court may take judicial notice of Baltisse's website and archived copies thereof. *See Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 2017 WL 3669625, at *3 n.7 (S.D.N.Y. Aug. 8, 2017) (judicial notice of Wayback Machine screenshots of party's website).

Belgium until October 19, 2021.  Ex. D, E, F (public records);[4] Ex. G (SRA) at p. 1 (Origis "a Belgian public limited liability company").[5]  By 2019, Plaintiffs "each effectively held approximately a 29% indirect interest in Origis USA" for a "combined majority interest."  AC ¶¶ 1, 10.  Specifically, Plaintiffs each held 36.12% of the shares of Origis, which held 80% of the equity in "Origis USA—its U.S. operating subsidiary."  *Id.* ¶¶ 7, 10; Ex. G (SRA) at p. 1 (recitals). Plaintiffs "each had representatives on the boards of Origis . . . and Origis USA."  AC ¶ 54.

Pelican was then a minority shareholder in Origis.  *Id.* ¶ 41; Ex. G (SRA) § 4.6 ("27.3847% of the shares").  Vanderhaegen allegedly "own[s] or control[s] all of Pelican . . . through . . . [the] Trust."  AC ¶ 41.  Vanderhaegen "was the CEO and President of both Origis . . . and later Origis USA."  *Id.* ¶ 7.  He was "the permanent representative of . . . Invest to the board of Origis [] and . . . member of the board of Origis USA."  *Id.* ¶ 54 & n.3.  Thus, Plaintiffs' representatives outnumbered Vanderhaegen two to one on the boards of Origis and Origis USA.  Plaintiffs allegedly grew "frustrated by Vanderhaegen" and "friction developed" over "a difference of views over how to allocate . . . funds" and his "attempts to isolate Plaintiffs."  *Id.* ¶¶ 60, 62.  After Plaintiffs pressed for more "dividends to the owners," Vanderhaegen allegedly made it "difficult for Plaintiffs to obtain the critical information about Origis USA's business necessary to effectively participate in decision-making."  *Id.* ¶¶ 60-61.

---

[4] "Courts routinely take judicial notice of such governmental records."  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

[5] The Court may consider documents incorporated by reference or relied upon and integral to the AC.  *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 141 (2d Cir. 2011) (considering "contracts . . . integral to the complaint"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (considering "document to see whether that representation was made").

**B.    Plaintiffs Negotiate at Arms' Length to Sell their Majority Shares in Origis**

On or about April 30, 2019, Boekema, Baltisse's Head of Private Equity, emailed Vanderhaegen requesting "a list of things" including "[a]vailable cash to pay dividends," "[c]ash flow forecast," "[p]roject overview of all projects," and "[h]istory of budgeted EPC costs and realizations."  Ex. H (email) at p. 2.  Boekema acknowledged "[a] lot will be available to and has already been shared with us," adding "it would be good to . . . update it."  *Id*.  Boekema copied Pentacon representative Geert Vanderstappen on his email.  *Id*.   Replying the same day, "Vanderhaegen . . . made a first proposal to buy Plaintiffs out."  AC ¶ 66.  Vanderhaegen wrote:

> I will get you the requested information ASAP.  Based on our conversations it has become clear to me that the focus of both Baltisse and Paul Thiers lies on optimization of short-term cash flows and, if possible, an exit, I informally checked whether financing could be obtained for a buy-out whereby everyone would exit except for myself.  The good news is that this would be feasible if I myself showed a lot of commitment and put everything at risk.  Since I strongly believe in our business, I am willing to consider this.  Please find attached a few slides that elaborate this scenario in more detail and an indication of what valuation would be achievable. . . .  If the shareholders . . . also strongly believe in the future, then a buy-out is absolutely not a must for me.  Ex. H (email) at p. 1.

He proposed a buyout of Plaintiffs' shares in Origis at a price implying an Origis USA "[v]aluation of $160 million" that "[c]orresponds to [an] average of all bids received" previously for Origis USA.  Ex. I (slides) at p. 4.  (The highest Origis USA valuation included in that average, $190 million, was from Global Atlantic's acquisition of 20% of Origis USA in late 2018, as the culmination of an extensive sales process run by Citibank.  *Id*. at p. 3.)  The buyout would have paid Plaintiffs $92,386,000,[6] over 2.5 times their total investment.  *Id.* at pp. 5-6.  Plaintiffs "considered whether [this] valuation might be on the low side."  AC ¶ 68; *see also id.* ¶¶ 60, 77.

---

[6] As noted, Plaintiffs owned about 72% of Origis, which in turn owned about 80% of Origis USA, so Plaintiffs' interest amounted to almost 58% of Origis USA.  A $160 million Origis USA valuation thus corresponded to an approximate $92 million value for Plaintiffs' interests in Origis.

The parties engaged in "negotiation of a letter of intent between December 2019 and February 2020." AC ¶ 80. In the same period, as Boekema emailed in January 2020, Plaintiffs engaged in "ongoing talks with Carlyle, OPG or APG," and initiated communications with Carlyle Group concerning its "assess[ment of] a potential investment in Origis." Ex. J (email) at pp. 2, 12.[7] Plaintiffs' solicitations of third-party investors did not succeed. On January 23, 2020, Boekema emailed Vanderhaegen with "our mark-up of the LOI" counteroffering on sale price:

> Purchase price – we based ourselves on the Global Atlantic valuation of USD 204.6 M, since 80% of that is USD 163.7 M plus our share % over that, then we come to a price of USD 59,065,308 [each] for Baltisse/Pentacon. We did not really understand where the price you wrote down came from.

*Id.* at p. 2. Plaintiffs therefore proposed a price increase of over $26 million to $118,130,616. *Id.*

The parties bargained over many other deal terms. *Id.* at pp. 1-2. For example, Plaintiffs sought a "price correction in case of sale at a higher price for a period of 18 months after the signing of the final agreement." *Id.* at p. 1. Vanderhaegen objected to that period as "too long" because it "de facto means giving a free option of almost 2 years from today where in the meantime I do have to bear the financing expenses and take all the risks." *Id.* Plaintiffs also sought a representation and warranty that "complete, up to date, accurate and non-misleading information" had been made available concerning certain subjects. *Id.* Vanderhaegen objected that "this clause can always be invoked because information is never complete," further arguing:

> You are a member of the Board of Directors towards which I have reporting obligations and this should be sufficient. If I purposely give a wrong representation, I would have a problem in any case. Moreover, you are always welcome to come to look at any information and even to audit, and to talk to whomever you like. I am not planning on deceiving you, but I do not want a catch-all clause either with which you can come after me at any time. *Id.*; *see also* AC ¶ 87.

---

[7] Boekema's emails are part of the email chain relied upon in paragraph 87 of the AC.

"The letter of intent ['LOI'] . . . was signed on February 3, 2020."  AC ¶ 86.  Subject to "definitive documentation," it set forth nonbinding compromises as to price ($112,224,350), the period during which a later sale at a higher valuation would trigger a price adjustment ("within 12 months after . . . closing"), and representations and warranties ("materially complete and non-misleading information" as to specified subjects), among other terms.  Ex. K (LOI) at pp. 1-3, 5.

### C.    Plaintiffs Sell their Shares for a Sizeable Return Pursuant to a Rigorously Negotiated Share Redemption Agreement

After months of further negotiations, "Plaintiffs entered into the SRA on September 14, 2020."  AC ¶ 115; *see also* Ex. G (SRA) § 9.7 ("The Parties have participated jointly in the negotiation and drafting of this [SRA].").  The Parties were Plaintiffs (as Sellers), Origis (as Buyer or the Company), and, for purposes of certain sections, Pelican and Origis USA.  Ex. G (SRA) at p. 1.  "The SRA contemplated that the purchase of Plaintiffs' interests would take place in two closings," which occurred on October 15, 2020, and January 4, 2021.  AC ¶¶ 23, 117.  "Plaintiffs received about $105 million" (*id.* ¶ 133), or more than three times their total investment (for Pentacon, more than five times).  Ex. I (slides) at p. 6.  That price corresponded to a Baseline Valuation for Origis USA of $185.1 million.  Ex. G (SRA) § 1.1.  Other SRA terms include:

### 1.    Potential Price Adjustments

The SRA provided that "Pelican shall not permit any Origis Sale to occur" during a period ending on September 14, 2021.  *Id.* § 5.5(a).  If an Origis Sale occurred in this period, "each Seller's sole and exclusive remedy . . . will be the right to receive from Pelican a payment calculated and paid in accordance with this <u>Section 5.5</u>."  *Id.* § 5.5(b).  Payment would be owed if the sale "is for a purchase price based on a valuation" that "exceeds the Baseline Valuation," and would be calculated under a specified formula.  *Id.* § 5.5(c).  The SRA contemplated certain notice to Plaintiffs of a "potential Origis Sale to occur" by September 14, 2021.  *Id*.  Separately, the SRA

provided for a price adjustment if the Rockhound Projects—three solar projects in Texas (*id.* § 1.1)—were sold for a profit by September 14, 2023. *Id.* § 2.3.

