**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PENTACON BV and BALTISSE NV,

Plaintiffs,

v.

GUY VANDERHAEGEN, GUY
VANDERHAEGEN REVOCABLE TRUST,
PELICAN INVEST, LLC, PELICAN INTER-
NATIONAL, LLC, and ORIGIS USA LLC,

Defendants.

Case No. 1:23-cv-02172-KPF

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE VANDERHAEGEN DEFENDANTS' MOTION TO DISMISS

DECHERT LLP
Steven B. Feirson
Cira Center
2929 Arch Street
Philadelphia, PA 19104
(215) 994 2000

Matthew L. Mazur
Three Bryant Park
New York, NY 10036
(212) 698 3500

25 Cannon Street
London EC4M 5UB
United Kingdom

David L. Attanasio
1900 K Street, NW
Washington, DC 20006
(202) 261 3300

*Attorneys for Plaintiffs*
*Pentacon BV and Baltisse NV*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 5

      A.    Plaintiffs Depended and Relied on Vanderhaegen as Origis USA's
           CEO .................................................................................................................. 6

      B.    Defendants Embark on a Scheme to Defraud Plaintiffs ............................ 7

      C.    Defendants Deliberately Misrepresent the Financial Condition of
           Origis USA and its Assets to Induce Plaintiffs into Accepting an
           Artificially Low Price ................................................................................... 7

      D.    Plaintiffs Bargain for the Buyout to Be Based on Complete and
           Accurate Information About Origis USA ................................................... 8

      E.    Defendants Continue to Feed Plaintiffs a Series of Materially
           False, Misleading, and Incomplete Statements to Induce them to
           Sign the SRA ................................................................................................. 9

      F.    The Vanderhaegen Defendants Breach the Information Warranty
           on the Dates of the SRA and the Two Closings ..................................... 11

      G.    Defendants Arbitrage the Difference Between the Fraudulent
           Buyout Valuation and Origis USA's True Valuation .............................. 12

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT .................................................................................................................... 14

    I.    Defendants Improperly Seek to Contest Plaintiffs' Allegations by
        Introducing Extraneous Factual Matter ............................................................ 14

    II.    Plaintiffs Did Not Waive or Release their Claims in the SRA Because this
        Is a "Case of Fraud" Asserting Claims "Based on Fraud" .............................. 16

    III.    The Amended Complaint Adequately States Each Claim .................................. 20

      A.    The Amended Complaint Properly Alleges Claims for Fraud and
           Fraudulent Inducement (Counts I and II) ............................................... 20

           1.    The Fraud Claims Are Stated with Particularity ........................... 21

2.    The Alleged Misrepresentations Are Actionable .......................... 23

    (a)    Defendants' Misrepresentations of Value Are Actionable ........................................................................... 23

    (b)    Defendants' Other Alleged Misrepresentations Are Actionable ........................................................................... 25

3.    The Alleged Concealment of Information is Actionable ............. 27

4.    Plaintiffs Relied on the Misrepresentations ................................. 29

5.    Plaintiffs Justifiably Relied on Defendants' Misrepresentations .......................................................................... 30

B.    The Amended Complaint States Claims for Aiding and Abetting Fraud (Count III) ........................................................................................ 32

C.    The Amended Complaint States a Claim for Civil Conspiracy (Count IV) ..................................................................................................... 33

D.    The Amended Complaint States Claims for Breach of Fiduciary Duty and Constructive Fraud (Counts V and VI) ..................................... 34

1.    The Vanderhaegen Defendants Owed Fiduciary Duties to Plaintiffs .......................................................................................... 34

2.    New York Law Applies to Plaintiffs' Claims .............................. 35

3.    In any Event, Belgian Corporate Law Recognizes Duties Which Are the Functional Equivalent of New York Law ........... 37

E.    The Amended Complaint States Claims for Breach of Contract (Counts VII, VIII, and IX) ........................................................................ 38

1.    The Vanderhaegen Defendants Are Jointly and Severally Liable for Breaches of the SRA ..................................................... 39

2.    The Vanderhaegen Defendants Breached the Information Warranty ........................................................................................... 41

3.    The Vanderhaegen Defendants Breached the No Origis Sale Clause .......................................................................................... 44

CONCLUSION ....................................................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ................................................................... 44

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
25 N.Y.3d 1043 (2015) ........................................................................ 30

*Aghaeepour v. N. Leasing Sys., Inc.*,
2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ...................................... 33

*Ajettix Inc. v. Raub*,
804 N.Y.S.2d 580 (N.Y. Sup. Ct. Monroe Cnty. 2005) ..................... 35

*Alpert v. 28 Williams St. Corp.*,
63 N.Y.2d 557 (1984) .......................................................................... 35

*Am. Fed. Grp., Ltd. v. Rothenberg*,
136 F.3d 897 (2d Cir. 1998) ............................................................... 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................. 13

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) ............................................................... 13

*Bank of China v. Chan*,
937 F.2d 780 (2d Cir. 1991) ............................................................... 46

*Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*,
106 F.3d 22 (2d Cir. 1997) ................................................................. 31

*BBS Norwalk One v. Raccolta, Inc.*,
60 F. Supp. 2d 123 (S.D.N.Y. 1999) .................................................. 37

*Bernstein v. Kelso & Co.*,
231 A.D.2d 314 (1st Dept. 1997)........................................................ 34

*Braddock v. Braddock*,
871 N.Y.S.2d 68 (1st Dep't 2009) ...................................................... 27

*Byrnes v. Small*,
142 F. Supp. 3d 1262 (M.D. Fla. 2015)............................................... 22

*Cap. Ventures Int'l v. Rep. of Arg.*,
652 F.3d 266 (2d Cir. 2011) ............................................................... 17

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
17 N.Y.3d 269 (2011) ................................................................... 19, 35

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ...................................................... 3, 14, 23

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*,
    773 F.3d 110 (2d Cir. 2014) ........................................................................... 17

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ........................................................... 37

*Cohen v. Schroeder*,
    248 F. Supp. 3d 511 (S.D.N.Y. 2017) ........................................................... 39

*Cordaro v. AdvantageCare Physicians, P.C.*,
    208 A.D.3d 1090 (1st Dep't 2022) ................................................................. 31

*Cornelio v. Connecticut*,
    32 F.4th 160 (2d Cir. 2022) ........................................................................... 13

*Cortlandt St. Recovery Corp. v. Bonderman*,
    215 A.D.3d 446 (1st Dep't 2023) ........................................................... 20, 41

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ............................................................................. 14

*CPC Int'l Inc. v. McKesson Corp.*,
    70 N.Y.2d 268 (1987) ................................................................................... 24

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
    15 N.Y.3d 147 (2010) ............................................................................. 30, 31

*DeBenedictis v. Malta*,
    140 A.D.3d 438 (1st Dep't 2016) ................................................................. 18

*Deutsche Bank Nat'l Tr. Co. v. Flagstar Cap. Mkts.*,
    32 N.Y.3d 139 (2018) ................................................................................... 36

*Diesenhouse v. Soc. Learning & Payments, Inc.*,
    2022 WL 3100562 (S.D.N.Y. Aug. 3, 2022) ................................................ 37

*Drenis v. Haligiannis*,
    452 F. Supp. 2d 418 (S.D.N.Y. 2006) ........................................................... 36

*Dubai Islamic Bank v. Citibank, N.A.*,
    256 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................... 33

*Dubbs v. Stribling & Assocs.*,
    96 N.Y.2d 337 (2001) ................................................................................... 35

*Enercon GmbH v. ITC*,
    151 F.3d 1376 (Fed. Cir. 1998) ................................................................... 44

*Epiphany Cmty. Nursery Sch. v. Levey*,
    171 A.D.3d 1 (1st Dep't 2019) ..................................................................... 31

*EQT Infrastructure Ltd. v. Smith*,
    861 F. Supp. 2d 220 (S.D.N.Y. 2012) ........................................................... 45

*Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*,
    797 F.3d 229 (2d Cir. 2015) ......................................................................... 13

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
  375 F.3d 168 (2d Cir. 2004) ............................................................................ 46

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
  902 F. Supp. 2d 476 (S.D.N.Y. 2012) .............................................................. 30

*Finkel v. Stratton Corp.*,
  962 F.2d 169 (2d Cir. 1992) ............................................................................ 44

*Fletcher v. Atex, Inc.*,
  68 F.3d 1451 (2d Cir. 1995) ............................................................................ 40

*Flycell, Inc. v. Schlossberg LLC*,
  2011 WL 5130159 (S.D.N.Y. Oct. 28, 2011) ................................................... 33

*Frame v. Maynard*,
  83 A.D.3d 599 (1st Dep't 2011) ...................................................................... 35

*Fries v. Merck*,
  167 N.Y. 445 (1901) ........................................................................................ 44

*Gao v. Yang*,
  2022 WL 2193290 (S.D.N.Y. Jun. 17, 2022) .................................................. 22

*Geller Biopharm, Inc. v. Amunix Pharms., Inc.*,
  2021 WL 4155015 (S.D.N.Y. Sept. 13, 2021) ................................................. 46

*Gem Advisors, Inc. v. Corporación Sidenor, S.A.*,
  667 F. Supp. 2d 308 (S.D.N.Y. 2009) .............................................................. 21

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) ............................................................................ 14

*Goldman v. Barrett*,
  2017 WL 4334011 (S.D.N.Y. July 25, 2017) ................................................... 34

*Greenspun v. Lindley*,
  36 N.Y.2d 473 (1975) ...................................................................................... 36

*Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*,
  380 B.R. 677 (S.D.N.Y. 2008) ......................................................................... 34

*Havens v. James*,
  76 F.4th 103 (2d Cir. 2023) ............................................................................. 15

*Hectronic GmbH v. Hectronic USA Corp.*,
  2020 WL 6947684 (S.D.N.Y. Nov. 24, 2020) .................................................. 39

*In re Blech Sec. Litig.*,
  928 F. Supp. 1279 (S.D.N.Y. 1996) ................................................................. 22

*In re Horsehead Holding Corp. Sec. Litig.*,
  2018 WL 4838234 (D. Del. Oct. 4, 2018), *report and recommendation adopted*,
  2019 WL 1409454 (D. Del. Mar. 28, 2019) ..................................................... 23

*In re P3 Health Grp. Holdings, LLC*,
  2022 WL 15035833 (Del. Ch. Ct. Oct. 26, 2022) ............................................ 20

*In re Platinum-Beechwood Litig.*,
    427 F. Supp. 3d 395 (S.D.N.Y. 2019) ................................................ 28

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ........................................................ 29

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*,
    363 F.3d 137 (2d Cir. 2004) ........................................................ 38

*IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*,
    20 N.Y.3d 310 (2012) ............................................................... 37

*Klembczyk v. DiNardo*,
    265 A.D.2d 934 (4th Dep't 1999) .................................................. 35

*LCM XXII Ltd. v. Serta Simmons Bedding LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ............................... 17, 45, 46

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
    589 F. Supp. 3d 302 (S.D.N.Y. 2022) .............................................. 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ........................................................ 21

*M&T Bank Corp. v. McGraw Hill Cos., Inc.*,
    126 A.D.3d 1414 (4th Dep't 2015) ................................................. 25

*M&T Mortg. Corp. v. White*,
    736 F. Supp. 2d 538 (E.D.N.Y. 2010) ............................................. 24

*M.S.S. Constr. Corp. v. Century Sur. Co.*,
    2015 WL 6516861 (S.D.N.Y. Oct. 28, 2015) ...................................... 39

*MacNaughton v. Young Living Essential Oils, LC*,
    67 F.4th 89 (2d Cir. 2023) .......................................................... 23

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) ............................................. 33

*MAFG Art Fund, LLC v. Gagosian*,
    123 A.D.3d 458 (1st Dep't 2014) .................................................. 32

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
    268 F.3d 58 (2d Cir. 2001) ......................................................... 40

*Manichaean Cap., LLC v. Exela Techs., Inc.*,
    251 A.3d 694 (Del. Ch. Ct. 2021) .................................................. 40

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 430 (S.D.N.Y. 2015) ............................................. 33

MBIA Ins. Corp. v. Royal Bank of Canada,
    706 F. Supp. 2d 380 (S.D.N.Y. 2009) ............................................. 41

*McBeth v. Porges*,
    171 F. Supp. 3d 216 (S.D.N.Y. 2016) ............................................. 39

*McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*,
    2022 WL 18027555 (S.D.N.Y. Dec. 30, 2022) .................................................. 22

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) ............................................................ 34, 35

*Mohegan Lake Motors, Inc. v. Maoli*,
    559 F. Supp. 3d 323 (S.D.N.Y. 2021) ................................................................ 41

*Murray Eng'g P.C. v. Remke*,
    2018 WL 3773991 (S.D.N.Y. Aug. 9, 2018) ..................................................... 38

*N.Y. Wheel Owner, LLC v. Mammoet Holding B.V.*,
    205 A.D.3d 651 (1st Dep't 2022) ................................................................ 20, 41

*Nakahara v. Bal*,
    1998 WL 35123 (S.D.N.Y. Jan. 30, 1998) ........................................................ 22

*Nat'l Conversion Corp. v. Cedar Bldg. Corp.*,
    23 N.Y.2d 621 (1969) ...................................................................................... 25

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008) ............................................................................. 39

*O'Leary v. S & A Elec. Contracting Corp.*,
    149 A.D.3d 500 (1st Dep't 2017) ..................................................................... 38

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) ............................................................................... 14

