**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PENTACON BV and BALTISSE NV,

                       Plaintiffs,

        v.

GUY VANDERHAEGEN, GUY
VANDERHAEGEN REVOCABLE TRUST,
PELICAN INVEST, LLC, PELICAN INTER-
NATIONAL, LLC, and ORIGIS USA LLC,

                    Defendants.

Case No. 1:23-cv-02172-KPF


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**ORIGIS USA'S MOTION TO DISMISS**

DECHERT LLP
Steven B. Feirson
Cira Center
2929 Arch Street
Philadelphia, PA 19104
(215) 994 2000

Matthew L. Mazur
Three Bryant Park
New York, NY 10036
(212) 698 3500

25 Cannon Street
London EC4M 5UB
United Kingdom

David L. Attanasio
1900 K Street, NW
Washington, DC 20006
(202) 261 3300

*Attorneys for Plaintiffs*
*Pentacon BV and Baltisse NV*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ALLEGED AS TO ORIGIS USA ........................................... 4

      A.     Defendant Vanderhaegen Acted in his Official Capacity with
           Origis USA ........................................................................................... 4

      B.     Origis USA and Multiple Senior Origis USA Executives Actively
           Participated in the Scheme ................................................................... 5

      C.     Origis USA Financed and Paid for the Buyout by Issuing Debt,
           Penny Warrants, and Dividends ........................................................... 6

      D.     Origis USA Acted for its Own Benefit ................................................ 6

ARGUMENT ....................................................................................................................... 8

    I.     The Amended Complaint Gives Origis USA Clear and Specific Notice of
        the Charges Against It ................................................................................... 8

    II.    The Amended Complaint Plausibly and Particularly Alleges That Origis
        USA Committed Fraud and Fraudulent Inducement (Counts I and II) ............... 10

      A.     The Amended Complaint Alleges Misrepresentations by Origis
           USA ..................................................................................................... 11

      B.     Plaintiffs Justifiably Relied on Origis USA's Misrepresentations .......... 12

      C.     The Amended Complaint Adequately Alleges Scienter ........................... 13

    III.    The Amended Complaint Plausibly Alleges Aiding and Abetting Fraud
        and Breach of Fiduciary Duty (Counts III and X) ................................................ 16

    IV.    The Amended Complaint Plausibly Alleges Origis USA's Participation In
        a Civil Conspiracy (Count IV) .................................................................... 18

    V.    The Amended Complaint Plausibly Alleges Tortious Interference with
        Contract (Counts XI and XII) ..................................................................... 19

    VI.    Plaintiffs Did Not Waive or Release their Claims Against Origis USA .............. 21

CONCLUSION .................................................................................................................... 23

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aghaeepour v. N. Leasing Sys., Inc.*,
  2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ............................................................ 18

*Agyin v. Razman*,
  986 F.3d 168 (2d Cir. 2021) ...................................................................................... 11

*Alvogen Grp. Holdings LLC v. Bayer Pharma AG*,
  176 A.D.3d 551 (1st Dep't 2019) ............................................................................. 22

*Amusement Indus., Inc. v. Stern*,
  693 F. Supp. 2d 301 (S.D.N.Y. 2010) ...................................................................... 19

*Angermeir v. Cohen*,
  14 F. Supp. 3d 134 (S.D.N.Y. 2014) ........................................................................ 10

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) .......................................................................................... 14

*Campbell v. Plant Health Intermediate, Inc.*,
  2020 WL 3127809 (S.D.N.Y. June 12, 2020) .......................................................... 22

*Center v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782 (1985) ............................................................................................... 17

*Cleft of the Rock Found. v. Wilson*,
  992 F. Supp. 574 (E.D.N.Y. 1998) ........................................................................... 19

*Comm'm on Ecumenical Mission & Relations of United Presbyterian Church v. Roger Gray, Ltd.*,
  27 N.Y.2d 457 (1971) ............................................................................................... 15

*Crane v. Anaconda Co.*,
  39 N.Y.2d 14 (N.Y. 1976) .......................................................................................... 3

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
  15 N.Y.3d 147 (2010) .......................................................................................... 12, 13

*De Sole v. Knoedler Gallery, LLC*,
  137 F. Supp. 3d 387 (S.D.N.Y. 2015) ...................................................................... 18

*Duval v. Albano*,
  2017 WL 3053157 (S.D.N.Y. July 18, 2017) .............................................................. 9

*Epiphany Cmty. Nursery Sch. v. Levey*,
  171 A.D.3d 1 (1st Dep't 2019) ................................................................................. 12

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  2020 WL 5518146 (S.D.N.Y. Sept. 14, 2020) .......................................................... 12

*First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*,
    629 F. Supp. 427 (S.D.N.Y. 1986) ........................................................................ 18

*FMC Corp. v. Boesky (In re Ivan F. Boesky Sec. Litig.)*,
    36 F.3d 255 (2d Cir. 1994) .................................................................................... 11

*Gibson v. Bartlett Dairy, Inc.*,
    2022 WL 784746, (E.D.N.Y. Mar. 15, 2022) ......................................................... 8

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ................................................................................. 8

*Grobow v. Perot*,
    539 A.2d 180 (Del. 1988) ..................................................................................... 14

*Havens v. James*,
    76 F.4th 103 (2d Cir. 2023) .................................................................................. 16

*Hecht v. Com. Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990) ................................................................................... 18

*Hughes v. United States*,
    138 S. Ct. 1765 (2018) ......................................................................................... 22

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ............................................................................................ 9

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) ................................................................................. 16

*Kuo Feng Corp. v. Ma*,
    248 A.D.2d 168 (1st Dep't 1998) ......................................................................... 18

*Lago v. Krollage*,
    78 N.Y.2d 95 (1991) ............................................................................................. 23

*McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*,
    2022 WL 18027555 (S.D.N.Y. Dec. 30, 2022) .................................................... 10

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d Cir. 1990) ..................................................................................... 9

*Refco Inc. Sec. Litig. v. Aaron*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2010) .................................................................. 17

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019) ................................................................................. 20

*Rynasko v. New York Univ.*, 63 F.4th 186 (2d Cir. 2023) ............................................. 19

*S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*,
    84 F.3d 629 (2d Cir. 1996) ............................................................................. 14, 15

*Silvercreek Mgmt. v. Citigroup, Inc.*,
    346 F. Supp. 3d 473 (S.D.N.Y. 2018) .................................................................. 17

*St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*,
   409 F.3d 73 (2d Cir. 2005) .................................................................................. 23

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ........................................................................................... 17

*Thayer v. Dial Indus. Sales, Inc.*,
   85 F. Supp. 2d 263 (S.D.N.Y. 2000) ................................................................. 15

