UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENTACON BV and BALTISSE NV,

                         Plaintiffs,

            -v.-

GUY VANDERHAEGEN; GUY VANDERHAEGEN
REVOCABLE TRUST; PELICAN INVEST, LLC;
PELICAN INTERNATIONAL, LLC; ORIGIS ENERGY
LLC; and ORIGIS USA LLC,

                         Defendants.

23 Civ. 2172 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

In October 2021, Defendants Guy Vanderhaegen; Guy Vanderhaegen

Revocable Trust; Pelican Invest, LLC; and Pelican International, LLC (together,

the "Vanderhaegen Defendants") sold their collective interest in Defendant

Origis USA LLC ("Origis USA," and together with the Vanderhaegen

Defendants, "Defendants"), a solar power start-up, for $1.4 billion. The

October 2021 sale rendered Defendants "as rich as Croesus" — not least

because, just over one year earlier, in September 2020, Defendants had bought

out the respective 29% interests of Plaintiffs Pentacon BV and Baltisse NV

(together, "Plaintiffs") in Origis USA for a total of only $105 million.

According to Plaintiffs, in the lead-up to the September 2020 sale,

Defendants[1] deliberately withheld critical information and intentionally

---

[1]     In this Opinion, the Court sometimes ascribes conduct to "Defendants" as a group, in
accordance with Plaintiffs' allegations in their Amended Complaint. However, as
discussed further *infra*, not all conduct is, or can be, attributed to all Defendants.

misrepresented material facts to Plaintiffs regarding the value of Origis USA, including, in particular, its pipeline of solar energy projects. Further, these actions were part of Defendants' scheme to seize Plaintiffs' interests in Origis USA at a "grossly deficient" price and resell them quickly thereafter for a significant profit. Plaintiffs brought the instant action to redress the harm they suffered as a result of this alleged scheme.

Before the Court are the separate motions to dismiss of the Vanderhaegen Defendants and Origis USA. Defendants ask this Court to dismiss each of the twelve counts of Plaintiffs' Amended Complaint, which allege a litany of violations stemming from the foregoing series of events. For the reasons set forth in the remainder of this Opinion, the Court grants in part and denies in part the motion of the Vanderhaegen Defendants and grants in full the motion of Origis USA.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties

Plaintiff Pentacon BV ("Pentacon") is a Belgian corporation, with its principal place of business in Evere, Belgium. (AC ¶ 36). Its primary investor

---

[2]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #30)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on Exhibit 1 to the Amended Complaint (Dkt. #30-1), a copy of the parties' Share Redemption Agreement (the "SRA"), which is incorporated by reference in the Complaint. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to the Vanderhaegen Defendants' memorandum of law in support of their motion to dismiss as "Van. Br." (Dkt. #34); to Plaintiffs'

is Paul Thiers, Sr., a successful Belgian entrepreneur and investor.  (*Id.* ¶¶ 6, 8).  Plaintiff Baltisse NV ("Baltisse") is a Belgian corporation with its principal place of business in Sint-Denijs-Westrem, Belgium.  (*Id.* ¶ 37).  Baltisse is owned by another Belgian entrepreneur, Filip Balcaen, a personal friend of Thiers.  (*Id.* ¶ 8).

Defendant Guy Vanderhaegen is a natural person, domiciled in Florida. (AC ¶ 38).  Vanderhaegen is the trustee of Defendant Guy Vanderhaegen Revocable Trust ("GVR Trust"), an entity that at all relevant times held Vanderhaegen's personal wealth and, pertinent to the instant dispute, his ownership interest in the entities Origis Energy LLC ("Origis Energy," formerly Origis Energy NV) and its subsidiary Origis USA.  (*Id.* ¶ 39).

Defendants Pelican Invest, LLC ("Pelican Invest") and Pelican International, LLC ("Pelican International") are each Delaware limited liability companies with a principal place of business in Florida at Vanderhaegen's residence.  (AC ¶¶ 40-41).  At all relevant times, each firm was owned or controlled by Vanderhaegen through Defendant GVR Trust and had no independent business purpose; each served, without regard to corporate formalities, solely as an instrument of Vanderhaegen's purposes.  (*Id.*).  For instance, by virtue of Vanderhaegen's shareholding in Origis Energy, Pelican

---

memorandum of law in opposition to the Vanderhaegen Defendants' motion as "Pl. Van. Opp." (Dkt. #40); and to the Vanderhaegen Defendants' reply memorandum of law as "Van. Reply" (Dkt. #47).  The Court similarly refers to Origis USA's memorandum of law in support of its motion to dismiss as "Origis Br." (Dkt. #36); to Plaintiffs' memorandum of law in opposition to Origis USA's motion as "Pl. Origis Opp." (Dkt. #43); and to Origis USA's reply memorandum of law as "Origis Reply" (Dkt. #46).

Invest held the position of "Board Director" of Origis Energy; Pelican Invest then appointed Vanderhaegen to occupy this position as Pelican Invest's permanent representative. (*Id.* ¶ 40). The other "Pelican" entity, Pelican International, is the successor company to Origis Energy. (*Id.* ¶ 42).

Defendant Origis USA is a Delaware limited liability company with a principal place of business in Miami, Florida. (AC ¶ 46). At all relevant times, it was the U.S. operating subsidiary of Origis Energy. (*Id.* ¶ 7). Vanderhaegen served as its President, managing director, chief executive officer, chief investment officer, and chief commercial officer, in addition to being one of its minority shareholders. (*Id.* ¶¶ 10, 47, 54).

### 2.     Development of Origis Energy and Origis USA

Origis Energy, a solar energy start-up, was founded in Belgium in 2008 with the goal of developing climate-friendly alternatives to fossil fuels. (AC ¶ 6). Paul Thiers, Sr., the primary investor in Plaintiff Pentacon, was the "driving force" behind Origis Energy's creation, providing both the "entrepreneurial vision" and the financing necessary to launch the company. (*Id.*). Defendant Vanderhaegen, however, ran the day-to-day business operations. (*Id.* ¶ 7).

While Pentacon provided financing to Origis Energy from the start, Plaintiff Baltisse did not become a shareholder in Origis Energy until 2016. (AC ¶ 51). Around this time, Origis Energy was winding down its business in Europe in favor of developing its U.S. business. (*Id.* ¶ 52). In order to build its U.S. business, Origis Energy formed Origis USA, which thereafter served as the operating subsidiary for all of Origis Energy's U.S. activity. (*Id.*). Pentacon,

which had a pre-existing relationship with Baltisse (thanks to the friendship between Thiers and Balcaen), asked Baltisse to invest in Origis Energy in order to help it establish Origis USA.  (*Id.* ¶ 51).  Pentacon and Baltisse each came to hold approximately 29% of Origis USA.  (*Id.* ¶ 52).

By 2019, Origis USA was the sole subsidiary of Origis Energy.  (AC ¶¶ 52, 55).  Moreover, Origis Energy had no independent personnel, operations, or projects; its 80% stake in Origis USA was its principal asset and source of value, rendering it little more than a holding company.  (*Id.*).  According to Plaintiffs, by this time, Origis Energy and Origis USA "functioned as a single business under Vanderhaegen's command and control."  (*Id.* ¶ 7).

### 3.    Vanderhaegen Seizes Control of Origis USA

Origis USA quickly became a leading renewable energy developer in the United States, with a strong development pipeline of solar energy and energy storage projects.  (AC ¶ 53).  Importantly, Vanderhaegen, as its President and CEO, exercised effective control over all material information about the business, including the flow of that information to Plaintiffs.  (*Id.* ¶¶ 56-57).  Among other roles, Vanderhaegen functioned as the final report for employees who were pursuing new development opportunities; managed ongoing projects; interacted directly with financiers, investors, bankers, and consultants; and was the point person for dealing with customers and vendors.  (*Id.* ¶ 56).  Accordingly, Plaintiffs were "heavily dependent on Vanderhaegen to identify and accurately transmit all relevant information to them" (*id.* ¶ 57), notwithstanding the fact that Plaintiffs had their own representatives on Origis

USA's Board of Directors (*id.* ¶ 61).  Later on, Vanderhaegen's control over the flow of information to Plaintiffs was amplified by the COVID-19 pandemic, which prevented Plaintiffs' representatives from traveling to the United States to interact in-person with representatives of Origis USA.  (*Id.* ¶ 58).

Over time, friction developed between the parties.  (AC ¶ 60).  Plaintiffs grew concerned about what they perceived to be Vanderhaegen's efforts to isolate them from the business.  (*Id.*).  They also disagreed with Vanderhaegen as to how to allocate certain funds available to Origis USA, specifically with respect to the payment of bonuses to Origis USA's management versus the distribution of dividends to its owners.  (*Id.*).  Vanderhaegen advocated for the payment of bonuses that were disconnected from Origis USA's profitability, and simultaneously contended that the company had insufficient funds to pay any dividends.  (*Id.*).  Plaintiffs, on the other hand, preferred to link bonuses to dividends.  (*Id.*).  This friction made it "even more difficult for Plaintiffs to obtain the critical information about Origis USA's business necessary to effectively participate in decisionmaking."  (*Id.* ¶ 61).

Determined to "take advantage of the situation he had created and his carefully [] orchestrated plan to restrict Plaintiffs' access to … information," Vanderhaegen then put in place a scheme to "remove Plaintiffs from the picture … and expropriate for himself an overwhelming portion of the value of Origis USA held by Plaintiffs."  (AC ¶ 63).  On March 25, 2019, Vanderhaegen sent an email to Origis USA's other minority shareholder, with whom Vanderhaegen was allied (the "Allied Shareholder"), postulating that he could

6

"probably … convince [Plaintiffs] to sell their shares to [him] at an attractive valuation." (*Id.* ¶¶ 64-65). According to Vanderhaegen, Plaintiffs "[we]re not fully on top of things anymore due to lack of knowledge," and that, "in the coming months," Origis USA was set "to sign some very attractive new [power purchase agreements] [that] will make [] the price [Plaintiffs] will be asking [for] go up." (*Id.* ¶ 65). A presentation attached to the email further described how Plaintiffs could be convinced to sell at a price that was much less than what their interests were actually worth, owing to Plaintiffs' "[l]ack of understanding of the business." (*Id.*).

### 4. Negotiation of the Buyout

A few weeks later, on April 30, 2019, Vanderhaegen made his first proposal to buy Plaintiffs' interests in Origis USA. (AC ¶ 66). Vanderhaegen told Plaintiffs that the company was worth about $160 million, proposing to pay just under $100 million for Plaintiffs' collective 58% ownership interest in Origis USA. (*Id.* ¶ 67). According to Plaintiffs, at the same time, Defendants had in their possession secret analyses showing that Origis USA was worth much more than that. (*Id.* ¶ 69). Those "hidden valuations" incorporated estimates of the value of Origis USA's project pipeline — the component of Origis USA's overall value that Defendants repeatedly claimed was essentially determinative of such value — that were far greater than those used in the valuations presented to Plaintiffs. (*Id.* ¶¶ 72-73). The hidden valuations also accounted for entire projects that were not included in the valuations provided to Plaintiffs. (*Id.*). To that point, on May 19, 2019, Vanderhaegen emailed a

potential financier of the buyout, reporting that the true value of Origis USA was no less than $230 to $260 million (*id.* ¶ 78), all the while reassuring Plaintiffs that his (much lower) representations to them of Origis USA's value were accurate (*id.* ¶ 77).

In December 2019, after Plaintiffs and Defendants had begun negotiating a letter of intent in anticipation of the deal, Vanderhaegen made another proposal to buy out Plaintiffs, this time on the basis of a $205 million valuation for Origis USA (comprising, *inter alia*, a $161 million valuation for its project pipeline). (AC ¶¶ 80-81). As before, other emails sent by Vanderhaegen during this time reveal that internal valuations of the company were much higher than $205 million — to be precise, at least $265 to $285 million (comprising, *inter alia*, a $197 million valuation for its project pipeline). (*Id.* ¶¶ 82-84).

On February 3, 2020, the parties signed the letter of intent, which letter set the purchase price for Pentacon's and Baltisse's interests at $56 million apiece, based on a total valuation for Origis USA of $205 million. (AC ¶¶ 86, 89). Just before the parties signed the letter of intent, Vanderhaegen reassured Plaintiffs in an email that they should trust the information that he was providing to them: "[y]ou are member[s] of the Board of Directors to which I have reporting obligations … [i]f I were to deliberately misrepresent things there, then I would have a problem." (*Id.* ¶ 87). Following the signing of the letter of intent, Vanderhaegen continued to communicate privately with the Allied Shareholder about internal valuations for Origis USA that were much greater than any presented to Plaintiffs. (*Id.* ¶¶ 90-92).

Vanderhaegen's misrepresentations did not stop there.  In an April 8, 2020 email to the Allied Shareholder (who, coincidentally, was also his financing source for the buyout), Vanderhaegen asked the Allied Shareholder to prepare a buyout loan letter that reported a lower loan amount than the Allied Shareholder was actually willing to extend to him.  (AC ¶ 97).  Vanderhaegen made this request with the specific intent of "put[ting] pressure on [Plaintiffs] to reduce the purchase price."  (*Id.*).  Vanderhaegen succeeded in extracting a further 10% price reduction from Plaintiffs via this ruse.  (*Id.*).

