UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENTACON BV and BALTISSE NV, <br><br> Plaintiffs, <br><br> -v.- <br><br> GUY VANDERHAEGEN; GUY VANDERHAEGEN REVOCABLE TRUST; PELICAN INVEST, LLC; and PELICAN INTERNATIONAL, LLC <br><br> Defendants. | 23 Civ. 2172 (KPF) <br><br> **ORDER** |

KATHERINE POLK FAILLA, District Judge:

      This Order resolves several outstanding discovery disputes. To review, Plaintiffs Pentacon BV ("Pentacon") and Baltisse NV ("Baltisse," and collectively, "Plaintiffs") brought this diversity action seeking redress for harms allegedly suffered as a result of a scheme to acquire their interests in Defendant Origis USA LLC ("Origis USA"), a solar power start-up, and resell those interests at a significant profit. After the Court issued its Opinion and Order (i) granting in part and denying in part the motion to dismiss Plaintiffs' amended complaint that was filed by Defendants Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust, Pelican Invest, LLC, and Pelican International, LLC, and (ii) granting in full the motion to dismiss that was filed by Defendant Origis USA (Dkt. #51), and after the Court issued a further order denying reconsideration of its prior decision (Dkt. #71), the parties remaining in the litigation filed, and the Court entered, a revised case management plan (Dkt. #77).

In July 2025, the parties, and third parties Global Atlantic and KKR, raised and responded to several discovery issues. (Dkt. #80, 82-85). Accordingly, the Court held a telephone conference on July 11, 2025, to discuss those issues. (Dkt. #86; July 11, 2025 Minute Entry). At the conference, the parties indicated that the dispute regarding Global Atlantic and KKR had been resolved for the time being. (*See* July 11, 2025 Minute Entry). The Court therefore proceeds to address the remaining disputes.

**A.    Communications Between Plaintiffs and Baltisse's In-House Counsel**

Prior to the conference, Defendants had asked this Court to order Plaintiffs to produce documents that Plaintiffs had "erroneously" asserted were protected from disclosure pursuant to the attorney-client privilege. (Dkt. #83 at 1). These included roughly 2,000 documents identified on Plaintiffs' privilege log as communications between Plaintiff Baltisse's in-house counsel, Ann Maurau, and Plaintiffs. (*Id.*). Defendants contend that those documents are not protected from disclosure under either Belgian or New York privilege law because Ms. Maurau is not a licensed attorney. (*Id.*).

At the conference, Plaintiffs indicated their desire to respond in writing to Defendants' arguments. They have now done so (Dkt. #89), and Defendants have submitted a reply regarding this issue (Dkt. #96). Applying New York law, the Court finds that the communications that Defendants seek between Baltisse and Ms. Maurau are privileged, but that any privilege inhering in communications between Baltisse employees and their in-house or outside counsel was waived by disclosure of the communications to Pentacon.

2

To begin, "[u]nder Federal Rule of Evidence 501, in diversity actions such as this one, the state law that governs the underlying action defines the elements of the attorney-client privilege." *FPP, LLC* v. *Xaxis US, LLC*, 2016 WL 1733466, at *2 (S.D.N.Y. Apr. 29, 2016) (finding that New York privilege law applied where the contract between the parties included a choice-of-law provision designating New York as the governing authority), *cited in WCA Holdings III, LLC* v. *Panasonic Avionics Corp.*, No. 20 Civ. 7472 (GHW), 2025 WL 1434375, at *4 (S.D.N.Y. May 17, 2025); *see also* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *cf. Dixon* v. *80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975) ("[I]n a diversity case, the issue of privilege is to be governed by the substantive law of the forum state."); *Parneros* v. *Barnes & Noble, Inc.*, 332 F.R.D. 482, 490 (S.D.N.Y. 2019) ("Because this Court's subject matter jurisdiction is based upon diversity, state law provides the rule of decision concerning the claim of attorney-client privilege." (citing *Dixon*, 516 F.2d at 1280) (internal citation omitted)).[1]  Given the expansive choice-of-law provision in the Share Redemption Agreement,[2] the Court finds — once again

---

[1]  That said, "it has long been recognized that New York law on attorney-client privilege is 'generally similar to accepted federal doctrine.'" *Parneros* v. *Barnes & Noble, Inc.*, 332 F.R.D. 482, 491 n.4 (S.D.N.Y. 2019) (citing *Bank of Am., N.A.* v. *Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002)) (collecting cases).