### 2.  Representations and Warranties

Pelican represented and warranted, as of the dates of the SRA and the two closings, that:

> Buyer has made available to each Seller documents and information regarding (a) the business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries, (b) the Company's development pipeline of solar power and energy storage projects and (c) any value indications by any party showing an interest to acquire . . . the Origis Equity or Assets.  Those documents and that information are (i) complete in all material respects and (ii) do not contain any untrue statement of a material fact or fail to state a material fact necessary to make the statements contained therein, not misleading . . . .

*Id.* § 4.4.  Neither Section 4.4 nor any other SRA provision contains a representation or warranty as to "the value of Origis and its pipeline" or "that the Rockhound projects could not be reliably valued or sold."  AC ¶ 237.  To the contrary, in Section 4.8, Pelican "disclaim[ed]" additional contractual representations and warranties.  Ex. G (SRA) § 4.8.  Further, in Section 9.8, the parties agreed the SRA "supersede[d] any prior . . . representations among the Parties" that "relate in any way to the subject matter of this Agreement."  *Id.* § 9.8.

### 3.  Mutual Release of Non-Party Affiliates

Section 9.11 includes a broad mutual release of Non-Party Affiliates from all claims, including tort claims, that relate to the SRA or its negotiation, execution, or performance.  Plaintiffs agreed such claims would be brought only against Contracting Parties:

> Other than pursuant to and to the extent provided in the Transaction Documents, all claims . . . (whether in Contract or in tort, in equity or at Law, or granted by statute) that may . . . be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against . . . the entities that are expressly identified as parties in the Preamble (the 'Contracting Parties').

*Id.* § 9.11.  Plaintiffs agreed to "release[] all of those liabilities, claims, causes of action . . . against any . . . Non-Party Affiliates," specifically including:

> any liability (whether in Contract or in tort, in equity or at Law, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or in its negotiation, execution, performance, or breach . . . .  *Id.*

Plaintiffs further released all "claims . . . to avoid or disregard the entity form of a Contracting Party," whether based on "alter ego," "domination," or "piercing the veil."  *Id.*  And Plaintiffs "disclaim[ed] any reliance upon any Non-Party Affiliates . . . with respect to . . . any representation or warranty made in, in connection with, or as an inducement to this Agreement."  *Id.*  Non-Party Affiliates included directors and officers of Contracting Parties, and any Person that owned or controlled, or was under common ownership or control with, Contracting Parties.  *Id.*  Thus, Vanderhaegen, the Trust, and Invest were Non-Party Affiliates.  *Id.*; AC ¶¶ 38-40.

### 4.    Exclusive Remedy and Dispute Resolution

Section 8.6 provided that "except for claims based on Fraud and except for any potential payments in accordance with Section 2.3 or Section 5.5, the remedies in this ARTICLE VIII will be the sole and exclusive remedy for any and all claims relating . . . [to] this Agreement," and Plaintiffs "waive[d] and relinquishe[d]" all other potential claims against other Parties.  Ex. G (SRA) § 8.6(a); *see also id.* § 1.1 ("Fraud" limited to "intentional and knowing misrepresentation of a material fact").  Article VIII remedies consist of "claims for indemnification" asserted against Plaintiffs, Origis, or Pelican by delivery of an Indemnity Notice.  *Id.* § 8.3.  The indemnity provisions afford Plaintiffs certain access to documents.  *Id.* § 8.4.  The SRA contains New York choice-of-law and forum selection provisions.  *Id.* §§ 9.12, 9.13.

**D.    Plaintiffs Regret Their Decision to Cash Out When, More than a Year Later, a New Investor Acquires a Majority Interest in Origis USA**

"By the summer of 2020 . . . the solar energy market in the U.S. had changed dramatically in favor of substantially higher values for sellers."  AC ¶ 104.  On September 21, 2020, "a week after the SRA's effective date," Vanderhaegen "received a solar market report" (*id.* ¶ 128) from Nomura titled "Renewable Energy Market Update."  Ex. L (slides) at p. 1.  One slide titled "A White Hot Market for Sustainability" cited "Biden's Clean Energy promises" and "Prospects for a Large Infrastructure Bill" after the upcoming elections.  *Id.* at p. 12.  Vanderhaegen forwarded the slides "to Origis USA's CIO" Samir Verstyn (AC ¶ 129): "Very interesting literature.  When I read this, we did a golden deal a week ago and that IPO slope is certainly realistic."  Ex. M (email) at p. 1.  Months later, "after the Second Closing" and President Biden's inauguration following a contested election result,[8] Vanderhaegen "received an updated U.S. solar market report" dated January 22, 2021.  AC ¶ 135.  That Nomura slide deck, titled "U.S. Market Update," forecast "A White Hot Market for Sustainability into 2021."  Ex. N (slides) at p. 2.  Nomura cited Biden's "favorable policy changes targeting Net Zero" and that "Biden will potentially push for a further ITC/PTC extension."  *Id.* at pp. 2-3.  President Biden would sign into law an extension of solar project tax credits through 2032, plus billions for electric grid and permitting improvements.  *See* Inflation Reduction Act, H.R. 5376, 117th Cong. §§ 13101-103, 13701-702 (tax credits); 50151-153 (grid); 23001, 40003, 50301-303, 60115, 60505, 70007 (permitting).

On January 22, 2021, Vanderhaegen "forwarded [Nomura's] report to the other remaining shareholder" (AC ¶ 135) in Origis USA, Global Atlantic, writing: "On pages 16 and 17, you will

---

[8] The Court may take judicial notice of election results.  *See Latifi v. Gonzales*, 430 F.3d 103, 106 n.1 (2d Cir. 2005) ("[W]e take judicial notice of the . . . elections in July.").

see some interesting information on how platforms are valued.  If you apply this to Origis, you get to a value as of today of more than $500 mio.  Not bad if you compare with buyout value." Ex. O (email) at p. 1.  Page 16 quoted third-party market reports (published after SRA execution) and stated "[p]ublic markets have had a material shift in valuations, with platforms now having an increased proportion of value derived from development growth, and implied terminal value multiples of 5-8x recognizing going concern value." Ex. N (slides) at p. 16.  Page 17 stated that Nomura "is currently involved in multiple . . . transaction processes and is observing highly credible . . . parties . . . now ascrib[ing] significant platform and terminal value." *Id.* at p. 17.

Nearly six months after the SRA was executed, "on March 1, 2021, Onpeak Capital reported to Vanderhaegen" (AC ¶ 139) with a slide deck that described a proposed "Pre-marketing and Two-phase Process" for a sale of interests in Origis USA.  Ex. P (slides) at pp. 5-6.  Under varying "Valuation Assumptions," Onpeak stated preliminary valuation estimates for Origis USA ranging from $369 million to $605 million.  *Id*. at pp. 7-8.  As part of a subsequent months-long sales process for which "Onpeak and Goldman Sachs" were retained, "invitations were issued to buyers to submit preliminary bids" for shares in Origis USA and, "[i]n August 2021, Defendants received fifteen bids." AC ¶¶ 148-49.  While Plaintiffs omit the amounts of the two low bids ($216 million with potential earnout and $250 million), they acknowledge the other preliminary bids ranged from $500 million to $1.25 billion.  *Id*.  "On October 18, 2021, Antin and Origis publicly announced that they had agreed on a sale of Origis USA . . . ." *Id.* ¶ 154.  The price "implied a valuation for Origis USA of well over $1 billion." *Id.* ¶ 155.  The announcement stated that Antin funds "entered into a definitive agreement to acquire a majority stake in Origis" with "[c]losing . . . expected in late 2021." Ex. Q (announcement).