*Pappas v. Tzolis*,
    20 N.Y.3d 228 (2012) ......................................................................... 18, 19, 20

*Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*,
    2020 WL 6690659 (S.D.N.Y. Nov. 13, 2020) .................................................. 41

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ............................................................. 37

*People v. Trump*,
    No. 452564/2022, Doc. 1531 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 26, 2023) ......... 25, 43

*Phoenix Capital Invs. LLC v. Ellington Mgmt. Grp., L.L.C.*,
    51 A.D.3d 549 (1st Dep't 2008) ....................................................................... 46

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (S.D.N.Y. 2016) ........................................................................... 40

*Project Verte, Inc. v. Zuchaer & Zuchaer Consulting, LLC*,
    2021 WL 2856522 (S.D.N.Y. July 8, 2021) ..................................................... 32

*Reynolds v. Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015) ......................................................... 21, 23

*Rynasko v. N.Y. Univ.*,
    63 F.4th 186 (2d Cir. 2023) ............................................................................. 34

*Salm v. Feldstein*,
  20 A.D.3d 469 (2d Dep't 2005) ................................................................. 34

*SEC v. Collins & Aikman Corp.*,
  524 F. Supp. 2d 477 (S.D.N.Y. 2007) ..................................................... 23

*SEC v. Medallion Fin. Corp.*,
  2022 WL 3043224 (S.D.N.Y. Aug. 2, 2022) .......................................... 14

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ..................................................................... 27

*Sports Tech. Apps., Inc. v. MLB Advanced Media, L.P.*,
  188 A.D.3d 619 (1st Dep't 2020) ...................................................... 28, 29

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004) ..................................................................... 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................. 13

*Tiny 1, Ltd. v. Samfet Marble Inc.*,
  201 A.D.3d 423 (1st Dep't 2022) ............................................................ 34

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ....................................................................... 45

*Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*,
  2017 WL 2116701 (E.D.N.Y. Mar. 31, 2017) ........................................ 23

*Turtur v. Rothschild Registry Int'l*,
  26 F.3d 304 (2d Cir. 1994) ....................................................................... 36

*UBS Sec. LLC v. Highland Cap. Mgmt., L.P.*,
  2011 WL 781481 (Sup. Ct. N.Y. Cnty. Mar. 1, 2011) ........................... 36

*Union Ave Estates, LLC v. Garsan Realty Inc.*,
  170 A.D.3d 498 (1st Dep't 2019) ............................................................ 32

*United States ex rel. Arnstein v. TEVA Pharms. USA, Inc.*,
  2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ........................................... 21

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
  50 F. Supp. 3d 497 (S.D.N.Y. 2014) ....................................................... 23

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017) ......................................................... 13, 14, 22

*United States ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) ................................................................. 14, 15

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) ....................................................................... 15

*Universal Health Servs. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ............................................................................ 28, 29

*Vengalattore v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022) ................................................................. 13

*Wakefield v. N. Telecom, Inc.*,
  769 F.2d 109 (2d Cir. 1985) ............................................................... 46

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) .................................................. 45

*Merriam Webster's Collegiate Dictionary* (11th ed. 2020) ............................ 45

**Rules**

Fed. R. Civ. P. 8 .................................................................................. 13

Fed. R. Civ. P. 9 .............................................................................. 13, 25

## PRELIMINARY STATEMENT[1]

The Vanderhaegen Defendants ask to end this case now because they say that Plaintiffs "cashed out prematurely" and should have "negotiate[d] better terms." Vanderhaegen Defendants' Mot. to Dismiss (ECF No. 34) ("V.D.Br.") 1. In their telling, Defendants were just savvier investors who lucked out when Origis USA's value happened to increase dramatically in a matter of mere months. *Id.* at 1–2. Indeed, they apparently claim to have been as surprised as Plaintiffs when Origis USA—a company whose pipeline assets they had represented to Plaintiffs were the only items of material value and had been valued at only $147 million—was transformed a very short time later into a company which sold for $1.4 billion. *Id.*

This counternarrative to the one laid out, in great detail, in the Amended Complaint ("AC") has no place in a motion to dismiss. As alleged in the Amended Complaint, Defendants decided as early as March 2019 to take advantage of Plaintiffs "lack of knowledge" and buy them out cheaply. AC ¶¶ 63–66. Defendants then carried out their plan through a series of deliberate misrepresentations to Plaintiffs about the value of Origis USA, including valuations of its solar energy projects and the company's goodwill. *See, e.g.*, *id.* ¶¶ 18, 27, 67, 75–78, 81–84, 90–91, 100–03. Vanderhaegen, in an effort to induce Plaintiffs to credit his misrepresentations, also made a carefully calculated misrepresentation that he would remain a long-term holder in the company to assure Plaintiffs that he could not arbitrage the purchase of their shares by quickly flipping the company for a higher price. *Id.* ¶¶ 27–28, 66.

Contrary to the Vanderhaegen Defendants' suggestion that the increase in value resulted from external factors such as President Biden's election in November 2020, V.D.Br. 1, the

---

[1] Plaintiffs incorporate their Memorandum of Law in Opposition to Origis USA's Motion to Dismiss as if fully set forth herein. Capitalized terms not defined herein have the meanings ascribed to them in the Amended Complaint.

Amended Complaint alleges that they were lowballing their valuations as early as April 2019, AC ¶¶ 66–67, and that they, unlike Plaintiffs, knew in July 2020 that the value of Origis USA's pipeline had already materially increased, based on, among other things, information received from its investment bankers about a possible sale of the company or its assets, *id.* ¶¶ 103–05. That summer, before Plaintiffs agreed to sell their shares, Origis USA prepared secret, detailed valuations of the projects in its pipeline, with input from its investment bankers. These secret analyses showed, contrary to what the Defendants were telling Plaintiffs, that those pipeline assets alone could be worth over a billion dollars. *Id.* ¶¶ 101–03. Yet, Defendants concealed this set of higher valuations from Plaintiffs, even as they touted the $147 million figure as being accurate and a good proxy for the value of the company as late as September 10, 2020, just before the signing of the SRA. *Id.* ¶¶ 99–100. Then, just over a week after getting Plaintiffs to sign up to the SRA and agree to transfer their shares—and well before President Biden's election—Vanderhaegen emailed another senior executive at Origis USA who had participated in the fraudulent scheme. He triumphantly wrote about their success in fleecing the Plaintiffs and pushing forward their plan to flip the company quickly: "we did a golden deal a week ago and that . . . IPO track is certainly real." *Id.* ¶ 129.

Fighting against the specific allegations in the Amended Complaint, the Vanderhaegen Defendants resort to inserting extrinsic factual matter into their briefing. They attach no fewer than 21 exhibits to their motion. They inject other supposed facts into their brief without any citation at all. *See, e.g.*, V.D.Br. 6 ("Plaintiffs' solicitations of third-party investors did not succeed."), *id.* at 11 (Origis USA received "two low bids."), *id.* at 12 ("Pelican produced over 136,000 pages of documents"), *id.* at 16 ("[O]ne of the Rockhound Projects has been cancelled and none has been sold or started construction."). This is, of course, improper on a motion to dismiss. Whatever Defendants' factual defenses may be, and whatever documents they offer to support them, are subjects

for the discovery process, not a motion to dismiss.

The Vanderhaegen Defendants also make certain legal arguments in service of their attempt to kill this case in its infancy before discovery can begin. But those arguments fare no better than their inappropriate factual attack. For instance, Defendants seek dismissal because the Amended Complaint supposedly does not give a sufficiently particularized account of Defendants' fraudulent scheme. V.D.Br. 22–23. The basic purpose of Rule 9(b)'s particularity requirement, however, is merely to put Defendants on notice of the claims they face. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018). As the Court recognized, even the original Complaint "was pretty detailed" "as complaints go." ECF 37-3 at 9. The Amended Complaint includes even more detail about the who, what, when, where, and why of Plaintiffs' claims. Indeed, it repeatedly identifies the exact dates of the emails and phone calls in which Defendants made fraudulent statements, as well as Plaintiffs' basis for alleging that those statements were false. These allegations easily satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud" be pled with particularity.

Defendants also maintain that Belgian law applies to the fiduciary duty claims and does not recognize fiduciary duties owed to shareholders. V.D.Br. 20–22. Defendants are wrong on both counts. New York law, not Belgian law, applies to the fiduciary duty claims based on the parties' agreement that claims "arising out of or in connection with" the SRA would be governed by New York law "without giving effect to any conflict-of-law rules or principles." SRA § 9.12. But the outcome would be no different under Belgian law. As explained in the accompanying declaration of Professor Marieke Wyckaert, who was one of the four principal drafters of the Belgian Code of Companies and Associations, Belgian law recognizes legal precepts, like the duty of loyalty, which are the functional equivalent of fiduciary duties and permits direct claims by shareholders. *See*

Expert Opinion of Professor Marieke Wyckaert ("Wyckaert Decl.") (filed herewith); *infra* Section III.D.3.

Further, Defendants argue that the SRA was not breached because the false and misleading information they provided to Plaintiffs supposedly fell outside the scope of the SRA's Information Warranty. V.D.Br. 33. However, that Warranty specifically extends to all "documents and information" concerning "the business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries," as well as "the Company's development pipeline of solar power and energy storage projects." SRA § 4.4. Plaintiffs bargained for the Information Warranty specifically to ensure that the buyout was "based on accurate information," AC ¶ 120, by requiring Defendants to provide information that was "*complete in all material respects*" and "*not misleading*," SRA § 4.4 (emphasis added). Yet Defendants sent false valuation after false valuation of Origis USA and its project pipeline to Plaintiffs even while concealing contemporaneous valuations that were massively higher than those sent to Plaintiffs. AC ¶¶ 75–78, 81–84, 90–92, 100–03, 111. Defendants cannot explain why this information is not exactly what the Information Warranty was intended to cover—information about the "business," its "financial condition," and its core "assets."

Defendants also argue that Plaintiffs' contractual right to be protected against any resale of the company within one year was not breached because they deliberately arranged for the Antin transaction to *close* just days after the No Origis Sale period ended. V.D.Br. 33–35. However, Defendants cannot escape their No Sale obligations in this manner since an agreement for the sale of the company actually occurred within the one-year period, and the law makes clear that it is that agreement, and not the date of closing, which constitutes a "sale." Furthermore, the implied covenant of good faith and fair dealing as applied to the alleged fact pattern blocks the escape hatch

4

Defendants attempted to erect. Plaintiffs demanded the No Origis Sale Clause specifically to protect against "arbitrage" by requiring Defendants to share any excess value if Defendants "permit[ted]" an Origis USA "sale" within one year of the SRA's date. AC ¶ 124; *see* SRA § 5.5. Here, Defendants not only accomplished such a sale of the entire company within the one-year period, but their machinations to immediately begin to arrange such sale, the concealment of the auction process, the timing of the parties' agreement on the material terms of the deal, and Defendants' deliberate delay of the closing were all directly at odds with the purpose of the No Sale provision and independently constituted violations of good faith and fair dealing.

Finally, the releases and disclaimers on which Defendants now rely do not bar any of Plaintiffs' claims. V.D.Br. 18–20. The SRA expressly provides that the releases and disclaimers would *not* apply in "cases of Fraud." SRA § 4.8; *see also id.* § 8.6(a) ("except for claims *based on Fraud* . . . the remedies in this ARTICLE VIII will be the sole and exclusive remedy") (emphasis added). The language of these carve outs is not limited to "Fraud claims." Rather, the language sweeps more broadly to encompass all claims in "cases of Fraud" or "based on Fraud." In this litigation, all Defendants have acknowledged that this is a "case of Fraud" with claims "based on Fraud." *See* Letter from Norton Rose Fulbright to Dechert dated October 27, 2022, attached to Mazur Decl. as **Exhibit 1** (hereinafter "Ex. 1") ("[Plaintiffs] have essentially accused our clients of fraud."); Origis USA Mot. to Dismiss (ECF No. 36) ("OUSA.Br.") 16 ("all of Plaintiffs' claims are based on the same alleged fraudulent scheme"). The claims therefore fall within the carveout to the releases. The Vanderhaegen Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiffs Pentacon and Baltisse—based in Belgium—were the principal investors and owners of Origis Energy and its operating subsidiary, Origis USA. AC ¶¶ 6–10, 50–53, 55. For years, Plaintiffs provided support and encouragement to Defendant Vanderhaegen, who served as

CEO and President of Origis Energy and Origis USA. *Id.* ¶¶ 6–9, 50–51, 54. Plaintiffs provided financial support, not only to Origis, but to Vanderhaegen personally, allowing him to acquire and maintain a significant ownership interest in Origis through his personal vehicles, Pelican International and the Guy Vanderhaegen Revocable Trust. *Id.* ¶¶ 6–10, 39, 41–42, 50–51. Vanderhaegen also served as a director of Origis USA and of Origis Energy as the appointed representative of his personal vehicle, Pelican Invest. *Id.* ¶¶ 40, 54 & n.3. Vanderhaegen, Pelican Invest, Pelican International, and the Trust "acted at all relevant times and continue to act as one combined, unified entity under the common control of Vanderhaegen." *Id.* ¶ 43.

### A.    Plaintiffs Depended and Relied on Vanderhaegen as Origis USA's CEO

Pentacon and Baltisse did not run and oversee Origis USA's day-to-day operations in the U.S. That was the role of Origis USA's management, including its CEO and President Vanderhaegen, who "exercised effective control over the detail and flow of information to Plaintiffs about Origis USA's business." *Id.* ¶ 57. Given his control over information about Origis USA, Plaintiffs were "heavily dependent on Vanderhaegen to identify and accurately transmit all relevant information to them." *Id.* This dependence was only heightened when the onset of Covid-19 prevented Plaintiffs from traveling to the United States. *Id.* ¶ 58.