*Tulino v. City of New York*,
   2016 WL 2967847 (S.D.N.Y. May 19, 2016) ..................................................... 11

## Other Authorities

11 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations §§ 2610,
   2641, 5320, 5349 (2023) ........................................................................................ 2

5 Andrew M. Johnston, Securities Law Techniques § 69.03(2) (2023) ......................................... 3

Hannah Ruth Roberts, "Anything but General: Pleading Scienter in Rule 9(b) Claims," *Am. Bar
Ass'n* (May 23, 2017), https://tinyurl.com/3v7pnrsu (last visited 27 Sept. 2023).................... 14

Richard A. Booth, Financing the Corporation § 6:3 (2022) ......................................................... 14

## Rules

Fed. R. Civ. P. 8 ............................................................................................................................ 19

Fed. R. Civ. P. 9 ............................................................................................................................ 16

<u>**PRELIMINARY STATEMENT**</u>[1]

Origis USA claims that it was just an innocent bystander to the unlawful conduct detailed in the Amended Complaint ("AC") (ECF 30). However, Origis USA ignores two critical factors that preclude its attempt to sever the company's conduct from the actions of its own executives who acted on its behalf, from its shareholders who benefitted from the scheme, and from its own formal corporate action that made the fraudulent transaction possible.

*First*, the Amended Complaint pleads specific facts that demonstrate Origis USA's indispensable role in the alleged unlawful conduct. Origis USA's CEO and President, Guy Vanderhaegen, formulated, structured, and then drove the fraudulent scheme. AC ¶¶ 43, 46–47. And he was not some lone wolf, as Origis USA now contends; rather, other high-ranking Origis USA officers acting in their official capacity actively and knowingly assisted him in creating the false financial information that was transmitted to Plaintiffs. *See id.* ¶¶ 47, 75–76, 83–84, 90, 100–03. Moreover, Origis USA secretly enlisted investment bankers to provide it with expert advice about the value of its assets, provided those bankers with the information to do their job, and incorporated the investment bankers' opinions into its own, internal valuation analyses that were hidden from Plaintiffs. *Id.* ¶¶ 19, 21, 47, 103. These Origis USA analyses—created using corporate personnel and assets—showed pipeline project values many, many times higher than those provided to Plaintiffs to induce them to sell their shares. *Id.* ¶¶ 100–01. Origis USA's employees concealed the higher valuations because they understood any disclosure to Plaintiffs would have scuttled the fraudulent transaction. *Id.* ¶ 107.

Origis USA also secured the financing to accomplish the acquisition of Plaintiffs' shares,

---

[1] Plaintiffs incorporate their Memorandum of Law in Opposition to the Vanderhaegen Defendants' Motion to Dismiss as if fully set forth herein. Capitalized terms not defined herein have the meaning ascribed to them in the Amended Complaint.

issuing debt and penny warrants to its minority shareholder (Global Atlantic) in exchange for the funds to be used to buy out Plaintiffs. *Id.* ¶¶ 47, 116–17. Then it declared a dividend for the purpose of making the payments to Plaintiffs in exchange for their controlling interests. *See* SRA § 2.1(c). The borrowing of funds, issuance of warrants, and the declaration of dividends are quintessential corporate acts. *See* William Meade Fletcher et al., *Cyclopedia of the Law of Corporations* §§ 2610, 2641, 5320, 5349 (West 2023). Without this deliberate corporate action by Origis USA, the fraudulent transaction would not have been possible.

Despite these and other specific allegations describing its role in the scheme, Origis USA nevertheless maintains that it is a victim of guilt by association because it is being unfairly "lumped" into some "group" pleading. Origis USA Mem. Mot. to Dismiss ("OUSA.Br.") (ECF 36) 2. However, Origis USA cannot evade the specific allegations laying out its linchpin role in the plot to eliminate Plaintiffs' controlling stake for a minute fraction of its true value.

*Second*, Origis USA improperly tries to escape this litigation before discovery can fully reveal its real role in the fraudulent scheme, arguing that it should be immune from liability because it "received absolutely nothing" in the SRA transaction. *Id.* The Amended Complaint alleges just the opposite: the scheme was not just for Vanderhaegen's personal benefit but also for the benefit of Origis USA. AC ¶ 47. This is undoubtedly why, shortly after Plaintiffs signed the SRA, Vanderhaegen wrote to Origis USA's Chief Investment Officer—whose only interest in the transaction was that of Origis USA and who signed the SRA on its behalf—that "*we* did a golden deal a week ago." *Id.* ¶¶ 21, 129 (emphasis added); SRA at 45. Even putting to one side the truth of that assertion, what Origis USA did and did not receive as a benefit is an inherently factual question. It cannot be decided on a motion to dismiss.

Origis USA tries to distract from the panoply of telling facts alleged in the Amended Complaint concerning Origis USA by focusing on the benefits to its senior management from the transaction, as if they acted separately and apart from the company. OUSA.Br. 3. But "personal gain and benefit to the corporation are not mutually exclusive objectives." *Crane Co. v. Anaconda Co.*, 39 N.Y.2d 14, 22 (1976). Repurchase transactions, in fact, are routinely viewed as bestowing a benefit on the company for a host of possible reasons. *See* 5 Andrew M. Johnston, *Securities Law Techniques* § 69.03 (2023) (stating that "[t]he business reasons for a corporation's repurchase of its outstanding shares are so numerous as to defy exhaustive listing or ready categorization," and identifying, among other reasons, "control[ling] the composition of the stockholder group," "terminating dissension," and maintaining "orderly or established corporate policy"). At best for Origis USA, which particular benefits flowed to the company is properly the subject for discovery (and perhaps expert testimony) as the litigation progresses. It is not a question which should be addressed, let alone decided, on a motion to dismiss where Plaintiffs are entitled to have their allegations taken as true and where they are entitled to all reasonable inferences flowing from those allegations.

At this stage of the litigation, before discovery has taken place, the specific allegations of action by Origis USA's top management—and its formal corporate acts undertaken to facilitate the fraudulent scheme—establish more than a reasonable inference that the company is liable to Plaintiffs.  Origis USA's motion to dismiss should therefore be denied.[2]

---

[2] If, as claimed, Origis USA's current owners, Antin, are unhappy to be involved in this lawsuit, *see* OUSA.Br. 3, their complaints are more properly directed at Vanderhaegen and the other senior Origis USA executives who used their positions within the company to perpetrate a fraud and who then may not have fully disclosed their actions to Antin.