Vanderhaegen also went to great lengths to mislead Plaintiffs about the prospects of three specific Origis USA solar energy projects in Texas known as the Rockhound projects.  (AC ¶ 109).  In the lead-up to the summer of 2020, internal valuations of the Rockhound projects, prepared by Origis USA and circulated among Origis USA senior management, showed them to be some of the most valuable of Origis USA's projects.  (*Id.* ¶ 111).  Vanderhaegen, however, convinced Plaintiffs to agree to a carve-out of the Rockhound projects from the anticipated purchase price.  (*Id.* ¶¶ 110, 114).

With the buyout transaction still pending, Plaintiffs began expressing their concerns to Vanderhaegen about the anticipated purchase price.  (AC ¶ 99).  Plaintiffs directed pointed questions to Vanderhaegen about the value of Origis USA (and, specifically, the value of the projects in Origis USA's pipeline).  (*Id.*).  Vanderhaegen reassured Plaintiffs in an email on August 28, 2020, that they would soon receive an updated set of valuations that would "remove[] [thei]r uncertainty about the value of [Origis USA's] projects."  (*Id.*).

Plaintiffs received the promised valuations on September 10, 2020, via a report provided by Vanderhaegen that estimated the value of Origis USA's project pipeline at $147 million.  (AC ¶ 18).  At the same time, Vanderhaegen concealed from Plaintiffs certain internal valuations that estimated the worth of Origis USA's projects as potentially exceeding $1.5 billion.  (*Id.* ¶ 101).  These internal valuations were not "simply some daydream of a few out-of-touch souls working deep within the bowels of Origis USA"; on the contrary, they were the product of "careful analysis and input from the top-ranking officers [of]," and "input from outside investment bankers enlisted by," Origis USA.  (*Id.* ¶¶ 102-103).

### 5.    The Buyout Transaction

A few days later, on September 14, 2020, the parties executed a Share Redemption Agreement (the "SRA").  (AC ¶ 115).  The SRA provided for the transfer of Plaintiffs' positions in Origis Energy and Origis USA to Defendants for a total of $105 million in two closings, one on October 15, 2020 (the "First Closing"), and one on January 4, 2021 (the "Second Closing," and together with the First Closing, the "Buyout Transaction").  (*Id.* ¶ 23).  Importantly, Section 4.4 of the SRA affirmed that Plaintiffs had been provided with complete and accurate information about the "business, financial condition, assets, liabilities and results of operations of [Origis]," "[Origis USA]'s development pipeline of solar power and energy storage projects," and "any value indications by any party showing an interest to acquire" all or part of Origis or any of its assets (the "Information Warranty").  (*Id.* ¶ 25 (quoting SRA § 4.4)).  The SRA

further recited Defendants' compliance with the Information Warranty as of the date of the SRA's execution, as well as the dates of the First and Second Closings. (*Id.* ¶ 204 (citing SRA arts. IV, VI §§ 6.2(a), 6.4(a))).

The Buyout Transaction nominally took the form of a share redemption by Origis Energy, but was effectively a buyout of Pentacon and Baltisse by Origis USA, financed by the Allied Shareholder, for the benefit of Origis USA's remaining owners. (AC ¶ 116). The SRA contemplated that all funds would be obtained by Origis USA. (*Id.*). And at the time the SRA was executed, Origis USA entered into a loan agreement with the Allied Shareholder, pursuant to which Origis USA issued penny warrants to the Allied Shareholder to increase that entity's ownership interest in Origis USA from 20% to 40%. (*Id.*).

When the Buyout Transaction was complete, as of the Second Closing, "Defendants had spent [over] a year and a half trying to convince Plaintiffs to sell their interests [in Origis USA] based on false and misleading information about their true beliefs as to the value of Origis USA [and] its pipeline[.]" (AC ¶ 115). Conversely, throughout the buyout process, Plaintiffs had accepted Defendants' representations regarding the value of Origis USA. (*Id.* ¶ 108). According to Plaintiffs:

> [t]hey did so in light of the past history of the parties; Vanderhaegen's control of the facts as CEO and President of Origis USA; the fiduciary duties which Vanderhaegen touted he owed to Plaintiffs; the representations and warranties in the SRA about Defendants' duty to provide complete and accurate information about Origis; the multiple times Defendants repeated to Plaintiffs, both orally and in writing, essentially the same low-value story; and ultimately Plaintiffs' trust in Vanderhaegen as someone

11

> who had been their partner for a very long time and who
> they had treated generously throughout all those years.

(*Id.*).

### 6.    The Antin Transaction

Before the Second Closing, unbeknownst to Plaintiffs, Defendants had entered into various agreements with investment bankers in anticipation of the potential sale of Origis USA and/or its assets to a third party, which sale was to follow Defendants' purchase of Plaintiffs' interests in the company.  (AC ¶ 29).  Indeed, Defendants had hired investment bankers to investigate such a sale as early as July 2020.  (*Id.* ¶ 105).  Initial market tests conducted in early 2021 — wherein the bankers put individual Origis USA assets up for sale — confirmed that Origis USA was worth far more than the Buyout Transaction price.  (*Id.* ¶ 136).  In fact, the Rockhound projects alone received a bid of $145 million.  (*Id.* ¶ 137).

Importantly, Plaintiffs had negotiated a provision in Section 5.5 of the SRA, pursuant to which Defendants agreed not to permit any sale of Origis equity or its assets for a period of one year following the date of the SRA (the "No Sale Clause").  (*See* SRA § 5.5(a)).  If a breach of the No Sale Clause occurred, Plaintiffs were entitled to share in the proceeds of the sale as if the Buyout Transaction had never occurred.  (*See id.* § 5.5(d)).

In March 2021, bankers informed Defendants that Origis USA could fetch up to $600 million in a private transaction and $1.25 billion in a special purpose acquisition company ("SPAC") transaction.  (AC ¶ 139).  Knowing what

Origis USA was potentially worth, Vanderhaegen sought a waiver of the No Sale Clause from Plaintiffs to pursue a SPAC transaction. (*Id.* ¶ 140). To that end, Vanderhaegen told Plaintiffs that a potential SPAC transaction would not produce much, if anything, in the way of profit, and hence that there was no upside to be shared with Plaintiffs. (*Id.* ¶ 141). Because Plaintiffs "trusted that Vanderhaegen had been telling the truth when he had promised he would not profit, accepting in return only a very modest potential payment if a SPAC transaction occurred," they agreed on April 23, 2021, to waive the No Sale Clause as to any SPAC transaction. (*Id.* ¶ 143).

By the summer of 2021, Origis USA's bankers had completed the preparatory work necessary to solicit bids for the company. (AC ¶¶ 29, 148). In August 2021, Defendants received fifteen bids for Origis USA's common shares: six of the bids valued the shares from $900 million to $1.25 billion, and the remaining nine valued the shares from $500 million to $900 million. (*Id.* ¶ 149). On September 8, 2021, Vanderhaegen met with Antin Infrastructure Partners ("Antin"), a highly experienced solar energy investor, confirming a deal for Origis USA for $1.4 billion (the "Antin Transaction"). (*Id.* ¶ 152).

The Antin Transaction was publicly announced on October 18, 2021. (AC ¶ 154). The $1.4 billion purchase price did not become known to Plaintiffs until early 2022, however, when the Allied Shareholder announced that it had sold its equity in Origis USA to Antin for twelve-times cost and had realized a gain of $429 million (allowing Plaintiffs to reverse-engineer the approximate purchase price for Origis USA in the Antin Transaction). (*Id.* ¶ 155). Plaintiffs

13

thereafter demanded certain information from Origis, in accordance with their rights under Section 8.4 of the SRA, so that Plaintiffs could investigate the Antin Transaction fully.  (*Id.* ¶¶ 156-158).

## B.  Procedural Background

Plaintiffs filed the initial complaint in this case in New York state court on February 14, 2023.  (Dkt. #1 at 2; *see generally* Dkt. #1-1 (state court complaint)).  Defendants filed a Notice of Removal on March 14, 2023, removing the case to this Court.  (*See generally* Dkt. #1).  On April 27, 2023, the Vanderhaegen Defendants and Origis USA filed separate pre-motion letters, each requesting leave to file a motion to dismiss Plaintiffs' complaint.  (*See* Dkt. #18 (Vanderhaegen Defendants); Dkt. #19 (Origis USA)).  Plaintiffs responded in turn on May 2, 2023.  (*See* Dkt. #20 (response to Vanderhaegen Defendants); Dkt. #21 (response to Origis USA)).

The Court held a pre-motion conference to discuss the parties' submissions on May 19, 2023.  (*See* May 19, 2023 Minute Entry; Dkt. #24 (transcript of proceedings)).  At the conference, the Court set a schedule for briefing on Defendants' anticipated motions to dismiss.  (*Id.*).  On June 12, 2023, Plaintiffs filed an Amended Complaint (Dkt. #30), which complaint removed Origis Energy (but not Origis USA) as a named Defendant upon Defendants' earlier representation that Origis Energy had ceased to exist following a statutory merger with Defendant Pelican International (Dkt. #27).

Thereafter, the Vanderhaegen Defendants and Origis USA each filed a motion to dismiss the Amended Complaint and accompanying papers on

July 28, 2023.  (*See* Dkt. #31-34 (Vanderhaegen Defendants); Dkt. #35-37

(Origis USA)).  Plaintiffs filed memoranda of law opposing the respective

motions on September 29, 2023.  (*See* Dkt. #40-42 (opposition to

Vanderhaegen Defendants); Dkt. #43 (opposition to Origis USA)).  Finally,

Defendants filed their reply papers on October 13, 2023.  (*See* Dkt. #47-48

(Vanderhaegen Defendants); Dkt. #46 (Origis USA)).

**DISCUSSION**

**A.    Applicable Law**

**1.    Motions to Dismiss Under Rule 12(b)(6)**

Generally speaking, when considering the adequacy of a complaint upon

a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

court must (i) accept all of the complaint's factual allegations (but not legal

conclusions) as true, and (ii) determine whether it states a "plausible" claim for

relief.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  In doing so, the

court must always "draw all reasonable inferences in the non-movant's favor."

*Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  Put another way,

the court's task is to "assess[] the legal feasibility of the complaint," not "weigh

the evidence that might be offered to support it."  *Glob. Network Commc'ns, Inc.*

v. *City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).  This is "a context-

specific task that requires the reviewing court to draw on its judicial experience

and common sense."  *Iqbal*, 556 U.S. at 679.

At the motion to dismiss stage, a court may consider only "the facts

alleged in the complaint, documents attached to the complaint as exhibits, and

15

documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016).  However, "where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' [rendering] the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

### 2.   Heightened Pleading Requirements for Fraud Claims Under Rule 9(b)

Plaintiffs alleging fraud claims face additional, heightened pleading requirements beyond those enumerated above.  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  These heightened requirements are circumscribed by Federal Rule of Civil Procedure Rule 9(b).  *Compare* Fed. R. Civ. P. 8 (describing "General Rules of Pleading"), *with* Fed. R. Civ. P. 9(b) (setting forth requirements of "alleging fraud or mistake").  Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud," Fed. R. Civ. P. 9(b); namely, "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent," *ATSI*, 493 F.3d at 99 (citation omitted).  While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to "allege[] generally" any requisite state of mind, *e.g.*, "[m]alice, intent, [or] knowledge[.]"  Fed. R. Civ. P. 9(b).

B.    **Analysis**

The Amended Complaint brings twelve distinct claims against one or more of the Defendants.  As against all Defendants, Plaintiffs bring claims for fraud (Count One); fraudulent inducement of contract (Count Two); aiding and abetting fraud (Count Three); and civil conspiracy (Count Four).  As against the Vanderhaegen Defendants only, Plaintiffs bring claims for constructive fraud (Count Five); breach of fiduciary duty (Count Six); breach of Section 4.4 of the SRA (*i.e.*, the Information Warranty) (Count Seven); breach of Section 5.5 of the SRA (*i.e.*, the No Sale Clause) (Count Eight); and breach of the implied covenant of good faith and fair dealing (Count Nine).  Finally, as to Origis USA only, Plaintiffs bring claims for aiding and abetting breach of fiduciary duty (Count Ten); tortious interference with the SRA as a consequence of the Vanderhaegen Defendants' alleged breach of Section 4.4 (Count Eleven); and tortious interference with the SRA as a consequence of the Vanderhaegen Defendants' alleged breach of Section 5.5 (Count Twelve).

For the reasons set forth in the remainder of this Opinion, the Court grants in part and denies in part the Vanderhaegen Defendants' motion to dismiss as follows:  The Court denies the Vanderhaegen Defendants' motion to dismiss Counts One, Two, Five, and Six; denies the Vanderhaegen Defendants' motion to dismiss Count Seven as to Pelican International, Pelican Invest, and GVR Trust, and grants it as to Vanderhaegen; and grants the Vanderhaegen Defendants' motion to dismiss Counts Three, Four, Eight, and Nine.  Further,

the Court grants Origis USA's motion to dismiss the claims against it in full

(*i.e.,* Counts One, Two, Three, Four, Ten, Eleven, and Twelve).