[2]  *See* Share Redemption Agreement § 9.12, at 35:

> This Agreement and any claim arising out of or in connection with this Agreement shall be governed by, construed, and enforced in accordance with the Laws of the State of New York without giving effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction.

— that New York law applies. *See Pentacon BV* v. *Vanderhaegen*, 725 F. Supp. 3d 350, 367-68 (S.D.N.Y. 2024) (finding that New York law governed Plaintiffs' claims); *Pentacon BV* v. *Vanderhaegen*, No. 23 Civ. 2172 (KPF), 2024 WL 3835334, at *11-14 (S.D.N.Y. Aug. 15, 2024) (denying motion to reconsider Court's decision that New York law governed fiduciary duty claims).

"Under New York law, the attorney-client privilege protects confidential communications between client and counsel where such communications are made for the purpose of providing or obtaining legal advice." *HSH Nordbank AG N.Y.* v. *Swerdlow*, 259 F.R.D. 64, 70 (S.D.N.Y. 2009) (citing N.Y. C.P.L.R. § 4503(a)(1) and *Rossi* v. *Blue Cross & Blue Shield of Greater N.Y.*, 73 N.Y.2d 588, 593 (1989)); *see also Ambac Assur. Corp.* v. *Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624 (2016) ("The party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship, that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived." (internal citations omitted)).  "The privilege is designed 'to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" *HSH Nordbank AG N.Y. Branch*, 259 F.R.D. at 70 (quoting *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)).

The attorney-client privilege shields client communications with both outside and in-house counsel. *See Rossi*, 73 N.Y.2d at 592 ("The privilege applies to communications with attorneys, whether corporate staff counsel or outside counsel."). However, "in light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice." *Pearlstein* v. *BlackBerry Ltd.*, No. 13 Civ. 7060 (KHP), 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019) (citing *Cnty. of Erie*, 473 F.3d at 418, and *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036-37 (2d Cir. 1984)); *accord In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 323 (S.D.N.Y. 2020); *see also Bank Brussels Lambert* v. *Credit Lyonnais (Suisse)*, 220 F. Supp. 2d 283, 286 (S.D.N.Y. 2002) ("[t]here is ... a concern that in-house attorneys are more likely to mix legal and business functions").

Defendants here do not suggest that the communications at issue concern business, rather than legal advice. Instead, Defendants argue that Plaintiffs' communications with Ms. Maurau, even if made in connection with the rendition of legal advice, cannot be privileged because Ms. Maurau relinquished her law license, as required by Belgian law, in connection with transitioning to an in-house position, and did not thereafter obtain a license to act as a "company lawyer" from the Belgian Institute of Company Lawyers (the "IBJ-IJE"). (Dkt. #83 at 1-3; Dkt. #83-2 (Declaration of Thierry Bontinck); Dkt.

5

#96). As Defendants' expert acknowledges, (i) "[a] member of a Bar Association in Belgium who becomes a full-time employee of any company (other than a law firm) is required by law to resign as a member of such Bar Association"; (ii) membership in the IBJ-IJE is "not mandatory"; and (iii) "[a] person may be employed in an in-house legal position, and such a person may provide legal advice to his or her employer in the course of that employment, without being a company lawyer." (Dkt. #83-2 ¶¶ 14, 19; *but see id.* ¶¶ 20-23 (contending that confidentiality only inheres in legal advice provided by a member of the IBJ-IJE)). For her part, Ms. Maurau avers that she obtained a law degree; that she remained a member of the Brussels bar until she transitioned to an in-house position; that she provides legal advice in her position as Head of Legal for Baltisse; and that she remains an inactive member of the Brussels bar. (Dkt. #90).