### E.        Plaintiffs Falsely Accuse Defendants of a "Fraudulent Scheme"

"On October 7, 2022, . . . Plaintiffs served Defendants with a formal Indemnity Notice," which alleged SRA breaches and requested documents pursuant to SRA § 8.4.  AC ¶ 156. "Defendants responded . . . on October 18, 2022," disputing Plaintiffs' allegations.  *Id.* ¶ 157. Pelican produced over 136,000 pages of documents to Plaintiffs, including "Antin data room" information, documents "relating to discussions with investment bankers and the financing of the buyout," and documents "from [Vanderhaegen's] email account." *Id.* ¶ 159; *see also* McCormack Dec. ¶ 23.  Plaintiffs commenced this action on February 14, 2023; it was removed on March 14, 2023.  ECF No. 1.  As amended on June 12, 2023, the AC asserts six causes of action against Defendants: fraud (Count One), fraudulent inducement (Count Two), aiding and abetting fraud (Count Three), civil conspiracy (Count Four), constructive fraud (Count Five), breach of fiduciary duty (Count Six), breach of SRA § 4.4 (Count Seven), breach of SRA § 5.5 (Count Eight), and breach of the implied covenant of good faith and fair dealing (Count Nine).  AC ¶¶ 161-224. Plaintiffs purport to allege "a fraudulent scheme" (*id.* ¶ 153) as summarized below.

### 1.        Alleged Misrepresentations as to "True Value of Origis USA"

Plaintiffs allege that, on a handful of occasions from April 30, 2019 to September 10, 2020, Vanderhaegen emailed to Plaintiffs copies of documents that allegedly contained statements concerning the value of Origis USA or its project pipeline.  *Id.* ¶¶ 75, 81, 83, 90, 100.  Plaintiffs do not specifically describe those documents or their contents.  To the extent identifiable from the AC, Plaintiffs mischaracterize documents they rely upon.  For example, the April 30, 2019 "proposal" did not "state[] that an accurate value of Origis USA was $160 million." *Id.* ¶ 75. Rather, that proposal provided "an indication of what valuation would be achievable" in a buyout, and stated the proposed price "[c]orresponds to average of all bids received" previously for Origis

USA, which reflected "a valuation of $160 million" for Origis USA.  Ex. H (email) at p. 1; Ex. I (slides) at p. 4.  This is not a representation of "accurate value."

Nor did Vanderhaegen, on September 10, 2020, "represent[] that the correct value of the pipeline was $147 million."  AC ¶ 100.  Instead, Vanderhaegen provided Plaintiffs a preliminary estimate of the purchase prices at which Global Atlantic could exercise its proposed option to acquire certain specified projects, pursuant to a methodology proposed by Global Atlantic.  By email on August 28, 2020 (*id.* ¶ 99), Vanderhaegen had written Plaintiffs:

> ***Global has now decided that they want to buy a large portion of our portfolio and are requesting a purchase option.  They propose a new way of valuation (see attached LLC agreement) that we now have to analyze in full.*** . . .  The positive thing is that this removes your uncertainty about the value of our projects because you will soon know.  Initial indication is around 130 million, but the financial team still has a lot of work to do before we can come to any conclusions.  Unfortunately, . . . we will have to choose a new date . . . it will be September 15.

Ex. R (email) at p. 1 (emphasis added).  The referenced "attached LLC agreement" was a draft amendment to Origis USA's LLC agreement prepared by Global Atlantic's counsel.  Ex. S (draft amendment).  The draft granted Global Atlantic an option to purchase "Identified Project[s]" "upon the applicable Project reaching mechanical completion," at a purchase price determined by reference to "Identified Projects Purchase Price Assumptions."  *Id.* at § 1.14 & Ex. 2.

Vanderhaegen's September 10, 2020 email to Plaintiffs (AC ¶ 100) forwarded an email from Samir Verstyn, Origis USA's CIO and COO.  Ex. T (email).  Verstyn wrote: "Below as per the latest . . . with Global based on what we know they have proposed, understanding that it is their option to exercise such purchase or not . . . ."  *Id.* at p. 1.  Verstyn set forth a table that identified 13 projects, the "Global Proposal" option price for each such project, and the total of $146,870,000. *Id*. at p. 2.  Verstyn added "[t]hese values are subject to change and are to be updated at various points in the future (MIPSA, NTP, MC)."  *Id.*  Vanderhaegen referred Plaintiffs to Verstyn's email:

"See below the overview created by Samir with regard to the valuation of the projects." *Id.* at p. 1. Thus, Vanderhaegen's September 10, 2020 email cannot fairly be described as "represent[ing] that the correct value of the pipeline was $147 million." AC ¶ 100. Plaintiffs' further allegation Vanderhaegen had "go[ne] through it in detail on the phone with Plaintiffs, assuring them all over again of their accuracy," does not identify the date or participants of such alleged phone call, what Vanderhaegen stated that "assur[ed]" Plaintiffs, or of what they had been "assur[ed]." *Id.*

Plaintiffs allegedly "[d]iscover[ed] that [t]hey [h]ad [b]een [d]eceived" in "early 2022" when "the approximate value of the Antin transaction became public," and it was "at odds with the facts as Defendants had represented." *Id.* at p. 49 & ¶ 155. Apart from such hindsight, to demonstrate fraud Plaintiffs rely upon alleged: (a) "information" from "internal valuations" and "investment bankers"; and (b) statements to "potential financing sources." *Id.* ¶¶ 82, 101, 103.

### a.     Alleged "Internal Valuations"

"[I]nformation" from "internal valuations" and "input from outside investment bankers" allegedly "showed that Origis USA's projects were potentially worth over $1.5 billion." AC ¶¶ 101, 103; *see also id.* ¶¶ 19. Those valuations allegedly were prepared in "June and July 2020." *Id.* ¶ 19. Plaintiffs do not identify the purpose of those valuations, anything stated in them, or how they "showed" what projects were "worth." Allegations that "valuations" were "the product of careful analysis and input from the top-ranking officers . . . including Vanderhaegen," do not identify the "analysis" or "input" from Vanderhaegen, or any other officers, reflected therein. *Id.* ¶ 102; *see also id.* ¶ 21. As for the alleged "input from outside investment bankers," Plaintiffs allege only that "in July 2020 . . . three different investment bankers working for Origis USA provided information to Defendants on value" that "supported that the value of Origis USA far exceeded what had been represented to Plaintiffs." *Id.* ¶¶ 102-03; *see also id.* ¶¶ 19, 21, 69. The

AC is silent on the bankers' identities, what "information" they provided, for what purpose, or how that information "supported . . . the value of Origis USA." *Id.* ¶ 103.[9]

### b.    Alleged Statements to "Potential Financing Sources"

Plaintiffs allege that, in 2019 and early 2020, Vanderhaegen emailed documents to "potential financing sources" showing the "true value" of Origis USA to be higher than he allegedly stated to Plaintiffs.  AC ¶¶ 76, 78, 82, 84, 91 (emphases omitted).  The AC does not specifically describe those documents, their contents, or any alleged Vanderhaegen statement about them.  Plaintiffs do not plead facts showing that any alleged statements to "potential financing sources" were believed to be more true (or false) than the alleged statements to Plaintiffs to which the AC compares them.  For example, Plaintiffs allege that, on December 11, 2019, "Vanderhaegen emailed a buyout proposal to Plaintiffs that valued Origis USA's project pipeline . . . at about $161 million." *Id.* ¶ 81.  Vanderhaegen allegedly "knew these valuations were phony," because, on January 7, 2020, he "emailed to potential financing sources a materially different valuation," which "reported the true value . . . as $197 million." *Id.* ¶ 82.  This allegation (and others like it) is a *non sequitur*, because it pleads no facts showing why the December 11, 2019 "proposal" was "phony" while the January 7, 2020 "valuation" was "true."