At all relevant times, "Plaintiffs trusted Vanderhaegen as their long-time business partner who had superior command of company information as CEO." *Id.* ¶ 68. Their trust was "founded on their long-standing partnership and their support of him personally over the years." *Id.* ¶ 14; *see also id.* ¶ 108. Plaintiffs sometimes disagreed with Vanderhaegen, including when he proposed large bonuses for senior management. *Id.* ¶ 60. Despite the occasional "frustrat[ion]" and even "friction," not uncommon in any business relationship, "Plaintiffs viewed his conduct . . . as nothing more than the normal give and take with a strong-willed executive." *Id.* ¶ 62. "Throughout this entire period, Pentacon and Baltisse continued to trust Vanderhaegen[.]" *Id.* ¶ 14.

### B.     Defendants Embark on a Scheme to Defraud Plaintiffs

By no later than 2019, Defendants began to implement a "carefully-orchestrated plan to restrict Plaintiffs' access to Origis USA information." *Id.* ¶ 63. Over time, Vanderhaegen made it "difficult for Plaintiffs to obtain the critical information about Origis USA's business necessary to effectively participate in decision-making, including reliable cash flow forecasts and an accurate picture of all aspects of the pipeline of solar energy projects." *Id.* ¶ 61. Vanderhaegen described his plan to exploit the information imbalance that he had created to "mislead Plaintiffs into selling their interest at a price that grossly understated Origis USA's true value" in an email to another Origis USA shareholder, on March 25, 2019. *Id.* ¶ 64. He wrote, Plaintiffs "are not fully on top of things anymore due to lack of knowledge" and therefore "I probably will be able to convince them to sell their shares to me at an attractive valuation." *Id.* ¶¶ 64–65. In other words, Vanderhaegen "intended to prey on Plaintiffs' perceived lack of understanding and information in order to convince them to sell their interest in Origis USA for an unconscionably low price." *Id.* ¶ 65.

### C.     Defendants Deliberately Misrepresent the Financial Condition of Origis USA and its Assets to Induce Plaintiffs into Accepting an Artificially Low Price

Pursuant to his plan, Vanderhaegen emailed an initial buyout proposal presentation—prepared by Origis USA employees—to Plaintiffs on April 30, 2019. *Id.* ¶ 75. In that proposal, the Defendants told Plaintiffs that Origis USA was worth only $160 million and proposed to buy out their ownership interest based on their proportionate share of that overall enterprise valuation. *Id.* ¶¶ 66–67, 75. However, just eight days earlier, on April 22, 2019, Vanderhaegen had told a potential funding source that Origis USA's pipeline of solar energy projects alone "was worth as much as 70% *more* than" $160 million. *Id.* ¶ 76. When Plaintiffs questioned Vanderhaegen about whether Defendants' valuation should be higher to account for goodwill, Vanderhaegen insisted in an email on May 19, 2019, that "nobody pays much goodwill." *Id.* ¶ 77. But, on that same day,

contrary to what he told Plaintiffs, Vanderhaegen sent an email valuing the company between $230 and $260 million, including $50 to $80 million for goodwill. *Id.* ¶¶ 76, 78.

Later in 2019 and early 2020, while negotiating the Letter of Intent for the buyout, Defendants—including both Vanderhaegen and Origis USA—sought to convince Plaintiffs that the value of Origis USA and its project pipeline was dropping, even though it was actually increasing. Defendants' misrepresentations, prepared and discussed with Origis USA management, included the following false, misleading, and incomplete statements:

- On December 11, 2019, Vanderhaegen emailed Plaintiffs that the Origis USA project pipeline was worth "about $161 million." *Id.* ¶ 81. But, less than a month later, on January 7, 2020, he emailed Global Atlantic that it was worth $197 million, 22% more. *Id.* ¶ 82.

- On January 28, 2020, Vanderhaegen emailed Plaintiffs that the Origis USA pipeline was worth only $153 million. *Id.* ¶ 83. But, the next day, on January 29, 2020, he told Ares Management that it was worth $205 million, 34% more. *Id.* ¶ 84.

- On March 2, 2020, Vanderhaegen emailed Plaintiffs that the Origis USA pipeline was worth only $134 million. *Id.* ¶ 90. But, that same day, he emailed Global Atlantic that the Origis USA pipeline was worth $215 million, 60% more. *Id.* ¶ 91.

### D. Plaintiffs Bargain for the Buyout to Be Based on Complete and Accurate Information About Origis USA

While negotiating the Letter of Intent based on the information Defendants had supplied, Plaintiffs sought a commitment that the information they were receiving was "materially complete and non-misleading" (the "Information Warranty"). *Id.* ¶ 88. Vanderhaegen initially tried to put Plaintiffs off by reassuring them that they could trust and rely upon him without such a warranty. He explained, in a January 24, 2020 email, "[y]ou are member[s] of the Board of Directors to which I have reporting obligations and this should be sufficient" because "[i]f I were to deliberately

misrepresent things there, then I would have a problem." *Id.* ¶ 87. That same day, Plaintiffs responded, "we are not assuming bad intentions either, but we feel that when we decide to sell we should decide it based on accurate information and since we are not at the source this is our only protection." *Id.* ¶ 120. Apparently understanding that he had little choice, Vanderhaegen replied that, while "it is not my intention to mislead or to withhold information," he would agree to the requested Information Warranty. *Id.* That Information Warranty was ultimately included in both the Letter of Intent and the SRA. *Id.* ¶¶ 88, 119.

Plaintiffs sought similar protection from a mechanism to correct the buyout price if Defendants were, within 12 months, to "permit" a sale of Origis USA and/or its assets at a higher valuation (the "No Origis Sale Clause"). *Id.* ¶ 123. "As Plaintiffs explained to Vanderhaegen, '[t]he clause is there to protect us against arbitrage, even if it happens on a smaller stake.'" *Id.* ¶ 124. The No Origis Sale Clause was therefore included in the Letter of Intent and the SRA to protect Plaintiffs from Defendants realizing "a risk-free profit at Plaintiffs' expense through his control of company information." *Id.*

### E. Defendants Continue to Feed Plaintiffs a Series of Materially False, Misleading, and Incomplete Statements to Induce them to Sign the SRA

Not satisfied with the fraudulently low valuation for Origis USA stated in the Letter of Intent, Defendants made additional misrepresentations designed to extract a further 10% price reduction. After emailing Global Atlantic on March 16, 2020, that he would "tell Plaintiffs 'things are on hold' in order to 'try to get something out of them,'" Vanderhaegen "emailed Plaintiffs that [Global Atlantic] . . . had demanded Plaintiffs make an 'effort' to lower their asking price in light of the COVID pandemic." *Id.* ¶ 95. This was a lie. Vanderhaegen then had Global Atlantic "prepare a buyout loan letter that reported a lower loan amount than [it] was actually willing to extend" in order to "'put pressure on [Plaintiffs] to reduce the purchase price.'" *Id.* ¶ 97. Based on this letter,

and "still trusting Vanderhaegen, Plaintiffs agreed to a further 10% price reduction." *Id.* ¶ 96.

Defendants' fraud and deception continued into the summer of 2020 and then through the signing of the SRA. In order to have more up-to-date information to inform their decision on whether or not to sell their shares, Plaintiffs asked Defendants to see current valuations of the assets in Origis USA's pipeline that the company had prepared. *See id.* ¶ 99. Understanding that Plaintiffs were worried about the real value of the company and about whether to proceed with any transaction, Vanderhaegen assured Plaintiffs that these valuations would "remove[] your uncertainty about the value of our projects." *Id.* ¶¶ 18, 99. On September 10, 2020, before Plaintiffs had agreed to sell their shares and signed the SRA, Vanderhaegen emailed a valuation for the Origis USA pipeline, listing project-by-project values which totaled only $147 million. *Id.* ¶¶ 18, 21, 100.

Defendants knew these valuations were false because just weeks earlier, in July 2020, Origis USA's senior management, in consultation with its investment bankers, had calculated the current values of all of Origis USA's pipeline projects. *Id.* ¶ 19. Defendants' undisclosed calculations "showed that Origis USA's projects were potentially worth over $1.5 billion." *Id.* ¶ 101. These valuations included three projects in Texas (the "Rockhound Projects") that "showed them to be some of the most valuable of Origis USA's projects." *Id.* ¶ 111. But Defendants had previously told Plaintiffs that the Rockhound projects were virtually unsaleable. *Id.* ¶ 110. Vanderhaegen and Origis USA senior officials also "exchanged emails regarding the internal, undisclosed valuations at least on July 22, 2020." *Id.* ¶ 102. "Moreover, on September 3, 2020, just days before the SRA was signed, Origis USA prepared further valuations of the Rockhound projects that again confirmed their outsized value in the Origis USA pipeline." *Id.* ¶ 111. But Defendants continued with their fraudulent plan by deliberately concealing these valuations from

Plaintiffs. *Id.* ¶¶ 101, 111.

On September 10, 2020, "Vanderhaegen . . . doubled down on the[] knowingly false valuations by going through [them] in detail on the phone with Plaintiffs, assuring [Plaintiffs] all over again of their accuracy." *Id.* ¶ 100. Relying on these misrepresentations and all the others that Defendants had previously conveyed, Plaintiffs agreed to sell their shares and signed the SRA. *Id.* ¶ 108. If Defendants had not misled them about Origis USA's value and its project pipeline, and had disclosed "their secret valuations of Origis USA, its project pipeline, and value of its platform and goodwill," Plaintiffs never would have gone forward with the deal. *Id.* ¶¶ 107–08, 115.

### F.   The Vanderhaegen Defendants Breach the Information Warranty on the Dates of the SRA and the Two Closings

Just a week after signing the SRA, and before the two closings, "Vanderhaegen triumphantly wrote concerning the SRA to Origis USA's CIO on September 21, 2020 that 'we did a golden deal a week ago and that the IPO track is certainly real.'" *Id.* ¶ 129. Defendants knew that the valuations on which the buyout had just proceeded were abysmally deficient, yet they failed to share this information with Plaintiffs prior to the First or Second Closings—as required by the Information Warranty, SRA §§ 6.2(a), 6.4(a), for one reason and one reason only: they did not want to jeopardize in any way the successful culmination of their fraudulent scheme, AC ¶ 130.

Unaware of the truth, Plaintiffs dutifully tendered their shares at the closings in exchange for $105 million. *Id.* ¶ 133. On January 22, 2021, just a few weeks after the Second Closing on January 4, 2021, Vanderhaegen wrote to Global Atlantic again, boasting about his "golden deal." He told Global Atlantic that Origis USA was worth at least $500 million—"not bad if you compare with the buyout value." *Id.* ¶ 135.[2]

---

[2] On March 1, 2020, Onpeak, another investment banker working with Origis USA, confirmed that the value could in fact be $600 million or more. AC ¶ 139.

### G.  Defendants Arbitrage the Difference Between the Fraudulent Buyout Valuation and Origis USA's True Valuation

Throughout the buyout negotiations, "Vanderhaegen . . . repeatedly told Plaintiffs that, in order to build value going forward, he intended to be a long-term shareholder in Origis." *Id.* ¶ 27. Defendants understood that Plaintiffs would rely upon these "long-term holder" representations as confirmation that the values being supplied by Defendants were genuine, *i.e.*, if Vanderhaegen was in it for the long haul to build value, there was no reason to suspect there was already substantial undisclosed value that could be harvested by quickly turning around and selling the company. *See id.* ¶¶ 27–28, 124. But flipping the company is exactly what Defendants intended to do.

Unbeknownst to Plaintiffs, Defendants had begun a process to sell the company even before the SRA transaction had been signed and long before the transaction closed. Initially, "[t]hey had conversations and communications with the bankers enlisted by Origis USA to begin planning for an eventual sale of the company on several occasions in July 2020." *Id.* ¶ 105. After the Second Closing on January 4, 2021, Defendants ramped up the efforts to realize what they had known for some time to be the true value of the company. "Defendants had by April 2021 built their data room containing the materials to be reviewed by potential buyers." *Id.* ¶ 148. "By July of 2021, Origis USA had formally retained the two investment bankers, Onpeak and Goldman Sachs; had identified a pool of potential buyers; had circulated Non-Disclosure Agreements to those potential buyers; had created a Confidential Information Memorandum; and provided that Information Memorandum to a long list of potential buyers." *Id.* ¶ 148.

A month later, Defendants had "received fifteen bids for Origis USA's common shares." *Id.* ¶ 149. "Six of the bids valued the shares from $900 million to $1.25 billion and the remaining nine essentially from $500 million to $900 million." *Id.* ¶ 149. The most promising bid, however, came from Antin Infrastructure Partners. *Id.* ¶ 152. "Vanderhaegen met with Antin on September

8, 2021 to confirm that a deal had been reached." *Id.* "A short time later, the lawyers had finished papering their deal and Antin had bought Origis USA for an eye-popping $1.4 billion." *Id.*

## **LEGAL STANDARD**

"A court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Cornelio v. Connecticut*, 32 F.4th 160, 168 (2d Cir. 2022) (quotation marks omitted). To that end, the Federal Rules impose a "minimal burden" on plaintiffs at the pleading stage. *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 104 (2d Cir. 2022). A complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard is satisfied where a plaintiff has alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making this plausibility determination, the court must "draw[] all reasonable inferences in favor of the plaintiff." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 403 (2d Cir. 2015). Those inferences must be drawn from "*all* of the facts alleged, taken collectively," not from "any individual allegation, scrutinized in isolation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

Even in cases of fraud, nothing in the Federal Rules "elevate[s] the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 (2d Cir. 2017). Rule 9(b) requires only that the plaintiff "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The "adequacy of particularized allegations" is "case- and context-specific." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015). In general, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

13

were fraudulent." *Chorches*, 865 F.3d at 81 (citation omitted). "The 'primary purpose' of these requirements is to 'afford [the] defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.'" *Charles Schwab*, 883 F.3d at 94 (alteration adopted; citation omitted).