## STATEMENT OF FACTS ALLEGED AS TO ORIGIS USA

The Amended Complaint is replete with detailed allegations describing Origis USA's conduct in furtherance of the scheme to defraud Plaintiffs by misrepresenting the financial condition of Origis USA and its pipeline of solar energy projects, redeeming their controlling interests for a fraction of their true value, and then flipping the company for many times more than what it paid. Where Origis USA bothers at all to address these allegations, it tries to dispute the facts, including by citing material outside the Amended Complaint. *See, e.g.*, OUSA.Br. 8, 11 (describing the supposed impact of the 2020 presidential election on the solar energy market). Such factual disputes may not be resolved at this stage.

### A.    Defendant Vanderhaegen Acted in his Official Capacity with Origis USA

Origis USA portrays the scheme as based on "alleged statements to Plaintiffs 'by Vanderhaegen' that would only benefit *him* personally." *Id.* at 2. But Vanderhaegen was (and remains) Origis USA's CEO and President, and he communicated with Plaintiffs in his official capacity. AC ¶¶ 11, 47, 49. Moreover, because he was the CEO and President of Origis USA, he could "speak authoritatively about all aspects of Origis USA, including on the value of Origis USA and its assets." *Id.* ¶ 47. Indeed, Plaintiffs "accepted, believed, and relied upon Vanderhaegen's representations about Origis USA only because he had direct access to all information about the company through his positions as CEO and President of Origis USA, the operational entity." *Id.* ¶ 47.[3] At the same time, "Vanderhaegen was able to control [the] flow of information [to Plaintiffs] only by virtue of his position as Origis USA's CEO." *Id.* ¶ 61.

---

[3] The exhibits (improperly) offered in support of the Vanderhaegen Defendants' motions to dismiss confirm that Vanderhaegen communicated with Plaintiffs and others through documents and emails bearing Origis USA's registered trade name, "Origis Energy." *See, e.g.*, McCormack Decl., Exs. I, R, and T.

### B.     Origis USA and Multiple Senior Origis USA Executives Actively Participated in the Scheme

Origis USA's involvement was not limited to statements by its CEO to Plaintiffs. Though Vanderhaegen may have orchestrated the fraud in that capacity, he did not act alone. Indeed, *other* senior executives and employees of Origis USA, including its COO and CIO, prepared the various false and misleading valuations provided to Plaintiffs, *see id.* ¶¶ 21, 47, 75, 81, 83, 90, 100, and the higher valuations that were concealed from Plaintiffs, *see id.* ¶¶ 76, 82, 84, 91, 101–02. These individuals possessed all of the relevant information about Origis USA's "business, financial statements, assets, liabilities, results, project pipeline, future prospects, interactions with investment bankers, investment banker valuations and analyses, and sales processes." *Id.* ¶ 47. But they went along with the scheme, even though they knew the truth. *See id.* ¶¶ 178–80, 229–30, 238.

Crucially, Origis USA's CIO prepared—and its CEO Vanderhaegen sent and then vouched for—the false $147 million "remove your uncertainty" valuations of Origis USA's pipeline projects the Defendants used as the final inducement to get Plaintiffs to sign the SRA. *Id.* ¶¶ 99–100. Yet, at that very moment, Origis USA had in its possession the secret, internal analyses which "showed that Origis USA's projects were potentially worth over $1.5 billion," *i.e.*, ten times more. *Id.* ¶¶ 102–03. These secret valuations were "the product of careful analysis and input from the top-ranking officers in Origis USA, including Vanderhaegen himself, Origis USA's CIO, and Origis USA's Executive Director," as well as from investment bankers engaged by Origis USA. *Id.*[4]

---

[4] Origis USA cites a "separate agreement"—not mentioned in the Amended Complaint—through which its CIO supposedly redeemed his shares. OUSA.Br. 8 n.14, 26 n.25. It is impossible to know, pre-discovery, all the circumstances surrounding their decision, including the actual terms of the deal, the existence of any side agreements, the role that promises of increased salary, bonus, and grants of equity in the new Origis USA may have played, and the individual personal circumstances that may have driven their decision. That is why such factual assertions in motions to dismiss may not be considered.

### C.    Origis USA Financed and Paid for the Buyout by Issuing Debt, Penny War-rants, and Dividends

Origis USA also "negotiated for and obtained the funds used to buy out the Plaintiffs'

ownership interests through a loan from its minority shareholder [Global Atlantic]." *Id.* ¶¶ 47,

116–17. To do so, "Origis USA issued penny warrants to [Global Atlantic] for a 20% additional

shareholding in Origis USA." *Id.* ¶¶ 47, 116. Origis USA then used the money it had borrowed to

pay out a dividend that was used to redeem Plaintiffs' interests. *Id.* ¶¶ 116–17; SRA § 2.1(c).[5]

Thus, while "[t]he buyout nominally took the form of a share redemption by Origis Energy," in

material reality, "it was a buyout by Origis USA, financed by Origis USA's minority shareholder,

for the benefit of Origis USA." AC ¶ 116; *see also id.* ¶ 47.

In light of these allegations, Origis USA's chart purporting to show no difference in its

ownership before and after the transaction is clearly misleading. OUSA.Br. 10–11. Because Origis

USA granted Global Atlantic penny warrants that could be converted at its discretion to shares for

just a penny, Global Atlantic's effective shareholding immediately increased "from 20% to 40%."

AC ¶ 116. In that way, the transaction fundamentally changed the ownership structure, such that

Origis USA is simply wrong to assert that its "corporate and ownership structure" was "entirely

unaffected by the Transaction." OUSA.Br. 11.

### D.    Origis USA Acted for its Own Benefit

Finally, the allegations in the Amended Complaint and the reasonable inferences therefrom

explain why Origis USA did what it did. Origis USA wanted to remove Plaintiffs as controlling

shareholders by redeeming their shares at an artificially low price. By doing so, Origis USA and

its executives could "escape any possible interference from Plaintiffs in the management of the

---

[5] Origis USA's pivotal role in financing the buyout is also why it was a party to the SRA itself. Its CIO, in his role as company secretary, signed on its behalf. *See* SRA at 45.

company," including with respect to the payment of bonuses. AC ¶¶ 21, 47, 60, 66, 162, 169. And removing Plaintiffs from the picture cheaply also benefitted Origis USA by misappropriating value properly belonging to Plaintiffs as shareholders in Origis Energy and transferring it to Origis USA and *its* shareholders. *Id.* ¶ 48. This is why, days after the SRA was signed, Vanderhaegen wrote triumphantly to Origis USA's CIO stating, "*we* did a golden deal a week ago and . . . the IPO track is certainly real," *id.* ¶¶ 21, 129 (emphasis added), and why, just days after the buyout of the Plaintiffs' shares closed, he wrote to Global Atlantic, the only other material shareholder beside himself, that Origis USA's "value as of today" is "more than $500 million" and that this value is "'[n]ot bad if you compare with the buy out value,'" *id.* ¶ 135. This "golden deal," which was certainly "not bad if you compare with the buy out value," was for the benefit of Origis USA.