### 1.    Plaintiffs' Claims Are Governed by New York Law

As an initial matter, before proceeding to the merits of Plaintiffs' claims,

the Court considers which law must be applied when doing so.  Importantly,

the SRA contains an explicit and conspicuously broad choice-of-law provision:

> This Agreement and any claim arising out of or in connection with this Agreement shall be governed by, construed, and enforced in accordance with the Laws of the State of New York *without giving effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction.*

(SRA § 9.12 (emphasis added)).  This language is sufficient to encompass all of

Plaintiffs' claims.  The Court therefore finds that all of Plaintiffs' claims are

governed by New York law.

Notwithstanding the SRA's choice-of-law provision, Defendants argue

that Plaintiffs' fiduciary duty claims (Counts Five and Six) are governed by

Belgian law on account of the "internal affairs" doctrine: that is, because Origis

Energy was incorporated under Belgian law, all claims concerning its internal

affairs are governed by Belgian law.  (Van. Reply 5-6; *see also* Van. Br. 21 (first

citing *Scottish Air Int'l, Inc.* v. *British Caledonian Grp., PLC,* 81 F.3d 1224, 1234

(2d Cir. 1996) ("[Q]uestions relating to the internal affairs of corporations are

decided in accordance with the law of the place of incorporation."); and then

citing *Diamond* v. *Shiftpixy, Inc.*, No. 20 Civ. 7305 (LJL), 2021 WL 3085405, at

*17 (S.D.N.Y. 2021) ("[A] claim involving breach of a fiduciary duty owed by a

corporate officer is governed by the law of his company's state of incorporation.")).

Under New York law, "courts will generally enforce choice-of-law clauses and … contracts should be interpreted so as to effectuate the parties' intent." *Petroleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 51 F.4th 456, 472 (2d Cir. 2022) (internal quotation marks omitted). Importantly, the SRA's choice-of-law provision instructs this Court to decline to "giv[e] effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction." (SRA § 9.12). It follows that this Court should not give effect to the internal affairs doctrine. *Cf. Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle[.]").

Moreover, Defendants do not cite any authority indicating that the internal affairs doctrine supplants a choice-of-law provision of the kind at issue in this case. In fact, the case that Defendants cite in support of their argument that the choice-of-law provision does not override the internal affairs doctrine, *City of Sterling Heights Police & Fire Ret. Sys.* v. *Abbey Nat'l*, affirmatively distinguishes cases in which "the parties expressly contracted to have any cause of action or controversy adjudicated under New York law 'without giving effect to conflict of law principles.'" 423 F. Supp. 2d 348, 364 (S.D.N.Y. 2006) (first citing *Turtur* v. *Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994) (interpreting choice-of-law provision similar to SRA § 9.12), and then citing *About.Com, Inc.* v. *Targetfirst, Inc.*, No. 01 Civ. 1665 (GBD), 2002 WL

19

826953, at *2 (S.D.N.Y. Apr. 30, 2002) (same)).  The Court concludes that New York law governs Plaintiffs' claims.

### 2. Plaintiffs' Claims Against Non-Parties Were Not Released

Another antecedent matter for the Court to resolve concerns the parties' competing interpretations of Section 9.11 of the SRA.  Section 9.11 serves to release certain claims against non-party affiliates and, in relevant part, states:

> *Other than pursuant to and to the extent provided in the Transaction Documents, no Person who is not a Contracting Party*, including any past, present or future Representative, stockholder or Affiliate of any Contracting Party … *will have any liability* (whether in Contract or in tort, in equity or at Law, or granted by statute) for any claims, causes of action, obligations, or liabilities *arising under, out of, in connection with, or related in any manner to this Agreement … or in its negotiation, execution, performance, or breach*; and, to the maximum extent permitted by applicable Law, each Contracting Party waives and releases all of those liabilities, claims, causes of action and obligations against any such Non-Party Affiliates[.]

(SRA § 9.11 (emphases added)).  The Vanderhaegen Defendants claim that the foregoing provision operates to bar Plaintiffs' claims against Defendants Vanderhaegen, GVR Trust, and Pelican Invest, none of which was defined as a "Contracting Party" in the SRA.  (*See* Van. Br. 18-19).[3]  In Defendants' estimation, "[a]llegations [that] Plaintiffs were 'fraudulently induced . . . into signing the SRA' (AC ¶ 169)[,] fall squarely within the subject of the release,

---

[3]     The "Contracting Parties" are defined to include Pentacon, Baltisse, Origis Energy, Origis USA, and Pelican International.  (*See* SRA, Preamble; *id.* at 3, 6; *id.* § 9.11).

which includes 'this Agreement' and 'its negotiation[] [and] execution' [(SRA § 9.11)]." (*Id.* at 19).

Viewing Section 9.11 in isolation, the Vanderhaegen Defendants appear to be correct. However, viewing Section 9.11 in concert with Section 4.8 of the SRA, which provision serves to disclaim certain representations and warranties on behalf of non-party affiliates (such as Vanderhaegen, GVR Trust, and Pelican Invest), the Court's sentiment shifts. Section 4.8 of the SRA states, in relevant part:

> Except for the express representations and warranties provided in this [Article IV of the SRA] and in cases of Fraud, *none of Pelican, [Origis Energy,] Origis USA, any of their respective Affiliates[,] or any of their or those Affiliates' respective Representatives* has made, or is making, any representation or warranty of any kind ... relating to any of Pelican, [Origis Energy,] or Origis USA ... to [Plaintiffs] ... and, *except in cases of Fraud, no such party will be liable in respect of the accuracy or completeness of any information provided to either [Plaintiff]*[.]

(SRA § 4.8 (emphases added)). Section 4.8 thus explicitly opens up non-party affiliates to liability "in respect of the accuracy or completeness of any information provided to either [Plaintiff]" in "cases of Fraud." (*Id.*). Stated differently, Section 4.8 suggests that "in cases of Fraud," there is a chance that "Pelican, [Origis Energy,] Origis USA, any of their respective Affiliates[,] or any of their or those Affiliates' respective Representatives" — namely, Vanderhaegen, GVR Trust, and Pelican Invest — could be held liable for such representations.

Further, the general release in Section 9.11 is limited "to the extent provided in the Transaction Documents," including, of course, the SRA.  (SRA § 9.11).  It must be the case, then, that Section 9.11's release does not cover the situations in which Section 4.8 suggests that non-party affiliates can be held liable.  If the parties intended for non-party affiliates to be completely immune from liability "in respect of the accuracy or completeness of any information provided to either [Plaintiff]," even "in cases of Fraud," the parties could have simply limited Section 4.8's disclaimer to "Pelican, [Origis Energy,] [and] Origis USA," without including "any of their respective Affiliates or any of their or those Affiliates' respective Representatives."  Had the parties done as much, Section 9.11's general release would have barred liability for non-party affiliates, even in "cases of Fraud."  But they did not.

Regardless, the Court need not decide at this stage of the litigation whether the SRA releases Plaintiffs' claims against non-party affiliates.  In the Court's view, while Plaintiffs have the better argument as to the interpretation of Section 9.11, the SRA is — at minimum — ambiguous.  And "'when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal' on a motion to dismiss under Rule 12(b)(6)." *LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *6 (S.D.N.Y. Mar. 29, 2022) (quoting *Crowley* v. *VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007)).  Accordingly, the Court declines to grant the Vanderhaegen Defendants' motion to dismiss as

to Defendants Vanderhaegen, GVR Trust, and Pelican Invest on the grounds

that the SRA released the claims against them.

### 3. Plaintiffs' Non-Fraud Claims Against Origis USA Were Not Released

The final preliminary matter that the Court must address before

proceeding to the merits of Plaintiffs' claims is the interpretation of Section 8.6

of the SRA, the so-called "exclusive remedies" provision.  Section 8.6 states, in

relevant part:

> *From and after the Second Closing … except for claims based on Fraud …* the remedies in [Article Eight] will be the sole and exclusive remedy for any and all claims relating, directly or indirectly, to the subject matter of this Agreement, and *each Party hereby waives and relinquishes any and all other rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth in any Transaction Document* or otherwise relating to the subject matter of any Transaction Document it may have against the other Party hereto, whether based on Contract, tort, strict liability, other Laws or otherwise[.]

(SRA § 8.6 (emphases added)).

The interpretation of Section 8.6 is disputed by Plaintiffs and Defendant

Origis USA, as opposed to the Vanderhaegen Defendants.  While conceding

that the SRA permits Plaintiffs to bring claims of "fraud" against it, Origis USA

argues that Section 8.6 bars Plaintiffs' remaining claims against Origis, *i.e.*, for

aiding and abetting (Counts Three and Ten), civil conspiracy (Count Four), and

tortious interference with contract (Counts Eleven and Twelve).  (Origis Br. 10,

26-28).  According to Origis USA, these claims "are secondary liability claims

asserting only that Origis USA assisted or abetted another Defendant's alleged misstatements," and thus are not "based on alleged 'Fraud.'" (*Id.* at 26).

The Court cannot conclude, however — at this stage in the litigation — that Section 8.6 bars these claims.  Origis USA relies in part on the finding of a sister court in this District in *Campbell* v. *Plant Health Intermediate, Inc.*, No. 19 Civ. 3017 (PMH), 2020 WL 3127809 (S.D.N.Y. June 12, 2020), in which the court dismissed a series of claims pursuant to a "nearly identical" exclusive remedy provision (excluding "any remedy related to fraud," *id.* at *7).  (Origis Br. 27).  In *Campbell*, however, "[e]ach of the[] allegedly untrue statements [comprising counter-plaintiff's fraud claim] [was] covered by a representation or warranty in the Equity Purchase Agreement."  *Campbell*, 2020 WL 3127809, at *7.  Accordingly, that case involved no underlying fraud at all, but rather a breach of contract.  *Id.* at *8 ("[Counter-plaintiff] has not premised its fraud claim on conduct that is separate and distinct from the underlying breach of contract.").  *Campbell* is thus inapposite, as the Court concludes in Sections B.4 and B.5, *infra*, that Plaintiffs have successfully alleged fraud separate and apart from their breach of contract claims.

Moreover, Section 8.6 broadly exempts all claims "based on Fraud," not just claims "of Fraud."  (SRA § 8.6).  As Origis USA concedes, "all of Plaintiffs' claims are [ultimately] based on the same alleged fraudulent scheme."  (Origis Br. 16).  Stated differently, the "factual matrix ... for Plaintiffs' fraud claims" is "the foundation for Plaintiffs' secondary liability claims."  (Pl. Origis Opp. 22).  Because the Court believes the exemption to Section 8.6 is potentially

24

ambiguous enough to cover Plaintiffs' aiding and abetting, civil conspiracy, and tortious interference with contract claims, it will not dismiss them as a matter of law pursuant to Section 8.6.  *See Serta Simmons Bedding*, 2022 WL 953109, at *6.

### 4. The Court Denies the Vanderhaegen Defendants' Motion to Dismiss and Grants Origis USA's Motion to Dismiss Plaintiffs' Claim for Fraud in the Inducement (Count Two)

The remainder of this Opinion proceeds through the twelve counts of the Amended Complaint in non-consecutive order, beginning with those of Plaintiffs' claims that most broadly inform the Court's determination of the remaining claims.  The Court first considers the primary violations of law alleged by Plaintiffs: the Opinion begins with Plaintiffs' fraud claims against all Defendants (Section B.4 and B.5, *infra* (discussing Counts One and Two)), proceeds to Plaintiffs' fiduciary duty claims against the Vanderhaegen Defendants (Section B.6, *infra* (discussing Counts Five and Six)), and concludes its discussion of the primary violations with Plaintiffs' breach of contract claims against the Vanderhaegen Defendants (Section B.7, *infra* (discussing Counts Seven, Eight, and Nine)).  The Court then turns to the Amended Complaint's claims for secondary violations of law: the Court begins with Plaintiffs' aiding and abetting and civil conspiracy claims against the Vanderhaegen Defendants (Section B.8, *infra* (discussing Counts Three and Four)), and ends with Plaintiffs' aiding and abetting and tortious interference claims against Origis USA (Section B.9, *infra* (discussing Counts Three, Ten, Eleven, and Twelve)).

The Court starts here with Count Two of the Amended Complaint, which charges all Defendants with fraudulent inducement of contract.  Broadly speaking, Count Two alleges that, between 2019 and 2020, all of the Defendants "deliberately and repeatedly misrepresented material facts and omitted material information … about Origis USA and the various solar energy projects in its pipeline, and thereby fraudulently induced Plaintiffs into signing the SRA."  (AC ¶ 169).

To withstand a Rule 12(b)(6) motion to dismiss a fraudulent inducement claim under New York law, a plaintiff must assert facts that plausibly allege: "'[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance.'"  *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)).  Additionally, in conjunction with the facial plausibility standard of Rule 12(b)(6), a plaintiff alleging fraud must satisfy the heightened pleading standard set forth in Rule 9(b).  *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 170-71 (2d Cir. 2015).  Specifically, to satisfy Rule 9(b), a plaintiff must: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent."  *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).  In accordance with the subsequent analysis, the

Court finds that Plaintiffs' fraudulent inducement claim has surmounted both the plausibility and particularity bars, and denies Defendants' motion to dismiss Plaintiffs' fraudulent inducement claim, but only as to the Vanderhaegen Defendants.