The Court finds that Belgium's requirement that in-house counsel surrender their bar registrations does not foreclose Ms. Maurau's ability under New York law to provide privileged (*i.e.*, confidential) legal advice, at least to other employees within Baltisse. To do otherwise would, as Plaintiffs argue, "elevate the niceties of Belgium's attorney registration regime over the substance of New York's privilege rules." (Dkt. #89 at 4). *Cf. Gucci America, Inc.* v. *Guess?, Inc.*, No. 09 Civ. 4373 (SAS), 2011 WL 9375, at *2-6 (S.D.N.Y. Jan. 3, 2011) (finding communications with an individual who had graduated from law school, been admitted to practice in multiple jurisdictions, and provided services that were legal in nature to be privileged, even though status

6

of individual was "inactive"); *Kleeberg* v. *Eber*, No. 16 Civ. 9517 (LAK) (KHP), 2019 WL 2085412, at *13 (S.D.N.Y. May 13, 2019) ("The attorney-client privilege typically is restricted to communications with licensed attorneys. Nonetheless, courts have found that communications with non-attorneys may be privileged in limited circumstances where a client seeks legal advice from an individual who they reasonably, but mistakenly, believe is a licensed attorney." (internal citations omitted) (collecting cases); *but cf. Anwar* v. *Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 118 (S.D.N.Y.) (declining to find privilege attached to communications with Dutch in-house counsel who had never been licensed to practice law in any jurisdiction, finding that (i) Dutch law did not recognize an attorney-client privilege for communications with unlicensed in-house lawyers; (ii) U.S. law would not recognize the privilege for communications with an unlicensed attorney; (iii) putative clients could not argue that they were confused about in-house lawyer's licensure status), *aff'd*, 982 F. Supp. 2d 260 (S.D.N.Y. 2013).

The remaining issue, then, is whether any privilege inhering in a particular Baltisse communication was waived when Ms. Maurau communicated that advice — and, in a few instances, legal advice that she had obtained from outside counsel — to Pentacon. (*See* Dkt. #83 at 3; Dkt. #89 at 4; Dkt. #96 at 3). On this issue, the Court finds that Defendants have the better of the argument concerning New York law.

The "common interest" doctrine — sometimes referred to as the "joint defense" doctrine — is not "a separate privilege, but an extension of the work

7

product or attorney client privilege." *BlackRock Balanced Cap. Portfolio (FI)* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 9367 (JMF) (SN), 2018 WL 3584020, at *3 (S.D.N.Y. July 23, 2018) (citing *United States* v. *Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)). Its requirements were succinctly explained by a sister court in this District in a recent opinion:

> For the common-interest privilege to apply, "(1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared, and (2) the statements for which protection is sought must have been designed to further that interest." *City of Almaty* v. *Ablyazov*, No. 15-cv-05345 (AJN) (KHP), 2019 WL 2865102, at *7 (S.D.N.Y. July 3, 2019) (alteration adopted) (quoting *Egiazaryan* v. *Zalmayev*, 290 F.R.D. 421, 434 (S.D.N.Y. 2013)). "To meet the first element of this test, the parties must show that they are 'coplaintiffs or persons who reasonably anticipate that they will become colitigants' concerning 'pending or reasonably anticipated litigation.'" *Id.* at *7 (quoting *Ambac Assurance Corp.* v. *Countrywide Home Loans, Inc.*, 57 N.E.3d 30, 37-38 (N.Y. 2016)). "Although some courts in this circuit have articulated a requirement that the common interest be identical and not merely similar, other courts have questioned this, and have simply focused on whether the parties had interests in common without exploring whether they were identical." *GMA Accessories, Inc.* v. *HMY Jewelry, Inc.*, No. 20-cv-11126 (JPC), 2021 WL 1885260, at *1 (S.D.N.Y. May 11, 2021) (internal quotation marks and citation omitted). "Because the privilege protects communications whenever there is a common legal interest, 'it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply.'" *Smith* v. *Pergola 36 LLC*, No. 22-cv-04052 (LJL), 2022 WL 17832506, at *7 (S.D.N.Y. Dec. 21, 2022) (quoting *United States* v. *Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989)).