### 2.    Alleged Misrepresentations as to Rockhound Projects

Vanderhaegen allegedly misrepresented that "the Rockhound projects could not be reliably valued and were not saleable" and "were very risky." AC ¶ 110.  Plaintiffs do not allege, even

---

[9] Defendants suspect Plaintiffs (unsuccessfully) allude to July 2020 presentations received from three advisory firms pitching for a potential engagement to market three specific Origis USA projects.  If so, Plaintiffs mischaracterize those presentations.  They stated preliminary valuation estimates in broad ranges for only three specific projects (comprising under 20% of the projects for which a PPA had been signed or awarded at that time)—not for Origis USA or its entire pipeline.  None stated what that pipeline was "potentially worth," let alone $1.5 billion.  AC ¶ 101.

generally, when such representations were made, where, or to whom (other than "Plaintiffs"). Plaintiffs do not plead what Vanderhaegen believed at that (unspecified) time about those projects. Instead, Plaintiffs allege "Defendants had, during Summer 2020 and before, received internal valuations of the Rockhound projects, prepared by Origis USA . . . that showed them to be some of the most valuable . . . projects." *Id.* ¶ 111.  Plaintiffs do not, however, identify any statements in those valuations or how they "showed" the Rockhound Projects to be "some of the most valuable."  Plaintiffs also allege "they had confirmed that view of value and salability with the investment bankers." *Id.*  But Plaintiffs do not plead which individual(s) "confirmed" with which "bankers," or any statements by those "bankers."

Plaintiffs further allege that, on February 26, 2021, five months after Plaintiffs executed the SRA, "the Rockhound projects . . . received a bid of $145 million." *Id.* ¶ 137.  "Upon receiving the . . . bid," Vanderhaegen reported to Global Atlantic (*id.* ¶ 138):

> ***It is probably too good to be true*** but we just got an offer of $145 million developer fee for our Rockhound (Texas) assets from AMP (Carlyle Backed).  There starts to be serious interest in our Rockhound assets . . . .  ***Don't put your hopes too high*** that we will get this $140 million but it's becoming more and more likely that we will get some value out of this.

Ex. U (email) (emphases added).  The AC does not allege this bid was consummated (it was not). Instead, Plaintiffs allege Defendants sold the Rockhound Projects "in the Antin transaction." *Id.* ¶ 113.  But the AC concedes Antin acquired "equity in Origis USA," not specific projects. *Id.* ¶ 155; *see also* Ex. Q (announcement).  To date, one of the Rockhound Projects has been cancelled and none has been sold or started construction.

### 3.    Alleged Miscellaneous Misrepresentations

***First***, Plaintiffs allege that in the "first proposal" on April 30, 2019, Vanderhaegen "claimed . . . he wanted to hold his interest in Origis USA for the long term."  AC ¶ 66; *see also*

*id.* ¶ 27.   The "first proposal" contains no such statement.   *See* Ex. H (email); Ex. I (slides). **Second**, on April 6, 2021, seven months after the SRA's execution, Vanderhaegen allegedly stated a potential SPAC transaction was "not an exit for me." AC ¶ 141.  Plaintiffs do not allege a SPAC transaction ever occurred (it did not), that Vanderhaegen believed it would have been "an exit," or that Vanderhaegen, even today, has exited.  Pelican remains a substantial, indirect minority owner of Origis USA and Vanderhaegen serves as Origis USA's CEO.  *Id.* ¶¶ 41, 46.[10]  **Third**, "in an email on May 19, 2019," Vanderhaegen allegedly wrote (to whom is unsaid) "nobody pays much goodwill."  *Id.* ¶ 77.  Plaintiffs plead no facts showing he made that statement believing it was false.  At most, Plaintiffs allege that, on May 19, 2019, Vanderhaegen "emailed Origis USA's other minority shareholder . . . who would potentially finance the buyout" and attached "a valuation" that "included between $50 and $80 million for goodwill."  *Id.* ¶ 78.  Plaintiffs do not, however, plead any facts showing Vanderhaegen believed this "valuation" represented how the market would value the company in a sale.  **Fourth**, Vanderhaegen allegedly "requested that his financing source . . . prepare a buyout loan letter that reported a lower loan amount than the source was actually willing to extend."  *Id.* ¶ 97.   Plaintiffs do not plead any alleged statement Vanderhaegen made to Plaintiffs regarding such "loan letter" or how, if at all, Plaintiffs relied thereon.  **Fifth**, Vanderhaegen allegedly "promised that Pentacon could remain a shareholder in Origis or reinvest . . . after the buyout."  *Id.* ¶ 106.  Plaintiffs do not identify the date such promise was made, in what form, or where; no such promise is found in the LOI or the SRA.

---

[10] Plaintiffs concede they entered an April 2021 agreement for a "payment if a SPAC transaction occurred," superseding SRA § 5.5 with respect to such potential transaction.  *Id.* ¶ 143.

## APPLICABLE LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "[T]he Court is not obliged to reconcile and accept as true 'pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference.'" *Larkem v. Dep't of Educ.*, 2018 WL 1959555, at *3 (S.D.N.Y. 2018). The Court may "reject" allegations "contradicted by matters of which judicial notice may be taken." *Tavares v. N.Y.C. Health and Hospitals Corp.*, 2015 WL 158863, at *3 (S.D.N.Y. 2015). Fraud claims are subject to a "heightened pleading standard," *Rombach* v. *Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004), and must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## ARGUMENT

### I.   All Counts Should Be Dismissed against Defendants Vanderhaegen, the Trust, and Invest because Plaintiffs Released those Claims

Plaintiffs released Vanderhaegen, the Trust, and Invest from "any claims . . . in connection with or related in any manner to this Agreement," or in respect of its "negotiation, execution, performance, or breach," whether "in Contract or in tort, in equity or at Law." Ex. G (SRA) § 9.11; *see also* Facts Part C.3, *supra*. "Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) ("*Centro II*"). "Further, a release that, by its terms, extinguishes liability on any and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud . . . ." *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 76 A.D.3d 310, 318-19 (1st Dep't 2010) ("*Centro I*"), *aff'd*, 17 N.Y.3d 269 (2011).

18

Section 9.11 is such a release.  *See id.*; *Morefun Co. v. Mario Badescu Skin Care Inc.*, 588 Fed. App'x 54, 55-56 (2d Cir. 2014) (summary order) (release of "all legal or equitable claims both direct and indirect . . . arising from or in connection with" subjects encompassed "fraud"). "[T]he plaintiff cannot rely on fraudulent inducement [to challenge such a release] unless 'it can identify a separate fraud from the subject of the release.'"  *Morefun Co.*, 588 Fed. App'x at 55 (quoting *Centro II*, 17 N.Y.3d at 276).  "Were this not the case, no party could ever settle a fraud claim with any finality."  *Centro II*, 17 N.Y.3d at 276.  Allegations Plaintiffs were "fraudulently induced . . . into signing the SRA" (AC ¶ 169) fall squarely within the subject of the release, which includes "this Agreement" and "its negotiation, [and] execution."  Ex. G (SRA) § 9.11.

Plaintiffs' contrary arguments fail.  ***First***, SRA § 9.11 is not "unenforceable" as a "release of . . . [a] fiduciary."  ECF No. 20 (letter) at p. 1.  None of Defendants owed Plaintiffs fiduciary duties under applicable Belgian law.  Argument Part II, *infra*.  Regardless, "[a] sophisticated principal is able to release its fiduciary from claims—at least where, as here, the fiduciary relationship is no longer one of unquestioning trust—so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into."  *Centro II*, 17 N.Y.3d at 276, 278.  There is no "unquestioning trust" where "sophisticated parties engaged in negotiations to terminate their relationship."  *Id.* at 279 (dismissing "claim [plaintiffs] were fraudulently induced to sell their ownership interests in a company they co-owned with . . . defendants").  Such was the case here: Plaintiffs engaged in vigorous, arms' length negotiations to secure a buyout of 100% of their shares in Origis.  Facts Part B-C, *supra*.  Further, allegations Plaintiffs "trusted Vanderhaegen" are contradicted by allegations that their decision to sell was motivated by "frustrat[ion]" and "friction" with him, and his alleged "attempts to isolate Plaintiffs" and preclude their "participat[ion] in decision-making."  AC ¶¶ 60-62, 68.