## **ARGUMENT**

## I. **DEFENDANTS IMPROPERLY SEEK TO CONTEST PLAINTIFFS' ALLEGA-TIONS BY INTRODUCING EXTRANEOUS FACTUAL MATTER**

Defendants labor throughout their motions to dismiss to introduce "evidence" and create factual disputes about the well-pleaded allegations in the Amended Complaint. The Vanderhaegen Defendants introduce a startling 21 new exhibits (not to mention numerous unsupported assertions of supposed facts), seeking to convert their motion to dismiss into an exercise in the weighing and evaluation of competing evidence. This they cannot do. At the motion-to-dismiss stage, this Court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). The court "must" generally limit its review "to the allegations contained within the four corners of [the] complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998).

To be sure, the Court may also consider documents "incorporated in the complaint by reference" or "integral to the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021). But "merely discuss[ing]" a document, or presenting "short quotations," does not incorporate the document by reference. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). And a document is considered "integral" to the complaint only "in a narrow set of circumstances, where the plaintiff relies heavily on the document's terms and effect in pleading his claims and there is no serious dispute as to the document's authenticity." *AECOM*, 19 F.4th at 107. Moreover, "even documents that may be considered on a motion to dismiss normally should not be considered for the truth of any statements made therein." *SEC v. Medallion Fin. Corp.*, 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022) (citing *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)). Nor may

such documents be considered unless it is "clear that there exist no material disputed issues of fact regarding [their] relevance." *AECOM*, 19 F.4th at 106 (quotation marks omitted).

Defendants violate these rules many times over. For instance, while "it is generally inappropriate for a court to rely on internet research when considering a motion to dismiss," *Havens v. James*, 76 F.4th 103, 109 n.4 (2d Cir. 2023), Defendants repeatedly attempt to inject their shading of the facts via one webpage after another, *see* V.D.Br. 3, 11, 16, 34 (citing Ex. A; Ex. B; Ex. C; Ex. Q (websites about Baltisse and about the Antin transaction)); OUSA.Br. 4, 5, 7, 8, 11 (citing websites about Origis USA, Baltisse, and Global Atlantic, as well as U.S. energy policy). Even if this Court could take judicial notice of those webpages, it could do so at this stage "only . . . to determine *what* statements [they] contain[]"—"*not for the truth of the matters asserted* therein." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quotation marks omitted). Defendants obviously have tried to include these materials, impermissibly, for their truth.

In other places, the Vanderhaegen Defendants baldly assert supposed facts without any citation. *See, e.g.*, V.D.Br. 6 ("Plaintiffs' solicitations of third-party investors did not succeed."); *id.* at 16 ("To date, one of the Rockhound Projects has been cancelled and none has been sold or started construction."). They also attempt to smuggle in exhibits that are neither incorporated by reference nor integral to the Amended Complaint. *See, e.g.*, *id.* at 6, 10, 11, 13, 35 (citing McCormack Decl. Exs. J, L, N, P, S (emails from Plaintiffs, slide decks, and a draft Origis USA LLC agreement)).

All of this is improper on a motion to dismiss. Although it ultimately makes no difference to the outcome, this Court should not even consider these exhibits. *AECOM*, 19 F.4th at 107 ("A district court . . . errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to

dismiss.") (cleaned up; citation omitted).

## II. PLAINTIFFS DID NOT WAIVE OR RELEASE THEIR CLAIMS IN THE SRA BECAUSE THIS IS A "CASE OF FRAUD" ASSERTING CLAIMS "BASED ON FRAUD"

The Vanderhaegen Defendants argue that Plaintiffs waived and released their claims against Vanderhaegen himself, the Trust, and Pelican Invest when they signed the SRA. V.D.Br. 18–20. But the waivers and releases in Section 9.11 of the SRA are subject to an exception for claims "pursuant to and to the extent provided in the Transaction Documents," SRA § 9.11, and the SRA expressly carves out claims against "Affiliates" and "Representatives" in "cases of Fraud," *id.* § 4.8 ("Except for the express representations and warranties . . . *and in cases of Fraud*, none of Pelican, Buyer or Origis USA, any of their respective Affiliates or any of their or those Affiliates' respective Representatives has made, or is making, any representation or warranty . . . and, *except in cases of Fraud*, no such party will be liable . . . .") (emphasis added); *see also id.* § 8.6(a) (*"[E]xcept for claims based on Fraud* . . . , the remedies in this Article VIII will be the sole and exclusive remedy for any and all claims relating, directly or indirectly, to the subject matter of this Agreement . . . .") (emphasis added). The Vanderhaegen Defendants maintain that Section 9.11 of the SRA trumps the SRA's express reservations of rights in "cases of Fraud" and thereby allows Vanderhaegen, the Trust, and Pelican Invest to avoid liability. *See* V.D.Br. 20. But Section 9.11 repeats no fewer than *three times* that its waiver and release of *certain* claims applies *only* "[o]ther than pursuant to and to the extent provided in the Transaction Documents." SRA § 9.11; *see also* SRA § 1.1 (defining "Transaction Documents" to include the SRA). As Origis USA recognizes in its brief, "all of Plaintiffs' claims are based on the same alleged fraudulent scheme" to deprive Plaintiffs of the fair value of their investments by means of intentionally false,

misleading, and incomplete representations. *See* OUSA.Br. 16.[3] Similarly, the Vanderhaegen Defendants, when first notified of Plaintiffs' contractual claims for breaches of the SRA's Information Warranty and No Origis Sale Clause, recognized that "[Plaintiffs] have essentially accused our clients of fraud." Ex. 1. As counsel for all Defendants stated, this is obviously a "case of Fraud."

The Vanderhaegen Defendants suggest that the exceptions in Section 9.11 apply only to "hypothetical" claims for breaches of the Transaction Documents. V.D.Br. 20. But that interpretation would read the "case of Fraud" carveout entirely out of the SRA, in defiance of the fundamental rule that a contract "should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (citation omitted). In addition, New York "follows the common (and commonsensical) rule that a specific provision like Section [4.8] governs the circumstance to which it is directed, even in the face of a more general provision like Section [9.11]." *Cap. Ventures Int'l v. Rep. of Arg.*, 652 F.3d 266, 271 (2d Cir. 2011). Therefore, even if Section 9.11 did not expressly limit itself "to the extent provided in the Transaction Documents"—which it does three times over—Section 4.8's specific exception to the general disclaimer of liability for "Affiliates" and "Representatives" in "cases of Fraud" would still govern. And, even if the disparate provisions rendered the intended scope of the releases susceptible of more than one interpretation, the ambiguity could not be resolved on a motion to dismiss. "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *LCM XXII Ltd. v. Serta Simmons Bedding LLC*, 2022 WL 953109, at *6–7 (S.D.N.Y. Mar. 29, 2022)

---

[3] Origis USA—also a party to the SRA—recognizes that the SRA's release provisions do not apply to claims "based on Fraud" and that Plaintiffs did not "relinquish" such claims. *See* OUSA.Br. 2, 10, 26.

(Failla, J.) (quoting *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13 (2d Cir. 2019)).

There is an additional and independent ground preventing the application of the releases in this case. Section 9.11 does not, by its own terms, extend beyond "the maximum extent permitted by applicable Law," and a release of Plaintiffs' claims would be unenforceable under New York law because of the Vanderhaegen Defendants' status as fiduciaries. *See infra* Section III.D.1. "It is true that sophisticated parties can release fiduciaries from their obligations and from claims" in some circumstances. *DeBenedictis v. Malta*, 140 A.D.3d 438, 438–39 (1st Dep't 2016) (citing *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278 (2011)). But such "waivers *must* be made where there is no longer a relationship of trust." *Id.* at 439 (emphasis added); *accord Pappas v. Tzolis*, 20 N.Y.3d 228, 232 (2012). "The test, in essence, is whether, given the nature of the parties' relationship at the time of the release, the principal is aware of information about the fiduciary that would make reliance on the fiduciary unreasonable." *Pappas*, 20 N.Y.3d at 233.

Plaintiffs have extensively alleged a continuing relationship of trust here. *See* AC ¶¶ 11, 14, 18, 57, 62, 68, 87, 92, 96, 108, 114, 120, 143. Plaintiffs "had worked with and trusted [Vanderhaegen] for years and had never had any reason to think that he was dishonest." *Id.* ¶ 62. Nor did they have any "reason to believe that Defendants had been privy to any" information that was "inconsistent" with that which he had provided Plaintiffs. *Id.* ¶ 18. In fact, Vanderhaegen affirmatively touted his legal "obligations" to be forthright with Plaintiffs. *See id.* ¶¶ 87–88.

The Vanderhaegen Defendants ignore these well-pleaded allegations and instead cherry-pick allegations describing "friction" and "frustrat[ion]" with Vanderhaegen. V.D.Br. 19. But those allegations do not "contradict[]" a relationship of trust. *Id.* They demonstrate only that Plaintiffs, unsurprisingly, did not see eye-to-eye with Vanderhaegen on every single business issue

facing the company. *See id.* ¶¶ 60–62. Simply put, nothing in the Amended Complaint "make[s] it clear that at the time of the buyout, the relationship between the parties was not one of trust." *Pappas*, 20 N.Y.3d at 233. The Amended Complaint alleges precisely the opposite. Despite the "friction" and "frustra[tion]," Plaintiffs never lost faith in Vanderhaegen. "It was just impossible for Plaintiffs to even contemplate that this individual for whom they had done so much could stab them in the back." AC ¶ 108. And tellingly, that relationship of trust persisted even *after* the Second Closing. Plaintiff Pentacon had actively sought to reinvest in Origis. *See id.* ¶ 106. Moreover, Vanderhaegen assured Pentacon that once Pentacon had transferred its shares it could reinvest in Origis USA because he "knew that [Pentacon] wanted to remain an investor in Origis." *Id.* Pentacon trusted him to the point where they did not even ask him at any point prior to the signing of the SRA or closings to put that promise in writing. *See id.* Similarly, when Vanderhaegen told Plaintiffs after the closings that a SPAC transaction "would not produce much, if anything, by way of profit," Plaintiffs believed him and agreed to waive whatever rights they may have had to block such a transaction for extraordinarily modest consideration. *Id.* ¶¶ 141–43.

In light of the Amended Complaint's allegations establishing trust, the Vanderhaegen Defendants try to recast *Centro* to avoid this fatal flaw. In their view, *Centro* stands for the *per se* rule that no trust can exist where "sophisticated parties engaged in negotiations to terminate their relationship." V.D.Br. 19 (quoting *Centro*, 17 N.Y.3d at 27). But in *Centro*, the plaintiffs admitted they affirmatively "*knew* that defendants had not supplied them with the financial information" to which they were entitled. *Centro*, 17 N.Y.3d at 279 (emphasis added). It was "[i]n this context" that the New York Court of Appeals held that "'the principal cannot blindly trust the fiduciary's assertions.'" *Pappas*, 20 N.Y.3d at 233 (quoting *Centro*, 17 N.Y.3d at 279). Unlike in *Centro*, Plaintiffs were not "aware of information about the[ir] fiduciar[ies] that would make reliance on

[them] unreasonable." *Id.* (describing this as "[t]he test"). Just the opposite was true. Accordingly, because of this trust relationship, even if the releases meant what the Vanderhaegen Defendants say, and they do not, the releases still could not be enforced.

Finally, even if there were no fiduciary duties and no relationship of trust, the law still would not permit the Vanderhaegen Defendants to escape liability through the use of an alter ego. *See infra* Section III.E.1. Given Plaintiffs' "allegations of misconduct under an alter ego theory," the contention that they have "bargained away their right to recourse against third parties is unavailing." *Cortlandt St. Recovery Corp. v. Bonderman*, 215 A.D.3d 446, 448 (1st Dep't 2023); *see also N.Y. Wheel Owner, LLC v. Mammoet Holding B.V.*, 205 A.D.3d 651, 651 (1st Dep't 2022) ("Because plaintiff sufficiently alleged misconduct by defendant under an alter ego theory, the no recourse clause of the contract does not insulate defendant from liability."); *cf. In re P3 Health Grp. Holdings, LLC*, 2022 WL 15035833, at *9 (Del. Ch. Ct. Oct. 26, 2022) ("[T]he No Recourse Provision cannot foreclose [the] ability to sue a Non-Party Affiliate for fraud.").

## III.   THE AMENDED COMPLAINT ADEQUATELY STATES EACH CLAIM

### A.   The Amended Complaint Properly Alleges Claims for Fraud and Fraudulent Inducement (Counts I and II)

Plaintiffs allege claims for fraud and fraudulent inducement with the particularity required by Rule 9(b). Among other things, the Amended Complaint details how Defendants repeatedly and deliberately misrepresented the value of Origis USA and its pipeline of solar energy projects— including by providing false valuation figures, while simultaneously concealing other inconsistent valuations which they had in their possession, on April 30, 2019, May 19, 2019, December 11, 2019, December 17, 2019, January 28, 2020, March 2, 2020, and September 10, 2020. AC ¶¶ 18, 21, 66–67, 75, 77, 81, 83, 90, 100. And it explains how Plaintiffs relied on these materially false and misleading misrepresentations in accepting the buyout. *See, e.g.*, *id.* ¶¶ 72, 108.