With Plaintiffs out of the picture, Origis USA moved on to the next phase of its plan—to cash in the benefit it had just derived from fraudulently taking Plaintiffs' shares. In March 2021, Vanderhaegen described a potential SPAC transaction to Plaintiffs as providing "a nice opportunity *for the company.*" *Id.* ¶ 141 (emphasis added).[6] In fact, consummating a sale had been the company's intent all along. Even before the SRA was signed, Origis USA had enlisted investment bankers "to begin planning for an eventual sale" *Id.* ¶ 105. As part of that effort, Origis USA "directed the investment bankers that prepared valuations and analyses of itself and its assets and received and controlled those valuations and analyses." *Id.* ¶ 47. Once the SRA transaction closed, Origis USA forced the sales process forward by pushing its investment bankers who "developed and executed the sales processes for Origis USA." *Id.* "By July of 2021, Origis USA had formally retained two investment bankers, Onpeak and Goldman Sachs; had identified a pool of potential

---

[6] On Vanderhaegen's telling, the SPAC transaction would have exchanged equity in Origis USA for an infusion of cash into Origis USA, at the time majority owned by Vanderhaegen. *See* AC ¶ 141. Defendants knew, but concealed from Plaintiffs, that Origis USA could be valued at $1.25 billion in that SPAC transaction. *Id.* ¶ 139.

buyers; had circulated Non-Disclosure Agreements to those potential buyers; had created a Confidential Information Memorandum; and provided that Information Memorandum to a long list of potential buyers." *Id.* ¶ 148. After reviewing the bids of between "essentially $500 million" "to $1.25 billion," *id.* ¶ 149, Vanderhaegen and the "senior officers of Origis USA" ultimately agreed to a sale with Antin on September 8, 2021, within the one-year No Origis Sale period, *id.* ¶ 152.

## ARGUMENT

### I.   THE AMENDED COMPLAINT GIVES ORIGIS USA CLEAR AND SPECIFIC NOTICE OF THE CHARGES AGAINST IT

Origis USA begins by arguing that Plaintiffs have impermissibly lumped the company together with Vanderhaegen and his entities and have not adequately identified Origis USA's role in the fraudulent scheme. *See* OUSA.Br. 17–20. But "[t]here can be no doubt that the Complaint gives each defendant notice of precisely what [that defendant] is charged with." *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985). "No more is required by Rule 9(b)." *Id.*; *see also Gibson v. Bartlett Dairy, Inc.*, 2022 WL 784746, at *8 (E.D.N.Y. Mar. 15, 2022) ("Even under Rule 9(b)'s heightened pleading standard, 'there is no fixed requirement . . . to identify a single entity within the group on pain of dismissal.'") (alteration in original) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015)). As detailed in the Amended Complaint, Origis USA was at the center of the fraudulent scheme, carried out with full company participation, to misrepresent the true financial condition and value of the company itself and to take the corporate action necessary to consummate the fraudulent transaction. Not only did the Amended Complaint detail Origis USA's distinct role at great length (including, but not only, in a separate section, AC § IV.C), it also explained how and why Origis USA was pivotal to the scheme.

Ignoring these well-pleaded allegations, Origis USA sets up a straw man, denying that

8

Origis USA was Vanderhaegen's alter ego. OUSA.Br. 19. But this is not what Plaintiffs alleged. Rather, the Amended Complaint makes clear that Origis USA took formal corporate action to enable the fraud and that its high-ranking employees' actions are *attributable* to the company—all of whom took "all material actions within the scope of their employment at Origis USA" and "considered their actions to be in the business interests of Origis USA." AC ¶¶ 47–48. It is Origis USA—not Plaintiffs—who argues that Vanderhaegen somehow commandeered corporate resources for his personal benefit. This factual dispute over who Vanderhaegen spoke or acted for cannot be resolved on a motion to dismiss. *See Duval v. Albano*, 2017 WL 3053157, at *12 n.4 (S.D.N.Y. July 18, 2017) (Failla, J.) (rejecting charge of "group pleading" where "the Complaint g[ave] grounds for attributing the [alleged] statements" to the defendants).[7]

Trying to distance itself from its own CEO Vanderhaegen, Origis USA tries to characterize him as a mere "affiliate." OUSA.Br. 18–19 (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990)). But *Ouaknine* addressed the bare allegation that one defendant company was the "affiliate" of another and held that such an allegation, without more, was "insufficient to link" the defendant company to the fraud. 897 F.2d at 80. By contrast, Vanderhaegen was CEO, President, and a board director of the company. AC ¶ 49. He was not some mere affiliate; he was the top leadership of Origis USA, and he was acting on its behalf. *Id.* Origis USA is therefore responsible for the fraud that he and its other executives and employees committed or facilitated in the company's name. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465–66 (2010).

In a footnote, Origis USA suggests that a person "can wear multiple 'hats' and his conduct in one role is not thereby imputed to all other entities where he worked." OUSA.Br. 24 n.24 . It is

---

[7] In another straw man, Origis USA fights the notion that it is a "close corporation" under Delaware law. OUSA.Br. 19–20 & 20 n.22. Whether or not that is true, it is irrelevant. The Amended Complaint does not allege any fiduciary duties owed by Origis USA. *See* AC ¶¶ 196–200 (limiting fiduciary duty claims to the Vanderhaegen Defendants).

true that an individual *can* change "hats." But nothing prevents an individual from wearing two "hats" at the same time. Here, Vanderhaegen acted for himself, for his personal vehicles, and for Origis USA at all relevant times. *See McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*, 2022 WL 18027555, at *9 (S.D.N.Y. Dec. 30, 2022) (rejecting charges of improper group pleading where allegations suggested that multiple business entities could be held liable for a common executive's acts). Moreover, the other Origis USA executives involved here wore only an Origis USA hat.

Origis USA finally plucks out a few isolated references to "Defendants" in the 252-paragraph Amended Complaint that, it says, "could not possibly apply to Origis USA." OUSA.Br. 18. It takes issue, in particular, with the remark that "***Defendants*** represented and warranted in the SRA," and a reference to "***Defendants'*** fiduciary duties to Plaintiffs." *Id.* (citing AC ¶¶ 25–26, 108, 144). In nearly the same breath, however, it acknowledges that "Plaintiffs dropped [their contractual and fiduciary duty] claims against Origis USA in the Amended Complaint." *Id.*; *see* AC ¶¶ 196–208. This only confirms that Origis USA is on "fair notice of the claims against [it]." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 150 (S.D.N.Y. 2014) ("[W]hile defendants are correct that the Complaint contains a number of allegations against all Defendants in general, the Complaint's other allegations specific to each Defendant are sufficient to give each Defendant fair notice of the claims against them and to accomplish the other goals of Rule 9(b).").