### a.  The Alleged Misrepresentations

Before diving into its analysis of the alleged misrepresentations, the Court begins with a brief description thereof.[4]  As previously noted, Plaintiffs allege that, between 2019 and 2020, Defendants "deliberately and repeatedly misrepresented material facts and omitted material information .... about Origis USA and the various solar energy projects in its pipeline, and thereby fraudulently induced Plaintiffs into signing the SRA."  (AC ¶ 169).  These misstatements and omissions are most easily conceptualized when separated into three broad categories.

The first category of alleged misrepresentations are quantitative, *i.e.*, those statements made by Vanderhaegen positing the value of Origis USA. These statements include, *e.g.*:

- On April 30, 2019, Vanderhaegen emailed a presentation to Plaintiffs "falsely stating that an accurate value of Origis USA was $160 million."  (AC ¶ 75).  Just two days before, Vanderhaegen had sent an email to a potential financing source that implied a valuation for Origis USA that was no less than $274 million.  (*Id.* ¶ 76).

---

[4]     The Court presumes familiarity with all of the putative misrepresentations detailed in the Amended Complaint and references specific statements here only for illustrative purposes.

- On December 17, 2019, Vanderhaegen emailed Plaintiffs a buyout proposal, indicating that it was "unlikely" Origis USA was worth more than $200 million on the market. (*Id.* ¶ 81). Soon after, on January 7, 2020, Vanderhaegen emailed a potential financing source with a valuation, prepared by Origis USA employees, that indicated that the proper Origis USA valuation was at least $265-285 million. (*Id.* ¶ 82).

- On March 2, 2020, Vanderhaegen emailed Plaintiffs an "updated pipeline report" prepared by Origis USA, which estimated the value of Origis USA's pipeline at $34 million. (*Id.* ¶ 90). The same day, Vanderhaegen emailed a valuation to the Allied Shareholder that valued the pipeline at $215 million. (*Id.* ¶ 91).

- On September 10, 2020, Vanderhaegen emailed Plaintiffs valuations prepared by Origis USA's CIO that represented the value of Origis USA's pipeline as $147 million, which valuations Vanderhaegen thereafter discussed with Plaintiffs on the phone. (*Id.* ¶ 100). Over a month earlier, on July 22, 2020, Vanderhaegen had exchanged emails with multiple top-ranking Origis USA officers concerning a potential valuation for Origis USA's pipeline in excess of $1 billion. (*Id.* ¶¶ 101-102).

The second category of alleged misrepresentations encompasses qualitative statements made by Vanderhaegen regarding aspects of Origis USA's business and his intentions for the company's future. For instance:

- On May 19, 2019, in an email to Plaintiffs, Vanderhaegen dismissed Plaintiffs' assertion that, accounting for goodwill, Origis USA could be worth more than $160 million, claiming that "nobody pays much for goodwill." (AC ¶ 77). On the same day, Vanderhaegen emailed the Allied Shareholder, attaching a valuation for Origis USA that attributed $50-80 million to goodwill. (*Id.* ¶¶ 78-79).

- Vanderhaegen "regularly and deliberately misrepresented to Plaintiffs" that the Rockhound projects "were virtually impossible to value accurately, were very risky, and would be extraordinarily difficult,

28

if not impossible, to sell." (*Id.* ¶ 110).  Nonetheless, internal valuations prepared by and circulated within Origis USA prior to the execution of the SRA showed the Rockhound projects to be "some of the most valuable of Origis USA's projects." (*Id.* ¶ 111).

- Vanderhaegen "repeatedly told Plaintiffs that … he intended to be a long-term shareholder in Origis." (*Id.* ¶ 27).  At the same time, Vanderhaegen was actively plotting to "flip" the company after the Buyout Transaction. (*Id.*).

- Prior to the Buyout Transaction, Vanderhaegen "promised that Pentacon could remain a shareholder in Origis or reinvest in Origis after the buyout." (*Id.* ¶ 106). But Vanderhaegen never intended to keep this promise, as evidenced by his diligent efforts to prevent Pentacon's reinvestment following the Buyout Transaction.  (*Id.*).

The final category of alleged misrepresentations constitutes Defendants' omissions — that is, things that Defendants failed to tell Plaintiffs.[5]  This category includes all of the valuations of Origis USA and its project pipeline that were never shared with Plaintiffs, some of which are identified alongside the misstatements in the first category, *supra.*  (*See also* AC ¶¶ 76, 78, 82, 84, 91, 101-103, 111).  This category also includes Defendants' omissions related to their plans for Origis USA after the Buyout Transaction, *e.g.*, their failure to disclose the "conversations and communications [they had] with the bankers enlisted by Origis USA to begin planning for an eventual sale of the company on several occasions in July 2020, including on July 27, 2020." (*Id.* ¶ 105).

---

[5]    Contrary to the Vanderhaegen Defendants' assertions (*see* Van. Br. 30), omissions may constitute fraud in this case, as a fiduciary relationship existed between the parties, *see* Section B.6, *infra.*

b.   **Antecedent Issues**

   i.   ***Plaintiffs' Fraudulent Inducement Claim Is
         Collateral to Their Breach of Contract Claims***

Before proceeding to the substance of Plaintiffs' fraudulent inducement

claim, the Court first considers whether the claim is collateral to their breach

of contract claims, ultimately concluding that it is.  The Court must do so, as

under New York law, a fraud claim alleged in the context of a contract dispute

must be dismissed to the extent that it "restat[es] what is, in substance, a

claim for breach of contract."  *Wall*, 471 F.3d at 416.  That said, New York law

specifically recognizes a cause of action for "fraud in the inducement" when the

misrepresentations underlying the alleged fraud are "collateral to" the contract

they induced.  *See WIT Holding Corp.* v. *Klein*, 724 N.Y.S.2d 66, 68 (2d Dep't

2001) ("[A] misrepresentation of material fact, which is collateral to the contract

and serves as an inducement for the contract, is sufficient to sustain a cause of

action alleging fraud.").

Such are the alleged misrepresentations in the instant case.  Plaintiffs

contend that Defendants repeatedly misrepresented to them the value of Origis

USA in an effort to convince Plaintiffs to sign the SRA, all the while knowing

Origis USA was worth far more than the figures they were actively reporting to

Plaintiffs.  This is precisely the kind of "misrepresentation of a present fact"

that is collateral to and serves as an inducement for a contract.  *Chase* v.

*Columbia Nat'l Corp.*, 832 F. Supp. 654, 661 (S.D.N.Y. 1993); *see also Alpha

Cap. Anstalt* v. *Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 340 (S.D.N.Y. 2017)

("In this case … [p]laintiffs allege that if not for [defendant]'s material

misrepresentations, they would not have entered into the contract in the first place … suggest[ing] a separate and distinct claim for fraud in the inducement is present here.").  Accordingly, Plaintiffs' fraudulent inducement claim is distinct from their breach of contract claims.

> ## ii. The Alleged Misrepresentations Are Attributable to the Vanderhaegen Defendants, But Not to Origis USA

The Court must also establish, as a preliminary matter, the parties to whom the alleged misrepresentations described above may be attributed.  The Court must do so because the Amended Complaint frequently attributes the alleged misrepresentations to "Defendants" generally and, to that point, names all Defendants in Count Two.  (*See, e.g.*, AC ¶¶ 2, 16, 71, 108, 154, 186).  Of course, as both parties acknowledge, the alleged misrepresentations are attributable to Defendant Vanderhaegen, who was undoubtedly their "speaker." (Pl. Van. Opp. 21).  But the parties dispute whether such misrepresentations can be attributed to the remainder of the Vanderhaegen Defendants or to Origis USA.  As set forth below, the Court finds that Vanderhaegen's misrepresentations are attributable to the broader set of Vanderhaegen Defendants, but not to Origis USA.

The Court begins its attribution analysis with the Vanderhaegen Defendants.  To meet the particularity requirement of Rule 9(b), a plaintiff must "identify the speaker" of each of the misrepresentations alleged in her complaint.  *Rombach*, 355 F.3d at 170.  In accordance with this principle, courts in this Circuit have declined to attribute the alleged misrepresentations

of one speaker to a broader group of "defendants," finding that "'lumping' all defendants together fails to satisfy the particularity requirement" of Rule 9(b). *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007).

Still, a plaintiff can circumvent this requirement when "the complaint gives grounds for attributing the statements to the group." *Loreley*, 797 F.3d at 173. Such grounds exist where, as here, the Vanderhaegen Defendants are alleged to have acted "as the same entity." *GEM Advisors, Inc.* v. *Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 332 n.9 (S.D.N.Y. 2009) (concluding that plaintiff "fairly charge[d]" multiple defendants with fraudulent statements because of plaintiff's assurance that defendants "should be treated as the same entity"); *see also Monterey Bay Mil. Hous., LLC* v. *Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 730-31 (S.D.N.Y. 2021) (rejecting group pleading argument where complaint alleged defendants "in essence ha[d] operated as one entity" and were "adequately inform[ed] … of [their individual] alleged participation in the fraud" (internal quotation marks omitted)).

The Amended Complaint provides extensive justification for attributing the alleged misrepresentations to each of the Vanderhaegen Defendants as one and the same with Vanderhaegen:

- *Defendant GVR Trust.* Vanderhaegen is GVR Trust's "sole director, officer, employee, and/or agent." (AC ¶ 39). Vanderhaegen's personal residence is GVR Trust's principal place of business. (*Id.*). Further, at all relevant times, GVR Trust held Vanderhaegen's "ownership interest in Origis Energy and Origis USA." (*Id.*).

- *Defendant Pelican Invest.* Vanderhaegen is Pelican Invest's "managing director as well as [its] sole officer, employee, and/or agent." Vanderhaegen's personal residence is Pelican Invest's principal place of business. (*Id.* ¶ 40). Furthermore, Pelican Invest has "no independent business and instead serves, without regard to corporate formalities, solely as an instrument of Vanderhaegen's purposes." (*Id.*). These purposes include "having Pelican Invest serve as board director for Origis Energy based on Vanderhaegen's shareholding in Origis Energy and then, in turn, to appoint Vanderhaegen himself to serve as Pelican Invest's permanent representative." (*Id.*).

- *Defendant Pelican International.* Vanderhaegen is Pelican International's "sole director, officer, employee, and/or agent." (*Id.* ¶ 41). Vanderhaegen's personal residence is Pelican International's principal place of business. (*Id.*). Pelican International has "no independent business and instead serves, without regard to corporate formalities, solely as an instrument of Defendant Vanderhaegen's purposes, including to hold Defendant Vanderhaegen's personal wealth and, specifically, shares in Origis Energy and Origis USA." (*Id.*). Further, Pelican International is the successor entity of Origis Energy, over which (at all relevant times) Vanderhaegen exercised full operational control. (*Id.* ¶ 42).

In sum, Vanderhaegen was empowered to both (i) effectuate the Buyout Transaction and (ii) benefit therefrom only *because of* and *through* his control of the other Vanderhaegen Defendants. These allegations make clear that the Vanderhaegen Defendants "operate[] as one entity." *Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 730-31. Accordingly, the Court finds the alleged misrepresentations are attributable to all of the Vanderhaegen Defendants, each of whom is properly named in Count Two.

Conversely, the alleged misrepresentations cannot be attributed to Origis USA. To begin, none of the alleged misrepresentations was made by Origis USA. Indeed, Origis USA could not have made many of them, as it explains:

> [attributing] the pled misrepresentations [to Origis USA] make[s] no sense …. For example, Origis USA could not have misrepresented that it "had no intention of selling the business in the foreseeable future" as it did not own its own stock, nor could Origis USA misrepresent that it "wanted to remain invested over the long haul" in itself.

(Origis Br. 21).

Further, to the extent information prepared by Origis USA made its way to Plaintiffs, Origis USA was not involved. Rather, Plaintiffs' allegations establish that any information prepared by Origis USA was transmitted to Plaintiffs exclusively via Vanderhaegen (*see* AC ¶¶ 75, 83, 90, 100), and do not support any plausible finding that Origis USA itself provided any valuation information to Plaintiffs (*see* Origis Reply 4). Nor did Origis USA have any duty of disclosure to Plaintiffs under the SRA or otherwise. (Origis Br. 21-23). And, critically, Origis USA was not a party to Section IV of the SRA, the provision of the SRA that committed its signatories to the Information Warranty. (*Id.* at 21-22).

Nor is it the case that Vanderhaegen was acting in his "official capacity" as Origis USA's CEO when he made the alleged misrepresentations. Under New York Law, vicarious liability attaches only where an employee's acts were "in furtherance of the employer's business and within the scope of employment." *Browne* v. *Lyft, Inc.*, 194 N.Y.S.3d 85, 87-88 (2d Dep't 2023)

(internal quotation marks omitted).  Here, it is clear that Vanderhaegen did not make the misrepresentations in furtherance of Origis USA's business; rather, he (allegedly) did so to benefit himself and the other Vanderhaegen entities in their capacity as owners of Origis USA.  (*See also* Origis Reply 3-4).  For the foregoing reasons, the Court declines to attribute the alleged misrepresentations to Origis USA and dismisses Count Two as to Origis USA.