*Han* v. *InterExchange, Inc.*, No. 23 Civ. 7786 (JLR), 2025 WL 1419527, at *2 (S.D.N.Y. May 16, 2025).

Defendants contend that Plaintiffs' common interest arguments fall at the first hurdle, inasmuch as there was neither pending nor contemplated litigation at the time the disclosures were made. (Dkt. #83 at 3; Dkt. #96 at 3). Plaintiffs do not dispute the absence of actual or contemplated litigation during the relevant time period, but argue that no litigation requirement exists where "a single attorney advised two parties simultaneously." (Dkt. #89 at 4). The Court disagrees with Plaintiffs' analysis.

As an initial matter, Plaintiffs' factual premise is incorrect: Ms. Maurau did not, and could not, simultaneously represent Baltisse and Pentacon on any matter. What is more, to the extent that Plaintiffs are seeking refuge in New York's common interest doctrine, their efforts fail. In *Ambac Assurance Corp.* v. *Countrywide Home Loans, Inc.*, 27 N.Y.3d 616 (2016), the New York Court of Appeals traced the history of the common interest doctrine, which it described as an

> exception to the general rule that the presence of a third party destroys any claim of privilege: where two or more clients separately retain counsel to advise them on matters of common legal interest, the common interest exception allows them to shield from disclosure certain attorney-client communications that are revealed to one another for the purpose of furthering a common legal interest.

*Id.* at 625 (internal footnote omitted). As relevant here, the Court of Appeals considered "whether to modify the existing requirement that shared communications be in furtherance of a common legal interest in pending or reasonably anticipated litigation in order to remain privileged from disclosure, by expanding the common interest doctrine to protect shared communications

9

in furtherance of *any* common legal interest." *Id.* at 628 (emphasis added). Ultimately, the Court determined to "adhere to the litigation requirement that has historically existed in New York," *id.*, explaining the mischief that could occur were it to adopt a broader position:

> In short, we do not perceive a need to extend the common interest doctrine to communications made in the absence of pending or anticipated litigation, and any benefits that may attend such an expansion of the doctrine are outweighed by the substantial loss of relevant evidence, as well as the potential for abuse. The difficulty of defining "common legal interests" outside the context of litigation could result in the loss of evidence of a wide range of communications between parties who assert common legal interests but who really have only nonlegal or exclusively business interests to protect.

*Id.* at 619.

As noted, Plaintiffs have not claimed the existence of pending or contemplated litigation, and thus have failed to satisfy the requirements of New York's common interest doctrine. (Dkt. #89 at 4). Accordingly, the Court rejects Plaintiffs' efforts to shield from production otherwise privileged communications from Baltisse's in-house or outside counsel that were shared with Pentacon. *See, e.g., Telx-New York, LLC* v. *60 Hudson Owner LLC*, 174 A.D.3d 435, 436 (1st Dep't 2019) ("The common interest privilege does not apply to the communications at issue, in which plaintiff and a third party collaborated to promote their common interest in closing a merger transaction, because the communications do not relate to litigation, either pending or reasonably anticipated."); *Starr Russia Invs. III B.V.* v. *Deloitte Touche Tohmatsu Ltd.*, 131 N.Y.S.3d 535, at *2 (N.Y. Sup. Ct. 2020) ("The common interest

privilege protects only documents prepared in anticipation of litigation. Although [plaintiff] indicates that it anticipated litigation as early as 2008, the argument rings hollow. The fact that one evaluates litigation risk and or uses litigation risk as a negotiating tool does not mean that litigation is reasonably anticipated." (internal citation omitted)); *cf. Pereira, Tr. for Est. of Capala* v. *Capala*, No. 17 Civ. 3434 (ILG) (SMG), 2019 WL 13392880, at *4 (E.D.N.Y. Apr. 16, 2019) ("Generally, courts that recognize a common interest privilege do so when the parties invoking the privilege are aligned as plaintiffs or defendants in a litigation.").