**Second**, Plaintiffs misread the SRA when they assert "none of Plaintiffs' claims were released" because Section 4.8 "contemplated claims against affiliates and their representatives 'in cases of Fraud.'"   ECF No. 20 (letter) at p. 1.   Section 9.11 excluded from its broad scope only hypothetical claims "pursuant to and to the extent provided in the Transaction Documents."   Ex. G (SRA) at § 9.11.   Section 4.8 (No Additional Representations and Warranties) does not, however, provide for claims against Non-Party Affiliates.   *Id.* § 4.8.   To the contrary, that section is a *disclaimer* of additional representations and warranties made by the Contracting Parties or "any of their respective Affiliates or . . . Representatives," other than "the express representations and warranties provided in this ARTICLE IV and in cases of Fraud."   *Id.*   Plaintiffs' reading of Section 4.8 also is inconsistent with their express disclaimer in Section 9.11 itself of "any reliance upon any Non-Party Affiliates . . . with respect to . . . any representation or warranty made . . . as an inducement to this Agreement."   *Id.* § 9.11.   That the Contracting Parties excluded "cases of Fraud" from the disclaimer of additional representations and warranties in Section 4.8, but chose not to exclude "cases of Fraud" from Section 9.11's release and disclaimer, further confirms Section 9.11 was intended to release Non-Party Affiliates from fraud claims.   Thus, all claims against Vanderhaegen, the Trust, and Invest should be dismissed.

## II.   Plaintiffs' Fiduciary Duty and Constructive Fraud Claims (Counts Five and Six) Should Be Dismissed Because Defendants Did Not Owe Plaintiffs Fiduciary Duties

Plaintiffs fail to state claims for breach of fiduciary duty or constructive fraud because Defendants did not owe fiduciary duties to Plaintiffs under applicable Belgian law.   *See Wilson v. Dantas*, 746 F.3d 530, 536 & n.2 (2d Cir. 2014) (fiduciary duty and constructive fraud claims dismissed because plaintiff "was not in a fiduciary relationship" with defendant).   Both claims depend on allegations that "[a]s officers, directors, and fellow shareholders in a close corporation, the Vanderhaegen Defendants owed fiduciary duties to Plaintiffs."   AC ¶¶ 190, 198.   But Origis

was incorporated in Belgium at all relevant times.  Ex. D-F (public records); Ex. G (SRA) at p. 1.

Pursuant to the internal affairs doctrine, Belgian law therefore governs whether Defendants owed

fiduciary duties to Plaintiffs.  *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d

1224, 1234 (2d Cir. 1996) ("[Q]uestions relating to the internal affairs of corporations are decided

in accordance with the law of the place of incorporation."); *Diamond v. Shiftpixy, Inc.*, 2021 WL

3085405, at *17 (S.D.N.Y. 2021) ("[A] claim involving breach of a fiduciary duty owed by a

corporate officer is governed by the law of his company's state of incorporation.").  The SRA

choice-of-law provision does not override this bedrock doctrine.  *See City of Sterling Heights*

*Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp.2d 348, 363-64 (S.D.N.Y. 2006)

(rejecting "choice-of-law provision in conflict with . . . the internal affairs doctrine," a "recognized

choice-of-law principle"); *BBS Norwalk One v. Raccolta, Inc.*, 60 F. Supp.2d 123, 129 (S.D.N.Y.

1999) ("the law of the state of incorporation—Delaware—governs" regardless of choice-of-law

provision, "because the claim in this case relates fundamentally to the conduct of the internal

affairs of BBS"), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).

Dr. Roman Aydogdu, a Professor at the University of Liège in Belgium, demonstrates in

his accompanying declaration that Defendants did not owe fiduciary duties to Plaintiffs under

Belgian law.  Aydogdu Dec. ¶¶ 8-13.  As an initial matter, Belgian law does not recognize any

concept of fiduciary duties as such.  *Id.* ¶ 8 & Ex. 2, 3, 4.  This Court reached the same conclusion.

*Beana v. Woori Bank*, 2006 WL 2935752, at *8 (S.D.N.Y. 2006) ("Belgian law does not recognize

a cause of action for . . . breach of fiduciary duty").  While a director (or day-to-day manager) of

a Belgian company owes a type of duty of loyalty, that duty runs only to the company, ***not*** to

individual shareholders.  Aydogdu Dec. ¶¶ 9-13 & Ex. 3, 5, 6, 7.  Any claim a shareholder might

bring under Belgian law against a director instead would have to meet the requirements of general

Belgian contract or tort law (if applicable).  Aydogdu Dec. ¶¶ 11-12 & Ex. 8.  Thus, none of Defendants owed this director-company duty of loyalty to Plaintiffs, who were individual shareholders.  Aydogdu Dec. ¶ 13.  Further, this limited duty of loyalty is owed only ***by*** a director or day-to-day manager.  *Id.* ¶ 9 & Ex. 5.  Neither Pelican nor the Trust held such position, and thus neither owed such a duty to Origis, much less to Plaintiffs.  AC ¶¶ 39, 41.  In any event, Plaintiffs fail to plead a breach of (nonexistent) fiduciary duty because their allegations that "Defendants provided false and misleading information" (*id.* ¶ 199) are, as further explained below, conclusory and not particularized, contradicted by documents the AC relies upon, and implausible.

## III.   Plaintiffs' Fraud Claims (Counts One, Two, and Five) Should Be Dismissed

### A.   Plaintiffs Fail to Plead Alleged Statements With Particularity

Rule 9(b) "require[s] that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach*, 355 F.3d at 170.  As detailed in part above, the AC does not satisfy these basic requirements.  *See* Facts Part E, *supra*.  ***First***, Plaintiffs fail to identify specifically the statements allegedly made by each defendant, instead lumping all Defendants together as "Vanderhaegen Defendants," and asserting that "[w]henever one Vanderhaegen Defendant is referred to . . . that reference should be read as referring to all."  AC ¶ 45; *see also id.* ¶ 49.  Such "'lumping' all defendants together fails to satisfy the particularity requirement."  *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6 (S.D.N.Y. 2007).  The bare allegation Vanderhaegen "acted . . . on behalf of and through the other Vanderhaegen Defendants" is insufficient to attribute his alleged statements to other defendants.  AC ¶ 43.  For example, the AC barely mentions Invest and the Trust.  *Id.* ¶¶ 39-40.  ***Second***, Plaintiffs frequently fail to specify the statements they contend were fraudulent, instead impermissibly summarizing a

larger document or conversation to reach a desired conclusion.  *See Gao v. Yang*, 2022 WL 2193290, at *3 (S.D.N.Y. 2022) (dismissing complaint that "only summarizes what Yang said" because "[a]llegedly fraudulent statements may not be presented as generic paraphrases").  For example, Plaintiffs allege that, on one occasion, Vanderhaegen "emailed Plaintiffs an updated pipeline report" that "put the value of Origis USA's pipeline at $134 million," and on another, "emailed Plaintiffs an overview of . . . pipeline projects . . . that valued [them] at $153 million." AC ¶¶ 83, 90; *see also id.* ¶¶ 81, 78, 100.  But in neither case do Plaintiffs specify a single statement contained in such document, or connect that statement to how the document "put the value" or "valued" the "pipeline."  *Id.* ¶¶ 83, 100.  And, as shown, documents the AC relies upon (to the extent identifiable) contradict Plaintiffs' characterizations.  ***Third***, Plaintiffs often fail to identify the speaker, instead alleging Vanderhaegen sent a document containing a statement, without identifying any individual who authored the document or statement.  For example, Vanderhaegen allegedly "emailed Plaintiffs an updated pipeline report . . . prepared by Origis USA."  AC ¶ 90; *see also id.* ¶¶ 75, 81, 83.  That is not enough.  *See Riker v. Premier Capital, LLC*, 2016 WL 5334980, at *5 (S.D.N.Y. 2016) (allegations law firm made representations "do not sufficiently identify an individual speaker").  ***Fourth***, Plaintiffs repeatedly fail to state where and to whom statements were made, instead alleging they were emailed or made to "Plaintiffs."  AC ¶¶ 75, 77, 81, 83, 87, 90, 95, 97, 100.  That is no small defect given Plaintiffs are private equity firms with investment teams and legal counsel.  *See Nakahara v. Bal*, 1998 WL 35123, at *10 (S.D.N.Y. 1998) (plaintiffs failed to plead "who at the Trump Organization received the statements").

## B.    Plaintiffs Fail to Plead Alleged Opinions Were Believed False when Stated

"[S]tatements of opinion generally cannot constitute fraud," with the "narrow exception" that opinions "*may* constitute actionable fraud where a present intent to deceive exists."  *Catskill*

*Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 134 (2d Cir. 2008) (emphasis in original); *see also Bailey v. N.Y. Law School*, 2021 WL 5500078, at *4 (2d Cir. 2021) (summary order) (fraud claim premised on "nonactionable statement of opinion" dismissed).  Alleged statements of the value of a private company's shares or of its pipeline of projects are statements of opinion.  *See Quattro Parent LLC v. Rakib*, 181 A.D.3d 518, 518 (1st Dep't 2020) ("valuation report" relied on to purchase "interest" in LLC was "nonactionable projection of future profitability").  Plaintiffs' bare allegation that the "value of specific project assets in the pipeline . . . could be objectively ascertained" is unsupported by facts.  AC ¶ 67.  Indeed, it is contradicted by the AC's portrayal of alleged "internal Origis USA valuations" as the subjective "product of careful analysis and input from the top-ranking officers in Origis" and "input from outside investment bankers."  *Id.* ¶¶ 102-103.  Thus, Plaintiffs were required to plead with specificity that each value statement was made "knowing full well that it[] . . . was false."  *Catskill Dev., LLC*, 547 F.3d at 134.

The AC does not plead particularized facts plausibly showing any alleged opinion was believed false when stated.  The allegation the Antin transaction "implied a valuation . . . well over $1 billion" is irrelevant to statements allegedly made more than a year earlier.  AC ¶ 155.  Courts "routinely reject" such "allegations of 'fraud by hindsight.'"  *Rubenstein v. S1 Corp.*, 2005 WL 743121, at *3 (S.D.N.Y. 2005).  Rather than fraud, the AC and documents on which it relies acknowledge the market "changed dramatically" (AC ¶ 104), including in anticipation of increased support for solar power following the November 2020 election.  Facts Part D, *supra*.

The allegation that, in June or July 2020, "information" from "internal valuations" and "input from outside investment bankers" purportedly "showed that Origis USA's projects were potentially worth over $1.5 billion," also fails to demonstrate present intent to deceive.  AC ¶¶ 101, 103.  This too is impermissible fraud by hindsight.  Vanderhaegen stated his alleged value opinions

to Plaintiffs between 3 and 15 months **before** he obtained the alleged inconsistent "information" in June or July 2020 (except as to the alleged September 10, 2020 statement, addressed below). *Id.* ¶¶ 75, 81, 83, 90, 100. Regardless, Plaintiffs' allegations are too generalized and conclusory to show intent to deceive. Facts Part E.1.a, *supra.* Plaintiffs cannot demonstrate **anything** was "showed" by "information" from "internal valuations"—let alone that "projects were potentially worth over $1.5 billion"—when the AC fails to identify a single statement contained in the valuations or connect such statement to Plaintiffs' conclusion. AC ¶¶ 101, 103. Nor does the AC plead facts sufficient to show what Vanderhaegen believed was "shown" by those valuations, instead only vaguely alleging the valuations were "the product of careful analysis and input" from him and others. *Id.* ¶ 102. Plaintiffs also plead no facts showing what Vanderhaegen believed about any "input" from "bankers." *Id.* ¶ 103.

Indeed, the September 10, 2020 email on which Plaintiffs heavily rely (*id.* ¶¶ 18, 21, 100) is inconsistent with an inference Vanderhaegen then believed "Origis USA's projects were potentially worth over $1.5 billion." *Id.* ¶ 101. That email stated a preliminary estimate of approximately $147 million as the total price at which Global Atlantic could potentially exercise its option to acquire 13 specific projects, pursuant to a draft agreement then under negotiation. Ex. T (email); Facts Part E.1, *supra.* It defies reason Vanderhaegen would have agreed to give Global Atlantic an option to acquire those projects at a price of $147 million if (as Plaintiffs suggest) he believed they were worth many times that price. Similarly, such a belief cannot be reconciled with Vanderhaegen's reaction months later—"[n]ot bad"—when he observed that a potential value for Origis USA of over $500 million could be inferred from a Nomura market report. Ex. O (email) at p. 1. That simply is not the reaction of someone who believed that the value of Origis USA's project pipeline alone had exceeded triple that amount as early as July 2020.

Plaintiffs' allegations that, in 2019 and early 2020, Vanderhaegen emailed documents to "potential financing sources" showing values higher than he allegedly stated to Plaintiffs, fare no better.  AC ¶¶ 76, 78, 82, 84, 91; Facts Part E.1.b, *supra*.  Plaintiffs plead no facts to show that Vanderhaegen made one such statement believing it was true, while he made the other such statement believing it was false.  Labeling an alleged statement to Plaintiffs as "phony" (AC ¶ 82), for example, does not suffice.  *See DiMuro v. Clinique Labs., LLC,* 572 Fed. App'x 27, 30 (2d Cir. 2014) (summary order) ("[N]o matter how many times Plaintiffs use these labels [like 'false and misleading'], they are not facts, and certainly not facts sufficient for Rule 9(b).").  Plaintiffs make no attempt whatsoever to compare the methodologies, assumptions, and inputs underlying such alleged value statements, much less demonstrate their dishonest manipulation to deceive Plaintiffs.

Other purported "independent frauds" asserted in the AC also rely upon nonactionable opinion.  AC ¶ 162.  For example, Plaintiffs plead no facts showing Vanderhaegen's alleged opinion that "the Rockhound projects could not be reliably valued and were not saleable" (*id.* ¶ 110), was believed false when stated.  Facts Part E.2, *supra*.  The allegation the Rockhound Projects "received a bid" five months after Plaintiffs executed the SRA (that was never consummated), for example, is another case of impermissible fraud by hindsight.  *Id.* ¶ 137.  Likewise, allegations Vanderhaegen "told Plaintiffs . . . he intended to be a long-term shareholder" (*id.* ¶ 27), and "nobody pays much goodwill" (*id.* ¶ 77), are at most statements of opinion or future expectation.  Plaintiffs plead no facts showing such statements were untrue, much less believed false when made.  Facts Part E.3, *supra*.  Last, the AC fails to allege Vanderhaegen made a "promise[] that Pentacon could . . . reinvest in Origis" (AC ¶ 106) intending not to keep it.  *See Nelson v. Publishers Circulation Fulfillment, Inc.*, 2012 WL 760335, at *4 (S.D.N.Y. 2012) ("[A]

breached promise may not form the basis of a fraud claim unless the defendant 'never intended to honor the contract.'"); Facts Part E.3, *supra*.[11]

### C.    Plaintiffs Fail to Plead Actual Reliance

Allegations Plaintiffs "relied upon Defendants' misrepresentations" are conclusory and unsupported by particularized facts.  AC ¶ 108; *see also id.* ¶¶ 166, 173, 194.  The Court should disregard them.  *See Newton v. Meyer*, 2023 WL 2563115, at *13 (S.D.N.Y. 2023) ("[M]ere allegation [plaintiff] 'did in fact reasonably rely on Meyer's promises' is insufficient"); *Stone v. Sutton View Cap., LLC*, 2017 WL 6311692, at *3 (S.D.N.Y. 2017) ("reliance . . . must also be pled with particularity").  Further, those allegations are contradicted by the AC and the documents it relies upon.  Rather than "believ[ing] what . . . had been represented to them" (AC ¶ 89), for example, the AC admits these sophisticated Plaintiffs "considered whether [Vanderhaegen's] valuation might be on the low side," "suggest[ed] . . . that Origis USA could be worth more," and "expressed concerns about the level of the purchase price and the value of Origis USA."  *Id.* ¶¶ 68, 77, 99.  Far from passively relying on Vanderhaegen to dictate valuation and price, Plaintiffs staked out their own affirmative position, and actively bargained for their preferred deal terms.  Ex. J (email) at p. 2; Facts Part B-C, *supra*.  Indeed, Plaintiffs recognized that a third-party equity sale at a higher implied valuation could occur and negotiated a post-closing price adjustment period.  Ex. G (SRA) § 5.5; Facts Part C.1, *supra*.  Before signing the SRA, Plaintiffs also communicated with Carlyle Group and other third parties in an unsuccessful attempt to get a better deal from an outside investor.  Ex. J (email) at pp. 2, 12.  These too are grounds for dismissal.  *See Jacobs v. Lewis*, 261 A.D.2d 127, 128 (1st Dep't 1999) (plaintiffs "make no sustainable claim that they relied

---

[11] Accordingly, Plaintiffs also fail to "allege facts that give rise to a strong inference of fraudulent intent" pursuant to Rule 9(b).  *Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

to their detriment upon [defendant's] representations as to . . . the expertise of Zahran," as "plaintiffs admitted to personally conducting an investigation of the work of Zahran").

### D.      Plaintiffs Fail to Plead Such Reliance Would Have Been Reasonable

Conclusory allegations Plaintiffs "justifiably relied" are not enough.  AC ¶¶ 166, 173, 194. Rather, reliance must be "justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud." *Granite Partners, LP v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999).  "[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." *Kaye Dentistry, PLLC v. Turchin*, 2014 WL 2649967, at *5 (S.D.N.Y. 2014) (citation omitted).  Plaintiffs are sophisticated private equity firms whose business is buying and selling other companies.  Facts Part A, *supra*.  Their allegation that the "value of specific project assets in the pipeline" could be "ascertained," so long as "you are knowledgeable about the company and industry," while conclusory, is a further admission Plaintiffs had the means to verify alleged value statements.  AC ¶ 67.  Plaintiffs do not allege any misrepresentation of the status of development of any project, the terms of any power purchase agreement, interconnection agreement, or engineering, procurement and construction contract, the status of any permit, dates of anticipated commencement and completion of construction, or cost estimates.  Nor do Plaintiffs allege they requested such information but were refused.  Thus, Plaintiffs cannot be heard to cry fraud because they regret a $105 million transaction.  *See Project Verte, Inc. v. Zuchaer & Zuchaer Consulting, LLC*, 2021 WL 2856522, at *4 (S.D.N.Y. 2021) ("no justifiable reliance" as to misrepresentations of "property's value"; counterclaim-plaintiff "could have easily performed an independent appraisal"); *MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459 (1st Dep't 2014) (dismissing

claim "defendants misrepresented . . . that the values were supported by market data" where plaintiffs "did not ask defendants, 'Show us your market data'").

Further, the gravamen of Plaintiffs' claims is that Vanderhaegen's alleged value statements were false because the "market in the U.S. had changed dramatically."  AC ¶ 104.  Plaintiffs do not plead, however, that such market information was peculiarly within Defendants' knowledge or that Plaintiffs were prevented from conducting market research, reviewing industry publications, or asking investment bankers or market participants for observations.  "The principle that sophisticated parties have 'a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they are assuming' has particular application where, as here, the true nature of the risk being assumed could have been ascertained from reviewing market data or other publicly available information."  *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (1st Dep't 2012) (fraud claim "insufficient" where complaint "makes plain that an examination of the relevant securities market would have revealed the fallibility of the credit ratings") (citations omitted).

Plaintiffs' claims of reasonable reliance also fail because they extensively negotiated representations and warranties in the SRA but omitted the alleged representations on which they base their fraud claims.  The Second Circuit affirmed dismissal of a fraud claim for lack of reasonable reliance where a sophisticated investor failed to incorporate an allegedly fraudulent statement within a stock purchase agreement's "extensive contractual representations concerning NETV's financial condition and operations."  *Emergent Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003).  Emergent allegedly was defrauded when it made an "investment of $2 million" in NETV in reliance on a statement that NETV held a "$14 million . . . equity interest in Brightstreet."  *Id.* at 193, 196.  The Second Circuit concluded: "Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement."

29

*Id.* at 196.  If anything, Plaintiffs had a greater duty to protect themselves than Emergent, as highly sophisticated professional investors entering into a transaction more than 50 times the size.  While Plaintiffs allege Vanderhaegen misrepresented "the true value of Origis USA," for example, they did not obtain any contractual representation of that "true value."  AC ¶ 74.  Instead, the ***only*** reference to "value" anywhere in SRA Article IV was to "value indications by any party showing an interest to acquire" equity or assets of Origis or its subsidiaries.  Ex. G (SRA) § 4.4; *see also id.* §§ 4.8, 9.8, 9.11.  "In short, this is an instance where plaintiffs 'have been so lax in protecting themselves that they cannot fairly ask for the law's protection.'"  *Centro II*, 17 N.Y.3d at 279.

The allegation Plaintiffs were "justified in trusting and relying upon the Vanderhaegen Defendants" because they "owed fiduciary duties" does not save Plaintiffs' fraud claims.  AC ¶ 190.  As explained above, none of Defendants owed fiduciary duties to Plaintiffs.  Regardless, Plaintiffs "cannot blindly trust the fiduciary's assertions" because they were "sophisticated parties engaged in negotiations to terminate their relationship."  *Centro II*, 17 N.Y.3d at 279.  And Plaintiffs would have been bound to a further "heightened degree of diligence" because they allege "knowledge that [their] fiduciary is not being entirely forthright."  *Id.*; *see also* AC ¶¶ 60-62 (alleging "frustrat[ion]" and "friction" with Vanderhaegen and "attempts to isolate Plaintiffs").[12]

### E.    Plaintiffs Fail to Plead Fraud by Omission

Plaintiffs' allegations of fraud fare no better to the extent the AC characterizes them as "omissions" (AC ¶ 23), including for the reasons set forth above.  In addition, as a general rule, "an omission does not constitute fraud unless there is a fiduciary relationship between the parties."

---

[12] Plaintiffs fail to allege actual, reasonable reliance on any other alleged fraudulent statement.  *See* Facts Part E.2-3.  For example, rather than relying on Vanderhaegen's alleged statements regarding the salability of the Rockhound Projects (AC ¶ 110), Plaintiffs bargained for an additional payment if a subsequent Rockhound Sale occurred.  Ex. G (SRA) § 2.3.

*SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 356 (1st Dep't 2004).   No such relationship existed here.   The "special facts" exception to that rule does not apply where, as here, alleged omissions were mere opinions rather than facts.   *See SSA Holdings LLC v. Kaplan*, 120 A.D.3d 1111, 1111 (1st Dep't 2014) (no "duty to disclose" because "defendants were not bound to volunteer their opinions").   Plaintiffs also fail to plead with particularity that any of Defendants withheld "information peculiarly within [their] knowledge," that such information "could [not] have been discovered by plaintiff through the exercise of ordinary intelligence," and that such defendant "knows [the plaintiff] is acting on the basis of mistaken knowledge," all of which are prerequisites to the special facts exception.   *First Hill Partners, LLC v. Bluecrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 638 (S.D.N.Y. 2014).   And that exception could at most apply to Pelican because "it applies only . . . ***between parties*** to a prospective transaction."   *See Merkin v. Berman*, 123 A.D.3d 523, 524 (1st Dep't 2014) (emphasis added).   Regardless, Plaintiffs "waive[d] and relinquishe[d]" any fraudulent omissions claims against Pelican pursuant to the SRA's exclusive remedy provision; the carveout therein for "claims based on Fraud" applied only to an affirmative "misrepresentation of fact" and not to claims based on omissions.   *See* Ex. G (SRA) §§ 1.1, 8.6(a).

## IV.   Plaintiffs' Aiding and Abetting Fraud and Civil Conspiracy Claims (Counts Three and Four) Should Be Dismissed

Plaintiffs' aiding and abetting claim should be dismissed for failure to plead "the existence of a fraud."   *Filler v. Hanvit Bank*, 156 Fed. App'x 413, 417 (2d Cir. 2005).   Further, conclusory allegations that "[e]ach Defendant . . . substantially assisted the fraudulent scheme" (AC ¶ 179) fail to satisfy "the particularity requirements of Rule 9(b) [that] apply to claims of aiding and abetting fraud no less than to direct fraud claims."   *Filler*, 156 Fed. App'x at 417.   For example, Plaintiffs do "not identify a single affirmative act by [Invest or the Trust] that assisted . . . primary violations."   *See Broad-Bussel Family LP v. Bayou Group LLC*, 472 F. Supp. 2d 528, 533

31

(S.D.N.Y. 2007).  Plaintiffs likewise fail to state a claim for civil conspiracy.  Such claim "'cannot stand alone' and must be dismissed if the underlying independent tort has not been adequately pleaded." *Filler*, 156 Fed. App'x at 418.  Nor are Plaintiffs' conclusory allegations that Defendants "agreed . . . to pursue a scheme," and engaged in "numerous actions in furtherance of their agreements" (AC ¶¶ 184-85), sufficient to plead those essential elements.  *See Treppel v. Biovail Corp.*, 2005 WL 2086339, at *6 (S.D.N.Y. 2005) (civil conspiracy claim dismissed for "no showing" defendants "agreed to participate in a conspiracy or committed an overt act").  Regardless, such claim is barred by "the principle that a corporation and its owner cannot conspire with each other," *Goldman v. Barrett*, 2017 WL 4334011, at *8 n.8 (S.D.N.Y. 2017), and as duplicative of Plaintiffs' other claims.  *Xue v. Jensen*, 2020 WL 6825676, at *12 (S.D.N.Y. 2020) ("[B]ecause Plaintiff 'adds no new allegations distinct from those underlying her fraud claim,' her civil conspiracy claim must be 'dismissed as duplicative' of her fraud claims.").

## V.    Plaintiffs' Breach of Contract Claims Should Be Dismissed

### A.    Defendants Not Party to the SRA

Plaintiffs state no contract claims against Vanderhaegen, the Trust, or Invest because none of them is a party to the SRA.  *See Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439, at *8 (S.D.N.Y. 2004) (dismissing claim for "breaching a contract to which [defendant] was not a party").  Plaintiffs' assertion that those defendants "were effectively Vanderhaegen's alter egos" does not change the result.  ECF No. 20 (letter) at p. 3.  Conclusory "domination and control" (AC ¶¶ 39-41) allegations fail to state a veil-piercing claim.  *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 402 (S.D.N.Y. 2013) (rejecting "domination and control" allegations).  Indeed, the AC pleads neither any of the factors in Delaware's "single economic

entity" test nor "abuse of the corporate form." *Id.* at 402, 406.[13]   And Plaintiffs released all "alter ego," "domination," or "piercing the veil" claims.  Ex. G (SRA) § 9.11.

### B.      Count Seven (Representations and Warranties)

Plaintiffs fail to plead an SRA breach premised on false statements regarding "the value of Origis USA and its pipeline" and "that the Rockhound projects could not be reliably valued or sold."  AC ¶ 205.  ***First***, the SRA contains no such representations and warranties.  Section 4.4's representations and warranties as to the "documents and information" made available to Plaintiffs were limited to specific subjects.  Ex. G (SRA) § 4.4.  The sole reference to "value" in Section 4.4 was to "value indications by any party showing an interest to acquire" equity or assets of Origis or its subsidiaries.  *Id.* § 4.4(c).  The SRA disclaimed additional representations and warranties.  *Id.* §§ 4.8, 9.8, 9.11.  Plaintiffs do not allege any misrepresentation or omission prior to closing concerning any third-party buyer's "value indications," let alone as to any binding offer to acquire Origis equity or assets.  ***Second***, Plaintiffs fail to plausibly allege "false and misleading statements of material fact" regarding the alleged (supposed) representation and warranty.  AC ¶ 205.  Their allegations are conclusory and devoid of facts, contradicted by documents the AC relies upon, and implausible.  *See* Facts Part E.1-2, Argument Part III.A-B, *supra*.

### C.      Counts Eight and Nine (Sale of Origis)

Plaintiffs fail to state a claim for breach of SRA § 5.5 because they do not allege an Origis Sale occurred by September 14, 2021.  Ex. G (SRA) § 5.5(a); AC ¶¶ 114, 133.  Rather, Plaintiffs concede the Antin agreement was not executed until a month after that date with closing later still.

---

[13] Pelican, the contracting party whose veil Plaintiffs purport to pierce, is a Delaware company. AC ¶ 41; *see also Standex Int'l Corp. v. QCP, Inc.*, 2017 WL 481447, at *4 (S.D.N.Y. Feb. 6, 2017) (Failla, J.) (applying "law of the state of incorporation" to veil-piercing claim).

AC ¶ 154; Ex. Q (announcement) at p. 2 ("[c]losing is expected in late 2021").  The SRA defines "Origis Sale" to require a **sale**, e.g., "any sale of Origis Equity or Assets."  Ex. G (SRA) § 1.1. "[A] 'sale' is ordinarily defined as 'the transfer of property or title for a price.'"  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012); *see also* N.Y.U.C.C. § 2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price.").  The SRA's use of the term "sale" confirms that no sale occurs until the transfer of equity interests.  Ex. G (SRA) §§ 2.1 ("Baltisse and Pentacon will sell, convey, transfer, assign and deliver" their shares at the closings), 2.2 ("delivery and sale by Pentacon and Baltisse" of their shares at the closings). Section 5.5(a) had no application to "actively pursu[ing]" (AC ¶ 213) an Origis Sale; it could be triggered only by "occur[rence]" of an Origis Sale.  Ex. G (SRA) § 5.5(a).  Plaintiffs also fail to allege a breach of Section 5.5(c)'s notice provision, which could be triggered only by a "potential Origis Sale *to occur* within a period" ending September 14, 2021.  Ex. G (SRA) § 5.5(c) (emphasis added).  Plaintiffs do not allege any potential transfer of equity interests was to occur by that date, and the Antin sale did not occur until months later.  AC ¶ 154; Ex. Q (announcement).

Last, Plaintiffs are unable to escape Section 5.5's limitations by resorting to "an implied covenant of good faith and fair dealing."  AC ¶ 218.  That covenant "cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights."  *Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006).  Courts have dismissed similar implied covenant claims where a transaction was consummated too late to trigger a contractual payment obligation, and the plaintiff alleged the defendant "delayed" the transaction to avoid payment.  *See Geller Biopharm, Inc. v. Amunix Pharm., Inc.*, 2021 WL 4155015, at *9 (S.D.N.Y. 2021) ("Geller only had a contractual right to be paid if the Transaction closed within a certain period of time."); *see also Phoenix Cap. Invs. LLC*

34

*v. Ellington Mgmt. Grp., LLC*, 51 A.D.3d 549, 550 (1st Dep't 2008) ("Plaintiff's claim that defendant caused Norges Bank to purposely delay its investment until after the lapse of the one-year tail period . . . is an invalid substitute for its nonviable breach of contract claim.").  The same result is warranted here, not least because the parties carefully negotiated the specific duration of SRA § 5.5's price adjustment period.  Ex. J (email) at p. 1; Facts Part B, *supra*.  Regardless, Plaintiffs fail to plausibly allege Defendants "delay[ed] the formal closing."  AC ¶ 249.

## **CONCLUSION**

Defendants respectfully request the Court grant their motion and enter an order dismissing the AC against them and granting such other and further relief as the Court deems just and proper.

Dated: July 28, 2023

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By          */s/ Thomas J. McCormack*

Thomas J. McCormack
Robert Kirby
Anthony Lauriello
1301 Avenue of the Americas
New York, NY  10019
Tel.: (212) 408-5100
thomas.mccormack@nortonrosefulbright.com
robert.kirby@nortonrosefulbright.com
anthony.lauriello@nortonrosefulbright.com

Robin Ball (*pro hac vice*)
555 South Flower Street, 41st Floor
Los Angeles, CA  90071
Tel.: (213) 892-9200
robin.ball@nortonrosefulbright.com

*Attorneys for Defendants Guy Vanderhaegen,*
*Guy Vanderhaegen Revocable Trust, Pelican*
*Invest, LLC, and Pelican International, LLC*