### 1.    The Fraud Claims Are Stated with Particularity

The Vanderhaegen Defendants submit a grab-bag of arguments that Plaintiffs have not stated their fraud claims with particularity in their 77-page Amended Complaint. V.D.Br. 22–23. To start, the Vanderhaegen Defendants complain about the Amended Complaint's use of the term "Vanderhaegen Defendants." But a plaintiff may charge fraudulent statements to multiple defendants where the defendants "should be treated as the same entity." *Gem Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 332 n.9 (S.D.N.Y. 2009) (quotation marks omitted); *accord United States ex rel. Arnstein v. TEVA Pharms. USA, Inc.*, 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016). Such is the case here. The Vanderhaegen Defendants "acted at all relevant times and continue to act as one combined, unified entity under the common control of Vanderhaegen." AC ¶ 43. They are alter egos of one another. *See infra* Section III.E.1.

Relatedly, the Vanderhaegen Defendants assert that the Amended Complaint has "fail[ed] to identify the speaker." V.D.Br. 23. Yet, in the few examples they complain of, they readily admit that "Vanderhaegen" sent the documents—*i.e.*, he was the speaker. Plaintiffs need not allege, especially at the pleading stage before discovery, exactly who at Origis USA created the underlying reports that Vanderhaegan held out as true. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) ("It would be strange indeed to demand greater precision of Plaintiffs in pleading the author's identity than they received as readers of these documents."). Nor do the Vanderhaegen Defendants explain how the claimed lack of "specifics about the speaker has hampered their defense in any way." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 522–23 (S.D.N.Y. 2015). That is an egregious failing given that they are the ones who know who participated in authoring the documents.

Next, the Vanderhaegen Defendants oddly claim that Plaintiffs have "repeatedly fail[ed] to state where and to whom statements were made." V.D.Br. 23. But Rule 9(b) is satisfied where

misrepresentations allegedly occurred, for example, "in an email exchange." *McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*, 2022 WL 18027555, at *8 (S.D.N.Y. Dec. 30, 2022). Here, the Amended Complaint specifies where each of the fraudulent statements the Vanderhaegen Defendants cite occurred—over email, or, in one case, over the phone. AC ¶¶ 75, 77, 81, 83, 87, 90, 95, 97, 100. There is no requirement that Plaintiffs specify at this stage exactly who at Baltisse and Pentacon received the fraudulent emails. *See, e.g.*, *Chorches*, 865 F.3d at 88–89 (upholding allegations that fraudulent claims were submitted "to Medicare or Medicaid").[4] The Vanderhaegen Defendants are on fair notice; indeed, their own exhibits show that they know exactly who received the fraudulent valuations.

The Vanderhaegen Defendants also argue that the allegations are in some places insufficient, seemingly because they do not quote all of Defendants' misrepresentations verbatim. V.D.Br. 22–23.[5] But that likewise asks for more than the law requires; "a complainant is not required to plead evidence," even in the context of Rule 9(b). *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1290 (S.D.N.Y. 1996) (quoting *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974)); *see also Byrnes v. Small*, 142 F. Supp. 3d 1262, 1270 (M.D. Fla. 2015) ("[T]here is no requirement that Plaintiffs allege each misrepresentation word-for-word."). The complaint need only provide enough "circumstantial detail," in light of "the nature of the case, the complexity or

---

[4] Even in the lone unpublished decision that the Vanderhaegen Defendants offer to support their contrary view, that factor was not dispositive; the complaint there also "provide[d] no particularized information as to when the statements were made," nor any allegations as to the "factual circumstances" suggesting "fraudulent intent." *Nakahara v. Bal*, 1998 WL 35123, at *10 (S.D.N.Y. Jan. 30, 1998). The same cannot be said here.

[5] For instance, they accuse Plaintiffs of "impermissibly summarizing" documents. V.D.Br. 22-23. But the Amended Complaint is replete with direct quotations and the exact figures Plaintiffs provided. *See, e.g.*, AC ¶¶ 99–100 ("Vanderhaegen reassured Plaintiffs in an email on August 28, 2020 that they would receive an updated set of valuations and that the updated valuations would 'remove[] your uncertainty about the value of our projects,'" before sending them valuations of pipeline projects totaling "$147 million"). The only case cited, *Gao v. Yang*, 2022 WL 2193290, at *3 (S.D.N.Y. Jun. 17, 2022), included no such allegations, and in any event addressed the "two layers of heightened pleading requirements" in federal securities fraud cases, which require plaintiffs to plead facts demonstrating a particularly strong inference of scienter. *Id.* at *2. The court did not even address whether plaintiff had stated state law fraud claims, declining to exercise its supplemental jurisdiction. *Id.* at *5 (citation omitted).

simplicity of the transaction or occurrence, [and] the relationship of the parties," to "give notice to the adverse party and enable him to prepare a responsive pleading." *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (citation omitted). Here, there can be little doubt that "Defendants have sufficient 'notice' of Plaintiff[s'] claim[s] such that they can respond and prepare an adequate defense." *Reynolds*, 136 F. Supp. 3d at 524; *see MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 100 (2d Cir. 2023) (vacating 9(b) dismissal where plaintiff "stated the circumstances" with "enough particularity to give fair notice of her claim and enable preparation of a defense"); *Charles Schwab*, 883 F.3d at 94 (similar).[6]

### 2. The Alleged Misrepresentations Are Actionable

The Vanderhaegen Defendants suggest that some of their misrepresentations are not actionable as statements of "value" or "opinion." *See* V.D.Br. 23–27. This is not the law.

#### (a) Defendants' Misrepresentations of Value Are Actionable

The Amended Complaint details how Defendants sent one phony assessment of Origis USA's assets after another, on specific dates, while knowingly concealing the accurate information that they prepared. AC ¶¶ 75–78, 81–84, 90–92, 100–03, 111. The valuations sent to Plaintiffs were not billed as, nor were they, Vanderhaegen's casual, subjective opinions. Rather, they were created as business records by the top executives of Origis USA. Vanderhaegen vouched for their

---

[6] The Vanderhaegen Defendants' remaining arguments are buried in the facts section and thus forfeited. *See, e.g.*, *Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*, 2017 WL 2116701, at *16 n.11 (E.D.N.Y. Mar. 31, 2017); *In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *17 (D. Del. Oct. 4, 2018), *report and recommendation adopted*, 2019 WL 1409454 (D. Del. Mar. 28, 2019). To the extent this Court considers them, they are meritless, premised on extraneous evidence, failures to take all reasonable inferences in Plaintiffs' favor, and a misunderstanding of the law. For instance, the Vanderhaegen Defendants fault Plaintiffs for not identifying the "purpose of [the July 2020] valuations," the exact "input" provided by Origis USA officers, or the "identities" of the investment bankers. V.D.Br. 14–15. But Rule 9(b) "does not demand that a plaintiff plead every fact that forms the alleged violations, and a defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007).

accuracy when he told Plaintiffs in writing that they would be provided to "remove[] your uncertainty about the value of our projects." *Id.* ¶ 99. What was especially pernicious about Defendants touting these misrepresentations is that they were in stark contrast to the simultaneously prepared, hidden, analyses of company assets which Origis USA had calculated for itself and that supported *Defendants'* decision to go forward with the SRA transaction. *See id.* ¶ 101.

Such false and misleading valuations are the proper subject of fraud claims. Fraud is actionable where, for example, plaintiffs allege that defendants "distributed a set of false and fictitious financial projections" while "intentionally withh[olding] other accurate projections." *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 274, 285–86 (1987). Moreover, "when [buyers] "actively induce[] a [seller] to forbear from investigating the value for themselves or otherwise dupe[] the [seller] through exceptional enough facts, courts will . . . hold the [buyer] responsible for his or her misstatements as fraud." *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 563 (E.D.N.Y. 2010) (citation omitted). The Amended Complaint alleges exactly this kind of active inducement. Even while sending false valuation after false valuation to Plaintiffs over a period of almost two years, Defendants urged Plaintiffs to rely on those valuations by emphasizing that they could be trusted, by underscoring their fiduciary duties, by responding to requests with false financial information that they knew would be relied upon, and by accepting the Information Warranty and No Origis Sale clauses in the SRA. *See* AC ¶¶ 87–89, 99–100, 120, 124.

Further, as Defendants concede, statements of value are actionable as fraud at least "where a present intent to deceive exists." V.D.Br. 23–24 (internal quotations omitted). Even if Defendants' phony valuations had been merely statements of opinion—and they were not—they would be "actionable because the speaker either [1] did not in fact hold the opinion stated or [2] because the speaker subjectively was aware that there was no reasonable basis for it." *M&T Bank Corp. v.*

*McGraw Hill Cos., Inc.*, 126 A.D.3d 1414, 1416 (4th Dep't 2015) (quoting *IKB Int'l S.A. v. Bank of Am.*, 2014 WL 1377801, at *1 (S.D.N.Y. Mar. 31, 2014)); *see also Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 628 (1969) (holding that statements are actionable "if misrepresented as a sincere opinion"). The emails from Vanderhaegen to potential financing sources, as well as the contemporary, concealed, higher valuations—which valued the project pipeline at up to $1.5 billion—confirm that the dramatically lower valuations provided to Plaintiffs were fraudulent misrepresentations. *Cf. People v. Trump*, No. 452564/2022, Doc. 1531, at 21–31 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 26, 2023) (rejecting the argument that inflated valuations of real property and licensing deals represented subjective, good faith estimates).

The Vanderhaegen Defendants fight the obvious inference from the allegations in the Amended Complaint that Defendants believed the valuations they concealed from Plaintiffs and disbelieved the starkly lower valuations sent to Plaintiffs at nearly identical points in time. *See* V.D.Br. 24–26.[7] Consistent with this inference, there was not a single occasion on which Defendants provided Plaintiffs with a valuation that was even remotely close to Defendants' contemporaneous, concealed, higher valuations. AC ¶¶ 75–78, 81–84, 90–92, 100–03, 111. The lower valuations that Defendants used "only" when "seeking to repurchase equity interests," at best for Defendants, raise an issue of fact as to whether they misrepresented their subjective opinions. *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 324–25 (S.D.N.Y. 2022).

### (b)   Defendants' Other Alleged Misrepresentations Are Actionable

The Vanderhaegen Defendants object that four other misrepresentations they made—in addition to the phony valuations—are not actionable. They are wrong.

---

[7] They also wrongly suggest that Plaintiffs must establish Vanderhaegen's state of mind through "particularized" allegations. V.D.Br. 24. "[C]onditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

*First*, Defendants misrepresented that "nobody pays much goodwill" to induce a near-exclusive focus on the misrepresented value of Origis USA's projects on the list provided to Plaintiffs, as opposed to on the value of Origis USA as a platform. AC ¶¶ 67, 77, 116. They knew that was not true. The very same day that they made one such representation to Plaintiffs, Vanderhaegen sent an email to Global Atlantic, a shareholder who was keeping and indeed increasing its ownership, representing that Origis USA's goodwill was worth between $50 to $80 million. *Id.* ¶¶ 77–78. Goodwill, like the various solar energy projects, is an asset of Origis USA, and like the lies about the project pipeline valuations, Defendants' statements about goodwill were both false and were known to be false when made. Whether Vanderhaegen "in fact held the belief he professed" with respect to goodwill is, at a minimum, an issue to be pursued during discovery. *Liekteig*, 589 F. Supp. 3d at 325.

*Second*, the Vanderhaegen Defendants misconstrue Plaintiffs' argument as to why their misrepresentation that "the Rockhound projects could not be reliably valued and were not saleable" is actionable. AC ¶ 110. They claim "fraud by hindsight" based on a post-closing $145 million bid for those projects. V.D.Br. 26.[8] But the Amended Complaint alleges Vanderhaegen's knowledge *before* the SRA transaction. "[E]ven while making these misrepresentations," Defendants already had internal valuations from Origis USA that showed the Rockhound projects "to be some of the most valuable of Origis USA's projects." AC ¶ 111. And, on September 3, 2020, they received further valuations "that again confirmed their outsized value in the Origis USA pipeline." *Id.* Vanderhaegen's statements about the Rockhound projects were thus neither true nor believed to be true when made.

---

[8] Defendants also inject new facts, without any citation, claiming that the projects still have not been sold. V.D.Br. 16. Not only is this improper, but it is flatly contradicted by the fact that the projects—along with all of Origis USA's assets—were sold to Antin.

*Third*, the Vanderhaegen Defendants' "long-term holder" misrepresentations are likewise actionable. "[A] promise 'made with a preconceived and undisclosed intention of not performing it'" constitutes "a material misrepresentation of fact." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 210 (2d Cir. 2018) (citation omitted). Moreover, "a present intention not to fulfill a promise is generally inferred from surrounding circumstances, since people do not ordinarily acknowledge that they are lying." *Braddock v. Braddock*, 871 N.Y.S.2d 68, 73 (1st Dep't 2009). Here, Defendants' intent to flip the company shortly after they obtained Plaintiffs' shares is alleged explicitly in the Amended Complaint, *see, e.g.*, AC ¶¶ 105, 162, and can easily be inferred from the specific allegations about their conduct before and after the execution of the SRA. Even *before* the two SRA closings, Origis USA had enlisted investment bankers to analyze the company and begin the sales process. *Id.* ¶¶ 103–05. And, within months of the closings, Defendants had built a data room, circulated information to potential buyers, solicited bids, and struck a deal to sell the company. *Id.* ¶¶ 148–52. These are not the actions that one takes when in it for the long haul.

*Fourth*, for similar reasons, Plaintiffs' allegations of the Amended Complaint show that Vanderhaegen never intended to keep his promise to Plaintiff Pentacon that it could reinvest. *See* V.D.Br. 26–27. Again, his plan all along was to eliminate Plaintiffs and then quickly resell their interests at a massive profit, which is why, when Pentacon asked him to reinvest, he told them they could not. AC ¶ 106. He only told Pentacon that it would be allowed to reinvest to induce them to go along with the buyout. *See id.*

### 3.     The Alleged Concealment of Information is Actionable

Defendants also defrauded Plaintiffs by knowingly and deliberately concealing material information while making contradictory representations to Plaintiffs. Some of the concealed valuations Plaintiffs have already learned about—pre-discovery—include those they shared internally on April 22, 2019, May 19, 2019, January 7, 2020, January 29, 2020, March 2, 2020, July 22,

2020, and September 3, 2020. *Id.* ¶¶ 76, 78, 82, 84, 91, 101–03, 111. Defendants' concealed valuations *all* showed much higher values for Origis USA and/or its pipeline than the contemporaneous information Defendants transmitted to Plaintiffs. *Id.* ¶¶ 75, 77, 81, 83, 90, 99–100.

The Vanderhaegen Defendants argue that concealing these internal valuations constitutes non-actionable acts of omission. V.D.Br. 30–31. But the "special facts" doctrine allows Plaintiffs to plead fraud by omission, even if the Vanderhaegen Defendants had no fiduciary duties to Plaintiffs (which they did). *Sports Tech. Apps., Inc. v. MLB Advanced Media, L.P.*, 188 A.D.3d 619, 620 (1st Dep't 2020) (citation omitted). As insiders who controlled the flow of information, Defendants had "superior knowledge of essential facts" regarding Origis USA that were not "discoverable through the exercise of ordinary intelligence." *Id.* And Defendants knew that Plaintiffs were "acting on the basis of mistaken knowledge" regarding the true value of Origis USA. *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 465 (S.D.N.Y. 2019) (citation omitted). Notably, the SRA transaction was not one in which Plaintiffs signed a so-called "big boy" letter confirming that they understood Defendants might be aware of other material, undisclosed information. To the contrary, in the Letter of Intent and the SRA, the parties agreed to a transaction that required and was based on full disclosure by Defendants precisely because Defendants had superior access to information about Origis USA and its assets. *See* SRA § 4.4; AC ¶¶ 119–20.

Moreover, even if Defendants had not had an affirmative duty to speak, once they "d[id] speak," they had to "disclose enough to prevent [their] words from being misleading." *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 188 n.3 (2016) (quoting W. Keeton et al., *Prosser and Keeton on Law of Torts* § 106 (5th ed. 1984)). "[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir.

28

2016) (quoting Restatement (Second) of Torts § 529 cmt. a (1977)). Selectively sharing only depressed valuations, while concealing higher ones, falls "squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Escobar*, 579 U.S. at 188–89 (citing *Junius Const. Co. v. Cohen*, 257 N.Y. 393, 400 (1931) (Cardozo, J.)).[9]

### 4.  Plaintiffs Relied on the Misrepresentations

The Vanderhaegen Defendants claim that, because Plaintiffs *initially* expressed some doubts about the information being conveyed to them, they did not rely on Defendants' misrepresentations. *See* V.D.Br. 27. But, far from disproving Plaintiffs' reliance, the actual sequence of events confirms it. When Plaintiffs brought these doubts to Vanderhaegen's attention in May 2019, he "firmly dismissed Plaintiffs' suggestion as to the [] company's [greater] value" AC ¶ 77. Defendants then sent Plaintiffs numerous additional false and misleading valuations, including an "updated" pipeline valuation of $147 million on September 10, 2020—right before the SRA was signed—to "remove[] [Plaintiffs'] uncertainty about the value of [Origis'] projects," and Vanderhaegan "doubled down on [those] knowingly false valuations by going through [them] in detail on the phone" *Id.* ¶¶ 99–100. Indeed, while Defendants argue that this phony valuation was not intended to state the true pipeline value, but only the price of options granted to Global Atlantic, V.D.Br. 13, this argument is neither credible nor appropriate for a motion to dismiss.

Especially after taking all reasonable inferences in Plaintiffs' favor, it is easy to see how producing that valuation and going over it on the telephone at the express request of Plaintiffs to

---

[9] For the same reason, the Court should reject Defendants' argument that the definition of "Fraud" in the SRA, which refers to "misrepresentations," does not cover "claims based on omissions." V.D.Br. 31; *see* OUSA.Br. 10 n.16. That argument attempts to rewrite the accepted definition of a misrepresentation, which includes both affirmative false statements and half-truths rendered misleading by non-disclosure or concealment. *See Escobar*, 579 U.S. at 189; *Sports Tech.*, 188 A.D.3d at 620.

help them understand value would induce reliance. Plaintiffs did not ask Defendants what options were being granted to Global Atlantic. After all, Plaintiffs would be gone from the company at the time any of those options would be exercised. The question asked of Vanderhaegen and the Origis USA management was very different and germane to Plaintiffs' decision about whether to sell their shares—what do your analyses show that the company and its assets are worth? Defendants clearly dissembled about that while at the same time hiding the higher $1.5 billion valuation they had in their pocket. That conduct was materially false and misleading.

Plaintiffs—relying on all of these misrepresentations—signed the SRA. *Id.* ¶¶ 108, 114. They would never have sold their interests at the grossly deficient price that they did if Defendants had been truthful. That should be glaringly obvious. No rational human being would have agreed to sell their controlling interest based on the valuations provided by Defendants if they had known about their much higher undisclosed valuations, including a higher, internal analysis valuing the solar energy pipeline at over $1 billion.

### 5. Plaintiffs Justifiably Relied on Defendants' Misrepresentations

The Vanderhaegen Defendants argue that Plaintiffs did not conduct adequate diligence and so their reliance on the information that was fed to them was unreasonable. V.D.Br. 28–30. As an initial matter, "the question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015); *see DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 155 (2010). It is a matter for discovery and trial. Moreover, "even sophisticated plaintiffs are not required as a matter of law to 'conduct their own audit' or 'subject their counterparties to detailed questioning' where they have bargained for representations of truthfulness." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 496 (S.D.N.Y. 2012) (alteration adopted) (quoting *DDJ*, 15 N.Y.3d at 156). Here, Plaintiffs took "reasonable steps" to protect themselves

against Defendants' fraud, going through "the trouble to insist on a [specific] written representation" that they had received a complete and not misleading set of all material information regarding the business and its assets. *DDJ*, 15 N.Y.3d at 154; *see* SRA § 4.4. They also specifically requested a project-by-project valuation report and went over that report with Vanderhaegen on the phone, and they insisted on the No Origis Sale Clause to protect themselves by removing the incentive to quickly flip the company to monetize hidden value. AC ¶ 18, 99–100, 124. These allegations suffice to show reasonable reliance, particularly after construing the facts in Plaintiffs' favor.

But there is more. Courts also take "account of the degree to which the truth was accessible to the defrauded person," *Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26–27 (2d Cir. 1997), as well as "the superior knowledge or means of knowledge on the part of the person making the representation," *Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1, 10 (1st Dep't 2019). Here, Defendants had "superior knowledge or means of knowledge" regarding the Origis business. *Id.* Vanderhaegen "was the CEO and President" of both Origis entities and "ran the day-to-day business." AC ¶¶ 7, 56. He also exercised "control over the detail and flow of information to Plaintiffs about [that] business" and "screened the information Plaintiffs received." *Id.* ¶ 57. Plaintiffs, by contrast, were "an ocean away" and could not obtain the information themselves. *See id.* ¶¶ 11, 52–55, 120. "The COVID pandemic prevented Plaintiffs from traveling to the United States." *Id.* ¶ 58.[10] Add it all up, and Plaintiffs *had* to rely on Defendants to provide complete and accurate information; they had no realistic way of accessing it themselves. *Id.* ¶ 14. Plaintiffs could not have discovered Defendants' fraud by studying the

---

[10] Plaintiffs' reliance was "all the more reasonable" because—as directors, officers, and fellow shareholders in a close corporation—the Vanderhaegen Defendants owed Plaintiffs fiduciary duties. *Cordaro v. AdvantageCare Physicians, P.C.*, 208 A.D.3d 1090, 1092 (1st Dep't 2022) (noting that a "fiduciary relationship between the parties" reinforces a finding of reasonable reliance) (citation omitted); *see also infra* Section III.D.1. Vanderhaegen even invoked those duties "to convince Plaintiffs to rely on the honesty and completeness of his statements." AC ¶ 87.

U.S. solar energy market, *see* V.D.Br. 29, because the facts misrepresented consisted of the company's own internal valuations of its projects. Indeed, Vanderhaegen admitted that Plaintiffs' "lack of understanding of the business" at the time gave Defendants the opportunity to take Plaintiffs' shareholdings at an artificially low price. *Id.* ¶¶ 64–65.

All that distinguishes this case from those on which Defendants rely. *See* V.D.Br. 28–29. This is not a case where Plaintiffs "conducted no due diligence" and "did not ask" Defendants for data. *MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459 (1st Dep't 2014). Nor is it a case where Plaintiffs "could have easily performed an independent appraisal," as with the real property sold in *Project Verte, Inc. v. Zuchaer & Zuchaer Consulting, LLC*, 2021 WL 2856522, at *4 (S.D.N.Y. July 8, 2021). This is instead a case where the Plaintiffs conducted the due diligence reasonably available to them, in a situation where Vanderhaegen and his management exercised complete control over the business and touted their disclosure obligations to Plaintiffs, and secured contractual protections to supplement that due diligence. In any event, whether reliance "was reasonable or whether due diligence would have revealed the truth are issues of fact that cannot be resolved at this stage of the litigation." *Union Ave Estates, LLC v. Garsan Realty Inc.*, 170 A.D.3d 498, 499 (1st Dep't 2019).

**B.** **The Amended Complaint States Claims for Aiding and Abetting Fraud (Count III)**

Each of the Defendants, including Vanderhaegen and Origis USA, collaborated to accomplish the alleged fraud—and each of the Defendants engaged in fraud themselves. *See supra* Section III.A.; Resp. to Origis USA Mot. to Dismiss, Section II. For this reason, the Vanderhaegen Defendants are wrong to suggest that there was no fraud to aid and abet. *See* V.D.Br. 31. Beyond that, the Vanderhaegen Defendants argue only that the Amended Complaint pleads no "affirmative

act" by Pelican Invest and the Vanderhaegen Trust. *Id.* (citation omitted). But the Amended Complaint alleges that Vanderhaegen acted through Invest and the Trust. AC ¶ 43. It was through Invest that Vanderhaegen served as board director for Origis Energy, and it was through the Trust that he held "his ownership interest in Origis Energy and Origis USA." *Id.* ¶¶ 39–40. His actions were the "affirmative" acts of Invest and the Trust, and there were no other individuals acting for them. *See id.*[11] In other words, Vanderhaegen was Invest and the Trust and they were him.

## C.  The Amended Complaint States a Claim for Civil Conspiracy (Count IV)

A claim of conspiracy is subject to "the more liberal pleading requirements of Rule 8(a)." *Aghaeepour v. N. Leasing Sys., Inc.*, 2015 WL 7758894, at *2 (S.D.N.Y. Dec. 1, 2015) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990)). This Court has emphasized that "great leeway should be allowed the pleader" in alleging such a claim, "since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008) (citation omitted). The Vanderhaegen Defendants offer a trio of perfunctory arguments for dismissal of the conspiracy claim, none of which comes close to hitting the mark. *See* V.D.Br. 32.

*First*, they suggest the absence of an overt act. But a plaintiff need only plead "one overt act by one of the conspirators in furtherance of the unlawful plan." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 490 (S.D.N.Y. 2015) (citation omitted). Here, Plaintiffs have "allege[d] countless overt acts committed by members of the conspiracy," *id.*, most notably the creation of the fraudulent valuations and their transmission to Plaintiffs.

---

[11] Furthermore, a defendant "may provide substantial assistance by *failing* to act when it was required to act." *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (emphasis added; citation omitted). Because Invest and the Trust—like all of the Vanderhaegen Defendants—owed Plaintiffs fiduciary duties, *see infra* Section III.D.1, they were required to speak up, and are all liable for concealing the acts of fraud of which they were aware. *See Dubai Islamic Bank*, 256 F. Supp. 2d at 167; *Flycell, Inc. v. Schlossberg LLC*, 2011 WL 5130159, at *9–10 (S.D.N.Y. Oct. 28, 2011); *see also* AC ¶¶ 12, 59, 180.

*Second*, the Vanderhaegen Defendants argue that a corporation cannot conspire with its owner. But that "principle" applies *only* where an individual is the "sole owner" of the company. *Goldman v. Barrett*, 2017 WL 4334011, at *8 n.8 (S.D.N.Y. July 25, 2017). At no point were any of the Vanderhaegen Defendants the "sole owner" of Origis USA. Nor were any of them even a *majority* owner of that company, not even indirectly, until the fraudulent buyout was complete.

*Third*, the Vanderhaegen Defendants suggest that the conspiracy claim is duplicative of Plaintiffs' other claims. But a conspiracy claim is not duplicative where "used to connect the [defendants] to torts committed by others." *Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 705 (S.D.N.Y. 2008). Furthermore, "[t]he Federal Rules specifically allow pleading in the alternative," and it would be premature to dismiss one theory of secondary liability or the other. *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 202 (2d Cir. 2023) (citing Fed. R. Civ. P. 8(d)(2)).

### D.   The Amended Complaint States Claims for Breach of Fiduciary Duty and Constructive Fraud (Counts V and VI)

It should be obvious that a fiduciary's execution of a plan to misrepresent and conceal material facts from the principal constitutes a breach of fiduciary duties. This is well supported under New York law. *See, e.g.*, *Tiny 1, Ltd. v. Samfet Marble Inc.*, 201 A.D.3d 423, 424 (1st Dep't 2022); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 120 (S.D.N.Y. 2009); *Salm v. Feldstein*, 20 A.D.3d 469, 470 (2d Dep't 2005); *Bernstein v. Kelso & Co.*, 231 A.D.2d 314, 320–21 (1st Dept. 1997). The Vanderhaegen Defendants' arguments for dismissal of the fiduciary duty claims lack merit.

#### 1.   The Vanderhaegen Defendants Owed Fiduciary Duties to Plaintiffs

The Vanderhaegen Defendants all owed fiduciary duties to Plaintiffs as officers, directors, and shareholders in Origis Energy.[12]  New York law is clear that "one who . . . is a shareholder,

---

[12] Vanderhaegen held the position of a board director, CEO, and President of Origis Energy, the entity in which Plaintiffs held their shares. AC ¶¶ 7, 51–51, 54. Pelican International and the Trust were the entities through which (continued…)

officer and director of a closely held corporation, is under a duty to deal fairly, in good faith, and with loyalty to the corporation *and other shareholders*." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 905 (2d Cir. 1998) (emphasis added; quotation marks omitted); *see Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 568–69 (1984); *see also* AC ¶ 12. Moreover, "when a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts." *Littman v. Magee*, 54 A.D.3d 14, 17 (1st Dep't 2008), *limited in part on other grounds by Centro*, 17 N.Y.3d 269 (citation omitted). In the context of a buyout, the fiduciary must "disclose any information in their possession that could reasonably bear on [the beneficiary's] consideration of [the fiduciary's] offer." *Id.*; *see also Dubbs v. Stribling & Assocs.*, 96 N.Y.2d 337, 340–41 (2001).[13]

The Vanderhaegen Defendants both uttered outright falsehoods to Plaintiffs and withheld from Plaintiffs critical information relevant to the potential market value of their shares. *See, e.g.*, AC ¶¶ 75–78, 81–84, 90–92, 100–103, 111. They "had no right to keep" such information from Plaintiffs in breach of their fiduciary duties. *Meisel*, 651 F. Supp. 2d at 121 (citation omitted).[14]

### 2.   New York Law Applies to Plaintiffs' Claims

The Vanderhaegen Defendants attempt to shift the battlefield to Belgium by arguing that

---

Vanderhaegen held his shares. *Id.* ¶¶ 39, 41. Pelican Invest was the entity through which Vanderhaegen held his directorship. *Id.* ¶ 40.

[13] Importantly, the fiduciary duties that were owed to Plaintiffs were not extinguished by the commencement of negotiations to repurchase their shares. Rather, they "continued 'until the moment the buy-out transaction closed'" on January 4, 2021. *Frame v. Maynard*, 83 A.D.3d 599, 602 (1st Dep't 2011) (quoting *Blue Chip Emerald v. Allied Partners*, 299 A.D.2d 278, 279 (1st Dep't 2002)); *see also Ajettix Inc. v. Raub*, 804 N.Y.S.2d 580, 587–88 (N.Y. Sup. Ct. Monroe Cnty. 2005).

[14] "The elements of constructive fraud are the same as those for actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties." *Klembczyk v. DiNardo*, 265 A.D.2d 934, 935 (4th Dep't 1999). Because the Vanderhaegan Defendants had fiduciary duties, and because the other elements of fraud are met, *see supra* Section III.A., Plaintiffs have stated their claim for constructive fraud as well.

Belgian law applies. V.D.Br. 20-22. But the parties agreed in the SRA's New York law choice-of-law clause that "conflict-of-law" rules would not apply:

> This Agreement and any claim arising out of *or in connection with this Agreement* shall be governed by, construed, and enforced in accordance with the Laws of the State of New York *without giving effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction*.

SRA § 9.12 (emphases added); *see* AC ¶ 126. In fact, this clause, rather than a Belgian law provision, was included in the SRA at Vanderhaegen's instance. AC ¶ 126.

Even though they were the ones who insisted on New York law, the Vanderhaegen Defendants now attempt to pirouette and argue that the "internal affairs" doctrine should override their express agreement. But the New York Court of Appeals has expressly "reject[ed]" any "automatic application of the so-called 'internal affairs' choice-of-law rule." *Greenspun v. Lindley*, 36 N.Y.2d 473, 478 (1975). And it has stressed that the "freedom to contract is an important public policy in New York." *Deutsche Bank Nat'l Tr. Co. v. Flagstar Cap. Mkts.*, 32 N.Y.3d 139, 154 (2018). As a result, New York "recognize[s] the right of contracting parties to agree to choice of law," including for tort claims related to the contract. *Turtur v. Rothschild Registry Int'l*, 26 F.3d 304, 310 (2d Cir. 1994). Indeed, this Court has rejected the rote application of the internal affairs doctrine even in the *absence* of a choice-of-law clause. *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006); *see also UBS Sec. LLC v. Highland Cap. Mgmt., L.P.*, 2011 WL 781481, at *3 (Sup. Ct. N.Y. Cnty. Mar. 1, 2011) (declining to apply internal affairs doctrine).

In light of these clear principles, the SRA's choice-of-law clause governs all of Plaintiffs' claims, including the fiduciary duty claims. In fact, "to eliminate uncertainty and to permit the parties to choose New York's 'well-developed system of commercial jurisprudence,'" the state legislature has provided that parties may agree to be governed by New York's laws even if their agreement bears no "'reasonable relation to th[e] state.'" *IRB-Brasil Resseguros, S.A. v. Inepar*

*Invs., S.A.*, 20 N.Y.3d 310, 314 (2012) (quoting N.Y. Gen. Obligations Law § 5-1401(1) and ac-companying Sponsor's Memorandum). New York has every interest in enforcing that voluntary choice of law, here a choice made at Vanderhaegen's own insistence. By contrast, Belgium has little interest in applying its law to trump the Parties' agreement—especially since the Belgian entity, Origis Energy, is now "defunct" and the Vanderhaegen Defendants "no longer serve" that company. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006) (refusing to apply the internal affairs doctrine to fiduciary duty claims where the companies are "defunct" and defendants "no longer serve" on their boards).

Defendants have not identified any case law to the contrary. Not a single one of their cases actually addressed a choice-of-law clause that, as does the SRA, required the application of New York law. *See* V.D.Br. 21; OUSA.Br.20 n.22.[15]

### 3. In any Event, Belgian Corporate Law Recognizes Duties Which Are the Functional Equivalent of New York Law

Even if this Court were to apply Belgian law, the result would be the same. The Vanderhaegen Defendants argue that Belgian law does not recognize "fiduciary" duties owed to shareholders, relying on a declaration from Prof. Roman Aydogdu. *See* V.D.Br. 20–22. But Professor Aydogdu's opinion on its face makes clear that it deals only with the exceedingly narrow question of whether Belgian law recognizes "fiduciary duties" by that name. *See* Aydogdu Decl. ¶ 3 (framing the question as whether, under Belgian law, the Defendants "owed so-called fiduciary duties towards the Plaintiffs"). He "deliver[ed] no opinion outside the scope of [that] question." *Id.* ¶ 5.

---

[15] In *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, the Parties "expressly contracted to have any cause of action or controversy adjudicated under New York law" but *did not* disclaim the application of New York conflict-of-law principles. 423 F. Supp. 2d 348, 363 (S.D.N.Y. 2006). And in *BBS Norwalk One v. Raccolta, Inc.*, the "choice-of-law provision" was "narrow and [did] not purport to govern" the claim at issue. 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999); *see also Diesenhouse v. Soc. Learning & Payments, Inc.*, 2022 WL 3100562, at *9 (S.D.N.Y. Aug. 3, 2022) (similar).

As Professor Wyckaert explains, however, Belgian law, unsurprisingly, has the functional equivalent of New York's fiduciary duty obligations.[16] The allegations in the Complaint, if true, would support a claim against Vanderhaegen and his entities based on their breaches of the duty of good faith and loyalty. Wyckaert Decl. ¶¶ 4–6, 18–22. That claim, Professor Wyckaert explains, could be brought not only by the corporation, but also by Plaintiffs as shareholders. *See id*. The fact that the application of Belgian law would not change the outcome is yet another factor supporting the Court's application of New York law. *See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *O'Leary v. S & A Elec. Contracting Corp.*, 149 A.D.3d 500, 501 (1st Dep't 2017) ("[I]n the absence of any conflict . . . with respect to plaintiffs' ability to maintain this action, no choice-of-law analysis is required[.]").

**E.     The Amended Complaint States Claims for Breach of Contract (Counts VII, VIII, and IX)[17]**

A fundamental premise of the SRA was that Plaintiffs would receive complete and accurate information as part of their decision to sell and Defendants would not attempt to deceive them or "arbitrage" the information asymmetry. But that is just what Defendants did, in breach of multiple SRA's provisions that were designed to protect Plaintiffs—including the Information Warranty, the No Origis Sale Clause, and the implied covenant of good faith and fair dealing.

---

[16] Even Professor Aydogdu acknowledges that Belgian law recognizes duties of loyalty and good faith. *See* Aydogdu Decl. ¶¶ 11–12.

[17] "A party advancing a breach of contract claim need not satisfy the particularity requirement of Rule 9(b)." *Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at *6 (S.D.N.Y. Aug. 9, 2018) (Failla, J.) (citing *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir. 2012)).

### 1. The Vanderhaegen Defendants Are Jointly and Severally Liable for Breaches of the SRA

The Vanderhaegen Defendants argue Vanderhaegen, the Trust, and Pelican Invest, cannot be liable "because none of them is a party to the SRA." V.D.Br. 32. But the Amended Complaint alleges that the Vanderhaegen Defendants are "alter egos" of one another, AC ¶¶ 41–44, and "a non-signatory may be held liable" where it "is the alter ego of the signatory." *M.S.S. Constr. Corp. v. Century Sur. Co.*, 2015 WL 6516861, at \*9 (S.D.N.Y. Oct. 28, 2015) (collecting cases).[18] A plaintiff need only plausibly allege that "the individual has 'complete domination and control over the entity such that it no longer has legal or independent significance of its own.'" *Hectronic GmbH v. Hectronic USA Corp.*, 2020 WL 6947684, at \*1 (S.D.N.Y. Nov. 24, 2020) (citation omitted). This can be done by alleging that the two "operated as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (alteration adopted; citation omitted). Importantly, this is a "fact intensive" inquiry that should not be resolved lightly on a motion to dismiss. *McBeth v. Porges*, 171 F. Supp. 3d 216, 233 (S.D.N.Y. 2016) (citation omitted); *see also Hectronic*, 2020 WL 6947684, at \*9 ("Keeping in mind the fact-intensive nature of the analysis, the Court cannot find, at this point, that plaintiffs fail to plausibly allege an alter-ego claim . . . .").

Here, Vanderhaegen "has exercised absolute domination and control over Pelican International at all relevant times." AC ¶ 41. Pelican International observes no "corporate formalities" and has "no independent business." *Id.* Vanderhaegen is Pelican International's "sole director, officer, employee and/or agent," and his personal residence is its place of business. *Id.* It serves "solely as an instrument of [Vanderhaegen's] purposes, including to hold [his] personal wealth."

---

[18] Even assuming this presents a question of Delaware law, as Defendants suggest, *see* V.D.Br.32–33 & n.13, "New York and Delaware veil-piercing law do not materially differ," *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 518 n.4 (S.D.N.Y. 2017) (citation omitted).

*Id.* ¶ 41. Through Vanderhaegen, Pelican International participated "in the negotiation and execution of the SRA" and "in accomplishing the violations of law" described in the Amended Complaint. *Id.* ¶¶ 43–44. And, once the Antin transaction closed, Vanderhaegen seemingly siphoned funds from Pelican International to buy himself "a new $32 million mansion in Coral Gables, Florida." *Id.* ¶ 31. These facts support a plausible inference that Pelican International acted as a single enterprise. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995) (identifying factors, including whether "corporate formalities were observed," whether "the dominant shareholder siphoned corporate funds," and whether "the corporation simply functioned as a facade") (citation omitted); *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (adding "overlap in ownership, officers, directors, and personnel," "common office space, address and telephone numbers," "the degree of discretion," treatment "as independent profit centers," and "intermingling" of "funds") (citation omitted).

Pelican Invest and the Trust are likewise alter egos of Vanderhaegen and, through him, Pelican International. *See Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 713–14 (Del. Ch. Ct. 2021) (endorsing reverse veil-piercing). They lack personnel other than Vanderhaegen, do not observe corporate formalities, conduct no business of their own, and share his residence as their place of business. *See* AC ¶¶ 39–40. Notably, Pelican Invest, owned by Vanderhaegen and which appointed Vanderhaegen as its representative on Origis Energy's board, would be jointly liable with him for breaches of their duty under Belgian law. Wyckaert Decl. ¶ 11.[19]

Vanderhaegen now seeks to channel all liability into a single vehicle, Pelican International,

---

[19] No traditional "veil piercing" analysis is even required for the Trust. "The property of a [Florida] revocable trust is subject to the claims of the settlor's creditors during the settlor's lifetime to the extent the property would not otherwise be exempt by law if owned directly by the settlor." *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 125 (S.D.N.Y. 2016) (quoting Fla. Stat. § 736.0505(1)(a)). The Trust cannot shield Vanderhaegen's assets from legitimate claims against him.

from which he has been siphoning assets. The law does not permit this misuse of corporate shells. Indeed, "[c]ourts routinely pierce the corporate veil where there is a nexus between the domination and the injustice, even if the injustice forms a basis for the underlying cause of action, so long as the corporate form is used to perpetrate the injustice." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 341 (S.D.N.Y. 2021); *see Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, 2020 WL 6690659, at *11 (S.D.N.Y. Nov. 13, 2020).[20]

Finally, whether or not it is an alter ego, a parent can be held liable when it is in privity of contract or its "conduct manifests an intent to be bound by the contract," including when it participates "in the negotiation of the contract," when the "the subsidiary is a dummy for the parent," or when "the subsidiary is controlled by the parent for the parent's own purposes." *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396–400 (S.D.N.Y. 2009) (quotation marks omitted). Vanderhaegen, Pelican Invest, and the Trust all participated in the negotiation and execution of the SRA, AC ¶ 44, and Pelican International was a "dummy" controlled by Vanderhaegen for his personal benefit. All are bound by the SRA.

### 2.    The Vanderhaegen Defendants Breached the Information Warranty

The Information Warranty in the SRA was included to protect Plaintiffs against the possibility that they had not received materially complete, accurate, and non-misleading information about Origis USA, its assets, and its project pipeline. It provided:

> Buyer has made available to each Seller documents and information regarding (a) the business, financial condition, assets, liabilities and results of operations of the Company and its Subsidiaries, (b) the Company's development pipeline of solar power and energy storage projects and (c) any value indications by any party showing an interest to acquire part or all of the shares of a direct or indirect Subsidiary of the Company, any assets held

---

[20] Nor can the Vanderhaegen Defendants seek refuge in the SRA's No Recourse Clause. V.D.Br. 33. As already explained, when a "plaintiff sufficiently allege[s] misconduct by defendant under an alter ego theory, the no recourse clause of the contract does not insulate defendant from liability." *N.Y. Wheel*, 205 A.D.3d at 651; *see Cortlandt St. Recovery Corp.*, 215 A.D.3d at 448.

> by a direct or indirect Subsidiary of the Company or by any party showing an interest in acquiring the Origis Equity or Assets. Those documents and that information are (i) complete in all material respects and (ii) do not contain any untrue statement of a material fact or fail to state a material fact necessary to make the statements contained therein, not misleading, in the case of clauses (i) and (ii) based on a reasonable assessment by Buyer or the Company of information reasonably available to Buyer or the Company and taking into account the experience of Buyer and the Company.

SRA § 4.4. The SRA also required that this warranty remain true at the date of the SRA and also at the First Closing on October 15, 2020 and the Second Closing on January 4, 2021, as if made again on those dates. *Id.* §§ 6.2(a), 6.4(a). The Vanderhaegen Defendants breached that warranty "by, among other things, making false and misleading statements of material fact regarding Origis, its financial condition, and its assets—including the value of Origis USA and its pipeline"—and by falsely "claim[ing] that the Rockhound Projects could not be reliably valued or sold." AC ¶ 205.

The Vanderhaegen Defendants argue that the Information Warranty was "limited to specific subjects" and fixate on its requirement to provide "value indications" from third parties. V.D.Br. 33. But the Warranty extended beyond the provision of such "value indications" to broadly include "documents and information regarding . . . the business, financial condition, assets, liabilities, and results of operations" of Origis USA and its "development pipeline of solar power and energy storage projects." SRA § 4.4. "Those documents and that information" were further warranted to be "complete in all material respects," free of "any untrue statement of a material fact," and inclusive of any "material fact necessary to make the statements contained therein, not misleading." *Id.* Defendants do not even begin to explain how their false valuations, coupled with the concealed higher valuations, fall outside the warranty's expansive scope. Nor could they. Those reports—whether for the business or pipeline as a whole or the specific Rockhound Projects—qualify as "documents" or "information" "regarding . . . the business, financial

condition, [and] assets," of Origis USA, as well as its "development pipeline." *Id.* Indeed, Defendants clearly understood that their valuations fell within the scope of the Information Warranty, since they specifically provided false valuations to Plaintiffs to feign compliance with it. AC ¶ 90.

Defendants also ignore that the Information Warranty forbade the provision of documents and information such that "the statements contained therein" were "misleading" or "[in]complete." SRA § 4.4. That is precisely what occurred here. For instance, while "vouching for the accuracy of the $147 million valuation" given to Plaintiffs, Vanderhaegen concealed information "show[ing] that Origis USA's projects were potentially worth over $1.5 billion." AC ¶ 101. That undisclosed valuation was "the product of careful analysis and input from the top-ranking officers in Origis USA, including Vanderhaegen himself," and "from outside investment bankers enlisted by Origis USA." *Id.* ¶¶ 102–03. Without disclosure of this information showing hundreds of millions of dollars of greater value than that presented to Plaintiffs, the information given to Plaintiffs by Defendants was *per se* misleading. *Cf. Trump*, No. 452564/2022, Doc. 1531, at 21 (finding that the magnitude of the discrepancies rendered defendants' representations obviously fraudulent).

The Vanderhaegen Defendants likewise fail to grapple with the fact that the Information Warranty was carried down to the First and Second Closings and that they warranted it would remain "true and correct in all respects" "as if made on [those] date[s]." SRA §§ 6.2(a), 6.4(a). They knew that they had a "golden deal" in hand well before the closings. AC ¶ 129. But they continued to suppress information regarding the business and its assets and failed to correct their earlier misrepresentations through the First Closing on October 15, 2020, and the Second Closing on January 4, 2021. *See id.* ¶¶ 128–30 (solar market report from investment bankers detailing "[a] [w]hite [h]ot [m]arket for [s]ustainability"); *Id.* ¶ 132 ("significant information" from investment bankers about Origis USA's value and "detailed information" regarding options for a sale of the

company). These failures constitute separate and additional breaches of the SRA.

### 3. The Vanderhaegen Defendants Breached the No Origis Sale Clause

The Vanderhaegen Defendants fare no better with respect to the alleged breach of the No Origis Sale Clause. It provides that "[f]rom and after the Second Closing Date until twelve (12) months after the date of [the] Agreement"—that is, September 14, 2021—"Pelican shall not permit any Origis Sale to occur." SRA § 5.5(a). Defendants do not dispute that there was a "sale of Origis Equity or Assets" to Antin. *See id.* § 1.1 (defining "Origis Sale"). Nor do they dispute that "a deal had been reached" with Antin by "September 8, 2021"—*i.e.*, within the one-year No Origis Sale period. AC ¶ 152. Nevertheless, they urge this Court to dismiss this claim at this stage before discovery on the basis that "no sale occur[red]" until the closing. V.D.Br. 34.

That cramped interpretation of the word "sale" withers under scrutiny. "Plainly, the common, or usual meaning of the term sale includes those situations in which a contract has been made between two parties who agree to transfer title and possession of specific property for a price." *Enercon GmbH v. ITC*, 151 F.3d 1376, 1382 (Fed. Cir. 1998); *cf. Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) (noting that a securities "sale" occurs when the sales contract is formed). Thus, a sale "occurs" when the parties to a transaction reach an agreement on the object of the sale and the price, not when the exchange of the consideration or closing occurs. The New York Court of Appeals has described a "sale" in precisely the same way. *See Fries v. Merck*, 167 N.Y. 445, 451 (1901) ("If goods are sold *to be delivered and paid for at a future time*, businessmen describe the transaction, and properly describe it, as a sale.") (citation omitted; emphasis added). Even the statute in *Absolute Activist*—upon which the Defendants rely—defines the word "sale" consistent with its ordinary understanding to "include any contract to sell." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) (quoting 15 U.S.C. § 78c(a)(14)).

Measured against this construction that respects the plain meaning of "sale," Plaintiffs have

plausibly alleged breaches of § 5.5 of the SRA. An agreement with Antin was reached—and an Origis Sale therefore occurred—no later than September 8, 2021, within the one year No Origis ale period. *See* AC ¶¶ 152, 215. While Defendants try to hide behind the fact that the "lawyers . . . finished papering the deal" soon thereafter, they cannot avoid the dispositive fact "that a deal had been reached" to sell Origis within the one-year window. AC ¶ 152; *see Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95–96 (2d Cir. 2007) (explaining that a "binding contract" is formed once the parties come to an "agreement with respect to all material terms," even if "non-material details [are] left to future negotiations") (citation omitted).

In any event, Defendants ignore an important part of the actual wording of this provision and by so doing mischaracterize their obligations. The No Origis Sale Clause prohibited Defendants, for 12 months, from taking action to "*permit* an Origis Sale to occur." SRA § 4.4(a) (emphasis added). One "permits" a sale to occur by making it possible or allowing it to happen. *See Merriam Webster's Collegiate Dictionary* 923 (11th ed. 2020) (defining "permit" as "to make possible"); *Black's Law Dictionary* 1332 (10th ed. 2014) ("To give opportunity for; to make (something) happen"). Surely, hiring bankers, setting up a data room for buyers, marketing the company, conducting an auction process, and reaching agreement "to sell Origis USA before the expiration of the 12-month No Origis Sale period" is more than just "permitting" a sale. AC ¶ 215.[21] At the very best for Defendants, even if some ambiguity exists with respect to the meaning of the No Origis Sale Clause, this claim could not be dismissed at this stage. *See LCM XXII*, 2022 WL 953109, at

---

[21] This reading is all the more plausible because a contract "must be construed to accord a meaning and purpose to each of its parts." *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 226 (S.D.N.Y. 2012) (citation omitted). The specific purpose of the No Origis Sale Clause was to protect Plaintiffs from "arbitrage." AC ¶ 124. Under any circumstances, a sales process for a company like Origis USA would likely take many months from commencement to conclusion. If the No Origis Sale Clause permitted Defendants to explore a sales process before signing the SRA and then run a sales process shortly after the closings, the clause would provide no protection and would be rendered an effective nullity. It would allow Defendants to arbitrage Plaintiffs' shareholding—taking advantage of their concealed knowledge about the true value of those shares—in just the same way as if the clause did not exist at all.

*6–7 (Failla, J.); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 178 (2d Cir. 2004) ("a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings").

Finally, the implied covenant of good faith and fair dealing encompasses "'promises that a 'reasonable person in the position of the promisee would be justified in understanding were included' in the contract." *LCM XXII*, 2022 WL 953109, at *14 (Failla, J.) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). And the covenant does not permit a defendant to "'eva[de] . . . the spirit of the bargain,'" *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (citation omitted), or "do[] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (citation omitted). Defendants, by lining up all their ducks in a row and then delaying the formal closing until outside the one-year window, plainly breached the covenant of good faith and fair dealing. *See, e.g.*, *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985) (holding that employer violated implied covenant by firing plaintiff "in order to avoid paying him commissions on sales that were completed but for formalities").[22] That breach not only informs the breach of the SRA but also constitutes a separate and independent cause of action. *See LCM*, 2022 WL 953109, at *14–15 (Failla, J.).

## **CONCLUSION**

The Vanderhaegen Defendants' motion to dismiss should be denied.

---

[22] The Vanderhaegen Defendants respond with a pair of cases, but neither supports dismissal. Unlike here, the agreement in *Geller Biopharm, Inc. v. Amunix Pharms., Inc.* specifically required that the transaction "close" during the tail period. 2021 WL 4155015, at *2, 8 (S.D.N.Y. Sept. 13, 2021). And, in *Phoenix Capital Invs. LLC v. Ellington Mgmt. Grp., L.L.C.*, the court rejected a "conclusory" and implausible theory that the defendant "delay[ed] its investment of hundreds of millions of dollars for two years so as to avoid paying plaintiff its fee." 51 A.D.3d 549, 550 (1st Dep't 2008).

Dated:     September 29, 2023               Respectfully submitted,
           New York, NY
                                           DECHERT LLP


                                           By:     /s/ Steven B. Feirson
                                                   Steven B. Feirson (*pro hac vice*)
                                                   Cira Center
                                                   2929 Arch Street
                                                   Philadelphia, PA 19104
                                                   Tel. (215) 994 2000
                                                   Steven.Feirson@dechert.com

                                                   Matthew L. Mazur
                                                   Three Bryant Park
                                                   New York, NY 10036
                                                   Tel. (212) 698 3500

                                                   25 Cannon Street
                                                   London EC4M 5UB
                                                   United Kingdom
                                                   Tel. +44 20 7184 7487

                                                   Matthew.Mazur@dechert.com

                                                   David L. Attanasio
                                                   1900 K Street, NW
                                                   Washington, DC 20006-1110
                                                   Tel. 202 261 3300
                                                   David.Attanasio@dechert.com

                                                   *Attorneys for Plaintiffs*
                                                   *Pentacon BV and Baltisse NV*