## II.   THE AMENDED COMPLAINT PLAUSIBLY AND PARTICULARLY ALLEGES THAT ORIGIS USA COMMITTED FRAUD AND FRAUDULENT INDUCEMENT (COUNTS I AND II)

Origis USA offers three arguments for dismissal of Plaintiffs' fraud claims: (1) lack of any alleged misstatement by Origis USA, (2) lack of justifiable reliance by Plaintiffs, and (3) lack of scienter. OUSA.Br. 20–26. But Origis USA does no more than dispute the factual merit of allegations as properly pled, which is not a basis for dismissal.

## A.    The Amended Complaint Alleges Misrepresentations by Origis USA

The Amended Complaint particularly alleges multiple misrepresentations by Origis USA, both by Vanderhaegen (in his capacity as CEO and President) and by other senior executives acting "within the scope of their employment at Origis USA." AC ¶ 47. These officers knowingly prepared and, in the case of Vanderhaegen, directly transmitted to Plaintiffs false and misleading valuations of Origis USA and its pipeline of solar energy projects, including on April 30, 2019, and January 28, March 2, and September 10, 2020. *Id.* ¶¶ 75, 83, 90, 100. They also knowingly concealed from Plaintiffs higher valuations they prepared and circulated elsewhere around those times—sometimes on the very same day. *Id.* ¶¶ 76, 84, 91, 100–02.

Despite Origis USA's apparent claim that Vanderhaegen and its other employees went rogue, Origis USA is liable for the misconduct of its agents taken within the scope of their authority so long as they "act[ed] *at least in part* to benefit [Origis USA]." *Agyin v. Razman*, 986 F.3d 168, 185 (2d Cir. 2021) (emphasis added); *see also FMC Corp. v. Boesky (In re Ivan F. Boesky Sec. Litig.)*, 36 F.3d 255, 265 (2d Cir. 1994). Here, Origis USA—including its shareholders and senior executives—*all* benefitted from the redemption of Plaintiffs' interests at an artificially low price followed by a sale of the company at a much higher valuation. *See* AC ¶¶ 47, 66, 162, 169, 177, 188, 228, 233, 251. This is why Vanderhaegen emailed Origis USA's CIO shortly after Plaintiffs signed the SRA to say, "*we* did a golden deal last week." *Id.* ¶¶ 21, 129 (emphasis added). To the extent that Origis USA disputes whether its own employees acted within the scope of their employment, that question cannot be resolved on a motion to dismiss—particularly not after taking all reasonable inferences in Plaintiffs' favor. *See Tulino v. City of New York*, 2016 WL 2967847, at *3 (S.D.N.Y. May 19, 2016) ("[T]he question of whether an act was committed outside the scope of employment is a 'fact-sensitive one' that is a poor candidate for resolution at the motion to dismiss stage.") (citation omitted).

Origis USA also submits that it cannot be liable for the misrepresentations of its employees because Vanderhaegen's personal shareholding vehicle, Pelican International, provided the Information Warranty in the SRA. OUSA.Br. 21–22. That Plaintiffs also sought and received a specific Information Warranty from Pelican International, however, does not insulate Origis USA from liability. After all, the warranty stated that Plaintiffs had been provided complete and accurate "documents and information regarding . . . the Company and its Subsidiaries . . . and [its] development pipeline," and the false and misleading valuations came from Origis USA, on company letterhead and in emails bearing its trade name. SRA § 4.4; *see supra* note 3; *see also* AC ¶¶ 75, 77, 83, 90, 100. Origis USA obviously intended and knew that the information would be sent to Plaintiffs. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co.,* 2020 WL 5518146, at *84 (S.D.N.Y. Sept. 14, 2020) (explaining that a defendant may be liable for fraud when it prepares "a false or misleading statement to an intermediary, intending it to be conveyed to the plaintiff and it is so conveyed"). Moreover, the SRA expressly provided that the disclaimer of reliance on "Origis USA" for misrepresentations would not apply "in cases of Fraud," which this case is. SRA § 4.8.

### B.     Plaintiffs Justifiably Relied on Origis USA's Misrepresentations

Plaintiffs also justifiably relied on Origis USA's misrepresentations. As an initial matter, "whether plaintiff's reliance was justifiable generally raises factual issues inappropriate for resolution on a motion to dismiss." *Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1, 10 (1st Dep't 2019) (citing *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015)). In fact, New York courts frequently deny motions to dismiss where the defendant had "superior knowledge or means of knowledge," *Levey*, 171 A.D.3d at 9–10, or the plaintiff insisted on a written representation as to the truth of the facts, *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154–55 (2010). The Amended Complaint alleges both.

First, Origis USA possessed superior knowledge and means of knowledge with respect to

its business and assets. Indeed, Origis USA "had exclusive control over and possession of all material information about itself and its value." AC ¶ 47. Plaintiffs in Belgium could not obtain that information themselves, particularly after the onset of the Covid-19 pandemic prevented travel to the United States. *See id.* ¶¶ 11, 52–55, 58, 120. Origis USA's CEO Vanderhaegen understood and exploited this information asymmetry, writing in an email that Plaintiffs would likely sell "at an attractive valuation" due to their "lack of knowledge." *Id.* ¶¶ 64–65.

Second, the fact that Plaintiffs bargained for an additional, personal assurance of "complete" and "not misleading" information only strengthens the inference of justifiable reliance because it shows that they "[took] reasonable steps to protect [themselves]." *DDJ*, 15 N.Y.3d at 154–56 (declining to hold as a matter of law that plaintiffs "were required to do more" than "obtain representations and warranties"). Origis USA suggests Plaintiffs' reliance could not be reasonable because they were sophisticated investors who contracted for *Pelican International* "to certify to the accuracy of such information." OUSA.Br. 23. But the New York Court of Appeals has squarely rejected that argument about third-party warranties, because it improperly "blurs the distinction between claims for breach of warranty and claims for fraud." *DDJ*, 15 N.Y.3d at 156–57.

### C.    The Amended Complaint Adequately Alleges Scienter

Contrary to Origis USA's argument, OUSA.Br. 23–24, the allegations in the Amended Complaint also support a strong inference of Origis USA's scienter. Rule 9(b) allows scienter to be alleged "generally." Plaintiffs may make this showing simply by "(1) alleging facts to show that [the] defendant[] had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior." *S.Q.K.F.C., Inc. v. Bell*

13

*Alt. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996).[8] Here, Plaintiffs have done both.

As to motive, Origis USA's management, including Vanderhaegen, considered Plaintiffs' views on the business to be an impediment to the company's future and wanted to "escape any possible interference from Plaintiffs in the management of the company" going forward. AC ¶¶ 47, 66; *see also id.* ¶¶ 162, 169. Such "differences of opinion" frequently motivate share repurchases. Richard A. Booth, *Financing the Corporation* § 6:3 (2022). In addition, Origis USA also benefitted because it was able to buy out Plaintiffs' controlling interests at an artificially depressed price, thereby transferring value from Plaintiffs to Origis USA and its shareholders (including not only Vanderhaegen but also Global Atlantic).

Critically, the transaction was structured as a share redemption, in which *Origis USA* borrowed the funds from its minority shareholder (in exchange for penny warrants) and paid those borrowed funds out as a dividend to pay Plaintiffs. AC ¶ 116; *see also* SRA § 2.1(c), (d), (f). In other words, it was Origis USA that effectively redeemed Plaintiffs' shares. AC ¶ 116. As in any share redemption, money may have flowed out of Origis USA, but the company nonetheless benefitted from the consolidation of control and elimination of potentially dissenting viewpoints. *Id.* ¶ 60; *cf. Grobow v. Perot*, 539 A.2d 180, 189–90 (Del. 1988) (rejecting argument that buying back shares from dissident shareholder yielded no benefits for the company), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Origis USA fights these allegations and the obvious inferences to be drawn from them, urging that the benefits of the transaction were to Origis USA's *management*, not the company itself. OUSA.Br. 25. But it is "black-letter law" that a corporation is a legal fiction that "can only

---

[8] Plaintiffs preserve their right to argue that the Second Circuit's "strong inference" standard is unmoored from and inconsistent with Rule 9(b)'s text, which provides that "intent . . . may be alleged generally." *See* Hannah Ruth Roberts, *Anything but General: Pleading Scienter in Rule 9(b) Claims*, Am. Bar Ass'n (May 23, 2017), https://tinyurl.com/3v7pnrsu ("The Second Circuit's approach has not been adopted by other circuits.").

act through its officers, directors and employees." *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 270 (S.D.N.Y. 2000) (citation omitted). "The officers, as such, *are* the corporation," and the employees are its "agent[s]." *Comm'n on Ecumenical Mission & Relations of United Presbyterian Church v. Roger Gray, Ltd.*, 27 N.Y.2d 457, 463 (1971) (emphasis added; citation omitted). Here, senior management "considered their actions to be in the business interests of Origis USA." AC ¶ 47. This was "confirmed just a week after the execution of the SRA, when Vanderhaegen boasted to Origis USA's CIO that '*we* did a golden deal a week ago.'" *Id.* ¶ 22. If the buyout was for Vanderhaegen's personal benefit only, he would have had no reason to remark on the deal to Origis USA's CIO using the pronoun "we."

Origis USA's fixation on the fact that its senior management sought the freedom to "award themselves bonuses without obstacle from Plaintiffs" ignores the forest for the trees. *Id.* ¶ 47. While it asserts that higher bonuses are "*costs*" to the company, it does not follow that they cannot "benefit the entity in any way." *See* OUSA.Br. 25. Of course, businesses pay such short-term costs in the hopes of attracting and retaining talent and fostering long-term growth.[9] Origis USA's myopic focus on whether it received money in the SRA transaction rather than the full picture of the overall plan to seize Plaintiffs' shares at a fraudulently low price, completely misses the point.

Even if Plaintiffs had not alleged a motive, scienter may be pled by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior." *S.Q.K.F.C.*, 84 F.3d at 634. Such is the case here. Origis USA suggests that Vanderhaegen acted alone, but the Amended Complaint alleges significant steps taken by Origis USA with knowledge that Plaintiffs were being

---

[9] Origis USA also notes that Plaintiffs could not have unilaterally prevented Origis USA from issuing bonuses because they held only two of the five seats on its board. *See* OUSA.Br. 25–26. Not only does that again ignore the broader motive of freeing the company from Plaintiffs' control, buying them out cheaply, and selling it for a huge profit, but it is also self-defeating. The transfer of Plaintiffs' interests *eliminated* their participation on Origis USA's board.

deceived as to the true value of their interests. Origis USA prepared the false valuations for transmittal to Plaintiffs, AC ¶¶ 47, 75, 83, 90, 100, concealed its vastly higher internal valuations, *id.* ¶¶ 47, 75, 83, 90, 100, financed the buyout by assuming a loan, providing collateral, and granting penny warrants to the financing source, *see id.* ¶¶ 116–17, agreed in the SRA to pay a dividend for the buyout, AC ¶ 116; SRA § 2.1(c), engaged with investment bankers, AC ¶¶ 105, 148, and drove the resale of the company to Antin, *id.* ¶ 148. These allegations support a strong inference that Origis USA acted knowingly and intentionally. Indeed, it is hard to imagine how a company could prepare false valuations in the context of a management buyout, while generating inconsistent ones for its own use, without awareness that Plaintiffs were being deceived.

III.   **THE AMENDED COMPLAINT PLAUSIBLY ALLEGES AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY (COUNTS III AND X)**

Origis USA cobbles together a number of arguments as to Plaintiffs' aiding-and-abetting claims. *See* OUSA.Br. 28–30. None of them holds water.

*First*, Origis USA insists that the Amended Complaint fails to "plead a cogent motive." OUSA.Br. 28. As a factual matter, that is wrong. *See supra* Facts Section D.; AC ¶¶ 47, 177. As a legal matter, it is beside the point. An entity's "motives . . . are *irrelevant* to the question of aiding and abetting." *Havens v. James*, 76 F.4th 103, 115 (2d Cir. 2023) (emphasis added); *see also Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (listing elements of aiding-and-abetting claims).

*Second*, Origis USA asserts that the Amended Complaint "contains no particularized allegations" of actual knowledge on the company's part. OUSA.Br. 28. But "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b). And the Amended Complaint expressly alleges that "Origis USA knew that the Vanderhaegen Defendants owed fiduciary duties" and that "Origis USA knowingly participated in and substantially assisted" the breaches of those duties. AC ¶ 229–30. Moreover, the knowledge of Origis USA's officers can be imputed to the company. *See, e.g.,*

*Kirschner*, 15 N.Y.3d at 465; *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 783 (1985). Origis USA, through Vanderhaegen and his fellow officers, knew that the valuations it prepared for Plaintiffs were false or misleading. AC ¶ 229. Such knowledge can be readily inferred from the fact that, while making those misrepresentations, those same officers had in their possession and had discussed internal valuations that showed the true, higher value of Origis USA and its assets. *Id.* ¶¶ 75–78, 81–84, 90–91, 100–03, 110–11, 230, 238.

*Third*, Origis USA contends that its participation was not "substantial" because its misdeeds did not "proximately cause" Plaintiffs' harm. OUSA.Br. 29–30 (citation omitted). But such "[i]ssues of proximate cause are generally fact matters to be resolved by a jury." *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 135 (2d Cir. 2021). Moreover, "[a]n aider and abettor's substantial assistance to a fraud can be considered a proximate cause where a plaintiff's injury was 'a direct or reasonably foreseeable result of the defendant's conduct.'" *Silvercreek Mgmt. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 488 (S.D.N.Y. 2018) (citation omitted). Here, producing false valuation reports for transmittal to Plaintiffs had the predictable consequence of causing them to accept an artificially low price for their shares.[10]

*Finally*, Origis USA adopts the Vanderhaegen Defendants' arguments that there was no "underlying fraud." OUSA.Br. 30. Those arguments are thoroughly refuted in Plaintiffs' brief responding to the Vanderhaegen Defendants' motion to dismiss.

---

[10] To the extent Origis USA suggests that only Vanderhaegen was the proximate cause or that Origis USA must personally make the misstatements or omissions, *see* OUSA.Br. 29, it would be hard to imagine any case where an aider or abettor could be held liable. Of course, "it is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011).

## IV.   THE AMENDED COMPLAINT PLAUSIBLY ALLEGES ORIGIS USA'S PAR-TICIPATION IN A CIVIL CONSPIRACY (COUNT IV)

Origis USA contends that Plaintiffs have not properly alleged a civil conspiracy claim be-cause there was no "agreement," "overt act," or "intentional participation." OUSA.Br. 30–31. It is wrong. "[P]leading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990); *accord Aghaeepour v. N. Leasing Sys., Inc.*, 2015 WL 7758894, at *2 (S.D.N.Y. Dec. 1, 2015). Even "disconnected acts, when taken together, may sat-isfactorily establish a conspiracy." *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F. Supp. 427, 443–44 (S.D.N.Y. 1986). The Amended Complaint plau-sibly alleges a "common plan" among all Defendants to defraud Plaintiffs. AC ¶ 48.

In addition to expressly alleging an agreement, the Amended Complaint alleges, in detail, that Origis USA had an intimate business relationship with the Vanderhaegen Defendants—who were its President, CEO, board director, and later shareholder—and that Origis USA not only knew of but actively participated in the misrepresentations and omissions. *Id.* ¶¶ 39–41, 47–48. Such "allegations of [an] 'intimate business relationship between' defendant and third-party, '[defend-ant's] knowledge of [third party's] unlawful acts,' and fraudulent misrepresentations 'constitute sufficient facts from which a trier of fact could infer an agreement.'" *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 414 (S.D.N.Y. 2015) (some alterations in original; citation omitted); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 240 (2d Cir. 1999) ("[A]greements in civil conspiracies . . . may be inferred from circumstantial evidence").

The Amended Complaint also alleges numerous overt acts committed in furtherance of the conspiracy, as well as Origis USA's intentional participation in the conspiracy. Take just two ex-amples. Origis USA's officers and employees prepared numerous fictitious valuations for

18

distribution to Plaintiffs, while concealing the legitimate analyses that they had developed and discussed internally. *See* AC ¶¶ 18–22, 47–48, 75–76, 82–84, 90–91, 100–03, 184. Further, both before and after the buyout, Origis USA's officers intentionally participated in the common plan by laying the groundwork for and quickly completing the sale to Antin. *See id.* ¶¶ 147–53. "The defendants' intentional participation in furtherance of the conspiracy [can] be inferred from the overt acts taken by them." *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998); *see also Sea Trade Mar. Corp. v. Coutsodontis*, 2012 WL 3594288, at \*8 (S.D.N.Y. Aug. 16, 2012).

To the extent Origis USA faults Plaintiffs for "fail[ing] to allege any motive for Origis USA," OUSA.Br. 31, that is both wrong, AC ¶¶ 47, 186; *see supra* Section II.A., and not required to state a claim for conspiracy, *see Amusement Indus., Inc. v. Stern*, 693 F. Supp 2d 301, 316 (S.D.N.Y. 2010) (explaining that a plaintiff "need not allege that each member of the conspiracy benefitted . . . but only that some member benefitted").[11]

## V.   THE AMENDED COMPLAINT PLAUSIBLY ALLEGES TORTIOUS INTER-FERENCE WITH CONTRACT (COUNTS XI AND XII)

Origis USA's arguments for dismissal of the tortious interference claims fare no better.

*First*, Origis USA urges that it did not "intentional[ly] procure[]" a breach of the Information Warranty by the Vanderhaegen Defendants. OUSA.Br. 32 (citation omitted). As a party to the SRA, however, Origis USA knew about the Information Warranty's requirement that Plaintiffs receive "complete" and "not misleading" "documents and information regarding . . . the business, financial condition, assets, liabilities, and results of operations" of Origis USA and its "development pipeline of solar power and energy storage projects." SRA § 4.4. Even so, its senior officers

---

[11] To the extent Origis USA argues that the claim is duplicative of Plaintiffs' other secondary liability claims, Plaintiffs are permitted at this stage to plead their claims in the alternative. *Rynasko v. New York Univ.*, 63 F.4th 186, 202 (2d Cir. 2023) ("The Federal Rules specifically allow pleading in the alternative."); Fed. R. Civ. P. 8(d)(2).

intentionally developed false and misleading reports for Plaintiffs, while suppressing the true valuations and other information that they had in their possession regarding the business and its assets through both the First and Second Closings. *See, e.g.*, AC ¶¶ 100–03, 111, 128–32, 238. Origis USA cannot escape liability for its employees' intentional procurement of those repeated breaches.

*Second*, Origis USA contends that it was not the "but for" cause of the Vanderhaegen Defendants' breaches of the SRA. But this is not a case in which the breaches occurred "independent of the alleged involvement" of Origis USA. OUSA.Br. 32 (quoting *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013)). Origis USA was right at the center of the breaches, and they would not have been possible without the company's participation. *See* AC ¶ 47. Particularly where, as here, Plaintiffs allege interfering conduct both before and after the SRA was signed, "the degree to which the contract would have been breached anyway is a question properly left for discovery and, perhaps, jury determinations." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019).

As to the breach of the Information Warranty, Origis USA had "exclusive control and possession of all material information about itself and its value." AC ¶ 47. It prepared the false and misleading valuations for transmission to Plaintiffs that enabled the breach, but it never corrected those valuations with the truthful information in its possession about its value. *Id.* ¶¶ 47, 75–76, 82–84, 90–91, 100–03. Moreover, when its executives received a report from the company's investment bankers confirming that "we did a golden deal a week ago," *id.* ¶¶ 129–30, not one of them spoke up to inform Plaintiffs that the misinformation they had previously provided was not accurate—even though, as Origis USA concedes, the Information Warranty remained in effect and carried down to the First and Second Closings. *See* OUSA.Br. 9 n.15. Origis USA thereby caused the breaches of the Information Warranty by the Vanderhaegen Defendants.

As to the breach of the No Origis Sale Clause, one person could not—and Vanderhaegen did not—sell a $1.4 billion company by himself in a matter of months. Rather, it took a team of Origis USA executives, employees, and company-retained investment bankers to test the market, build a data room, develop and provide materials to prospective buyers, solicit and review bids, and ultimately, strike a deal. *See* AC ¶¶ 136–38, 148–52, 250. Acting within the scope of their employment, the company's officers and employees "oversaw the entire sales process, procured potential buyers, presented them to the Vanderhaegen Defendants," and "prepared for" the meeting "with Antin on September 8, 2021," in which the deal for the sale was struck. *Id.* ¶¶ 136–52, 250. Again, Origis USA was a major cause of the breach.

## VI. PLAINTIFFS DID NOT WAIVE OR RELEASE THEIR CLAIMS AGAINST ORIGIS USA

Unlike the Vanderhaegen Defendants, Origis USA concedes that the SRA permits Plaintiffs to bring claims of "Fraud" against it. *See* OUSA.Br. 10, 26. Nevertheless, it argues that Section 8.6 bars Plaintiffs' remaining claims for aiding and abetting, civil conspiracy, and tortious interference with contract. *See id.* at 26–28. But Section 8.6, in fact, does not waive or release any of these claims, all of which are "based on Fraud" or, in the case of tortious interference with the SRA's No Origis Sale provision, on future intentional conduct that renders any release ineffective. Indeed, Origis USA expressly admits that "all of Plaintiffs' claims *are based on* the same alleged fraudulent scheme" when arguing that they should all be subject to Rule 9(b). OUSA.Br. 16 (emphasis added). By the same token, Section 8.6 of the SRA does not bar any of Plaintiff's claims.

The basic premise of the SRA was that its limitations on legal claims would not apply in cases of "Fraud"—defined as "an intentional and knowing misrepresentation of a material fact with intent to deceive that constitutes common law fraud." SRA § 1.1; *see also id.* §§ 3.5, 4.8, 8.6

(collectively mentioning the carveout five separate times). Section 8.6(a) of the SRA, the Exclusive Remedies provision, includes such a carveout for any "claims *based on* Fraud," not just claims *of* Fraud. *Id.* § 8.6(a) (emphasis added). A claim is "based on Fraud" if it has its foundation in the intentional misrepresentations of material facts with the intent to deceive. *See Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) ("[A] 'base' is '[t]he starting point or foundational part of something.'") (quoting Black's Law Dictionary 180 (10th ed. 2014)).[12]

Section 8.6 does not bar Plaintiffs' claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, civil conspiracy, or tortious interference with the SRA because each is premised on Origis USA's deliberate involvement in Vanderhaegen's misrepresentations. *See* AC ¶¶ 178–80, 185–86, 229–30, 237–38. The Amended Complaint alleges, among other things, that "Origis USA's senior officers and employees—including its CEO, CIO and CCO—and its other minority shareholder all participated in the preparation of the false and misleading information that the Vanderhaegen Defendants provided to Plaintiffs," "possessed full information about the true value of Origis USA and its assets," and "intentionally concealed all information which would have alerted Plaintiffs to the breaches of duty and the fraudulent conduct." *Id.* ¶¶ 229–30; *see also id.* ¶¶ 178–80, 185–86, 237–38. That factual matrix—the same as for Plaintiffs' fraud claims—is the foundation for Plaintiffs' secondary liability claims. Moreover, contrary to Origis USA's suggestion, nothing in Section 8.6(a) requires that the "Fraud" be committed "by Origis USA" itself. OUSA.Br. 26. Even if the Fraud had been Vanderhaegen's alone, Section 8.6 would still not bar

---

[12] Neither of Origis USA's cited cases suggests to the contrary. *See Campbell v. Plant Health Intermediate, Inc.*, 2020 WL 3127809, at *6–8 (S.D.N.Y. June 12, 2020) (applying Delaware law, *not New York law*, to an issue of duplicative claims, not to the scope of a claim release); *Alvogen Grp. Holdings LLC v. Bayer Pharma AG*, 176 A.D.3d 551, 551 (1st Dep't 2019) (addressing a case in which *no fraud* was alleged).

the secondary liability claims against Origis USA.[13]

Section 8.6 of the SRA provides no bar to Plaintiffs' claim for tortious interference with the No Origis Sale Clause for an additional reason. Under New York law, an exculpatory agreement is "wholly void . . . where it purports to grant exemption from liability for [future] willful or grossly negligent acts." *Lago v. Krollage*, 78 N.Y.2d 95, 100 (1991); *accord St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 85 (2d Cir. 2005). Plaintiffs' claim for tortious interference with the No Origis Sale clause alleges intentional wrongdoing, so to the extent Section 8.6(a) applies, it is legally ineffective to release that future claim.

## **CONCLUSION**

The Court should deny Origis USA's motion to dismiss in full.

---

[13] Plaintiffs' claim for civil conspiracy is based on Fraud committed by both the Vanderhaegen Defendants *and Origis USA*, as well as other wrongful acts. *See* AC ¶¶ 184–86. So even if the company's construction of Section 8.6 were correct, there would be no grounds for dismissal of the civil conspiracy claim.

Dated:   September 29, 2023
New York, NY

Respectfully submitted,

DECHERT LLP

By:   /s/ *Steven B. Feirson*
Steven B. Feirson (*pro hac vice*)
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel. (215) 994 2000
Steven.Feirson@dechert.com

Matthew L. Mazur
Three Bryant Park
New York, NY 10036
Tel. (212) 698 3500

25 Cannon Street
London EC4M 5UB
United Kingdom
Tel. 44 0 20 7184 7000
Matthew.Mazur@dechert.com

David L. Attanasio
1900 K Street, NW
Washington, DC 20006-1110
Tel. (202) 261 3300
David.Attanasio@dechert.com

*Attorneys for Plaintiffs*
*Pentacon BV and Baltisse NV*