### c. Plaintiffs Have Stated a Claim for Fraudulent Inducement

As previously noted, to survive a Rule 12(b)(6) motion to dismiss a fraudulent inducement claim under New York law, a plaintiff must assert facts that plausibly allege: "'[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance."  *Wall*, 471 F.3d at 415-16 (quoting *Bridgestone*, 98 F.3d at 19).  Plaintiffs have done just that: they allege that (i) in the lead-up to the SRA, Defendants "deliberately withheld critical information and intentionally misrepresented material facts to Plaintiffs relating to the value of Origis USA and its assets" (AC ¶ 2); (ii) Defendants did so "intentionally[,] to induce Plaintiffs into entering into the SRA and thereby unlawfully expropriate large amounts of money from Plaintiffs in order to enrich themselves" (*id.* ¶ 169); (iii) Plaintiffs reasonably relied on those statements because of, *inter alia*, "the fiduciary duties which Vanderhaegen touted he owed to Plaintiffs" and "the representations and warranties in the

SRA" (*id.* ¶ 108); and (iv) Plaintiffs suffered damages because the statements induced them to sign the SRA and "relinquish their ownership interests [in Origis USA] at a grossly deficient value" (*id.* ¶ 220).

The Vanderhaegen Defendants object on several grounds, none of which the Court finds availing.  *First*, the Vanderhaegen Defendants claim that Defendants' statements concerning the value of Origis USA (*i.e.*, the first category of alleged misstatements) are statements of opinion and, as such, cannot be materially false.  (Van. Br. 23-26).  While it is true that "statements of value" are "generally considered opinion and therefore not as demonstrably false as other possible misrepresentations," *M&T Mortg. Corp.* v. *White*, 736 F. Supp. 2d 538, 563 (E.D.N.Y. 2010), Defendants concede that such statements can be actionable in fraud where "the speaker either [i] did not in fact hold the opinion stated or ... [ii] subjectively was aware that there was no reasonable basis for it," *M&T Bank Corp.* v. *McGraw Hill Cos., Inc.*, 5 N.Y.S.3d 783, 785 (4th Dep't 2015) (quoting *IKB Int'l S.A.* v. *Bank of Am.,* No. 12 Civ. 4036 (LAK), 2014 WL 1377801, at *1 (S.D.N.Y. Mar. 31, 2014)).

Such is the case here, where the allegations of the Amended Complaint, taken as true, establish that Vanderhaegen did not believe the alleged misrepresentations when made.  Defendants cannot sidestep the series of instances, delineated in the Amended Complaint, in which Vanderhaegen discussed a valuation of Origis USA or its assets with Plaintiffs and then shortly thereafter discussed a materially different valuation of Origis USA or its assets with someone else.  (*See generally* Section B.4.a, *supra* (listing

examples)).  The "obvious inference" from these allegations is that
Vanderhaegen did not believe the valuations he was presenting to Plaintiffs at
the time he presented them.  (Pl. Van. Opp. 25).  Accordingly, the alleged
misrepresentations of Origis USA's value are actionable.

The same is true for the more qualitative misrepresentations in the
second category of alleged misstatements, *e.g.*, that Vanderhaegen "intended to
be a long-term shareholder in Origis" (AC ¶ 27), or that he "promised that
Pentacon could … reinvest in Origis after the [B]uyout [Transaction]" (*id.*
¶ 106).  Analogous to the above situation (wherein a speaker says something
she does not believe), where a speaker makes "a promise … with a preconceived
and undisclosed intention of not performing it," such promise may constitute
"a material misrepresentation of fact."  *Spinelli* v. *Nat'l Football League*, 903
F.3d 185, 210 (2d Cir. 2018) (internal quotation marks omitted).  Here, the
Amended Complaint alleges that Vanderhaegen had no intention of following
through on his promises to be a long-term shareholder or to permit Pentacon to
reinvest in Origis.  Thus, these misrepresentations are likewise actionable.

*Second*, the Vanderhaegen Defendants dispute that Plaintiffs have
adequately alleged actual reliance, *i.e.*, that Plaintiffs were actually induced
into signing the SRA based upon Defendants' misrepresentations.  According to
Defendants, "[f]ar from passively relying on Vanderhaegen to dictate valuation
and price, Plaintiffs staked out their own affirmative position, and actively
bargained for their preferred deal terms." (Van. Br. 27).  That Plaintiffs did not
blindly accept Defendants' representations, at times conducting independent

inquiries and pushing back on Vanderhaegen's assurances, does not defeat Plaintiffs' claim of actual reliance.  In fact, such independent investigation is typically requisite to a finding of reliance.  *See Cambridge Cap. LLC* v. *Ruby Has LLC*, No. 20 Civ. 11118 (LJL), 2023 WL 3956868, at *43 (S.D.N.Y. June 2, 2023) ("Particularly in a [sophisticated] transaction such as this, the party claiming fraud must at least have conducted minimal diligence and not have been reckless." (internal quotation marks omitted)).

Plaintiffs' claim of actual reliance is further bolstered by the alleged information asymmetry between themselves and Vanderhaegen.  Plaintiffs claim that they could not help but rely on Vanderhaegen because he "had superior command of company information as CEO and President of Origis USA."  (AC ¶ 68).  Because Plaintiffs' access to information about Origis USA's business was inferior to that of Defendants — notwithstanding Plaintiffs' efforts to "stake[] out their own affirmative position" on the deal — some amount of *de facto* reliance remained.  (Van. Br. 27).  *See McGraw Hill*, 5 N.Y.S.3d at 786 (finding actual reliance where plaintiff alleged "it did not have access to the same data as defendant"); *cf. Royal Am. Managers, Inc.* v. *IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) (noting that "[w]here the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth," New York courts are less likely to find reliance).  The Court thus concludes that Plaintiffs have successfully pleaded actual reliance.

*Third*, Defendants dispute whether Plaintiffs' reliance was reasonable. (Van. Br. 28-30). But in the same way that the alleged information imbalance between Plaintiffs and Vanderhaegen supports Plaintiffs' claim of actual reliance, it also supports Plaintiffs' claim that their reliance was reasonable. *See Epiphany Cmty. Nursery Sch.* v. *Levey*, 94 N.Y.S.3d 1, 9-10 (1st Dep't 2019) (finding "superior knowledge or means of knowledge on the part of the person making the representation" a consideration in ascertaining whether reliance was justified). Further, Plaintiffs took "reasonable steps" to protect themselves from Defendants' potential misrepresentations — further justifying their reliance — by, *inter alia*, insisting that the SRA include a provision ensuring "that [Plaintiffs] had received a complete and not misleading set of all material information regarding [Origis USA] and its assets." (Pl. Van. Opp. 30-31 (citing SRA § 4.4)). *See DDJ Mgmt., LLC* v. *Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010) ("In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.").[6] Lastly, the Court acknowledges that "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." *STMicroelectronics, N.V.* v. *Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011). For these

---

[6]     Defendants cite as analogous *Centro Empresarial Cempresa S.A.* v. *Am. Movil, S.A.B. de C.V.*, claiming that the instant case is similarly one where "[P]laintiffs have been so lax in protecting themselves that they cannot fairly ask for the law's protection." 17 N.Y.3d 269, 279 (2011). (Van. Br. 29-30). The plaintiffs in *Centro*, however — in stark contrast to Plaintiffs in this case — demanded no contractual assurances whatsoever as to the accuracy of defendants' representations. *Centro*, 17 N.Y.3d at 279.

reasons, the Court will not conclude, at this stage in the litigation, that Plaintiffs' reliance was unreasonable as a matter of law.

*Fourth* (and finally), Defendants argue that Plaintiffs have failed to plead fraud by omission, specifically in relation to the third category of alleged misstatements. According to Defendants, Plaintiffs cannot plead fraud by omission because such "an omission does not constitute fraud unless there is a fiduciary relationship between the parties." *SNS Bank, N.V.* v. *Citibank, N.A.*, 777 N.Y.S.2d 62, 66 (1st Dep't 2004). This argument is dead on arrival; as the Court discusses in Section B.6, *infra*, there was a fiduciary relationship between Plaintiffs and the Vanderhaegen Defendants. Accordingly, Plaintiffs may proceed on a fraud-by-omission theory.

### d.     Plaintiffs' Allegations Are Sufficiently Particular

As previously explained, "[a] complaint of fraud satisfies Rule 9(b) if it sets forth who made the fraudulent statements, the dates on which and places at which the alleged fraudulent statements were made, the manner in which the statements were false[,] and upon which statements plaintiffs relied." *M&T Mortg. Corp.* v. *Miller*, 323 F. Supp. 2d 405, 412 (E.D.N.Y. 2004). The Court finds that the Amended Complaint has sufficiently set forth such facts, as detailed in Section B.4.a. *See also Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) ("There is no doubt that [d]efendants have fair notice of, and understand the factual basis for, the misrepresentations and omissions that underlie [plaintiff's] claims."). Accordingly, in addition to surmounting the Rule 12(b)(6) facial plausibility standard, Plaintiffs' fraudulent

40

inducement claim is stated with sufficient particularity for purposes of
Rule 9(b).

In seeking dismissal, Defendants emphasize a number of shortcomings
in Plaintiffs' delineation of the alleged misrepresentations that purport to
undermine the Amended Complaint's particularity.  According to Defendants,
Plaintiffs: (i) do not "specify" the actual statements made in the emails and
documents that the parties exchanged (providing instead Plaintiffs'
"characterizations" of those statements); (ii) do not identify the individuals who
authored the documents or statements that were attached to or included in
those exchanges; and (iii) do not state where and to whom each statement was
made.  (Van. Br. 22-23).  The Court rejects each of these objections.

As to the first objection, at this stage in the litigation, the Court will not
require Plaintiffs to "specify [the] ... statement[s] contained in" the various
communications containing the alleged misrepresentations.  (*See* Van. Br. 23).
To that point, the Court finds that Plaintiffs' specific descriptions of the
contents of those communications do not, in this case, amount to
"impermissibl[e] summarizing," as Defendants would have it.  (*See id.* at 22-23
(citing *Gao* v. *Yang*, No. 20 Civ. 7285 (JPO), 2022 WL 2193290, at *3 (S.D.N.Y.
June 17, 2022)); *see also, e.g.,* AC ¶¶ 83 ("[O]n January 28, 2020[,] ...
Vanderhaegen emailed Plaintiffs an overview of the advanced pipeline projects,
prepared at Origis USA, that valued the projects at $153 million.  He claimed
that all other pipeline projects were so unimportant to value that he did not
even follow them."), 100 ("On September 10, 2020, Vanderhaegen emailed

Plaintiffs … [valuations] prepared by Origis USA's CIO … [which] represented that the correct value of the pipeline was $147 million.  Vanderhaegen then doubled down on these knowingly false valuations by going through it in detail on the phone with Plaintiffs[.]")).

Further, the Court declines to examine for itself the individual communications referenced in the Amended Complaint, which ought not be considered by this Court in ruling on a motion to dismiss.  *See Cosmos* v. *Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (holding that where "[t]he amended complaint merely discussed [certain] documents and presented short quotations from them," such documents were not incorporated by reference because "[l]imited quotation does not constitute incorporation by reference" (internal quotation marks omitted)).  At this stage, it is not the Court's job to parse the parties' exhibits — incorporated by reference or not — to determine the accuracy *vel non* of Plaintiffs' characterizations thereof.  *See SEC* v. *Medallion Fin. Corp.*, No. 21 Civ. 11125 (LAK), 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022) ("[E]ven documents that may be considered on a motion to dismiss normally should not be considered for the truth of any statements made therein.").

For similar reasons, the Court rejects Defendants' second and third objections.  It is not necessary, at this stage of the litigation, for Plaintiffs to have identified the author of any of the allegedly misleading statements or reports that were sent to them by Vanderhaegen, given that they have clearly established that Vanderhaegen was the sender.  *Loreley*, 797 F.3d at 173

(noting that it "would be strange … to demand greater precision of [p]laintiffs in pleading the author's identity than they received as readers of the[] documents").  Finally, the Court finds it sufficient for Plaintiffs to have alleged that they were on the receiving end of the alleged misstatements.  For all of these reasons, the Court declines to dismiss Plaintiffs' fraudulent inducement claim as to the Vanderhaegen Defendants.

### 5. The Court Denies the Vanderhaegen Defendants' Motion to Dismiss and Grants Origis USA's Motion to Dismiss Plaintiffs' Claim for Fraud (Count One)

Count One of the Amended Complaint, like Count Two, alleges fraud against all of the Defendants.  The fraud alleged in Count One of the Amended Complaint, however, is broader than the fraudulent inducement alleged in Count Two; in fact, the former subsumes the latter.  Whereas Count Two alleges that, between 2019 and 2020, Defendants "deliberately and repeatedly misrepresented material facts and omitted material information … about Origis USA and the various solar energy projects in its pipeline, and thereby fraudulently induced Plaintiffs into signing the SRA" (AC ¶ 169), Count One alleges that, between 2019 and 2021, Defendants "engaged in a fraudulent scheme … in order to obtain Plaintiffs' ownership interests in Origis at a fraudulently low price, and then promptly turn around and reap a massive profit by selling the company at what they knew would be a dramatically higher amount" (*id.* ¶ 162).

Plaintiffs' *prima facie* case for fraud (Count One) proceeds on the same allegations as Plaintiffs' *prima facie* case for fraudulent inducement (Count

Two), Section B.4.c, *supra*, with a few critical extensions in scope.  While both claims stem from the misrepresentations described in Section B.4.b.ii, *supra*, Count One also encompasses misstatements and omissions of the same type that were made after the execution of the SRA on September 14, 2020, but before the closing of the Antin Transaction (*e.g.*, Vanderhaegen's failure to disclose certain valuations of Origis USA to Plaintiffs in the spring of 2021, when he convinced Plaintiffs to waive the No Sale Clause in the event of a SPAC transaction).  (*See* AC ¶¶ 140-143).  Count One correspondingly extends to allegations of Plaintiffs' reliance following the execution of the SRA: that is, Count One recites that Plaintiffs, in addition to signing the SRA, "[i] [went] through with the First Closing and Second Closing, [ii] refrain[ed] from seeking to affect the sales process being conducted by Defendants, and [iii] [failed to] mitigat[e] their harm by seeking to prevent the Antin [Transaction]" as a result of their reliance on Defendants' misrepresentations.  (*Id.* ¶ 166).

Likely due to the significant substantive overlap between Count One and Two, both parties address the fraud counts in tandem, bringing the same arguments for and against dismissal of each.  (*See generally* Van. Br. 22-31; Origis Br. 20-26; Pl. Van. Opp. 20-32; Pl. Origis Opp. 10-16; Van. Reply 7-10; Origis Reply 3-7).  In the same vein, the Court has already addressed — and rejected — each of Defendants' arguments for dismissal as to Count One. Accordingly, the Court declines to dismiss Count One of the Amended Complaint as to the Vanderhaegen Defendants, but does so as to Origis USA, for substantially the reasons set forth in Section B.4, *supra*.  *See, e.g.*, *Stanley*

v. *Bray Terminals, Inc.*, 197 F.R.D. 224, 229 (N.D.N.Y. 2000) (declining to dismiss either fraud claim or fraudulent inducement claim arising from same facts).

**6.    The Court Denies the Vanderhaegen Defendants' Motion to Dismiss Plaintiffs' Claims for Constructive Fraud (Count Five) and Breach of Fiduciary Duty (Count Six)**

Counts Five and Six of the Amended Complaint allege constructive fraud and breach of fiduciary duty, respectively, as to the Vanderhaegen Defendants only.  (AC ¶¶ 188-195 (constructive fraud), 196-200 (breach of fiduciary duty)). Having already determined that Plaintiffs' fraud claims may proceed against the Vanderhaegen Defendants, the Court's analysis here is necessarily truncated. Under New York law, in order to establish a claim for constructive fraud, a party must establish the same elements as a claim for fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.  *Petrello* v. *White*, 412 F. Supp. 2d 215, 229 (E.D.N.Y. 2006), *aff'd*, 344 F. App'x 651 (2d Cir. 2009) (summary order).  Further, the commission of a fraud against someone to whom one owes a fiduciary duty certainly amounts to a breach of that fiduciary duty.  *Salm* v. *Feldstein*, 799 N.Y.S.2d 104, 105-06 (2d Dep't 2005) (noting that fiduciaries must "make full disclosure of all material facts").  Accordingly, the viability of Plaintiffs' constructive fraud and fiduciary duty claims turns on the existence of a fiduciary relationship between the Vanderhaegen Defendants and Plaintiffs.

Because the Court has determined that all of Plaintiffs' claims are governed by New York law, *see* Section B.1, *supra*, the Court must determine

whether the Vanderhaegen Defendants had a fiduciary duty to Plaintiffs under New York law.  Pursuant to New York law, in a so-called "close corporation" — "the ownership of which is in the hands of a small number of stockholders and for which there is little objective evidence of fair market value," *Reich* v. *Reich*, 830 N.Y.S.2d 29, 30 (1st Dep't 2007) (internal quotation marks omitted) — shareholders are owed fiduciary duties from officers, directors, and fellow shareholders, *Am. Fed. Grp.* v. *Rothenberg*, 136 F.3d 897, 905 (2d Cir. 1998). Here, the Amended Complaint alleges both that Origis Energy was a close corporation (AC ¶ 227), and that each of the Vanderhaegen Defendants was an officer, director, or shareholder in Origis Energy, as discussed in Section B.4.b.ii, *supra*.  Therefore, pursuant to *Rothberg*, the Vanderhaegen Defendants owed fiduciary duties to Plaintiffs, who were shareholders in Origis Energy.[7]  The Court thus declines to dismiss Plaintiffs' constructive fraud and breach of fiduciary duty claims.

---

[7]     The Court also notes that, while the Vanderhaegen Defendants presently dispute that they owed any fiduciary duties to Plaintiffs, Vanderhaegen's representations to the Plaintiffs during the events underlying the Amended Complaint suggest otherwise, at least as to Vanderhaegen himself.  For example:

- "During the entire buyout process … Plaintiffs accepted and relied upon Defendants' misrepresentations about the value of Origis USA and its assets … in light of … the fiduciary duties which Vanderhaegen touted he owed to Plaintiffs[.]" (AC ¶ 108).

- Vanderhaegen stated in an email on January 24, 2020, that Plaintiffs should trust that the information he was providing was complete and accurate because: "[y]ou are member[s] of the Board of Directors to which I have reporting obligations and this should be sufficient. If I were to deliberately misrepresent things there, then I would have a problem." (*Id.* ¶ 87).

**7.    The Court Denies the Vanderhaegen Defendants' Motion to Dismiss Plaintiffs' Claim for Breach of Section 4.4 of the SRA (Count Seven), Except as to Vanderhaegen, but Grants in Full the Vanderhaegen Defendants' Motion to Dismiss Plaintiffs' Claims for Breach of Section 5.5 of the SRA (Count Eight) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Nine)**

The Court now pivots to those claims that turn on an interpretation of the SRA and Defendants' obligations thereunder (Counts Seven, Eight, and Nine).  Counts Seven and Eight, the more straightforward of the group, each allege breach of contract against the Vanderhaegen Defendants.  Under New York law, the elements of a breach of contract claim are: (i) existence of a contract, (ii) performance of the contract by one party, (iii) breach by the other party, and (iv) damages.  *See Terwilliger* v. *Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  With respect to Counts Seven and Eight, Defendants challenge only element (iii), and the Court focuses its analysis accordingly.  As set forth below, the Court finds that Plaintiffs have plausibly alleged breach of contract as to Pelican International, Pelican Invest, and GVR Trust as to Count Seven, but not as to Count Eight, of the Amended Complaint.

Count Nine of the Amended Complaint, while not a claim for breach of contract *per se*, is part and parcel of Defendants' alleged failure to fulfill their obligations under the SRA.  Count Nine alleges that the Vanderhaegen Defendants breached not a specific provision of the SRA, but rather the so-called "implied covenant of good faith and fair dealing."  (AC ¶ 220).  The implied covenant of good faith and fair dealing is a contractual obligation implicit in all contracts under New York Law that "embraces a pledge that

47

'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirke La Shelle Co.* v. *Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)).  Also as set forth below, the Court finds that Plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing as to Pelican International, Pelican Invest, and GVR Trust.

But as to Vanderhaegen himself, the Court finds that Plaintiffs have not established that Vanderhaegen was a party to the SRA in his individual capacity.  Accordingly, the Court finds that he cannot be held personally liable on any claims arising directly therefrom (*i.e.*, Counts Seven, Eight, or Nine).

### a.    Defendants Pelican International, Pelican Invest, and GVR Trust, But Not Vanderhaegen, May Be Held Liable for Breach of the SRA

As a preliminary matter, the Court finds that Pelican International, Pelican Invest, and GVR Trust, but not Vanderhaegen, may be held liable with respect to Counts Seven through Nine.  As both sides readily concede, only Pelican International is a party to the SRA and therefore may be held liable thereto by default.  (Van. Br. 32; Pl. Van. Opp. 39).  Further, under New York law, "a party who is not a signatory to a contract [generally] cannot be held liable for breaches of that contract[.]"  *M.S.S. Const. Corp.* v. *Century Sur. Co.*, No. 15 Civ. 2801 (ER), 2015 WL 6516861, at *9 (S.D.N.Y. Oct. 28, 2015) (internal quotation marks and citations omitted).  That said, New York law does permit non-signatories to be held liable for breach of contract under limited

48

circumstances: namely, "where the non-signatory [i] is the alter ego of the signatory, [ii] manifests an intent to be bound by the contract, or [iii] [acts so as to] show they are in privity of contract or assumed obligations under the contract." *Id.* (citations omitted).

With respect to the first of these three circumstances, the Court finds that Plaintiffs have sufficiently alleged that non-signatories Pelican Invest and GVR Trust operate as "alter egos" of signatory Pelican International. In New York, to assert alter-ego liability, a plaintiff must show that: "[i] [one entity] exercised complete domination of [another entity] [with] respect to the transaction attacked; and [ii] that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Xiotech Corp.* v. *Express Data Prod. Corp.*, 11 F. Supp. 3d 225, 236 (N.D.N.Y. 2014) (internal quotation marks omitted). New York courts consider the following ten factors in deciding whether the requisite domination is present:

> [i] the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, [ii] inadequate capitalization, [iii] whether funds are put in and taken out of the corporation for personal rather than corporate purposes, [iv] overlap in ownership, officers, directors, and personnel, [v] common office space, address and telephone numbers of corporate entities, [vi] the amount of business discretion displayed by the allegedly dominated corporation, [vii] whether the related corporations deal with the dominated corporation at arms length, [viii] whether the corporations are treated as independent profit centers, [ix] the payment or guarantee of debts of the dominated corporation by other corporations in the group, and [x] whether the corporation in question had property

> that was used by other of the corporations as if it were
> its own.

*JSC Foreign Econ. Ass'n Technostroyexport* v. *Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 486 (S.D.N.Y. 2004) (quoting *Wm. Passalacqua Builders, Inc.* v. *Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

Here, many of these factors are satisfied on their face. As to factor (iv), the entities clearly share "ownership, officers, directors, and personnel," *JSC Foreign*, 306 F. Supp. 2d at 486, as — according to Plaintiffs — Vanderhaegen is the "sole director, officer, employee, and/or agent" of each and GVR Trust owns all of Pelican International and substantially all of Pelican Invest (*see* AC ¶¶ 39-42). As to factor (v), the entities certainly share office space, as Vanderhaegen's personal residence is for each its "principal place of business." (*Id.*). As to factors (vi), (vii), and (vii), Pelican International neither has "business discretion" separate and apart from, nor "deal[s] … at arms length" with, nor operates as an "independent profit center" from, Pelican Invest and GVR Trust, *JSC Foreign*, 306 F. Supp. 2d at 486, given that the three entities act in concert as a single entity (*see generally* Section B.4.b.ii, *supra* (describing how Vanderhaegen Defendants act "as one entity")). At this stage, these allegations are sufficient to surmount the bar for "control and domination." *See also CityR Grp. Holdings LLC* v. *Foresite Realty Mgmt., LLC*, No. 17 Civ. 7850 (RJS), 2019 WL 1437519, at *3 (S.D.N.Y. Mar. 29, 2019) (finding non-signatory liable where "[p]laintiffs argue[d] that [signatories and non-signatory] share common ownership and operations, that [signatories] are

financially dependent on [non-signatory], and that [signatories] exist exclusively to serve [non-signatory]").

Moreover, the Court has already established that "Vanderhaegen was empowered to both (i) effectuate the Buyout Transaction and (ii) benefit therefrom only because of and through his control of the other Vanderhaegen Defendants" (Section B.4.b.ii, *supra*), and therefore that Plaintiffs have sufficiently alleged fraud claims against all of the Vanderhaegen Defendants (*see generally* Section B.4 and B.5, *supra*). It follows, therefore, that Plaintiffs have also sufficiently alleged that the Vanderhaegen Defendants' control over one another was "used to commit a fraud or wrong against the [P]laintiff[s] which resulted in the [P]laintiff[s'] injury." *Xiotech*, 11 F. Supp. 3d at 236.

With respect to the second and third circumstances — beyond alter-ego liability — in which a non-signatory may be held liable for breach of contract, the Court finds that Plaintiffs have adequately pleaded that Pelican Invest and GVR Trust "manifest[ed] an intent to be bound by the contract" or otherwise acted in a manner "show[ing] they [we]re in privity of contract or assumed obligations under the contract." *M.S.S. Const.*, 2015 WL 6516861, at *9. For instance, while (technically speaking) only Vanderhaegen participated in the negotiation of the SRA, both Pelican Invest and GVR Trust can be said to have "participated" in such negotiation by dint of his involvement, as Vanderhaegen simultaneously acted as, with, and for the benefit of Pelican Invest and GVR Trust. (*See generally* Section B.4.b.ii, *supra*). Further, Vanderhaegen "own[ed] and control[ed] all of Pelican International," the only Vanderhaegen Defendant

51

actually party to the contract, through GVR Trust.  (AC ¶ 41).  *See, e.g.*, *Horsehead Indus., Inc.* v. *Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997) ("[Non-signatory]'s alleged extensive participation in negotiations leading up to [agreement to sell signatory's interest in third company], during which time [signatory] was wholly owned by [non-signatory] and allegedly had no purpose other than to hold [shares of third company], manifest[ed] [non-signatory]'s intent to be bound [to agreement].").  Additionally, Pelican Invest appears in the SRA's signature block alongside Origis Energy as the "Buyer"; Vanderhaegen signed the SRA on behalf of Origis Energy as the "[P]ermanent Representative for Pelican Invest."  (*See* SRA).  *See, e.g.*, *CityR Grp.*, 2019 WL 1437519, at *3-4 (finding non-signatory liable where "structure of the signature blocks support[ed] a plausible inference that [non-signatory] — which was otherwise an unnecessary party to the[] contracts between two distinct legal entities — intended to be bound by the contracts" (alteration adopted) (internal quotation marks omitted)).

For the foregoing reasons, the Court finds that Plaintiffs have set forth a plausible factual basis for Pelican Invest and GVR Trust to be held liable on Plaintiffs' contract claims.  Accordingly, Pelican Invest and GVR Trust "shall remain [] defendant[s] to this suit as to all [] alleged contractual breaches at least until there has been discovery on this issue."  *CityR Grp.*, 2019 WL 1437519, at *4.

Conversely, the Court finds that Defendant Vanderhaegen may not be held personally liable as to Plaintiffs' contract claims.  "For a corporate

representative to be personally bound by a contract, the officer must sign both in a representative and in an individual capacity." *See, e.g.*, *Bonnant* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 467 F. App'x 4, 8, 10 (2d Cir. 2012) (summary order).  Further, "New York law requires 'clear and explicit evidence' of such intention to bind an individual to a contract signed on a corporation's behalf." *Schwartz* v. *Sensei, LLC*, No. 17 Civ. 4124 (SN), 2020 WL 5817010, at *11 (S.D.N.Y. Sept. 30, 2020) (quoting *Novak* v. *Scarborough Alliance Corp.*, 481 F. Supp. 2d 289, 294 (S.D.N.Y. 2007)).

Where, as here, "[t]here is no reflection in the body of the [contract] that [a corporate officer] signed in anything other than a corporate capacity and no allegation in the [c]omplaint that [he] w[as] asked to or did sign in [his] individual capacit[y]," a court will decline to hold such officer personally liable. *HSM Holdings, LLC* v. *Mantu I.M. Mobile Ltd.*, No. 20 Civ. 967 (LJL), 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021) (finding corporate officers not personally liable under contract where contract's signature block identified the corporate officers with both their names and corporate titles).  Vanderhaegen signed the SRA on behalf of Origis Energy as the "Permanent representative for Pelican Invest LLC, authorized signatory," and on behalf of Pelican International as "Manager," evincing in both cases an intent to sign only in his corporate capacity.  (*See* SRA).  While Plaintiffs may proceed against Vanderhaegen directly with respect to their fraud claims, the Court finds no basis to expose him to personal liability on Plaintiffs' contract claims.

#### b. The Court Denies the Vanderhaegen Defendants' Motion to Dismiss Plaintiffs' Claim for Breach of Section 4.4 of the SRA as to Defendants Pelican International, Pelican Invest, and GVR Trust (Count Seven)

Count Seven addresses the Vanderhaegen Defendants' alleged breach of Section 4.4 of the SRA, the Information Warranty, which states (in relevant part):

> [*Origis Energy*] *has made available to each* [*Plaintiff*] *documents regarding* (a) *the business, financial condition, assets, liabilities and results of operations of* [*Origis Energy*] *and its Subsidiaries*, (b) [*Origis Energy's*] *development pipeline of solar power and energy storage projects* and (c) any value indications by any party showing an interest to acquire part or all of the shares of a direct or indirect Subsidiary of [Origis Energy], any assets held by a direct or indirect Subsidiary of [Origis Energy][,] or by any party showing an interest in acquiring the Origis Equity or Assets. *Those documents and that information are* (i) *complete in all material respects and* (ii) *do not contain any untrue statement of a material fact* or fail to state a material fact necessary to make the statements contained therein, not misleading[.]

(SRA § 4.4 (emphases added)).  According to Plaintiffs, the Vanderhaegen Defendants breached Section 4.4's Information Warranty by "making false and misleading statements of material fact regarding Origis, its financial condition, and its assets," and by "omitt[ing] material facts needed to make the information provided on those matters not misleading."  (AC ¶ 205).  In terms of the timeline, Plaintiffs allege that breaches of the Information Warranty occurred "at the time of the SRA's signing, again at the time of the First Closing, and finally … at the time of the Second Closing."  (*Id.* ¶ 204 (citing SRA arts. IV, VI §§ 6.2(a), 6.4(a))).

As to Count Seven, the Court finds that Plaintiffs successfully state a claim for breach of Section 4.4 of the SRA.  A plain reading of Section 4.4 directs as much.  Plaintiffs allege that the Vanderhaegen Defendants provided them "documents regarding ... the business, financial condition, assets, liabilities and results of operations of [Origis USA]," as well as its "development pipeline of solar power and energy storage projects."  (SRA § 4.4).  Plaintiffs further allege that "[t]hose documents and that information" were not "complete in all material respects" and did, in fact, "contain ... untrue statement[s] of [] material fact."  (*Id.*; *see also* Section B.4.a, *supra* (describing the alleged misrepresentations); Section B.4.c, *supra* (explaining why the alleged misrepresentations were materially false)).  Section 4.4's protective scope thus encompasses the fraud described in the Amended Complaint.

What is more, in the time period between the execution of the SRA and the Second Closing, Defendants remained subject to the Information Warranty. Nonetheless, Plaintiffs allege that during that time, "Vanderhaegen ... received a solar market report from [an investment-banking] firm[] confirming that the SRA valuation was far too low[.]"  (AC ¶ 128).  Plaintiffs also allege that, in November 2020, Defendants "held further discussions with investment bankers about a potential sale of Origis USA," which bankers "provided [them with] significant information about Origis USA's value, and ...  their options for [] a sale."  (*Id.* ¶ 132).  Defendants' failure to pass this information on to Plaintiffs would appear to undermine Defendants' earlier assurances that the information they had provided to Plaintiffs was "complete in all material

55

respects" and "d[id] not contain any untrue statement of a material fact[.]"

(SRA § 4.4).  For these reasons, the Court will not dismiss Count Seven of the

Amended Complaint.

      **c.**    **The Court Dismisses Plaintiffs' Claim for Breach of Section 5.5 of the SRA (Count Eight)**

Count Eight, by contrast, concerns the Vanderhaegen Defendants'

alleged breach of Section 5.5 of the SRA.  Section 5.5 contains the No Sale

Clause, and states, in relevant part:

(a)    From and after the Second Closing Date *until twelve (12) months after the date of this Agreement, Pelican shall not permit any Origis Sale to occur.*

(b)    Notwithstanding anything in this Agreement to the contrary, if Pelican [International] breaches the covenant in Section 5.5(a), each [Plaintiff]'s sole and exclusive remedy in respect of such breach will be the right to receive from Pelican [International] a payment calculated and paid in accordance with this Section 5.5.

(c)    *[Origis Energy] shall* (i) *promptly inform [Plaintiffs] of any Origis Sale to occur within a period of twelve (12) months after the date of this Agreement,* (ii) *keep [Plaintiffs] informed on the progress of such potential Origis Sale on at least a quarterly basis* and (iii) *submit to [Plaintiffs] any transaction documents (including any Proposal) relating to a potential Origis Sale.*

(SRA § 5.5(a)-(c) (emphases added)).  According to Plaintiffs, the Vanderhaegen

Defendants breached Section 5.5 by (i) "commencing a sales process even

before Plaintiffs had signed the SRA"; (ii) "failing to promptly and regularly

provide Plaintiffs with information on a potential Origis [USA] sale";

(iii) "agreeing to sell Origis USA before the expiration of the [twelve]-month No []

Sale period"; and (iv) "refusing to make the payments required by Section 5.5 in the event that such a sale occurred[.]"  (AC ¶ 215).

By way of context, the SRA was executed on September 14, 2020, making the "twelve (12) months after the date of th[e] [SRA]," for the purposes of Section 5.5, the period through September 14, 2021.  (AC ¶ 115).  The Amended Complaint indicates that, on September 8, 2021, Vanderhaegen "confirm[ed]" the $1.4 billion deal for Origis USA.  (*Id.* ¶ 152).  But the Antin Transaction did not officially occur until October 2021, *i.e.*, more than twelve months after the SRA was executed.  (*Id.* ¶ 154).  Applying the "ordinary meaning" of the term "sale" — "the transfer of property or title for money or other consideration" — the "sale" of Origis USA did not occur within the twelve-month post-SRA period covered by the No Sale Clause.  *Stifel, Nicolaus & Co., Inc.* v. *Shift Techs., Inc.*, No. 21 Civ. 4135 (NRB), 2022 WL 3648145, at *5 (S.D.N.Y. Aug. 23, 2022) (quoting *Anthracite Cap., Inc.* v. *MP-555 W. Fifth Mezzanine, LLC*, No. 03 Civ. 5219 (DLC), 2005 WL 1155418, at *7 (S.D.N.Y. May 17, 2005), *aff'd*, 165 F. App'x 875 (2d Cir. 2005) (summary order)); *see also Sale*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "sale" as "[t]he transfer of property or title for a price").  Accordingly, Defendants cannot have breached the No Sale Clause.[8]

---

[8]      Plaintiffs argue that:

> The No Origis Sale Clause prohibited Defendants, for 12 months, from taking action to "permit an Origis Sale to occur."  One "permits" a sale to occur by making it possible or allowing it to happen.  *See Merriam Webster's Collegiate Dictionary* 923 (11th ed. 2020) (defining "permit" as "to make possible"); *Black's Law Dictionary* 1332 (10th ed. 2014) ("To give opportunity for; to make

Nor can Plaintiffs plausibly allege that Defendants violated Section 5.5(c), requiring, *inter alia*, Defendants to "promptly inform [Plaintiffs] of any Origis Sale to occur within a period of twelve (12) months after the date of this Agreement." (SRA § 5.5(c)). Again, because the "sale" of Origis did not occur in the twelve-month post-SRA period covered by the No Sale Clause, there was nothing of which Defendants were contractually obligated to inform Plaintiffs. The Court therefore dismisses Count Eight of the Amended Complaint for breach of Section 5.5 of the SRA.

### d.   The Court Dismisses Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Nine)

Count Nine of the Amended Complaint brings a claim for breach of the implied covenant of good faith and fair dealing. "Under New York law … '[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.'" *Woodard* v. *Reliance Worldwide Corp.*, No. 18 Civ. 9058 (RA), 2019 WL 3288152, at *2 (S.D.N.Y. July 22, 2019) (alteration in

---

(something) happen"). Surely, hiring bankers, setting up a data room for buyers, marketing the company, conducting an auction process, and reaching agreement to sell Origis USA before the expiration of the 12-month No [] Sale period is more than just "permitting" a sale.

(Pl. Origis Opp. 45 (some citations omitted)). The Court declines to adopt this interpretation of Section 5.5. If the parties had intended Section 5.5's prohibition to cover such activities — *e.g.*, marketing, hiring bankers, negotiating a potential deal, etc. — they could have simply listed such activities in the provision alongside "permit[ting]" a sale. Further, Plaintiffs did not sign a waiver of the No Sale Clause in advance of Vanderhaegen's efforts to negotiate a SPAC transaction in the wake of the Second Closing, just in advance of the actual SPAC transaction itself (which transaction was ultimately not consummated); the Court can infer from that fact the parties' understanding that Section 5.5 did not bar Vanderhaegen's negotiation of the SPAC transaction (just the consummation of the transaction itself).

original) (quoting *Dalton*, 87 N.Y.2d at 389), *aff'd*, 819 F. App'x 48 (2d Cir. 2020) (summary order).  "This [obligation] embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton*, 87 N.Y.2d at 389 (quoting *Kirke*, 263 N.Y. at 87).  Here, Plaintiffs allege that the Vanderhaegen Defendants breached this covenant (i) "by commencing a sales process even before Plaintiffs had signed the SRA and sold their Origis interest" and (ii) by "failing to promptly and regularly provide Plaintiffs with information on a potential Origis sale, including commencing a sale process, hiring investment bankers, and obtaining bids for Origis USA."  (AC ¶ 215).

Importantly, "[i]n order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties."  *Gaia House Mezz LLC* v. *State St. Bank and Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted).  Here, Section 5.5 of the SRA indicates that the parties' intention was to provide Plaintiffs protection with respect to the sale of Origis USA only if such sale occurred during the twelve-month period immediately following the execution of the SRA.  For the Court essentially to extend that protection beyond the twelve-month period via the implied covenant of good faith and fair dealing "would undo the [SRA]'s terms and create an independent contractual right that was never negotiated by the parties."  *Woodard* v. *Reliance Worldwide Corp.*, 819 F. App'x 48, 49 (2d Cir. 2020) (summary order).

Further, courts in circumstances similar to those at hand have almost universally dismissed claims for breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Woodard*, 2019 WL 3288152, at *2 (denying claim where plaintiff-employee — whose employment agreement awarded him a $500,000 bonus if he was fired within seven days after the acquisition of his employer — was denied bonus when fired twenty-nine days after such acquisition); *see also Geller Biopharm, Inc.* v. *Amunix Pharms., Inc.*, No. 20 Civ. 4334 (JPC), 2021 WL 4155015, at *10 (S.D.N.Y. Sept. 13, 2021) (denying claim where plaintiff-advisory firm — whose consulting agreement with pharmaceutical company entitled it to "success fee" on each transaction occurring within year-long period after the termination of such agreement — was denied success fee on transaction that closed two months after such period); *Phoenix Cap. Invs. LLC* v. *Ellington Mgmt. Grp., L.L.C.*, 859 N.Y.S.2d 46, 48 (1st Dep't 2008) (denying claim where plaintiff-broker — whose agreement with hedge fund entitled it to fee on any investment made by an investor that was introduced to the fund by the broker, so long as investment was made within one-year period after the termination of such agreement — was denied fee on such investment made two years after such termination). The Court declines to depart from the reasoning of these cases and therefore dismisses Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

### 8.     The Court Dismisses Plaintiffs' Claims for Aiding and Abetting Fraud (Count Three) and Civil Conspiracy (Count Four)

Count Three of the Amended Complaint charges all Defendants with "aid[ing] and abet[ing] the [other] Defendants' fraud against Plaintiffs." (AC ¶ 176). Specifically, Plaintiffs allege that "[e]ach Defendant knowingly participated in and substantially assisted the fraudulent scheme and acts committed by each remaining Defendant." (*Id.* ¶ 179). Count Four brings a similar claim against all Defendants under the banner of "civil conspiracy." (*See id.* ¶ 184 ("Defendants agreed … to pursue a scheme in which they would convince Plaintiffs to sell their ownership interests to Defendants for far less than their true value[.]")).

The Court begins with Count Three. Under New York law, "[t]o establish an aiding and abetting claim, a plaintiff must adequately plead '[i] the existence of a violation by the primary wrongdoer; [ii] knowledge of the violation on the part of the aider and abettor; and [iii] proof that the aider and abettor substantially assisted the primary wrongdoer.'" *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 333 (S.D.N.Y. 2010) (quoting *Chemtex, LLC* v. *St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007)); *accord Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006). Of course, Plaintiffs have adequately pleaded element (i), the existence of a violation by a primary wrongdoer; the Court found that Plaintiffs adequately stated a claim for fraud on behalf of the Vanderhaegen Defendants in Sections B.4 and B.5, *supra*.

61

Still, Plaintiffs come up short as to the other elements, and the Court must dismiss Count Three as to all Defendants.

With respect to the Vanderhaegen Defendants, Plaintiffs cannot establish element (iii), *i.e.*, that any of the Defendants assisted another.  As the Court described in Section B.4.b.ii, *supra*, the Vanderhaegen Defendants acted together as the "one entity" in committing the purported fraud, and thus could not have offered assistance to one another.  *Cf. Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, No. 12 Civ. 3723 (RJS), 2016 WL 5719749, at *6 (S.D.N.Y. Sept. 29, 2016) ("New York courts have been particularly reluctant to dismiss aiding and abetting claims at the pleading stage, so long as plaintiffs do not merely allege that defendants aided and abetted their own fraud." (internal quotation marks omitted)).  With respect to Origis USA, the Court comes to a similar conclusion, but defers its explanation thereof until Section B.9.a, *infra*, wherein the Court discusses Origis USA's aiding and abetting liability generally.

Count Four, Plaintiffs' civil conspiracy claim, suffers a similar fate. Under New York law, "[t]o state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following four elements: [i] an agreement between two or more parties; [ii] an overt act in furtherance of the agreement; [iii] the parties' intentional participation in the furtherance of a plan or purpose; and [iv] resulting damage or injury."  *Ritchie Cap. Mgmt., L.L.C.* v. *Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 339 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (internal quotation marks omitted).  Critically, where a

plaintiff's conspiracy claim "offers no new allegations beyond those alleged in support of other tort claims," the conspiracy claim must be dismissed as duplicative.  *AT&T Corp.* v. *Atos IT Sols. & Servs., Inc.*, No. 21 Civ. 4550 (VSB) (RWL), 2024 WL 379952, at *18 (S.D.N.Y. Feb. 1, 2024) (quoting *Loreley*, 2016 WL 5719749, at *7 ("[P]laintiffs may not reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." (internal quotation marks omitted))).

Such is the instant case.  "Here, a brief perusal of the Amended Complaint reveals that Plaintiffs' conspiracy claims add no new allegations distinct from those underlying their fraud and aiding and abetting fraud claims."  *Loreley*, 2016 WL 5719749, at *7.  Because Plaintiffs do nothing more than "reiterate that [Defendants] had conspired to commit the acts heretofore described," *Durante Bros. & Sons* v. *Flushing Nat. Bank*, 755 F.2d 239, 251 (2d Cir. 1985), the Court dismisses Count Four as duplicative (*see, e.g.*, AC ¶ 183 ("Defendants engaged in a civil conspiracy to commit the violations of law described in th[e] [Amended] Complaint, including the fraud, fraudulent inducement of contract, constructive fraud, breach of fiduciary duty, and tortious interference with contract[.]")).

9.     **The Court Grants Origis USA's Motion to Dismiss Plaintiffs'
Claims for Aiding and Abetting (Counts Three and Ten) and
Tortious Interference with Contract (Counts Eleven and
Twelve)**

a.     **The Court Dismisses Plaintiffs' Aiding and Abetting
Claims Against Origis USA (Counts Three and Ten)**

Count Three of the Amended Complaint alleges that Origis USA aided
and abetted the Vanderhaegen Defendants' fraud against Plaintiffs.  (AC ¶ 176).
Specifically, Plaintiffs claim that Origis USA "knowingly participated in and
substantially assisted the [overall] fraudulent scheme," including by
"misrepresenting material factual information to Plaintiffs" and "concealing and
failing to disclose material facts," for the purposes of "[enriching] its senior
management and its minority shareholder, [freeing] its senior management
from any interference by Plaintiffs, and [facilitating] the awarding of large
bonuses to the senior management."  (*Id.* ¶¶ 177-180).  Count Ten of the
Amended Complaint similarly charges Origis USA with aiding and abetting, but
this time as to the Vanderhaegen Defendants' breaches of their fiduciary
duties.  (*Id.* ¶ 226).  Specifically, Plaintiffs claim that Origis USA's senior
officers "knowingly participated in and substantially assisted" such breaches
by, among other things "participat[ing] in the preparation of the false and
misleading information that the Vanderhaegen Defendants provided to
Plaintiffs," "obtain[ing] the financing to permit Defendants to buy out
Plaintiffs," "work[ing] with Origis USA's investment bankers and receiv[ing]
their valuations," and "assist[ing] in the preparation of Origis USA's own

analyses and valuations." (*Id.* ¶ 230).  The Court finds Plaintiffs' allegations insufficient to state a claim for aiding and abetting liability in either case.

As previously noted, under New York law, "[t]o establish an aiding and abetting claim, a plaintiff must adequately plead '[i] the existence of a violation by the primary wrongdoer; [ii] knowledge of the violation on the part of the aider and abettor; and [iii] proof that the aider and abettor substantially assisted the primary wrongdoer.'" *In re Refco*, 759 F. Supp. 2d at 333 (quoting *Chemtex*, 490 F. Supp. 2d at 546).  With respect to pleading element (ii), "actual knowledge," a plaintiff cannot meet her burden by pleading "constructive knowledge," "ignor[ance] [of] obvious warning signs," "recklessness," or "willful blindness" alone.  *Berdeaux* v. *OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (internal quotation marks omitted) ("Allegations that the defendant should have known of the conduct are insufficient to raise an inference of actual knowledge, as are allegations of … negligent failure to identify warning signs of fraudulent activity, even where such signs converge to form a veritable forest of red flags[.]" (internal quotation marks and citations omitted)).

Here, Plaintiffs have failed to satisfy element (ii) on both counts, that is, they have failed to allege actual knowledge on the part of Origis USA as to either the underlying fraud or the breaches of fiduciary duty.  "The only alleged involvement of Origis USA" in the Vanderhaegen Defendants' purported scheme to buy Plaintiffs' interests in Origis USA for far less than they were worth "is that [Origis USA's] employees on occasion prepared information about its

business, some of which Vanderhaegen then provided to Plaintiffs." (Origis Br. 28-29). Indeed, the Amended Complaint lacks any allegations that Origis USA, specifically, knew of Vanderhaegen's plan to defraud Plaintiffs or that it was assisting in Vanderhaegen's alleged fraud and accompanying breach of fiduciary duty.[9] Absent plausible allegations of this knowledge, Plaintiffs cannot implicate Origis USA in Vanderhaegen's fraud merely due to the fact that it provided financial information to Vanderhaegen. Accordingly, the Court dismisses Plaintiffs' aiding and abetting claims against Origis USA.

### b. The Court Dismisses Plaintiffs' Tortious Interference Claims Against Origis USA (Counts Eleven and Twelve)

Count Eleven charges Origis USA with tortious interference with the SRA "through the Vanderhaegen Defendants' breaches of the Information Warranty" in Section 4.4 of the SRA. (AC ¶ 233). According to Plaintiffs, Origis USA "intentionally procured the Vanderhaegen Defendants' breaches of the Information Warranty" because "Origis USA, including its senior executives and shareholders, was the effective beneficiary of the sale of Plaintiffs' ownership interests and the breaches of the Information Warranty." (*Id.* ¶¶ 238-239). Count Twelve similarly charges Origis USA with tortious interference with the SRA, except "through the Vanderhaegen Defendants' breaches of Section 5.5 of that contract," which breaches were (again) "intentionally procured" by Origis

---

[9]   The Court refers the reader to Section B.4.b.ii, *supra*, for its discussion of why Vanderhaegen was not acting in his "official capacity" as Origis USA's CEO — *i.e.*, on behalf of Origis USA — when he made the alleged misrepresentations to Plaintiffs, and therefore why Origis USA is not liable for such misrepresentations.

USA. (*Id.* ¶¶ 244, 250). The Court finds Plaintiffs' allegations insufficient to state a claim for tortious interference in either case.

Under New York law, to plead a cause of action for tortious interference with contract, "a plaintiff must plead [i] the existence of a valid contract between the plaintiff and a third party, [ii] the defendant's knowledge of that contract, [iii] the defendant's intentional procurement of the third party's breach of the contract without justification, [iv] actual breach of the contract, and [v] damages." *Influx Cap., LLC* v. *Pershin*, 131 N.Y.S.3d 712, 715 (2d Dep't 2020). "Further, the plaintiff must specifically allege that the contract would not have been breached but for the defendant's conduct." *Id.*

As an initial matter, it is clear that Plaintiffs' claims for tortious interference stemming from the Vanderhaegen Defendants' breaches of Section 5.5 of the SRA must be dismissed. As discussed in Section B.7.c and B.7.d, *supra*, the Court found the allegations in the Amended Complaint insufficient to state a claim for breach of contract stemming from the Vanderhaegen Defendants' (implicit or explicit) obligations under Section 5.5 of the SRA. Accordingly, Plaintiffs cannot establish element (iv) — an "actual breach of the contract" by a third party — and thus fail to state a claim for tortious interference with the SRA through Defendants' (nonexistent) breaches of Section 5.5.

The charge of tortious interference through Defendants' breach of Section 4.4 of the SRA suffers the same fate, but for a different reason: Plaintiffs plainly fail to demonstrate that the breach would not have occurred "but for" Origis

USA's intentional procurement of it.  *Pershin*, 131 N.Y.S.3d at 715.  Indeed, the Amended Complaint singles out Vanderhaegen as the driving force behind Defendants' effort to defraud Plaintiffs.  (*See, e.g.*, AC ¶¶ 13 ("[Vanderhaegen] … execute[d] a plan to profit at Plaintiffs' expense by acquiring their combined majority shareholding interest at a price he knew was a bargain for him and which he intentionally led them to believe was both full and fair."), 66 ("Vanderhaegen … acted on Plaintiffs' vulnerability by seeking to pocket for [himself] the overwhelming value of Plaintiffs' holdings."), 153 ("[The Buyout Transaction] made Vanderhaegen, in particular, as rich as Croesus when Antin purchased Origis USA for $1.4 billion.")).  As discussed above, the Amended Complaint provides no basis to conclude that Origis USA knew that it was assisting in Vanderhaegen's efforts, either by preparing information that was shared with Plaintiffs (which Origis USA itself did not share), failing to disclose certain information to Plaintiffs (which Origis USA had no obligation to do), discussing a potential sale of Origis USA with prospective buyers (which Origis USA was not prohibited from doing), or otherwise.  Accordingly, Count Twelve must be dismissed.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part the Vanderhaegen Defendants' motion to dismiss as follows: the Court hereby DENIES the Vanderhaegen Defendants' motion to dismiss Counts One, Two, Five, and Six; DENIES the Vanderhaegen Defendants' motion to dismiss Count Seven as to Pelican International, Pelican Invest, and GVR Trust, and

GRANTS it as to Vanderhaegen; and GRANTS the Vanderhaegen Defendants'
motion to dismiss Counts Three, Four, Eight, and Nine.  Further, the Court
GRANTS Origis USA's motion to dismiss in full (*i.e.,* as to Counts One, Two,
Three, Four, Ten, Eleven, and Twelve).

   The Clerk of Court is directed to terminate the motions at docket entries
31 and 35.  The parties remaining in this litigation are directed to submit a
proposed case management plan on or before **April 19, 2024**.

   SO ORDERED.

Dated:     March 25, 2024
           New York, New York

                            _____
                                 KATHERINE POLK FAILLA
                               United States District Judge