### B.     Vanderhaegen's Communications with the Norton Rose Firm

For their part, Plaintiffs argue that they are entitled to disclosure of Defendant Vanderhaegen's communications with law firm Norton Rose Fullbright US LLP ("Norton Rose") "up to the closing of the buyout," January 4, 2021." (Dkt. #91 at 3).[3] Specifically, Plaintiffs point to 250 documents listed on Defendants' amended privilege log, served on July 7, 2025, which consist of communications between Defendant Vanderhaegen and Norton Rose and relate to the buyout of Plaintiffs' interests. (*Id.* at 2). Plaintiffs claim that they are entitled to these documents because they (i) owned a majority interest in Origis's Belgian parent company, which in turn owned 80% of Origis USA, and

---

[3]     Plaintiffs assert that Norton Rose continued to serve as Origis's outside counsel throughout the negotiation of the buyout and through the second closing of the buyout transaction on January 4, 2021, which included drafting the agreements related to the buyout and representing Origis in the Share Redemption Agreement transaction. (Dkt. #91 at 1-2). At the time, Defendant Vanderhaegen was serving as the CEO for Origis Energy NV, which was the buyer opposite Plaintiffs in the transaction. (Dkt. #99 at 1).

11

(ii) had seats on the Board of Directors of Origis's parent, Origis Energy, and its operating subsidiary, Origis USA. (*Id.* at 1-2). Therefore, they assert that they are "within the privilege group, such that privilege belonging to the company during their tenure cannot be asserted against them." (*Id.*). In addition, Plaintiffs argue that Norton Rose could not, consistent with its professional obligations, concurrently represent Vanderhaegen on an individual basis in the Origis transaction. (Dkt. #91 at 2; Dkt. #105 at 1-2). The Court disagrees with both prongs of the argument.

The record before the Court makes clear that Plaintiffs were represented by their own counsel during the negotiations to sell their interests in Origis. For instance, during the drafting of the share purchase agreement, Ms. Maurau sent a draft of the share purchase agreement to Defendant Vanderhaegen and indicated that Plaintiffs' attorneys had commented on the agreement. (Dkt. #99 at 2). Later, when the transaction structure changed to a share redemption, the notice provision in the Share Redemption Agreement itself listed Norton Rose as counsel to "Buyer" and listed Ms. Maurau's contact information for Plaintiff Baltisse. (*Id.*; *see also* Dkt. #32-7 at 32 (Share Redemption Agreement)).

While the Court agrees that it would have been prudent for Defendant Vanderhaegen to retain separate counsel, it denies Plaintiffs' request for an order requiring Defendants to produce Defendant Vanderhaegen's communications with Norton Rose through January 4, 2021, during a transaction in which Plaintiffs had their own counsel (whose communications

12

they seek to ensure remain privileged) and were not aligned with either Vanderhaegen or Origis.  Considering first Plaintiffs' argument that "they are within the group that was entitled to access privileged communications of Origis," the Court finds that any such entitlement has long passed.  In so doing, the Court relies on the First Department's reasoning in *Barasch* v. *Williams Real Estate Co.*, 961 N.Y.S.2d 125 (1st Dep't 2013), which found that "[a] director of a corporation 'should not be allowed to use her corporate position to waive the privilege that attaches to the corporation in a litigation relating to her own rights or in which she is asserting claims that are or may be adverse to the corporation.'"  *Id.* at 127 (alterations adopted).  The *Barasch* court explained:

> In granting petitioner's motion and denying respondents' cross motion (respondents did not appeal from the denial of the cross motion), the motion court framed the issue before it as follows: "[W]hether a corporate director, by dissenting from a corporate transaction, retaining separate counsel, and threatening potential legal challenges to block the transaction, becomes 'adverse' to the corporation, such that she waives her absolute right to inspect corporate books and records, including attorney-client communications." The court answered that question in the negative.  We disagree.
>
> The underpinning of the motion court's determination was that petitioner, as a director of Williams, was a corporate insider by definition, and therefore could not be adverse to Williams.  However, this case involves a party who is both a corporate director and a shareholder, suing in her capacity as a shareholder, and seeking to invade the corporation's attorney-client privileged communications about her, which took place at a time when she was adverse to the corporation, in order to advance her own interests as a shareholder.  It is evident from the September emails that Williams's

13

> transaction counsel believed petitioner to be hostile to the transaction and that it was advising Williams on how to handle petitioner. Furthermore, that petitioner retained separate counsel to represent her interests demonstrates that she did not believe that Williams's in-house counsel or transaction counsel were representing her interests as a shareholder. Thus, it is clear that as of September 8, 2008, petitioner was in an adversarial position with Williams, and the attorney-client communications between Williams and its counsel regarding how to deal with petitioner are privileged.

*Id.*[4] And, like the *Barasch* court, *see* 961 N.Y.S.2d at 128, this Court finds the facts of the instant case to be distinguishable from those in *People ex rel. Spitzer* v. *Greenberg*, 851 N.Y.S.2d 196 (1st Dep't 2008), on which Plaintiffs rely (*see* Dkt. #91 at 2). In *Greenberg*, the First Department held that "former directors, who were clearly privy to, and participated in, legal consultations regarding the transactions, and who were not adverse to the corporation, were entitled to documents in support of an 'advice of counsel' defense." That "joint client" situation simply is not present here.

---

[4] A sister court in this District considering federal common law adopted a similar analysis:

> The obligations of any director to see to the affairs of the corporation and to speak for it last only so long as the director remains in that official position. This distinction is crucial. We understand the Chancery Court's point to be that while charged with these responsibilities and in order to carry them out, the director must be able to see pertinent communications, including those between other corporate representatives and the company's attorneys. *Once a director leaves his corporate position, however, his obligations in this respect cease, and hence there is no logical reason why at that point he would need, and should be expected, to be able to access or have any control over corporate communications, including documents embodying privileged communications made in the past while he served the corporation.*

*Fitzpatrick* v. *Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 108 (S.D.N.Y. 2010) (emphasis added) (internal citation omitted) (citing *CFTC* v. *Weintraub*, 471 U.S. 343, 349 & n.5 (1985).

Separately, Plaintiffs challenge Norton Rose's ability to represent Vanderhaegen in the transaction. (Dkt. #91 at 2; Dkt. #105). For substantially the reasons set forth in Defendants' opposition submission (*see* Dkt. #101), the Court agrees that Norton Rose could, and did, represent Vanderhaegen concurrently in the transaction, and that his communications with the firm regarding the transaction are thus privileged.

## CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' request for disclosure of communications between Baltisse employees and Ms. Maurau that were made for the purpose of seeking or rendering legal advice; GRANTS Defendants' request for disclosure of otherwise-privileged Baltisse communications with in-house or outside counsel that were shared with Pentacon; and DENIES Plaintiffs' request for disclosure of Defendant Vanderhaegen's communications with Norton Rose. Plaintiffs are to produce the relevant materials within 21 days of this Order.

Finally, the Court DENIES Defendants' request for the Court to strike the Declaration of Ms. Maurau at docket entry 103.

The Clerk of Court is directed to terminate the pending motions at docket entries 91, 100, 104, 106, 107, and 108, and to maintain docket entries 101, 105, and 108 under seal.

SO ORDERED.

Dated:  August 11, 2025
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge